No. 22-1823

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————

ESTADOS UNIDOS MEXICANOS,

*Plaintiff-Appellant*,

v.

SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS
MANUFACTURING, INC.; BERETTA U.S.A. CORP.; BERETTA HOLDING
S.P.A.; CENTURY INTERNATIONAL ARMS, INC.; COLT'S
MANUFACTURING COMPANY LLC; GLOCK, INC.; GLOCK GES.M.B.H.;
STURM, RUGER & CO., INC.; WITMER PUBLIC SAFETY GROUP, INC.
D/B/A INTERSTATE ARMS,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the District of Massachusetts (Saylor, C.J.)
No. 1:21-CV-11269-FDS

———————————

## JOINT APPENDIX – VOL. 1

———————————

Steve D. Shadowen
Richard M. Brunell
Nicholas W. Shadowen
SHADOWEN PLLC
1135 W. 6th Street, Suite 125
Austin, TX 78703
Phone: 855-344-3298
sshadowen@shadowenpllc.com

Jonathan E. Lowy
GLOBAL ACTION ON GUN
VIOLENCE
805 15th Street NW, #601
Washington, DC 20005
Phone: (202) 415-0691
jlowy@actiononguns.org

*Counsel for Estados Unidos Mexicanos*

March 14, 2023

# TABLE OF CONTENTS

## Volume 1 of 2

District Court Docket Report . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000001-JA000043

ECF No. 1 – Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000044-JA000184

ECF No. 108 (Ex. 2) – Plaintiff's First Expert Report on Tort Law of Mexico . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000185-JA000219

## Volume 2 of 2

ECF No. 108 (Ex. 55) – *Fox v. L&J Supply, LLC*, No. 2014-24619 (Pa. Ct. Cmmn. Pl. Nov. 26, 2018) . . . . . . . . . . . . . . . .. . . . . . . . . JA000220-JA000222

ECF No. 108 (Ex. 58) – *Goldstein v. Earnest*, No. 37-2020-00016638-CU-PO-CTL (Ca. Super. Ct. Jul. 2, 2021) . . . . . . . . . . . . . . . . . . . . . JA000223-JA000234

ECF No. 164 – Electronic Order re Sturm, Ruger & Company's Motion to Dismiss, [ECF No. 56]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000235

ECF No. 165 – Electronic Order re Barrett Firearms Manufacturing, Inc.'s Motion to Dismiss [ECF No. 58]. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000236

ECF No. 166 – Electronic Order re Witmer Public Safety Group, Inc.'s Motion to Dismiss [ECF No. 60]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000237

ECF No. 167 – Electronic Order re Glock Inc.'s Motion to Dismiss [ECF No. 62]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000239

ECF No. 168 – Electronic Order re Colt's Manufacturing Company LLC's Motion to Dismiss [ECF No. 64] . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000239

ECF No. 169 – Electronic Order re Smith & Wesson Brands, Inc.'s Motion to Dismiss [ECF No. 69]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000240

ECF No. 170 – Electronic Order re Century International Arms, Inc.'s Motion to Dismiss [ECF No. 70]. . . . . . . . . . . . . . . . . . . . . . . . . . . . .JA000241

ECF No. 171 – Electronic Order re Beretta U.S.A. Corp.'s Motion to Dismiss [ECF No. 73] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000242

ECF No. 172 – Transcript, Motion to Dismiss Hearing . . . . . . . JA000243-JA000301

ECF No. 175 – Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . JA000302-JA000303

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:21-cv-11269-FDS

Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc. et al
Assigned to: Chief Judge F. Dennis Saylor, IV
Case in other court: USCA - First Circuit, 22-01823
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 08/04/2021
Date Terminated: 10/01/2022
Jury Demand: None
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Estados Unidos Mexicanos**
represented by
**Jonathan Lowy**
840 First Street, N.E., #400
Washington, DC 20005
(202) 415-0691
Email: jlowy@bradyunited.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Shadowen**
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steve D. Shadowen**
Shadowen PLLC
1135 W. 6th St.
Suite 125
Austin, TX 78703
717-903-1177
Fax: 512-233-2824
Email:
sshadowen@shadowenpllc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard M. Brunell**

JA000001

Shadowen PLLC
1135 W. 6th Street
Suite 125
Austin, TX 78703
(202) 600-9640
Email: rbrunell@shadowenpllc.com
*ATTORNEY TO BE NOTICED*

**Tina J. Miranda**
Hilliard Shadowen LLC
1135 W. 6th St.
Ste. 1215
Austin, TX 78703
512-585-3260
Email:
tmiranda@hilliardshadowenlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Smith & Wesson Brands, Inc.**    represented by    **Andrew E. Lelling**
Jones Day (Bos)
100 High Street, 21st Flr.
Boston, MA 02110
(617) 449-6856
Email: alelling@jonesday.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony Dick**
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-7679
Email: ajdick@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noel J. Francisco**
Jones Day
51 Louisiana Aveenue, NW

Washington, DC 20001-2113
202-879-5485
Email: njfrancisco@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Barrett Firearms**
**Manufacturing, Inc.**

represented by **James M. Campbell**
Campbell Conroy & O'Neil, P.C.
20 City Square
Suite 300
Boston, MA 02129
617-241-3000
Fax: 617-241-5115
Email: jmcampbell@campbell-trial-
lawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James W. Porter , II**
Porter, Porter & Hassinger
880 Monclair Road, Ste 175
Birmingham, AL 35213
(205) 322-1744
Email: jwporterii@pphlaw.net
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard W. Kinney , III**
Porter, Porter & Hassinger
880 Monclair Road, Ste 175
Birmingham, AL 35213
(205) 322-1744
Email: wkinney@pphlaw.net
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Trevor J. Keenan**
Campbell Conroy & O'Neil, P.C.
20 City Square

Suite 300
Boston, MA 02129
617-241-3000
Email: tkeenan@campbell-trial-
lawyers.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Beretta USA Corp.**                    represented by    **Michael A. Savino**
Braverman Greenspun
110 E 42nd St
17th Floor
New York
New York, NY 10017
212-682-2900
Email: msavino@braverlaw.net
*TERMINATED: 02/04/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy Kennedy Venoit**
Cozen O'Connor
101 Arch Street, 8th Floor
Boston, MA 02109
617-849-5002
Email: wvenoit@cozen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Kennedy McDonald**
Cozen O'Connor
1650 Market Street
Suite 2800
Philadelphia, PA 19103
215-864-8046
Fax: 215-701-2225
Email: jmcdonald@cozen.com
*ATTORNEY TO BE NOTICED*

**Michael B. DE Leeuw**
Cozen O'Connor
45 Broadway
Suite 1600

New York, NY 10006-3792
212-908-1331
Fax: 212-509-9492
Email: mdeleeuw@cozen.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Baretta Holdings SPA**
*TERMINATED: 01/03/2022*

**Defendant**

**Glock, Inc.**                    represented by    **Christopher Renzulli**
Renzulli Law Firm, LLP
81 Main St #508,
White Plains, NY 10601
(914) 285-0700
Email: crenzulli@renzullilaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey M Malsch**
Renzulli Law Firm
One North Broadway
Ste 1005
White Plains, NY 10601
914-285-0700
Fax: 914-285-1213
Email: jmalsch@renzullilaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John F. Renzulli**
Renzulli and Rutherford, LLP
300 East 42nd Street
New York, NY 10005
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter M. Durney**
Cornell & Gollub

JA000005

88 Broad Street, 6th Flr.
Boston, MA 02110
617-482-8100
Fax: 617-482-3917
Email: pdurney@smithduggan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia A. Hartnett**
Cornell & Gollub
88 Broad Street, 6th Flr.
Boston, MA 02110
617-482-8100
Fax: 617-482-3917
Email:
PHartnett@cornellgollub.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Glock Ges.m.b.H.**
*TERMINATED: 01/03/2022*

**Defendant**

**Sturm Ruger & Co., Inc.**          represented by **James B. Vogts**
Swanson, Martin & Bell, LLP
Chicago
330 N. Wabash
Ste 3300
Chicago, IL 60611
312-321-9100
Email: jvogts@smbtrials.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan I. Handler**
Day Pitney LLP
One Federal Street
Suite 2900
Boston, MA 02110
617-345-4734
Fax: 617-345-4745
Email: jihandler@daypitney.com
*ATTORNEY TO BE NOTICED*

JA000006

**Keith H. Bensten**
Day Pitney LLP
One Federal Street
Suite 2900
Boston, MA 02110
617-345-4740
Email: kbensten@daypitney.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Witmer Public Safety Group, Inc.**
*doing business as*
Interstate Arms

represented by **Nora R. Adukonis**
Litchfield Cavo LLP
Suite 200
6 Kimball Lane
Lynnfield, MA 01904
781-309-1521
Email:
adukonis@litchfieldcavo.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Century International Arms, Inc.**

represented by **Anthony Pisciotti**
Pisciotti Lallis Erdreich
30 Columbia Turnpike, Suite 205
Florham Park, NJ 07932
(973) 245-8100
Email: apisciotti@pisciotti.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danny Lallis**
Pisciotti Lallis Erdreich
30 Columbia Turnpike, Suite 205
Florham Park, NJ 07932
(973) 245-8100
Email: dlallis@pisciotti.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Erdreich**

Pisciotti Lallis Erdreich
30 Columbia Turnpike, Suite 205
Florham Park, NJ 07932
(973) 245-8100
Email: rerdreich@pisciotti.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph G. Yannetti**
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
617-439-7585
Email:
jyannetti@morrisonmahoney.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Colt's Manufacturing Co. LLC**      represented by   **Christine M. Netski**
Sugarman, Rogers, Barshak &
Cohen
9th Floor
101 Merrimac Street
Boston, MA 02114
617-227-3030
Fax: 617-523-4001
Email: netski@sugarmanrogers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G. O'Neill**
Sugarman, Rogers, Barshak &
Cohen
101 Merrimac Street
9th Floor
Boston, MA 02114
6i7-227-3030
Fax: 617-523-4001
Email: oneill@sugarmanrogers.com
*ATTORNEY TO BE NOTICED*

**Michael L. Rice**

Harrison Law LLC
141 West Jackson Boulevard
Suite 2055
Chicago, IL 60604
312-638-8781
Fax: 312-638-8793
Email: mikerice@hlawllc.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**International Law Professors**         represented by   **Ellen Valentik Leonida**
BRAUNHAGEY & BORDEN LLP
351 California Street
10th Floor
San Francisco, CA 10036
415-684-7285
Email: leonida@braunhagey.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew B. Borden**
BraunHagey & Borden LLP
351 California Street, 10th Floor
Ste 10th Floor
San Fransico, CA 94104
415-599-0210
Email: borden@braunhagey.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Salomon**
4163 Shafter Avenue
351 California Street, 10th Floor
94104
Oakland, CA 94609
845-729-9105
Email: ssalomon48@gmail.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas M. Sobol**
Hagens Berman Sobol Shapiro
One Faneuil Hall Sq/
5th Floor
Boston, MA 02109
617-482-3700
Fax: 617-482-3300
Email: Tom@hbsslaw.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Non-Party Proposed Amici**        represented by   **David Duncan**
Zalkind Duncan & Bernstein LLP
65A Atlantic Avenue
Boston, MA 02110
617-742-6020
Fax: 617-742-3269
Email: dduncan@zalkindlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ellen Valentik Leonida**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew B. Borden**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Salomon**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John A. Freedman**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001

202-942-5316
Fax: 202-942-5999
Email:
John.Freedman@aporter.com
*ATTORNEY TO BE NOTICED*

**Max Bernstein**
BraunHagey & Borden LLP
118 W 22nd Street
12th Floor
New York, NY 10011
646-828-9470
Email: bernstein@braunhagey.com
*ATTORNEY TO BE NOTICED*

**Thomas M. Sobol**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Professors Of Transnational Litigation**      represented by      **Edward V. Colbert , III**
Casner & Edwards LLP
303 Congress Street
Boston, MA 02210
617-426-5900
Fax: 617-426-8810
Email: colbert@casneredwards.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Commonwealth of Massachusetts**      represented by      **Elizabeth N. Dewar**
Office of the State Solicitor
Attorney General's Office
One Ashburton Place
Boston, MA 02133
617-963-2204
Email: bessie.dewar@mass.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

**California, State of**      represented by      **Elizabeth N. Dewar**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Amicus**

**Connecticut, State of**                  represented by **Elizabeth N. Dewar**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**Delaware, State of**                     represented by **Elizabeth N. Dewar**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**District of Columbia**                   represented by **Elizabeth N. Dewar**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**Hawaii, State of**                       represented by **Elizabeth N. Dewar**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**Illinois, State of**                     represented by **Elizabeth N. Dewar**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**Maryland, State of**                     represented by **Elizabeth N. Dewar**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**Michigan, State of**                     represented by **Elizabeth N. Dewar**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**Minnesota, State of**                    represented by **Elizabeth N. Dewar**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**New Jersey, State of**          represented by  **Elizabeth N. Dewar**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**New Mexico, State of**         represented by  **Elizabeth N. Dewar**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**New York, State of**           represented by  **Elizabeth N. Dewar**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Oregon, State of**             represented by  **Elizabeth N. Dewar**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Antigua & Barbuda**            represented by  **Crystal Lohmann Parker**
Paul Weiss Rivkind Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3069
Email: cparker@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Tarver-Mason Wood**
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
Email: jwood@paulweiss.com
*(Inactive)*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roberto Gonzalez**
Paul Weiss Rifkind Wharton &
Garrison LLP
2001 K Street, NW
Washington, DC 20006
202-223-7316
Email: rgonzalez@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aaron Haier**
Paul Weiss Rivkind Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: ahaier@paulweiss.com
*ATTORNEY TO BE NOTICED*

**James Mandilk**
Paul Weiss Rivkind Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: jmandilk@paulweiss.com
*ATTORNEY TO BE NOTICED*

**William Taylor**
Paul Weiss Rivkind Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: wtaylor@paulweiss.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Belize**                           represented by    **Crystal Lohmann Parker**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

JA000014

**Julia Tarver-Mason Wood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roberto Gonzalez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aaron Haier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Mandilk**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Taylor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Association for Public Policies**
*d/b/a/ the Latin American and Caribbean Network for Human Security ("SEHLAC")*

represented by **Crystal Lohmann Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Tarver-Mason Wood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roberto Gonzalez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aaron Haier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Mandilk**

(See above for address)
*ATTORNEY TO BE NOTICED*

**William Taylor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Everytown for Gun Safety**          represented by   **James Pollack**
Marten Law LLP
77 Sleeper Street
Boston, MA 02210
650-773-4359
Email: jpollack@martenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Gun Violence Prevention Groups**    represented by   **Lawson E. Fite**
Marten Law LLP
1050 SW 6th Ave
Ste 2150
Portland, OR 97204
503-243-2200
Email: lfite@martenlaw.com
*ATTORNEY TO BE NOTICED*

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 08/04/2021 | 1 | COMPLAINT against All Defendants Filing fee: $ 402, receipt number 0101-8887732 (Fee Status: Filing Fee paid), filed by Estados Unidos Mexicanos. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Cover Sheet Category Form 4-4-11)(Brunell, Richard) (Entered: 08/04/2021) |
| 08/04/2021 | 2 | ELECTRONIC NOTICE of Case Assignment. Chief Judge F. Dennis Saylor, IV assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (Danieli, Chris) (Entered: 08/04/2021) |

| 08/04/2021 | 3 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Burgos, Sandra) (Entered: 08/04/2021) |
|---|---|---|
| 08/04/2021 | 4 | NOTICE of Appearance by Richard M. Brunell on behalf of Estados Unidos Mexicanos (Brunell, Richard) (Entered: 08/04/2021) |
| 08/04/2021 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of Steve D. Shadowen Filing fee: $ 100, receipt number 0101-8888085 by Estados Unidos Mexicanos.(Brunell, Richard) (Entered: 08/04/2021) |
| 08/04/2021 | 6 | MOTION for Leave to Appear Pro Hac Vice for admission of Jonathan W. Lowy Filing fee: $ 100, receipt number 0101-8888100 by Estados Unidos Mexicanos.(Brunell, Richard) (Entered: 08/04/2021) |
| 08/04/2021 | 7 | MOTION for Leave to Appear Pro Hac Vice for admission of Nicholas Shadowen Filing fee: $ 100, receipt number 0101-8888107 by Estados Unidos Mexicanos.(Brunell, Richard) (Entered: 08/04/2021) |
| 08/05/2021 | 8 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 5 Motion for Leave to Appear Pro Hac Vice Added Nicholas W. Shadowen. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** ; granting 6 Motion for Leave to Appear Pro Hac Vice Added Jonathan E. Lowy. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** ; granting 7 Motion for Leave to Appear Pro Hac Vice Added Steve D. Shadowen. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then** |

|  |  | **Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Halley, Taylor) (Entered: 08/05/2021) |
|---|---|---|
| 08/13/2021 | [9](#) | AFFIDAVIT OF SERVICE Executed by Estados Unidos Mexicanos. Beretta USA Corp. served on 8/12/2021, answer due 9/2/2021. Acknowledgement filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 08/13/2021) |
| 08/13/2021 | [10](#) | AFFIDAVIT OF SERVICE Executed by Estados Unidos Mexicanos. Colt's Manufacturing Co., Inc. served on 8/12/2021, answer due 9/2/2021. Acknowledgement filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 08/13/2021) |
| 08/13/2021 | [11](#) | AFFIDAVIT OF SERVICE Executed by Estados Unidos Mexicanos. Glock, Inc. served on 8/11/2021, answer due 9/1/2021. Acknowledgement filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 08/13/2021) |
| 08/13/2021 | [12](#) | AFFIDAVIT OF SERVICE Executed by Estados Unidos Mexicanos. Smith & Wesson Brands, Inc. served on 8/12/2021, answer due 9/2/2021. Acknowledgement filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 08/13/2021) |
| 08/13/2021 | [13](#) | AFFIDAVIT OF SERVICE Executed by Estados Unidos Mexicanos. Sturm Ruger & Co., Inc. served on 8/12/2021, answer due 9/2/2021. Acknowledgement filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 08/13/2021) |
| 08/13/2021 | [14](#) | AFFIDAVIT OF SERVICE Executed by Estados Unidos Mexicanos. Witmer Public Safety Group, Inc. served on 8/12/2021, answer due 9/2/2021. Acknowledgement filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 08/13/2021) |
| 08/20/2021 | [15](#) | AFFIDAVIT OF SERVICE Executed by Estados Unidos Mexicanos. Barrett Firearms Manufacturing, Inc. served on 8/12/2021, answer due 9/2/2021. Acknowledgement filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 08/20/2021) |
| 08/27/2021 | [16](#) | AFFIDAVIT OF SERVICE Executed by Estados Unidos Mexicanos. Century International Arms, Inc. served on 8/26/2021, answer due 9/16/2021. Acknowledgement filed by Estados Unidos Mexicanos. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2)(Brunell, Richard) (Entered: 08/27/2021) |

| 08/31/2021 | 17 | NOTICE of Appearance by Peter M. Durney on behalf of Glock, Inc. (Durney, Peter) (Entered: 08/31/2021) |
| 08/31/2021 | 18 | STIPULATION *to Extend Time to Respond to Complaint* by Glock, Inc.. (Durney, Peter) Modified on 9/2/2021 (McKillop, Matthew). (Entered: 08/31/2021) |
| 08/31/2021 | 19 | Assented to MOTION Regarding Briefing Schedule and Page Limits for Anticipated Motions to Dismiss by Defendants by Glock, Inc..(Durney, Peter) (Entered: 08/31/2021) |
| 09/02/2021 | 20 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 18 Motion for Extension of Time to File Response/Reply Responses due by 11/22/2021 (McKillop, Matthew) (Entered: 09/02/2021) |
| 09/02/2021 | 21 | NOTICE of Appearance by Jonathan I. Handler on behalf of Sturm Ruger & Co., Inc. (Handler, Jonathan) (Entered: 09/02/2021) |
| 09/02/2021 | 22 | NOTICE of Appearance by Keith H. Bensten on behalf of Sturm Ruger & Co., Inc. (Bensten, Keith) (Entered: 09/02/2021) |
| 09/02/2021 | 23 | NOTICE of Appearance by Christine M. Netski on behalf of Colt's Manufacturing Co., Inc. (Netski, Christine) (Entered: 09/02/2021) |
| 09/02/2021 | 24 | NOTICE of Appearance by John G. O'Neill on behalf of Colt's Manufacturing Co., Inc. (O'Neill, John) (Entered: 09/02/2021) |
| 09/07/2021 | 25 | NOTICE of Appearance by Patricia A. Hartnett on behalf of Glock, Inc. (Hartnett, Patricia) (Entered: 09/07/2021) |
| 09/08/2021 | 26 | NOTICE of Appearance by Joseph G. Yannetti on behalf of Century International Arms, Inc. (Yannetti, Joseph) (Entered: 09/08/2021) |
| 09/08/2021 | 27 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Anthony Pisciotti, Danny Lallis and Ryan Erdreich Filing fee: $ 300, receipt number 0101-8936023 by Century International Arms, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Yannetti, Joseph) (Entered: 09/08/2021) |
| 09/08/2021 | 28 | NOTICE of Appearance by Trevor J. Keenan on behalf of Barrett Firearms Manufacturing, Inc. (Keenan, Trevor) (Entered: 09/08/2021) |
| 09/08/2021 | 29 | NOTICE of Appearance by James M. Campbell on behalf of Barrett Firearms Manufacturing, Inc. (Campbell, James) (Entered: |

| | | |
|---|---|---|
| | | 09/08/2021) |
| 09/08/2021 | 30 | CORPORATE DISCLOSURE STATEMENT by Barrett Firearms Manufacturing, Inc.. (Campbell, James) (Entered: 09/08/2021) |
| 09/08/2021 | 31 | NOTICE of Appearance by Andrew E. Lelling on behalf of Smith & Wesson Brands, Inc. (Lelling, Andrew) (Entered: 09/08/2021) |
| 09/09/2021 | 32 | MOTION for Leave to Appear Pro Hac Vice for admission of Noel J. Francisco Filing fee: $ 100, receipt number 0101-8937678 by Smith & Wesson Brands, Inc.. (Attachments: # 1 Affidavit Noel Francisco Affidavit)(Lelling, Andrew) (Entered: 09/09/2021) |
| 09/09/2021 | 33 | MOTION for Leave to Appear Pro Hac Vice for admission of Anthony J. Dick Filing fee: $ 100, receipt number 0101-8937947 by Smith & Wesson Brands, Inc.. (Attachments: # 1 Affidavit Anthony Dick Affidavit)(Lelling, Andrew) (Entered: 09/09/2021) |
| 09/09/2021 | 34 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of John F. Renzulli Filing fee: $ 100, receipt number 0101-8938050 by Glock, Inc.. (Attachments: # 1 Exhibit 1 - Certification of J. Renzulli)(Durney, Peter) (Entered: 09/09/2021) |
| 09/09/2021 | 35 | MOTION for Leave to Appear Pro Hac Vice for admission of James W. Porter, II Filing fee: $ 100, receipt number 0101-8938317 by Barrett Firearms Manufacturing, Inc.. (Attachments: # 1 Exhibit A - Certification)(Keenan, Trevor) (Entered: 09/09/2021) |
| 09/09/2021 | 36 | MOTION for Leave to Appear Pro Hac Vice for admission of Richard Warren Kinney Filing fee: $ 100, receipt number 0101-8938344 by Barrett Firearms Manufacturing, Inc.. (Attachments: # 1 Exhibit A - Certification)(Keenan, Trevor) (Entered: 09/09/2021) |
| 09/10/2021 | 37 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 27 Motion for Leave to Appear Pro Hac Vice Added Anthony Pisciotti, Danny Lallis, and Ryan Erdreich. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Halley, Taylor) (Entered: 09/10/2021) |
| 09/10/2021 | 38 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 35 Motion for Leave to Appear Pro Hac Vice ; granting 36 Motion for Leave to Appear Pro Hac Vice ; granting 32 Motion for Leave to Appear Pro Hac Vice ; granting 33 Motion for Leave |

| | | |
|---|---|---|
| | | to Appear Pro Hac Vice ; granting <u>34</u> Motion for Leave to Appear Pro Hac Vice Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. (Halley, Taylor) Modified on 9/10/2021 (Halley, Taylor). (Entered: 09/10/2021) |
| 09/17/2021 | 39 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. granting <u>19</u> Assented to MOTION Regarding Briefing Schedule and Page Limits for Anticipated Motions to Dismiss (McKillop, Matthew) (Entered: 09/17/2021) |
| 09/21/2021 | <u>40</u> | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Christopher Renzulli Filing fee: $ 100, receipt number AMADC-8965685 by Glock, Inc.. (Attachments: # <u>1</u> Exhibit Certification of C. Renzulli)(Hartnett, Patricia) (Entered: 09/21/2021) |
| 09/21/2021 | <u>41</u> | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Jeffrey M. Malsch Filing fee: $ 100, receipt number AMADC-8965773 by Glock, Inc.. (Attachments: # <u>1</u> Exhibit Certification of J. M. Malsch)(Hartnett, Patricia) (Entered: 09/21/2021) |
| 09/22/2021 | <u>42</u> | CORPORATE DISCLOSURE STATEMENT by Smith & Wesson Brands, Inc. identifying Other Affiliate Smith & Wesson, Inc., Other Affiliate Smith & Wesson Sales Company for Smith & Wesson Brands, Inc... (Lelling, Andrew) (Entered: 09/22/2021) |
| 09/30/2021 | <u>43</u> | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Michael L. Rice Filing fee: $ 100, receipt number AMADC-8985669 by Colt's Manufacturing Co., Inc.. (Attachments: # <u>1</u> Exhibit Exhibit A)(O'Neill, John) (Entered: 09/30/2021) |
| 10/01/2021 | 44 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>40</u> Motion for Leave to Appear Pro Hac Vice Added Christopher Renzulli. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF |

| | | |
|---|---|---|
| | | accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(McManus, Caetlin) (Entered: 10/01/2021) |
| 10/01/2021 | 45 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 41 Motion for Leave to Appear Pro Hac Vice Added Jeffrey M. Malsch.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(McManus, Caetlin) (Entered: 10/01/2021) |
| 10/01/2021 | 46 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 43 Motion for Leave to Appear Pro Hac Vice Added Michael L. Rice.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(McManus, Caetlin) (Entered: 10/01/2021) |
| 10/01/2021 | 47 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of James B. Vogts Filing fee: $ 100, receipt number AMADC-8987276 by Sturm Ruger & Co., Inc.. (Attachments: # 1 Declaration)(Handler, Jonathan) (Entered: 10/01/2021) |

| | | |
|---|---|---|
| 10/01/2021 | 48 | CORPORATE DISCLOSURE STATEMENT by Sturm Ruger & Co., Inc. identifying Corporate Parent Sturm, Ruger & Co., Inc. for Sturm Ruger & Co., Inc... (Handler, Jonathan) (Entered: 10/01/2021) |
| 10/01/2021 | 49 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 47 Motion for Leave to Appear Pro Hac Vice Added James B. Vogts.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(Currie, Haley) (Entered: 10/01/2021) |
| 10/01/2021 | 50 | CORPORATE DISCLOSURE STATEMENT by Glock, Inc.. (Durney, Peter) (Entered: 10/01/2021) |
| 10/15/2021 | 51 | NOTICE of Appearance by Nora R. Adukonis on behalf of Witmer Public Safety Group, Inc. (Adukonis, Nora) (Entered: 10/15/2021) |
| 10/15/2021 | 52 | MOTION for Leave to Appear Pro Hac Vice for admission of S. Jan Hueber Filing fee: $ 100, receipt number AMADC-9015275 by Witmer Public Safety Group, Inc.. (Attachments: # 1 Affidavit) (Adukonis, Nora) Modified on 10/19/2021 to include payment information (McManus, Caetlin). (Entered: 10/15/2021) |
| 10/19/2021 | 53 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 52 Motion for Leave to Appear Pro Hac Vice Added S. Jan Hueber.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |

| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(McManus, Caetlin) (Entered: 10/19/2021) |
|---|---|---|
| 10/27/2021 | [54](#) | NOTICE of Appearance by Michael L. Rice on behalf of Colt's Manufacturing Co. LLC (Rice, Michael) (Entered: 10/27/2021) |
| 11/22/2021 | [55](#) | NOTICE of Appearance by Michael A. Savino on behalf of Beretta USA Corp. (Savino, Michael) (Entered: 11/22/2021) |
| 11/22/2021 | [56](#) | MOTION to Dismiss *Defendant Sturm, Ruger's Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(2)* by Sturm Ruger & Co., Inc..(Handler, Jonathan) (Entered: 11/22/2021) |
| 11/22/2021 | [57](#) | MEMORANDUM in Support re [56](#) MOTION to Dismiss *Defendant Sturm, Ruger's Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(2)* filed by Sturm Ruger & Co., Inc.. (Handler, Jonathan) (Entered: 11/22/2021) |
| 11/22/2021 | [58](#) | MOTION to Dismiss for Lack of Jurisdiction by Barrett Firearms Manufacturing, Inc..(Porter, James) (Entered: 11/22/2021) |
| 11/22/2021 | [59](#) | MEMORANDUM in Support re [58](#) MOTION to Dismiss for Lack of Jurisdiction filed by Barrett Firearms Manufacturing, Inc.. (Porter, James) (Entered: 11/22/2021) |
| 11/22/2021 | [60](#) | MOTION to Dismiss *Pursuant to Fed. R. Civ. P. 12(b)(6)* by Witmer Public Safety Group, Inc..(Adukonis, Nora) (Entered: 11/22/2021) |
| 11/22/2021 | [61](#) | MEMORANDUM in Support re [60](#) MOTION to Dismiss *Pursuant to Fed. R. Civ. P. 12(b)(6)* filed by Witmer Public Safety Group, Inc.. (Adukonis, Nora) (Entered: 11/22/2021) |
| 11/22/2021 | [62](#) | MOTION to Dismiss for Lack of Jurisdiction , *for Lack of Article III Standing, and for failure to state a claim* by Glock, Inc.. (Malsch, Jeffrey) (Entered: 11/22/2021) |
| 11/22/2021 | [63](#) | MEMORANDUM in Support re [62](#) MOTION to Dismiss for Lack of Jurisdiction , *for Lack of Article III Standing, and for failure to state a claim* filed by Glock, Inc.. (Malsch, Jeffrey) (Entered: 11/22/2021) |

| 11/22/2021 | 64 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Colt's Manufacturing Co. LLC.(O'Neill, John) (Entered: 11/22/2021) |
| 11/22/2021 | 65 | MEMORANDUM in Support re 64 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Colt's Manufacturing Co. LLC. (O'Neill, John) (Entered: 11/22/2021) |
| 11/22/2021 | 66 | Joint MOTION to Dismiss by Barrett Firearms Manufacturing, Inc., Beretta USA Corp., Century International Arms, Inc., Colt's Manufacturing Co. LLC, Glock, Inc., Smith & Wesson Brands, Inc., Sturm Ruger & Co., Inc., Witmer Public Safety Group, Inc.. (Lelling, Andrew) (Entered: 11/22/2021) |
| 11/22/2021 | 67 | Joint MEMORANDUM in Support re 66 Joint MOTION to Dismiss filed by Barrett Firearms Manufacturing, Inc., Beretta USA Corp., Century International Arms, Inc., Colt's Manufacturing Co. LLC, Glock, Inc., Smith & Wesson Brands, Inc., Sturm Ruger & Co., Inc., Witmer Public Safety Group, Inc.. (Lelling, Andrew) (Entered: 11/22/2021) |
| 11/22/2021 | 68 | MOTION for Leave to Appear Pro Hac Vice for admission of John K. McDonald and Michael B. de Leeuw Filing fee: $ 200, receipt number AMADC-9067335 by Beretta USA Corp..(Savino, Michael) (Entered: 11/22/2021) |
| 11/22/2021 | 69 | MOTION to Dismiss by Smith & Wesson Brands, Inc..(Lelling, Andrew) (Entered: 11/22/2021) |
| 11/22/2021 | 70 | MOTION to Dismiss , MOTION to Dismiss for Lack of Jurisdiction ( Responses due by 12/6/2021) by Century International Arms, Inc..(Yannetti, Joseph) (Entered: 11/22/2021) |
| 11/22/2021 | 71 | MEMORANDUM in Support re 70 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction filed by Century International Arms, Inc.. (Yannetti, Joseph) (Entered: 11/22/2021) |
| 11/22/2021 | 72 | MEMORANDUM in Support re 69 MOTION to Dismiss filed by Smith & Wesson Brands, Inc.. (Lelling, Andrew) (Entered: 11/22/2021) |
| 11/22/2021 | 73 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Rule 7.1 Statement and Memorandum of Law* by Beretta USA Corp.. (Attachments: # 1 rule 7.1 Statement, # 2 Memorandum of Law)(Savino, Michael) (Entered: 11/22/2021) |

| 11/22/2021 | 74 | MOTION to Modify Memorandum of Law by Beretta USA Corp.. (Savino, Michael) (Entered: 11/22/2021) |
|---|---|---|
| 11/23/2021 | 75 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 68 Motion for Leave to Appear Pro Hac Vice Added John K. McDonald and Michael B. de Leeuw. <br><br> **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> (McManus, Caetlin) (Entered: 11/23/2021) |
| 11/24/2021 | 76 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Plaintiff Estados Unidos Mexicanos shall file any opposition to defendants' motions to dismiss (Docket Nos. 56 , 58 , 60 , 62 , 64 , 66 , 69 , 70 , 73 ) by December 23, 2021. Defendants shall file any reply memoranda by January 10, 2022. A hearing on the motions to dismiss is hereby set for Thursday, January 27, 2022 at 2:00 p.m. Counsel to notify the clerk by January 20th whether they intend to appear in person or by video. (McKillop, Matthew) (Entered: 11/24/2021) |
| 11/24/2021 | 77 | **ELECTRONIC NOTICE Setting Hearing on Motions to Dismiss:** Motion Hearing set for 1/27/2022 02:00 PM in Courtroom 10 (In person with remote access provided) before Chief Judge F. Dennis Saylor IV. <br><br> (McKillop, Matthew) (Entered: 11/24/2021) |
| 11/30/2021 | 78 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. The Electronic Order entered on 11/24/21 D. 76 is vacated. Counsel to continue to follow the schedule granted by the Court on 9/17/21 D. 39 . Motion hearing set for 1/27/22 at 2:00 PM is cancelled. (McKillop, Matthew) (Entered: 11/30/2021) |

| | | |
|---|---|---|
| 12/22/2021 | [79](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Daniel G. Litchfield Filing fee: $ 100, receipt number AMADC-9111600 by Witmer Public Safety Group, Inc.. (Attachments: # [1](#) Exhibit Affidavit of Daniel G. Litchfield)(Adukonis, Nora) (Entered: 12/22/2021) |
| 12/23/2021 | 80 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting [79](#) Motion for Leave to Appear Pro Hac Vice Added Daniel G. Litchfield.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(McDonagh, Christina) (Entered: 12/23/2021) |
| 12/31/2021 | [81](#) | NOTICE by Estados Unidos Mexicanos *of Voluntary Dismissal of Defendants Beretta Holding S.p.A. and Glock Ges.m.b.H* (Brunell, Richard) (Entered: 12/31/2021) |
| 01/28/2022 | [82](#) | NOTICE of Appearance by Thomas M. Sobol on behalf of International Law Professors (Sobol, Thomas) (Entered: 01/28/2022) |
| 01/28/2022 | [83](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Ellen V. Leonida Filing fee: $ 100, receipt number AMADC-9159314 by Non-Party Proposed Amici. (Attachments: # [1](#) Exhibit A)(Sobol, Thomas) (Entered: 01/28/2022) |
| 01/28/2022 | [84](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Max B. Bernstein Filing fee: $ 100, receipt number AMADC-9159327 by Non-Party Proposed Amici. (Attachments: # [1](#) Exhibit A) (Sobol, Thomas) (Entered: 01/28/2022) |
| 01/28/2022 | [85](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Matthew Borden Filing fee: $ 100, receipt number AMADC- |

|  |  | 9159335 by Non-Party Proposed Amici. (Attachments: # 1 Exhibit A)(Sobol, Thomas) (Entered: 01/28/2022) |
|---|---|---|
| 01/28/2022 | 86 | MOTION for Leave to Appear Pro Hac Vice for admission of Sarah Salomon Filing fee: $ 100, receipt number AMADC-9159346 by Non-Party Proposed Amici. (Attachments: # 1 Exhibit A)(Sobol, Thomas) (Entered: 01/28/2022) |
| 01/28/2022 | 87 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 83 Motion for Leave to Appear Pro Hac Vice Added Ellen V. Leonida.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(McDonagh, Christina) (Entered: 01/28/2022) |
| 01/28/2022 | 88 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 84 Motion for Leave to Appear Pro Hac Vice Added Max Bernstein.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(McDonagh, Christina) (Entered: 01/28/2022) |
| 01/28/2022 | 89 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 85 Motion for Leave to Appear Pro Hac Vice Added Matthew Borden. |

**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.

(McDonagh, Christina) (Entered: 01/28/2022)

| 01/28/2022 | 90 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 86 Motion for Leave to Appear Pro Hac Vice Added Sarah Salomon.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(McDonagh, Christina) (Entered: 01/28/2022) |
| --- | --- | --- |
| 01/28/2022 | 91 | NOTICE of Appearance by Ellen Valentik Leonida on behalf of Non-Party Proposed Amici (Leonida, Ellen) (Entered: 01/28/2022) |
| 01/28/2022 | 92 | NOTICE of Appearance by Matthew B. Borden on behalf of Non-Party Proposed Amici (Borden, Matthew) (Entered: 01/28/2022) |
| 01/28/2022 | 93 | NOTICE of Appearance by Sarah Salomon on behalf of Non-Party Proposed Amici (Salomon, Sarah) (Entered: 01/28/2022) |
| 01/31/2022 | 94 | NOTICE of Appearance by Max Bernstein on behalf of Non-Party Proposed Amici (Bernstein, Max) (Entered: 01/31/2022) |
| 01/31/2022 | 95 | NOTICE of Appearance by David Duncan on behalf of Non-Party Proposed Amici (Duncan, David) (Entered: 01/31/2022) |
| 01/31/2022 | 96 | MOTION for Leave to File *Amicus Brief in Support of Plaintiff's Opposition to Motion to Dismiss* by Non-Party Proposed Amici. (Attachments: # 1 Exhibit Proposed Amicus Brief in Support of Plaintiff's Opposition to Motion to Dismiss)(Duncan, David) (Entered: 01/31/2022) |

| 01/31/2022 | 97 | Opposition re 69 MOTION to Dismiss *filed by Smith & Wesson* filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 98 | Opposition re 58 MOTION to Dismiss for Lack of Jurisdiction *filed by Barrett* filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 99 | Opposition re 73 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Rule 7.1 Statement and Memorandum of Law filed by Beretta* filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 100 | Opposition re 70 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction *filed by Century* filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 101 | Opposition re 64 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *filed by Colt* filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 102 | Opposition re 62 MOTION to Dismiss for Lack of Jurisdiction , *for Lack of Article III Standing, and for failure to state a claim filed by Glock* filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 103 | Opposition re 56 MOTION to Dismiss *Defendant Sturm, Ruger's Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(2) filed by Ruger* filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 104 | Opposition re 60 MOTION to Dismiss *Pursuant to Fed. R. Civ. P. 12(b)(6) filed by Witmer d/b/a Interstate Arms* filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 105 | MOTION for Leave to File *Amici Curiae in Support of Plaintiff's Oppositions to Defendants' Motions to Dismiss* by Non-Party Proposed Amici.(Leonida, Ellen) (Entered: 01/31/2022) |
| 01/31/2022 | 106 | NOTICE of Appearance by Edward V. Colbert, III on behalf of Professors Of Transnational Litigation (Colbert, Edward) (Entered: 01/31/2022) |
| 01/31/2022 | 107 | NOTICE of Appearance by Edward V. Colbert, III on behalf of Professors Of Transnational Litigation (Colbert, Edward) (Entered: 01/31/2022) |

| 01/31/2022 | 108 | DECLARATION *of Nicholas W. Shadowen in Support of Plaintiff's Opposition to Defendants' Motions to Dismiss* by Estados Unidos Mexicanos. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit, # 46 Exhibit, # 47 Exhibit, # 48 Exhibit, # 49 Exhibit, # 50 Exhibit, # 51 Exhibit, # 52 Exhibit, # 53 Exhibit, # 54 Exhibit, # 55 Exhibit, # 56 Exhibit, # 57 Exhibit, # 58 Exhibit, # 59 Exhibit) (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 109 | MOTION for Leave to File *As Amici Curiae* by Professors Of Transnational Litigation. (Attachments: # 1 Appendix Proposed Amicus Brief)(Colbert, Edward) (Entered: 01/31/2022) |
| 01/31/2022 | 110 | MOTION for Leave to File *Amicus Brief* by Commonwealth of Massachusetts, California, State of, Connecticut, State of, Delaware, State of, District of Columbia, Hawaii, State of, Illinois, State of, Maryland, State of, Michigan, State of, Minnesota, State of, New Jersey, State of, New Mexico, State of, New York, State of, Oregon, State of. (Attachments: # 1 Proposed Amicus Brief) (Dewar, Elizabeth) (Entered: 01/31/2022) |
| 01/31/2022 | 111 | Opposition re 66 Joint MOTION to Dismiss filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 01/31/2022) |
| 01/31/2022 | 112 | MOTION for Leave to File *Amici Curiae Brief of Scholars of International Law in Support of Plaintiff's Opposition to Defendants' Motions to Dismiss* by Non-Party Proposed Amici. (Attachments: # 1 Proposed Amici Curiae Brief)(Sobol, Thomas) (Entered: 01/31/2022) |
| 01/31/2022 | 113 | MOTION for Leave to File *Amicus Brief* by Antigua & Barbuda, Belize, The Association for Public Policies. (Attachments: # 1 Amicus Brief)(Parker, Crystal) (Entered: 01/31/2022) |
| 01/31/2022 | 114 | MOTION of Gun Violence Prevention Groups for Leave to File Brief as Amicus Curiae re. 66 Defendant's Joint Motion to Dismiss entered by James Pollack on behalf of Everytown for Gun Safety. |

| | | |
|---|---|---|
| | | (Attachments: # <u>1</u> Exhibit Amicus Curiae, # <u>2</u> Exhibit Exhibit A, # <u>3</u> Exhibit Exhibit B)(Pollack, James) Modified on 2/1/2022 to correct filing event used by attorney and docket text(McManus, Caetlin). (Entered: 01/31/2022) |
| 01/31/2022 | <u>115</u> | Amicus Curiae APPEARANCE entered by John A. Freedman on behalf of Non-Party Proposed Amici. (Freedman, John) (Entered: 01/31/2022) |
| 01/31/2022 | <u>116</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Lawson E. Fite Filing fee: $ 100, receipt number AMADC-9162247 by Everytown for Gun Safety.(Pollack, James) (Entered: 01/31/2022) |
| 02/01/2022 | 117 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>116</u> Motion for Leave to Appear Pro Hac Vice Added Lawson E. Fite.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at <u>https://pacer.uscourts.gov/register-account</u>.**<br><br>Pro Hac Vice Admission Request Instructions <u>https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm</u>.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(McManus, Caetlin) (Entered: 02/01/2022) |
| 02/02/2022 | <u>118</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Roberto Gonzalez, Julia Tarver Mason Wood, James Mandilk, Aaron Haier, and William Taylor Filing fee: $ 500, receipt number AMADC-9166248 by Antigua & Barbuda, Belize, The Association for Public Policies. (Attachments: # <u>1</u> Certification of Roberto Gonzalez, # <u>2</u> Certification of Julia Tarver Mason Wood, # <u>3</u> Certification of James Mandilk, # <u>4</u> Certification of Aaron Haier, # <u>5</u> Certification of William Taylor)(Parker, Crystal) (Entered: 02/02/2022) |
| 02/03/2022 | 119 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting <u>118</u> Motion for Leave to Appear Pro Hac Vice Added |

Roberto Gonzalez, Julia Tarver Mason Wood, James Mandilk, Aaron Haier, and William Taylor.

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

(McManus, Caetlin) (Entered: 02/03/2022)

| 02/03/2022 | 120 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting D. 96 , 105 , 109 , 110 , 112 and 113 MOTIONS for Leave to File Amicus Briefs ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (McKillop, Matthew) (Entered: 02/03/2022) |
| 02/03/2022 | 121 | AMICUS BRIEF filed by California, State of, Connecticut, State of, Delaware, State of, District of Columbia, Hawaii, State of, Illinois, State of, Maryland, State of, Commonwealth of Massachusetts, Michigan, State of, Minnesota, State of, New Jersey, State of, New Mexico, State of, New York, State of, Oregon, State of . (Dewar, Elizabeth) (Entered: 02/03/2022) |
| 02/03/2022 | 122 | AMICUS BRIEF filed by Non-Party Proposed Amici *Mexican Activists, Scholars & Victims, Leave to File Granted 2/3/22*. (Duncan, David) (Entered: 02/03/2022) |
| 02/03/2022 | 123 | AMICUS BRIEF filed by Non-Party Proposed Amici *Prosecutors in Cities Across the United States, Leave to File Granted 2/3/22*. (Leonida, Ellen) (Entered: 02/03/2022) |
| 02/03/2022 | 124 | AMICUS BRIEF filed by Non-Party Proposed Amici *Amici Curiae Brief of Scholars of International Law in Support of Plaintiff's Opposition to Defendants' Motions to Dismiss*. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 |

| | | |
|---|---|---|
| | | Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8) (Sobol, Thomas) (Entered: 02/03/2022) |
| 02/03/2022 | 125 | AMICUS BRIEF filed by Gun Violence Prevention Groups *Leave to File Granted 2/03/2022*. (Attachments: # 1 Exhibit A - Licensed Gun Dealers in the United States and Mexico, # 2 Exhibit B - Images of Guns)(Pollack, James) (Entered: 02/03/2022) |
| 02/03/2022 | 126 | AMICUS BRIEF filed by Antigua & Barbuda, Belize, The Association for Public Policies . (Parker, Crystal) (Entered: 02/03/2022) |
| 02/03/2022 | 127 | Amicus Curiae APPEARANCE entered by Julia Tarver-Mason Wood on behalf of Antigua & Barbuda, Belize, The Association for Public Policies. (Wood, Julia) (Entered: 02/03/2022) |
| 02/04/2022 | 128 | NOTICE of Appearance by Wendy Kennedy Venoit on behalf of Beretta USA Corp. (Venoit, Wendy) (Entered: 02/04/2022) |
| 02/04/2022 | 129 | NOTICE of Withdrawal of Appearance by Wendy Kennedy Venoit *(w/d of Michael Savino)* (Venoit, Wendy) (Entered: 02/04/2022) |
| 02/07/2022 | 130 | NOTICE of Appearance by Lawson E. Fite on behalf of Gun Violence Prevention Groups (Fite, Lawson) (Entered: 02/07/2022) |
| 02/08/2022 | 131 | Amicus Curiae APPEARANCE entered by Roberto Gonzalez on behalf of Antigua & Barbuda, Belize, The Association for Public Policies. (Gonzalez, Roberto) (Entered: 02/08/2022) |
| 02/08/2022 | 132 | Amicus Curiae APPEARANCE entered by James Mandilk on behalf of Antigua & Barbuda, Belize, The Association for Public Policies. (Mandilk, James) (Entered: 02/08/2022) |
| 02/08/2022 | 133 | Amicus Curiae APPEARANCE entered by Aaron Haier on behalf of Antigua & Barbuda, Belize, The Association for Public Policies. (Haier, Aaron) (Entered: 02/08/2022) |
| 02/08/2022 | 134 | Amicus Curiae APPEARANCE entered by William Taylor on behalf of Antigua & Barbuda, Belize, The Association for Public Policies. (Taylor, William) (Entered: 02/08/2022) |
| 02/11/2022 | 135 | Assented to MOTION for Extension of Time to 3/14/2022 to File Response/Reply as to 60 MOTION to Dismiss *Pursuant to Fed. R. Civ. P. 12(b)(6)*, 56 MOTION to Dismiss *Defendant Sturm, Ruger's Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(2)*, 66 Joint MOTION to Dismiss , 70 MOTION to Dismiss MOTION to Dismiss for Lack |

| | | |
|---|---|---|
| | | of Jurisdiction , 58 MOTION to Dismiss for Lack of Jurisdiction , 62 MOTION to Dismiss for Lack of Jurisdiction , *for Lack of Article III Standing, and for failure to state a claim*, 64 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 69 MOTION to Dismiss , 73 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Rule 7.1 Statement and Memorandum of Law and a limit of 35 pages for Defendants' Reply in Support of their Joint Motion* by Glock, Inc..(Malsch, Jeffrey) (Entered: 02/11/2022) |
| 02/15/2022 | 136 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 135 Assented to MOTION for Extension of Time to 3/14/2022 to File Joint and Individual Replies. (McKillop, Matthew) (Entered: 02/15/2022) |
| 03/14/2022 | 137 | REPLY to Response to 56 MOTION to Dismiss *Defendant Sturm, Ruger's Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(2) with Certificate of Service* filed by Sturm Ruger & Co., Inc.. (Handler, Jonathan) (Entered: 03/14/2022) |
| 03/14/2022 | 138 | REPLY to Response to 64 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Colt's Manufacturing Co. LLC. (O'Neill, John) (Entered: 03/14/2022) |
| 03/14/2022 | 139 | REPLY to Response to 69 MOTION to Dismiss filed by Smith & Wesson Brands, Inc.. (Lelling, Andrew) (Entered: 03/14/2022) |
| 03/14/2022 | 140 | Joint REPLY to Response to 66 Joint MOTION to Dismiss filed by Barrett Firearms Manufacturing, Inc., Beretta USA Corp., Century International Arms, Inc., Colt's Manufacturing Co. LLC, Glock, Inc., Smith & Wesson Brands, Inc., Sturm Ruger & Co., Inc., Witmer Public Safety Group, Inc.. (Lelling, Andrew) (Entered: 03/14/2022) |
| 03/14/2022 | 141 | REPLY to Response to 70 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction filed by Century International Arms, Inc.. (Yannetti, Joseph) (Entered: 03/14/2022) |
| 03/14/2022 | 142 | REPLY to Response to 60 MOTION to Dismiss *Pursuant to Fed. R. Civ. P. 12(b)(6)* filed by Witmer Public Safety Group, Inc.. (Adukonis, Nora) (Entered: 03/14/2022) |
| 03/14/2022 | 143 | REPLY to Response to 58 MOTION to Dismiss for Lack of Jurisdiction filed by Barrett Firearms Manufacturing, Inc.. (Porter, James) (Entered: 03/14/2022) |

| 03/14/2022 | [144](#) | NOTICE of Appearance by Michael B. DE Leeuw on behalf of Beretta USA Corp. (DE Leeuw, Michael) (Entered: 03/14/2022) |
|---|---|---|
| 03/14/2022 | [145](#) | REPLY to Response to [73](#) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Rule 7.1 Statement and Memorandum of Law* filed by Beretta USA Corp.. (DE Leeuw, Michael) (Entered: 03/14/2022) |
| 03/14/2022 | [146](#) | REPLY to Response to [62](#) MOTION to Dismiss for Lack of Jurisdiction *, for Lack of Article III Standing, and for failure to state a claim* filed by Glock, Inc.. (Malsch, Jeffrey) (Entered: 03/14/2022) |
| 03/15/2022 | 147 | **ELECTRONIC NOTICE Setting Hearing:** Motion Hearing set for 4/12/2022 10:00 AM in Remote Proceeding : Boston before Chief Judge F. Dennis Saylor IV.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(McKillop, Matthew) (Entered: 03/15/2022) |
| 03/21/2022 | [148](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Tina J. Miranda Filing fee: $ 100, receipt number AMADC-9235906 by Estados Unidos Mexicanos.(Brunell, Richard) (Entered: 03/21/2022) |
| 03/21/2022 | 149 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting [148](#) Motion for Leave to Appear Pro Hac Vice Added Tina J. Miranda.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically** |

| | | |
|---|---|---|
| | | **file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(McDonagh, Christina) (Entered: 03/21/2022) |
| 03/23/2022 | 150 | MOTION for Leave to File *Sur-reply in Opposition to Defendants' Motions to Dismiss* by Estados Unidos Mexicanos. (Attachments: # 1 Exhibit Proposed Plaintiff's Sur-reply Memorandum of Law in Opposition to Defendants' Motions to Dismiss)(Brunell, Richard) (Entered: 03/23/2022) |
| 03/24/2022 | 151 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 150 MOTION for Leave to File Sur-reply in Opposition to Defendants' Motions to Dismiss ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (McKillop, Matthew) (Entered: 03/24/2022) |
| 03/24/2022 | 152 | SUR-REPLY to Motion re 62 MOTION to Dismiss for Lack of Jurisdiction *, for Lack of Article III Standing, and for failure to state a claim*, 60 MOTION to Dismiss *Pursuant to Fed. R. Civ. P. 12(b)(6)*, 64 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 56 MOTION to Dismiss *Defendant Sturm, Ruger's Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(2)*, 66 Joint MOTION to Dismiss , 69 MOTION to Dismiss , 73 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Rule 7.1 Statement and Memorandum of Law*, 70 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction , 58 MOTION to Dismiss for Lack of Jurisdiction filed by Estados Unidos Mexicanos. (Brunell, Richard) (Entered: 03/24/2022) |
| 04/01/2022 | 153 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 114 MOTION of Gun Violence Prevention Groups for Leave to File Brief as Amicus Curiae. (McKillop, Matthew) (Entered: 04/01/2022) |

| 04/01/2022 | 154 | Letter/request (non-motion) from Defendants proposing order of arguments on pending Motions to Dismiss *with Consent of Plaintiff*. (Malsch, Jeffrey) (Entered: 04/01/2022) |
| 04/11/2022 | 155 | NOTICE of Appearance by Tina J. Miranda on behalf of Estados Unidos Mexicanos (Miranda, Tina) (Entered: 04/11/2022) |
| 04/12/2022 | 156 | NOTICE of Appearance by John Kennedy McDonald on behalf of Beretta USA Corp. (McDonald, John) (Entered: 04/12/2022) |
| 04/12/2022 | 157 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Motion Hearing held by video on 4/12/2022. Case called; Arguments heard re Pending Motions to Dismiss. Court takes matter under advisement. (Court Reporter: Kathleen Silva at kathysilva@verizon.net.)(Attorneys present: Steve D. Shadowen, Jonathan Lowy, Richard M. Brunell and Tina J. Miranda for the plaintiff. Andrew E. Lelling, Anthony Dick, Michael B. DE Leeuw, John F. Renzulli, Michael L. Rice and John G. O'Neill) (McKillop, Matthew) (Entered: 04/12/2022) |
| 06/06/2022 | 158 | Notice of Supplemental Authorities re 150 MOTION for Leave to File *Sur-reply in Opposition to Defendants' Motions to Dismiss* (Brunell, Richard) (Entered: 06/06/2022) |
| 06/09/2022 | 159 | *Joint* Response by Smith & Wesson Brands, Inc. *to Plaintiff's Notice of Supplemental Authorities*. (Lelling, Andrew) (Entered: 06/09/2022) |
| 08/26/2022 | 160 | Notice of Supplemental Authorities re 150 MOTION for Leave to File *Sur-reply in Opposition to Defendants' Motions to Dismiss* (Brunell, Richard) (Entered: 08/26/2022) |
| 09/02/2022 | 161 | Joint Notice of Supplemental Authorities re 66 Joint MOTION to Dismiss *in Response to Plaintiff's Notice (ECF Doc. 160)* filed by Glock, Inc.. (Attachments: # 1 Exhibit A - Order)(Malsch, Jeffrey) (Entered: 09/02/2022) |
| 09/30/2022 | 162 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered.<br><br>The motion of defendant Beretta USA Corp. to modify its memorandum of law (Docket No. 74 ) is GRANTED to the extent that defendant seeks to substitute a corrected version of its memorandum in support of its motion to dismiss (Docket No. 73 ). (de Oliveira, Flaviana) (Entered: 09/30/2022) |

| 09/30/2022 | 163 | Chief Judge F. Dennis Saylor, IV: MEMORANDUM AND ORDER. |
| | | For the foregoing reasons: |
| | | The motion of all defendants to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 66 ) is DENIED as to Rule 12(b)(1) and GRANTED as to Rule 12(b)(6); |
| | | The motion of defendant Sturm, Ruger & Company to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Docket No. 56 ) is DENIED without prejudice as moot; |
| | | The motion of defendant Barrett Firearms Manufacturing, Inc., to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 58 ) is DENIED as to Rule 12(b)(1), GRANTED as to Rule 12(b)(6), and otherwise DENIED without prejudice as moot; |
| | | The motion of defendant Witmer Public Safety Group, Inc., d/b/a Interstate Arms to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 60 ) is GRANTED; |
| | | The motion of defendant Glock Inc. to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 62 ) is DENIED as to Rule 12(b)(1), GRANTED as to Rule 12(b)(6), and otherwise DENIED without prejudice as moot; |
| | | The motion of defendant Colt's Manufacturing Company LLC to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 64 ) is DENIED as to Rule 12(b)(1), |

GRANTED as to Rule 12(b)(6), and otherwise DENIED without prejudice as moot;

The motion of defendant Smith & Wesson Brands, Inc. to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 69 ) is DENIED as to Rule 12(b)(1) and GRANTED as to Rule 12(b)(6);

The motion of defendant Century International Arms, Inc. to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Docket No. 70 ) is DENIED without prejudice as moot; and

The motion of defendant Beretta U.S.A. Corp. to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Docket No. 73 ) is DENIED without prejudice as moot.

**So Ordered.** (de Oliveira, Flaviana) (Entered: 09/30/2022)

| 09/30/2022 | 164 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. The motion of defendant Sturm, Ruger & Company to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Docket No. 56 ) is DENIED without prejudice as moot. (de Oliveira, Flaviana) (Entered: 09/30/2022) |
| 09/30/2022 | 165 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. The motion of defendant Barrett Firearms Manufacturing, Inc., to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 58 ) is DENIED as to Rule 12(b)(1), GRANTED as to Rule 12(b)(6), and otherwise DENIED without prejudice as moot. (de Oliveira, Flaviana) (Entered: 09/30/2022) |
| 09/30/2022 | 166 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. |

|  |  | The motion of defendant Witmer Public Safety Group, Inc., d/b/a Interstate Arms to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 60 ) is GRANTED. (de Oliveira, Flaviana) (Entered: 09/30/2022) |
| 09/30/2022 | 167 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered.<br><br>The motion of defendant Glock Inc. to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 62 ) is DENIED as to Rule 12(b)(1), GRANTED as to Rule 12(b)(6), and otherwise DENIED without prejudice as moot. (de Oliveira, Flaviana) (Entered: 09/30/2022) |
| 09/30/2022 | 168 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered.<br><br>The motion of defendant Colt's Manufacturing Company LLC to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 64 ) is DENIED as to Rule 12(b)(1), GRANTED as to Rule 12(b)(6), and otherwise DENIED without prejudice as moot. (de Oliveira, Flaviana) (Entered: 09/30/2022) |
| 09/30/2022 | 169 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered.<br><br>The motion of defendant Smith & Wesson Brands, Inc. to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 69 ) is DENIED as to Rule 12(b)(1) and GRANTED as to Rule 12(b)(6). (de Oliveira, Flaviana) (Entered: 09/30/2022) |
| 09/30/2022 | 170 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered.<br><br>The motion of defendant Century International Arms, Inc. to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. |

| | | |
|---|---|---|
| | | 12(b)(2) (Docket No. 70 ) is DENIED without prejudice as moot. (de Oliveira, Flaviana) (Entered: 09/30/2022) |
| 09/30/2022 | 171 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered.<br><br>The motion of defendant Beretta U.S.A. Corp. to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Docket No. 73 ) is DENIED without prejudice as moot. (de Oliveira, Flaviana) (Entered: 09/30/2022) |
| 09/30/2022 | 172 | Transcript of Motion Hearing held on April 12, 2022, before Chief Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kathleen Silva at kathysilva@verizon.net. Redaction Request due 10/21/2022. Redacted Transcript Deadline set for 10/31/2022. Release of Transcript Restriction set for 12/29/2022. (Coppola, Katelyn) (Entered: 10/11/2022) |
| 09/30/2022 | 173 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 10/11/2022) |
| 10/01/2022 | 174 | Chief Judge F. Dennis Saylor, IV: ORDER entered. ORDER DISMISSING CASE. (de Oliveira, Flaviana) (Entered: 10/17/2022) |
| 10/26/2022 | 175 | NOTICE OF APPEAL as to 174 Order Dismissing Case by Estados Unidos Mexicanos Filing fee: $ 505, receipt number AMADC-9559901 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to |

| | | deliver official record to Court of Appeals by 11/15/2022. (Brunell, Richard) (Entered: 10/26/2022) |
|---|---|---|
| 10/26/2022 | 176 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 175 Notice of Appeal. (Paine, Matthew) (Entered: 10/26/2022) |
| 10/27/2022 | 177 | USCA Case Number 22-1823 for 175 Notice of Appeal, filed by Estados Unidos Mexicanos. (Paine, Matthew) (Entered: 10/27/2022) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/09/2023 12:26:13 | | | |
| **PACER Login:** | tinajmiranda | **Client Code:** | MEXICO GUNS |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-11269-FDS |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ESTADOS UNIDOS MEXICANOS,
*Plaintiff,*

*vs.*

SMITH & WESSON BRANDS, INC.;
BARRETT FIREARMS MANUFACTURING,
INC.; BERETTA U.S.A. CORP.; BERETTA
HOLDING S.P.A.; CENTURY
INTERNATIONAL ARMS, INC.; COLT'S
MANUFACTURING COMPANY LLC;
GLOCK, INC.;  GLOCK GES.M.B.H.;
STURM, RUGER & CO., INC.;
WITMER PUBLIC SAFETY GROUP, INC.
D/B/A INTERSTATE ARMS,
*Defendants.*

Civil Action No. _____

**COMPLAINT**

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................... 1

II.    PARTIES ........................................................................................................ 8

III.   JURISDICTION AND VENUE..................................................................... 14

IV.    DEFENDANTS HAVE LEGAL DUTIES TO DISTRIBUTE THEIR GUNS
       SAFELY AND AVOID ARMING CRIMINALS IN MEXICO........................ 14

       A.    Defendants Voluntarily Assumed Duties to Comply with All Relevant
             Laws and the Highest Standard of Care............................................... 15

       B.    Defendants Must Comply with the Gun-Import Laws of Mexico. ....... 15

       C.    Defendants Must Comply with the Tort Law of Mexico. .................... 17

       D.    Defendants Must Comply with the Gun-Export Laws of the U.S. ...... 17

       E.    Defendants Must Comply with Other U.S. Federal Laws Governing Guns......... 18

       F.    Defendants Must Comply with U.S. State Laws Applicable to Guns. ................ 19

       G.    Defendants Must Comply with U.S. State Tort Law............................. 20

             1.    Defendants have a duty to carefully monitor and supervise
                   their downstream distributors and dealers. ............................. 20

                   a.    Defendants have a duty to sell guns responsibly. ........................ 20

                   b.    Defendants have a duty not to supply the criminal
                         market in Mexico. ......................................................... 24

             2.    Defendants have a duty to design safe guns. ............................ 26

             3.    Defendants have a duty to refrain from inflammatory and
                   reckless marketing likely to attract criminal users.................... 27

       H.    Defendants Cannot Avoid Their Duties by Being Willfully Blind to the
             Facts. ................................................................................................. 27

V.     DEFENDANTS ARE FULLY ON NOTICE THAT THEIR CONDUCT CAUSES
       UNLAWFUL TRAFFICKING TO MEXICO. .................................................. 29

       A.    Defendants Know That Some of Their Dealers Sell Significant Numbers
             of Crime Guns................................................................................... 29

ii

B. Government and Media Reports Give Defendants Continual Notice That Their Distribution Systems Facilitate Gun Trafficking to Mexico. ...................... 34

C. Specific Incidents Give Defendants Continual Notice That Their Distribution Systems Actively Assist Trafficking to Mexico. ............................. 37

D. Notorious Violent Incidents Give Defendants Continual Notice That Their Guns Are Trafficked to Mexico. .......................................................... 51

VI. DEFENDANTS ACTIVELY ASSIST AND FACILITATE TRAFFICKING OF THEIR GUNS TO DRUG CARTELS IN MEXICO. ........................................... 56

A. Defendants Actively Assist and Facilitate Trafficking Through Straw Purchasing. ..................................................................................................... 58

B. Defendants Actively Assist and Facilitate Trafficking Through Multiple and Repeat Sales. .............................................................................................. 61

C. Defendants Actively Assist and Facilitate Trafficking Through Kitchen-Table Sales. ......................................................................................................... 63

D. Defendants Actively Assist and Facilitate Trafficking Through "Missing" Guns. ................................................................................................................. 64

E. Defendants Actively Assist and Facilitate Trafficking Through Gun Shows. .............................................................................................................. 65

F. Defendants Actively Assist and Facilitate Trafficking by Designing and Marketing Their Rifles as Military-Style Assault Weapons. ............................... 67

    1. Defendants design their guns as military-style assault weapons............................................................................................ 67

    2. Defendants market their guns as military-style assault weapons............................................................................................ 76

    3. Defendants know that their military-style weapons are the cartels' weapons of choice. ..................................................... 81

    4. Defendants' reckless marketing of these weapons is unlawful. .................................................................................... 84

G. Defendants Actively Assist and Facilitate Trafficking by Designing Their Guns to Allow Use by Unauthorized Persons.................................................... 86

H. Defendants Actively Assist and Facilitate Trafficking by Designing Their Guns to Enable Defacement of Serial Numbers. ................................................. 88

iii

I.    Defendants Actively Assist and Facilitate Trafficking by Refusing to Implement the Reforms They Know Are Necessary............................................ 89

VII.   DEFENDANTS ACTIVELY ASSIST AND FACILITATE THE UNLAWFUL TRAFFICKING BECAUSE IT MAXIMIZES THEIR SALES AND PROFITS. ............ 94

A.    Defendants Intentionally Created and Use a Distribution System that Aids Sales to the Criminal Market. ............................................... 94

B.    A Substantial Portion of Defendants' Sales and Profits Come From Guns Trafficked to Mexico................................................. 95

VIII.  THE GOVERNMENT HAS TAKEN REASONABLE MEASURES TO TRY TO PROTECT ITSELF FROM DEFENDANTS' UNLAWFUL CONDUCT........................ 98

A.    The Government Has Significantly Restricted the Lawful Ownership and Use of Guns Within Mexico. ............................................. 98

B.    The Government Has Implemented Many Other Programs to Try to Blunt the Effects of Defendants' Conduct. ................................... 100

IX.    DEFENDANTS CAUSE MASSIVE INJURY TO THE  GOVERNMENT. ................... 107

A.    Defendants Have Flooded Mexico with Their Guns. ......................................... 107

B.    Defendants' Unlawful Conduct Has Caused Massive Injury............................. 112

1.    Death and destruction ........................................... 113

2.    Economic harm ...................................................... 116

3.    Not statistics ........................................................... 118

X.    CLAIMS FOR RELIEF ................................................................... 125

XI.    DEMAND FOR JUDGMENT ............................................................ 134

iv

## I.    INTRODUCTION

1.    Plaintiff Estados Unidos Mexicanos (the "Government"), a sovereign nation, brings this action to put an end to the massive damage that the Defendants cause by actively facilitating the unlawful trafficking of their guns to drug cartels and other criminals in Mexico. Almost all guns recovered at crime scenes in Mexico—70% to 90% of them—were trafficked from the U.S. The Defendants include the six U.S.-based manufacturers whose guns are most often recovered in Mexico—Smith & Wesson, Beretta, Century Arms, Colt, Glock, and Ruger. Another manufacturer defendant is Barrett, whose .50 caliber sniper rifle is a weapon of war prized by the drug cartels. The remaining defendant—Interstate Arms—is a Boston-area wholesaler through which all but one of the defendant manufacturers sell their guns for re-sale to gun dealers throughout the U.S.

2.    For decades the Government and its citizens have been victimized by a deadly flood of military-style and other particularly lethal guns that flows from the U.S. across the border, into criminal hands in Mexico. This flood is not a natural phenomenon or an inevitable consequence of the gun business or of U.S. gun laws. It is the foreseeable result of the Defendants' deliberate actions and business practices.

3.    Defendants design, market, distribute, and sell guns in ways they know routinely arm the drug cartels in Mexico. Defendants use reckless and corrupt gun dealers and dangerous and illegal sales practices that the cartels rely on to get their guns. Defendants design these guns to be easily modified to fire automatically and to be readily transferable on the criminal market in Mexico. Defendants know how to make and sell their guns to prevent this illegal trade; the U.S. government and a U.S. court told them how. Defendants defy those recommendations, and many others, and instead choose to continue supplying the criminal gun market in Mexico— because they profit from it.

1

4.      The Government has strong domestic laws that make it virtually impossible for criminals to lawfully obtain guns in Mexico. Mexico has one gun store in the entire nation and issues fewer than 50 gun permits per year.

5.      Defendants undermine these stringent laws, and wreak havoc in Mexican society, by persistently supplying a torrent of guns to the drug cartels. It is estimated that more than a half million guns annually are trafficked from the U.S. into Mexico. Defendants produce more than 68% of those U.S.-origin trafficked guns, which means that they annually sell more than 340,000 guns that flow from their plants in Massachusetts and other U.S. states to criminals south of the border.

6.      Defendants are fully on notice of the massive trafficking of their guns into Mexico. It has been extensively documented in news accounts, academic studies, government reports, United Nations inquiries and reviews, and law enforcement "traces" of guns from crime scenes in Mexico to the Defendants' factories in the U.S.

7.      Despite this abundant notice, *Defendants have not implemented any public-safety-related monitoring or disciplining controls on their distribution systems—**none at all***. Their policy is to sell to any distributor or dealer that has a U.S. license to buy and sell the product, regardless of the buyer's record of flouting the law and despite blazing red flags indicating that a gun dealer is conspiring with straw purchasers or others to traffic Defendants' guns into Mexico. Defendants use this head-in-the-sand approach to deny responsibility while knowingly profiting from the criminal trade.

8.      Defendants exacerbate their refusal to monitor and discipline their distribution systems by designing military-style assault weapons and marketing them in ways that attract and arm ruthless transnational criminal organizations like the drug cartels.

2

9.      Defendant Barrett manufactures a .50 caliber sniper rifle that can shoot down helicopters and penetrate lightly armored vehicles and bullet-proof glass. It has become one of the cartels' guns of choice. Barrett markets its sniper rifle as a weapon of war ("with confirmed hits out to 1800 meters, the Barrett model 82A1 is battle proven"), but nevertheless sells it to the general public without restriction. Barrett knows that its dealers sell these military guns to traffickers, often in bulk, to arm the cartels that use them to battle Mexican military and police who are trying to stop the drug trade.

10.     Defendant Century Arms imports into the U.S. from Romania a version of the AK-47 assault rifle, which it modifies to try to evade U.S. import restrictions on assault weapons, and then sells them into the "civilian" market. Century Arms has long known that its WASR assault rifles are among the cartels' favorites.

11.     Century Arms and the other Manufacturer Defendants specifically design their semi-automatic rifles for the battlefield rather than for sport, and make them easily convertible into fully automatic machine guns. Defendants are well aware that the drug cartels in fact routinely convert Defendants' assault rifles to fire automatically, with devastating effect in Mexico.

12.     The link between Defendants' design, distribution, and marketing practices and the destruction wrought in Mexico is undeniable. During the period 1999 to 2004—when Defendants were prohibited from selling assault weapons because they were banned in the U.S.—gun production in the U.S. declined appreciably. With the ban's expiration in 2004, Defendants exploited the opening to vastly increase production, particularly of the military-style assault weapons favored by the drug cartels.

3

13.    In a mirror image of that gun-production data, from 1999 to 2004 homicides in Mexico were declining. But they then increased dramatically beginning in 2004 exactly contemporaneously with Defendants' increased production, distribution, and marketing of their military-grade weapons:



14.    The consequences in Mexico have been dire. In addition to causing the exponential growth in the homicide rate, Defendants' conduct has had an overall destabilizing effect on Mexican society. Late 2004 saw the drug cartels' first assassination of a Mexican Mayor, followed in later years by their use of Defendants' military-style weapons to attack the

4

Mexican military and police, and by rampant increases in other gun-related crimes such as extortion and kidnapping.

15.    Defendants' willfully blind, standardless distribution practices aid and abet the killing and maiming of children, judges, journalists, police, and ordinary citizens throughout Mexico. Defendants' unlawful conduct has substantially reduced the life expectancy of Mexican citizens and cost the Government billions of dollars a year. And armed with Defendants' guns, the cartels have aggressively marketed drugs such as fentanyl, destroying and ending lives in and outside of Mexico, including in the U.S. Defendants' guns are the venom in the snakes that are the drug cartels; without those guns, they could be controlled and stopped.

16.    Defendants are not accidental or unintentional players in this tragedy; they are deliberate and willing participants, reaping profits from the criminal market they knowingly supply—heedless of the shattering consequences to the Government and its citizens.

17.    This need not happen. In a 2003 domestic public nuisance case against U.S. gun manufacturers and distributors—including Defendants Beretta, Century Arms, Colt, Glock, Smith & Wesson, Ruger, and Interstate—the late United States District Court Judge Jack B. Weinstein found as a fact after a trial that "each manufacturer should implement readily available reforms," including "imposing liability insurance standards; limiting sales at gun shows; limiting multiple sales; limiting how the consumer gun transaction can be conducted to insure security; education and training of dealers; and monitoring dealers through visitation and other regular interaction." *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 523 (E.D.N.Y. 2003). Gun industry insiders have urged Defendants to make similar reforms.

18.    In 2001, the U.S. federal government similarly called on Defendants to monitor, supervise, and set reasonable conditions for their distribution systems to prevent supplying

criminals. Defendants refused. Defendant Smith & Wesson entered into a settlement agreement with the United States and several U.S. cities, committing to specific distribution-system reforms designed to prevent supplying guns to the criminal market. Under pressure from others in the industry, Smith & Wesson reneged on the agreement.

19.    Defendants instead closed ranks with other industry participants to lobby the U.S. Congress for legislation to protect them in certain instances from liability for domestic injuries resulting from their conduct. Congress responded by enacting the Protection of Lawful Commerce in Arms Act ("PLCAA") in 2005, which protects gun companies from some liability for harm solely caused by the unlawful misuse of guns in the U.S. resulting in injury in the U.S.

20.    The United States is, of course, free to choose its social policy reflecting a balance between the financial interests of the gun industry and the rights of victims within its jurisdiction. By the same token, however, the Government of Mexico is entitled to choose a different social policy that reflects a different balance between the interests of victims in Mexico and the interests of gun manufacturers that foreseeably and deliberately cause trafficking of their guns into Mexico.

21.    Defendants know that their porous distribution systems cause guns to be routinely trafficked over the border into Mexico, resulting in vast and continual harm to the Government and its people. They therefore must monitor and discipline those distribution systems to comply with not only U.S. law, but also the substantive law of Mexico, including its tort law.

22.    The Supreme Court of the United States has repeatedly held that, where conduct in one nation causes injury in another the "default rule for tort cases" is that "the local law of the state where the injury occurred determines the rights and liabilities of the parties," *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), and that "a court will ordinarily apply foreign law to

6

determine the tortfeasor's liability to a plaintiff injured in a foreign country," *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2109 (2016). And *RJR Nabisco* emphasized that where U.S.-based corporations cause injury abroad to foreign sovereigns, the U.S. Constitution and statutes allow those sovereigns to sue for "violations *of their own laws* and to invoke federal diversity jurisdiction as a basis for proceeding in U.S. courts." *Id.*

23. The U.S. Congress honored this principle of trans-national torts when it enacted PLCAA. Even if applied, PLCAA would not bar the Government's case. But it does not apply because it bars certain claims against gun manufacturers and distributors only when the injury occurred in the U.S. and the criminal's misuse of the gun was unlawful under U.S. domestic law. The Government's injuries here occur in Mexico, and its claims result from unlawful misuse of guns in Mexico, not in the U.S. Every aspect of PLCAA confirms that the U.S. Congress enacted that statute with only U.S. domestic concerns in mind.

24. Just as Defendants may not dump toxic waste or other pollutants to poison Mexicans across the border, they may not send their weapons of war into the hands of the cartels, causing repeated and grievous harm, and then claim immunity from accountability.

25. To be clear, this lawsuit does not challenge or question the law, policy, or actions of the United States; the Government seeks to hold accountable and stop the reckless actions of private companies that foreseeably send their guns into Mexico.

26. Likewise, this case has nothing to do with the Second Amendment right of law-abiding, responsible U.S. citizens to keep and bear arms within the U.S. This case involves Defendants' supplying their guns to law-breaking Mexican nationals and others in Mexico. The cartels have no Second Amendment rights, and the Defendants have no right to supply them.

7

27.    The Government comes to this Court because, while the actionable harm occurs south of the U.S. border, it is caused by Defendants' conduct north of the border.

28.    Defendant Smith & Wesson, for example, makes decisions in Massachusetts to design, market, and distribute its guns in the reckless, dangerous ways that supply traffickers and cartels. Smith & Wesson's decisions to renege on the reforms to which it had agreed with the U.S. government, and to use corrupt dealers and high-risk business practices that it knows arm the cartels, all occur in the U.S. This Court can stop the flow of guns into Mexico at its source in Massachusetts by requiring Smith & Wesson to stop actively facilitating the criminal gun trade into Mexico. The same is true for the other Defendants.

29.    The Government is entitled to that relief under the substantive law of Mexico as well as under U.S. law.

## II.    PARTIES

30.    Plaintiff Estados Unidos Mexicanos (the "Government") is a sovereign nation that shares a border with the United States. The Government brings this action in its own behalf. In addition, it raises, to preserve for appellate review, its right also to bring these and similar claims as *parens patriae* on behalf of its citizens.

31.    Defendant Smith & Wesson Brands, Inc. ("Smith & Wesson") is a corporation organized and existing under the laws of Nevada, with its principal place of business at 2100 Roosevelt Avenue, Springfield, Massachusetts. Smith & Wesson is at home in Massachusetts and resides here. Smith & Wesson is a manufacturer and seller of guns. It regularly conducts business in this district, including by regularly making substantial sales to Defendant Interstate Arms in Middlesex County. Smith & Wesson's unlawful conduct as alleged below resulted in guns that it sold to Defendant Interstate Arms in Middlesex County, and to other distributors and

dealers, being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains.

32.     Defendant Barrett Firearms Manufacturing, Inc. ("Barrett") is a corporation organized and existing under the laws of Tennessee, with its principal place of business at 5926 Miller Lane, Christiana, Tennessee. Barrett is a manufacturer and seller of guns. It regularly conducts business in this district, including by regularly making substantial sales here. Natick Outdoor Store, located in Middlesex County, is Barrett's authorized dealer in Massachusetts. Barrett's unlawful conduct as alleged below resulted in guns that it sold to distributors and dealers being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains.

33.     Defendant Beretta U.S.A. Corp. ("Beretta U.S.A.") is a corporation organized and existing under the laws of Maryland, with its principal place of business at 17601 Beretta Drive, Accokeek, Maryland. Beretta U.S.A. is a manufacturer and seller of guns. It regularly conducts business in this district, including by regularly making substantial sales to Defendant Interstate Arms in Middlesex County. Beretta U.S.A.'s unlawful conduct as alleged below resulted in guns that it sold to Defendant Interstate Arms in Middlesex County, and to other distributors and dealers, being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains.

34.     Defendant Beretta Holding S.p.A. ("Beretta Holding Group") is a corporation organized and existing under the laws of Italy, with its principal place of business in Gardone Val Trompia, Italy. Beretta Holding Group is the parent corporation of Defendant Beretta U.S.A. and participated with Beretta U.S.A. in the design, manufacturing, marketing, advertising,

9

distribution, and sales at issue in this case. Beretta Holding Group and Beretta U.S.A. are hereafter collectively referred to as "Beretta."

35.     Defendant Century International Arms, Inc. ("Century Arms") is a corporation organized and existing under the laws of Vermont, with its principal place of business at 430 S. Congress Avenue, Suite 1A, Delray Beach, Florida. Century Arms is a manufacturer and seller of guns. It regularly conducts business in this district, including by regularly making substantial sales to Defendant Interstate Arms in Middlesex County. Century Arms' unlawful conduct as alleged below resulted in guns that it sold to Defendant Interstate Arms in Middlesex County, and to other distributors and dealers, being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains.

36.     Defendant Colt's Manufacturing Company LLC ("Colt") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 545 New Park Avenue, West Hartford, Connecticut. Colt is a manufacturer and seller of guns. It regularly conducts business in this district, including by regularly making substantial sales to Defendant Interstate Arms in Middlesex County. Colt's unlawful conduct as alleged below resulted in guns that it sold to Defendant Interstate Arms in Middlesex County, and to other distributors and dealers, being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains.

37.     Defendant Glock, Inc. ("Glock") is a corporation organized and existing under the laws of Georgia, with its principal place of business at 6000 Highlands Parkway, Smyrna, Georgia. Glock is a manufacturer and seller of guns. It regularly conducts business in this district, including by regularly making substantial sales to Defendant Interstate Arms in Middlesex County. Glock's unlawful conduct as alleged below resulted in guns that it sold to

10

Defendant Interstate Arms in Middlesex County, and to other distributors and dealers, being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains.

38. Defendant Glock Ges.m.b.H. ("Glock Limited") is a corporation organized and existing under the laws of Austria, with its principal place of business in Deutsch-Wagram, Austria. Glock Limited is the parent corporation of Defendant Glock, Inc. and participated with Glock, Inc. in the design, manufacturing, marketing, advertising, distribution, and sales at issue in this case. Glock Limited and Glock, Inc. are hereafter collectively referred to as "Glock."

39. Defendant Sturm, Ruger & Co., Inc. ("Ruger") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1 Lacey Place, Southport, Connecticut. Ruger is a manufacturer and seller of guns. It regularly conducts business in this district, including by regularly making substantial sales to Defendant Interstate Arms in Middlesex County. Ruger's unlawful conduct as alleged below resulted in guns that it sold to Defendant Interstate Arms in Middlesex County, and to other distributors and dealers, being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains.

40. Defendant Witmer Public Safety Group, Inc. is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 311 Creese Street, Ambridge, Pennsylvania. In 2018 Witmer acquired Interstate Arms Corp., which was the U.S.'s oldest gun wholesaler and was incorporated in Massachusetts and had its principal place of business in Middlesex County. Upon the acquisition, Witmer dissolved Interstate Arms Corp. and continued in the wholesaling business in Middlesex County, at the same location and with the same key executives, under the registered fictitious name "Interstate Arms."

11

41.     Witmer (hereafter "Interstate Arms") is a distributor of guns, billing itself as a distributor of, among other guns, "military-style weapons." Interstate Arms has conducted its gun-wholesaling business in Massachusetts for more than 40 years and was incorporated in Massachusetts until 2018. It continues to conduct its business through its location in Middlesex County. It regularly conducts business in this district, including by making substantial purchases from Defendants Smith & Wesson, Beretta, Century Arms, Colt, Glock, and Ruger, and reselling those guns to a system of gun dealers located throughout the U.S. Interstate Arms is at home in Massachusetts and resides in Middlesex County. In addition, Interstate Arms' unlawful conduct as alleged below resulted in guns that it bought from the other Defendants, and from other gun manufacturers, being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains.

42.     Smith & Wesson, Beretta, Century Arms, Colt, Glock, and Ruger each has purposefully availed itself of the privilege of conducting activities within Massachusetts, including by systematically serving the gun market here; regularly marketing and advertising its products here; regularly making substantial sales to Defendant Interstate Arms in Middlesex County; and imposing the policies and practices by which it sells its guns to Interstate Arms in Middlesex County and by which Interstate Arms must sell those guns to dealers throughout the U.S. Each of these Defendants' unlawful conduct as alleged throughout this Complaint—including the sales, marketing, advertising, and distribution policies and practices that occurred in Middlesex County—resulted in guns that each of them sold to Defendant Interstate Arms in Middlesex County being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains.

12

43.     In addition to Defendant Interstate Arms, at least 10 gun dealers in the Boston area (Barnstable, Bristol, Dukes, Essex, Middlesex, Nantucket, Norfolk, Plymouth, and Suffolk counties) sold guns that were traced to crimes in Mexico. Each of these 10 dealers sold guns manufactured and distributed by some or all of the Defendants and were, and some still are, subject to those Defendants' distribution policies and procedures.

44.     The Government's claims arise out of Defendants' contacts with Massachusetts; the Government's claims relate to those contacts; and those contacts give rise to the Government's claims. This Court has specific personal jurisdiction over each of Smith & Wesson, Beretta, Century Arms, Colt, Glock, and Ruger, as well as both general and specific jurisdiction over Smith & Wesson and Interstate Arms.

45.     Barrett has purposefully availed itself of the privilege of conducting activities within Massachusetts, including by systematically serving the gun market here; regularly marketing and advertising its products here; regularly making substantial sales to its authorized Massachusetts dealer, Natick Outdoor Sales, in Middlesex County; and imposing the policies and practices by which it sells its guns to Natick Outdoor Sales in Middlesex County and by which Natick Outdoor Sales must sell those guns to consumers in Middlesex County and elsewhere. Barrett's unlawful conduct as alleged throughout this Complaint—including the sales, marketing, advertising, and distribution policies and practices that occurred in Middlesex County—resulted in guns that its dealers sold being trafficked into Mexico and used in criminal activities there, causing the harm about which the Government complains. The Government's claims arise out of Barrett's contacts with Massachusetts; the Government's claims relate to those contacts; and those contacts give rise to the Government's claims. This Court has specific personal jurisdiction over Barrett.

13

46.     All of the Defendants' wrongful actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and undertaken by the Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of the Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and with the Defendants' actual, apparent, and ostensible authority.

## III.   JURISDICTION AND VENUE

47.     This action is between a foreign state as plaintiff and citizens of a State or of different States, and the matter in controversy exceeds the sum or value of $75,000.00. The Court therefore has subject matter jurisdiction under U.S. Const., Art. III, § 2, cl. 1, and 28 U.S.C. § 1332(a)(4).

48.     Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) & (3), in that multiple Defendants reside in this district, each Defendant regularly transacts business in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## IV.   DEFENDANTS HAVE LEGAL DUTIES TO DISTRIBUTE THEIR GUNS SAFELY AND AVOID ARMING CRIMINALS IN MEXICO.

49.     The flow of guns from Defendants' U.S. manufacturing plants and stores to the streets of Mexico is not an inevitable, natural phenomenon like the migration of monarch butterflies. Nor is it a necessary consequence of selling a lethal product or of U.S. gun laws.

50.     The flow of guns into Mexico is a foreseeable result of Defendants' deliberate and knowing decisions to design, market, distribute, and sell guns in ways they know with virtual certainty will supply criminals in Mexico.

14

51. Defendants know they have an obligation to help enforce the gun laws, and not to circumvent them. But Defendants continually violate and actively undermine these laws in order to profit from the criminal market in Mexico.

52. The cartels that cause such bloodshed and terror may fire Defendants' guns in Mexico, but they are able to do so only because of deliberate decisions made in Massachusetts and in the other Defendants' domestic corporate offices.

**A.    Defendants Voluntarily Assumed Duties to Comply with All Relevant Laws and the Highest Standard of Care.**

53. Guns are restricted, lethal weapons, sought after by persons who cannot legally possess them. Therefore U.S. law allows only persons who commit to fully comply with all applicable laws, and to act as agents of law enforcement, to engage in the gun business at any level. Defendants know this.

54. Defendants chose to apply for and obtain a U.S. federal license to engage in the gun business. When they did so, they effectively took an oath to the United States that, to obtain the privilege of selling guns, they would fully comply with and help enforce the law to prevent their guns from being obtained by criminals. Defendants voluntarily assumed a duty to design, market, distribute, sell, export, and import guns while carefully adhering to all relevant law in the U.S., as well as the law in Mexico where they know their guns are routinely trafficked, to minimize gun violence.

**B.    Defendants Must Comply with the Gun-Import Laws of Mexico.**

55. The statutory law of Mexico prohibits gun traffickers—and those aiding and abetting them—from bringing any of Defendants' guns into the country.

56.     Mexico's Federal Law on Firearms and Explosives of 1972, as amended February 19, 2021 ("LFAFE"), prohibits the possession of specific guns including those classified as exclusively for military use.

57.     LFAFE, Article 11 reserves for the exclusive use of the Army, Navy, and Air Force numerous types of handguns, rifles, and shotguns.

58.     LFAFE, Article 55 provides that importing *any* gun into Mexico without a permit is unlawful and carries a prison term of up to 10 years. LFAFE, Article 84 bis. And importing guns classified as exclusively for military use without a permit carries a prison term of up to 30 years. LFAFE, Article 84(I).

59.     Gun traffickers do not have the required permits, and Defendants are prohibited from aiding and abetting their importing guns into Mexico.



(A border crossing sign upon entry into Mexico)

C.    **Defendants Must Comply with the Tort Law of Mexico.**

60.    Mexico's Federal Civil Code regulates tort liability (responsabilidad civil extra-contractual) and wrongful acts, in articles 1910 to 1934. Under the Code, Defendants have a duty not to create any risk that harms a person or entity in Mexico.

61.    The Code imposes on Defendants an obligation not to engage in any unlawful, negligent, or harmful conduct that causes injury to another. Specifically, Article 1910 of the Code provides:

> Whoever acting illicitly or against good customs causes damage to another, is obliged to repair it, unless they prove that the damage was produced as a consequence of inexcusable fault or negligence of the victim.

62.    The principles of tort liability stemming from Article 1910 require Defendants to act with the greatest possible skill and care, taking necessary precautions to avoid causing any damage to others.

D.    **Defendants Must Comply with the Gun-Export Laws of the U.S.**

63.    Defendants have a duty to comply with various U.S. export regulations—including, but not limited to, the Export Administration Regulations—so as to minimize the risk that their guns will be misused by malicious actors in Mexico.

64.    Under 15 C.F.R. § 738.4, any exporter of an item with a so-called "ECCN" designation and where there are one or more reasons for special control/oversight of the product must acquire a license to export the product to certain countries designated on a table contained in Supp. No. 1 to 15 C.F.R. § 738.

65.    Semi-automatic guns (other than shotguns), such as the Smith & Wesson M&P 15 and the Century Arms WASR-10, are designated under ECCN 0502.a and flagged as requiring

17

the exporter to apply for a license to transport them to Mexico. Supp. No.1 to 15 C.F.R. 774;

Supp. No. 1 to 15 C.F.R. 738.

**E.    Defendants Must Comply with Other U.S. Federal Laws Governing Guns.**

66.    The Defendants also have a duty to comply with all other U.S. federal laws,

including various provisions of the Gun Control Act of 1968 ("GCA," 18 U.S.C. §§ 921 et seq.),

and the National Firearms Act of 1934 ("NFA," 26 U.S.C. Ch. 53).

67.    The GCA prohibits anyone, including, of course, gun traffickers, from engaging

in the sale of guns without a license. 18 U.S.C. § 923(a). Defendants are prohibited from aiding

and abetting the sale of guns by anyone who does not have the required license.

68.    Other relevant GCA provisions include:

  a.   a prohibition on assembling "from imported parts any semi-automatic rifle or
       any shotgun which is . . . not particularly suitable for or readily adapted to
       sporting purposes" for resale to the general public (see § 922(r));

  b.   a prohibition on selling "machinegun[s]" to members of the general public (§
       922(b)(4));

  c.   various provisions that ensure that a gun is bought by only its actual intended
       purchaser, criminalizing false, deceptive or inaccurate statements, records or
       practices associated with "straw purchases," including, but not limited to, §§
       922(a)(6), 922(m), 922(t)(1), 923(g), 924(a)(1)(A), 924(a)(3)(A) (see also
       relevant non-GCA provisions at §§ 3, 4); and

  d.   various provisions prohibiting the sale of guns to or possession of guns by
       various categories of prohibited persons (e.g., § 922(d), 922(g)).

69.    A "straw purchaser" is a person who buys a gun on someone else's behalf. Straw

purchases violate a number of federal and, in some cases, state gun laws including, but not

limited to, provisions of the GCA. Gun sellers who knowingly supply straw purchasers also

violate those laws.

70.    The NFA and related provisions of the GCA mandate that machine guns and

certain other weapons may be made, sold, and possessed only subject to strict regulation and

18

JA000065

registration, and may not be sold to the general public. The statute prohibits the sale of a

"machinegun" to any person except those specifically authorized by the U.S. Attorney General.

18 U.S.C. § 922(b)(4).

71.     This provision incorporates the NFA's definition of "machinegun" as:

"any weapon which shoots, is *designed to shoot,* or can be readily restored to
shoot, automatically more than one shot, without manual reloading, by a single
function of the trigger. The term shall also include [parts] designed and intended,
*for use in converting a weapon into a machinegun,* and any combination of parts
from which a machinegun can be assembled if such parts are in the possession or
under the control of a person." 26 U.S.C. § 5845(b) (emphasis added).

72.     A gun is "designed to shoot" automatically if it is designed so that it can be

simply or easily modified to fire automatically. The U.S. Bureau of Alcohol, Tobacco, Firearms

and Explosives ("ATF") has recognized that the NFA's definition of "machinegun[s]" "includes

those weapons which have not previously functioned as machineguns but possess design features

which facilitate full automatic fire *by a simple modification or elimination of existing component

parts.*" ATF Rul. 82-8 at 1.

**F.      Defendants Must Comply with U.S. State Laws Applicable to Guns.**

73.     Defendants likewise assumed a duty to comply with the laws of relevant U.S.

states that prohibit dangerous conduct such as straw purchases, and state laws, including public-

nuisance statutes, that prohibit supplying criminal gun markets.

74.     Defendants must also comply with other U.S. state laws applicable to guns,

including state unfair business practices statutes that prohibit unfair and deceptive advertising,

including advertising that induces the unlawful and reckless use of dangerous products like guns.

75.     These laws include, but are not limited to, laws from the home states of the

Defendants such as the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §§ 42-110a et

seq.) (for Colt), and the Massachusetts Consumer Protection Act (Mass. Gen. Laws c. 93A) (for Smith & Wesson).

76.     These and similar laws prohibit Defendants from encouraging the unlawful or dangerous use of guns. They apply to such reckless marketing even where the resulting harm occurs outside of the state but the marketing originated from within the state.

**G.    Defendants Must Comply with U.S. State Tort Law.**

**1.    Defendants have a duty to carefully monitor and supervise their downstream distributors and dealers.**

**a.    Defendants have a duty to sell guns responsibly.**

77.     By designing, distributing, selling, and marketing highly dangerous products, Defendants assumed a duty to ensure that their guns are sold lawfully and carefully, in full compliance with all applicable laws, and not to circumvent those laws through their business practices.

78.     Part of the duty Defendants assumed was to carefully sell and distribute their guns. This duty is violated when Defendants sell guns without standards, conditions, or monitoring, through downstream dealers and distributors some of whom Defendants know will recklessly or illegally sell guns.

79.     The existence and contours of this duty have been known for decades.

80.     The fact that selling guns without standards or conditions supplies criminals has also been known. For example, a congressional report in 1976, supported by the U.S. Departments of Justice and Treasury, highlighted that large-volume sales were a major source of illegal gun supply, and that the multiple-sale reporting requirement (that requires reporting to ATF of sales of more than one handgun by a dealer to a purchaser within five business days) was not enough to stop it. In public Congressional hearings in 1993, ATF's director described how

criminals obtain guns through corrupt dealers, noting that 6,000 to 10,000 handguns were diverted to the illegal market by one dealer alone.

81.     Voices within the gun industry have long recognized that Defendants have a duty to control their distribution networks to prevent the supply of guns to criminals.

82.     For example, a then-top gun industry trade association official, Robert Ricker, stated under oath that gun manufacturers and distributors have long known that their gun distribution system "encourages and rewards illegal activity by a few corrupt dealers and distributors," but they choose "a see-no-evil, hear-no-evil, speak-no-evil approach" and "hide behind the fiction that as long as a retail dealer has a valid federal firearms license to sell guns, no attention to the dealer's business practices is required by its suppliers."  Declaration of Robert A. Ricker filed in *People v. Arcadia Mach. & Tool, Inc.*, Judicial Council Coordination Proceedings No. 4095 (Cal. Super. Ct. Feb. 3, 2003) ("*Ricker Declaration*") ¶¶ 9, 11, 12.

83.     Mr. Ricker also stated that "Leaders in the industry [including some of Defendants], have long known that greater industry action to prevent illegal transactions is possible and would curb the supply of firearms to the illegal market," but they "have consistently resisted taking constructive voluntary action to prevent firearms from ending up in the illegal gun market and have sought to silence others within the industry who have advocated reform." *Ricker Declaration*, ¶8.

84.     In 1993, a National Alliance of Stocking Gun Dealers ("NASGD") publication recognized that "children and felons are being sold guns by licensed firearm dealers," "[w]e as an industry have failed to 'police' ourselves in the past" and "[w]e must do so now." *The Alliance Voice*, July 1993.

21

85.     In 1994, NASGD joined then-U.S. Secretary of the Treasury Lloyd Bentsen and others in a statement recognizing that "within the firearms industry are elements who divert the flow of firearms from the legitimate trade into the more lucrative firearms black market." *The Alliance Voice,* Apr. 1994.

86.     In 1999, a column by a former Gun Dealer of the Year called on manufacturers and distributors to "wake-up" and control their distribution systems, including requiring that dealers "adhere to some strict guidelines," writing that:

> IF YOU DO NOT KNOW WHERE AND HOW YOUR PRODUCTS ARE ULTIMATELY BEING SOLD – YOU CHOOSE TO BE WILLFULLY BLIND TO THE FACT OR ANTICIPATED THAT THEY WOULD BE ILLEGALLY SOLD AND SUBSEQUENTLY MISUSED.

Paul M. Barrett, "Loaded Words: A Dealer Breaks Rank, Blaming Gun Makers," *Wall Street Journal* (June 22, 1999).

87.     Over twenty years ago, a former Senior Vice-President for Defendant Smith & Wesson stated under oath that the gun industry is aware "that the black market in firearms" is in part supplied by "multiple thousands of unsupervised federal firearms licensees," but "[i]n spite of their knowledge, however, the industry's position has consistently been to take no independent action to insure responsible distribution practices." Affidavit of Robert Hass filed in *Hamilton v. Accu-Tek*, No. 95CV0049 (E.D.N.Y.) ¶ 20.

88.     Dating at least to the 1990s, officials in several gun industry trade associations proposed that manufacturers regulate their distribution by selling through authorized dealers and requiring standards and safe practices to sell guns. Those proposals were all rejected, and some of their proponents were forced out of industry positions in response.

89.     Defendants have received similar calls for reform from U.S. federal law enforcement in the U.S., but have refused to heed them. For example, ATF's strategic plan

22

issued in 2000 stated that its "[e]nforcement efforts would benefit if the firearms industry takes affirmative steps to track weapons and encourage proper operation of Federal Firearms Licensees to ensure compliance with all applicable laws." ATF, *2000-2005 Strategic Plan* 11 (2000).

90.    In 2001, the U.S. Department of Justice stated in a public report that "[g]un manufacturers and importers could substantially reduce the illegal supply of guns by taking . . . steps to control the chain of distribution for guns." DOJ, *Gun Violence Reduction: National Integrated Guns Violence Reduction Strategy* § IV (2001).

91.    The Department of Justice then listed several recommended steps that Defendants should take to avoid supplying criminal gun markets:

> The firearms industry can make a significant contribution to public safety by adopting measures to police its own distribution chain. In many industries, such as the fertilizer and explosives industries, manufacturers impose extensive controls on their dealers and distributors. Gun manufacturers and importers could substantially reduce the illegal supply of guns by taking similar steps to control the chain of distribution for guns. To properly control the distribution of guns, gun manufacturers and importers should: identify and refuse to supply dealers and distributors that have a pattern of selling guns to criminals and straw purchasers; develop a continual training program for dealers and distributors covering compliance with guns laws, identifying straw purchase scenarios and securing inventory; and develop a code of conduct for dealers and distributors, requiring them to implement inventory, store security, policy and record keeping measures to keep guns out of the wrong hands, including policies to postpone all gun transfers until [background] checks are completed. *Id.*

92.    The Justice Department offered Defendants information to help them identify which of their dealers were supplying crime guns, including trace data—the data obtained by ATF when it contacts the manufacturer and others in the distribution chain to identify a gun's entire commercial history:

> To assist industry efforts to keep guns from falling into the wrong hands, ATF will supply manufacturers and importers that request it with information about crime gun traces of the manufacturer's or importer's guns. The Department of Treasury

23

and the Department of Justice are continuing to work with responsible members
of the firearms industry to encourage voluntary measures, such as a code of
conduct and comprehensive training for dealers, to ensure that guns are not stolen
or sold to criminals or straw purchasers. *Id.*

93.    After a gun is recovered at a crime scene, the ATF's first step in tracing it is to

contact the gun's manufacturer. *See* ATF, *Commerce in Firearms in the United States* 20 (2000)

(describing trace procedure). Defendants could use these trace requests to monitor and discipline

their distribution systems.

94.    In a March 17, 2000 settlement agreement with the U.S. government and various

cities (the "2000 Agreement"), Defendant Smith & Wesson accepted an obligation to sell to only

"authorized distributors and authorized dealers" who abided by a code of conduct, including the

requirement that the distributors and dealers store all trace requests and report them to Smith &

Wesson. Under pressure from other industry players, Smith & Wesson later reneged on the 2000

Agreement. But its existence and terms-including the use of trace data to monitor and discipline

the distribution system-help to define the duty that Defendants assumed when designing and

marketing their guns.

> **b.    Defendants have a duty not to supply the criminal market in Mexico.**

95.    Defendants assumed an obligation to ensure that their distributors and dealers do

not recklessly or illicitly supply the criminal market in Mexico.

96.    Aspects of this duty include, but are not limited to:

 a.   providing guns only to downstream distributors and dealers that abide by
      protocols and safety standards to prevent the unlawful or negligent diversion
      of guns to bad actors in Mexico;

 b.   terminating business relationships, refusing to supply or otherwise
      disciplining any downstream distributor or seller of a Defendant's products
      where trace data or other indicators suggest that the party is likely engaging in
      reckless or unlawful practices supplying the criminal market;

24

c. where it appears that a Defendant's guns are being trafficked from a certain source jurisdiction into Mexico, limiting the supply of guns or certain classes of guns to retailers in the source jurisdiction or creating special point-of-sale restrictions on any relevant classes of guns;

d. requiring all retail sellers to employ safe and reasonable business practices to enforce and adhere to their obligations, including but not limited to asking screening questions of customers to identify purchasers likely to illegally sell or misuse guns or transport them into Mexico;

e. requiring that purchasers show multiple forms of state identification beyond those necessitated by federal or state law;

f. limiting bulk, multiple, and repeat sales or imposing other limitations designed to prevent illicit gun trafficking into Mexico;

g. obtaining, retaining, and analyzing relevant information to determine if their business practices are supplying criminals in Mexico with guns, and taking appropriate responsive action to prevent that continued supply, including but not limited to:

  • requiring downstream sellers to provide timely information regarding their business practices including alleged or proven violations of law, straw purchasing or trafficking incidents at their stores, "missing" guns, trace requests, inspections and audits, sales of assault weapons and sniper rifles, multiple and bulk sales, and repeat purchasers;

  • noting and recording all instances of federal or state law enforcement officials tracing guns recovered during criminal investigations in Mexico back to each Defendant or to any downstream distributors or dealers selling the Defendant's guns;

  • noting and recording all connections between any Defendant's guns and criminal misuse in Mexico identified in the media or other sources;

  • conducting continuous, routine analyses of trace or other data so as to determine, among other things, whether certain distributor and dealer networks are associated with abnormally high rates of diversion of guns to the criminal market in Mexico; whether certain types of a Defendant's guns (such as semi-automatic assault rifles and sniper rifles) appear to be disproportionately used by criminals in Mexico; and whether there are any geographic or other patterns in the manner in which a Defendant's guns are being diverted to the criminal market in Mexico.

### 2. Defendants have a duty to design safe guns.

97.     The common law of U.S. states, like the applicable civil law of Mexico, requires Defendants to exercise a high degree of caution in the design, distribution, sale, and marketing of their exceedingly dangerous products.

98.     This includes a duty not to include features making guns more attractive to and useful for malicious actors and to include safety features reducing their susceptibility to theft and diversion to the criminal market in Mexico.

99.     These affirmative design safeguards include, but are not limited to, personalized or authorized-user features, such as internal locks or "smart gun" technology, that inhibit all but a gun's authorized user from discharging it. These safety features have been technologically feasible for many years. Internal locks, and other features less sophisticated than smart guns, have been used in some guns sold to the public. Guns with authorized-user features are less likely to be attractive targets for theft and misuse by criminals because they cannot be fired by anyone except the authorized user.

100.     Defendants also assumed a duty to make guns that could not easily have their serial numbers defaced or obliterated, which criminals and traffickers often do to evade law enforcement.

101.     Defendants have long had the commercial and technological capability to install these safeguards in their guns. And they have been well aware of the need for this technology. For example, Defendant Smith & Wesson undertook in the 2000 Agreement to install smart-gun technology in all of its new handgun designs by 2003. Smith & Wesson recognized that this would be an important step to "reduce the criminal misuse of guns [and to] combat the illegal acquisition, possession and trafficking of guns."

26

102.    Smith & Wesson further vowed to invest 2% of its annual gun sales revenue to the development of this smart-gun technology. It filed multiple patent applications for specific embodiments of smart-gun technology between approximately 1998 and 2001.

103.    Smith & Wesson further committed to include a second, hidden serial number on all guns, so that law enforcement could still fully investigate the commercial history of the gun in a criminal investigation, even if the criminal or trafficker defaced or obliterated one serial number.

### 3.    Defendants have a duty to refrain from inflammatory and reckless marketing likely to attract criminal users.

104.    Independent of any state unfair trade practices statutes, all Defendants have an obligation to avoid inflammatory or reckless marketing tactics likely to attract and motivate criminals or other dangerous users of their guns.

105.    The Smith & Wesson 2000 Agreement reflects this duty, acknowledging an obligation to "[n]ot market any gun in a way that would make the gun particularly appealing to juveniles or criminals."

### H.    Defendants Cannot Avoid Their Duties by Being Willfully Blind to the Facts.

106.    The statutes, regulations, and law identified above reflect a standard of conduct and care below which reasonably prudent manufacturers and distributors may not lawfully fall. Together, these requirements make clear that Defendants are required to possess and exercise specialized and sophisticated knowledge, skill, information, and understanding of the market for guns. They must also be aware of, and prevent, the risks and dangers of gun trafficking that arise when Defendants choose to sell guns through standardless sales and distribution without proper monitoring and discipline.

27

JA000074

107.    Further, these proscriptions make clear that Defendants have a duty and responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the diversion of their guns into Mexico.

108.    Prominent among Defendants' obligations is the duty to be aware of the reality of how their guns are sold and used, to take that reality into account when they decide how to design, sell, and distribute their guns, and not to be willfully blind to the facts.

109.    Defendants also have, and are required to have, access to specialized and detailed knowledge of suspicious sales activities. ATF traces, extensive public reports of unlawful trafficking activity, and sophisticated sales data allow Defendants to monitor the volume and type of sales that would alert them to suspicious sales activity and problematic dealers. This information enabled and required Defendants to play a decisive role in stopping the supply of their guns to the cartels in Mexico.

110.    A manufacturer of a dangerous product is an accessory or co-conspirator to illicit conduct by downstream actors where it continues to supply, support, or assist the downstream parties and has knowledge—*actual or constructive*—of the illicit conduct.

111.    "Willful blindness" to clear indicators of unlawful conduct constitutes constructive knowledge of that conduct.

112.    "Red flags," when assessed in the aggregate, can render it obvious that a downstream seller is engaging in criminal or unlawful activity. A manufacturer or supplier that continues to supply, support, or assist that seller, after the red flags are raised, is a culpable and intentional participant in that unlawful conduct.

113.    The flags that put Defendants on notice that they were facilitating unlawful trafficking of guns into Mexico were blazingly red and astoundingly numerous. Defendants

28

JA000075

cannot shield themselves from responsibility by claiming to be ignorant of the fact that they routinely supply, and profit from, trafficking to criminals in Mexico.

114.    Defendants knowingly violated all of the aforementioned duties and responsibilities. Their knowing violations of those obligations caused harm, and continues to cause harm, to the Government and its people.

## V.    DEFENDANTS ARE FULLY ON NOTICE THAT THEIR CONDUCT CAUSES UNLAWFUL TRAFFICKING TO MEXICO.

115.    For years Defendants have been confronted with a mountain of facts that make clear that their chosen business practices routinely arm the cartels in Mexico with massive and lethal arsenals.

116.    The U.S. federal government has determined that Defendants' guns are the overwhelming source of the cartels' arsenals, and that the trafficking of Defendants' guns across the border into Mexico is a crisis of extraordinary proportions. Media reports, trafficking prosecutions, reported cases, articles, trace data, and other information confirm the same facts.

117.    Defendants' response to this mountain of information has been to double down on their unlawful practices and fight law enforcement efforts to stop the trafficking.

### A.    Defendants Know That Some of Their Dealers Sell Significant Numbers of Crime Guns.

118.    Defendants have long been aware that some of the dealers they use to sell their guns at retail supply significant numbers of guns to the criminal market in Mexico. Defendants know that these dealers engage in straw sales, multiple sales, repeat sales, and other business practices that supply traffickers who arm the drug cartels.

119.    It is well known that the overwhelming majority of gun dealers—more than 85%—sell zero crime guns, while a small minority of dealers—fewer than 10%—sell about 90% of crime guns. Defendants know that a fairly small percentage of their dealers sell virtually all

29

crime guns recovered in Mexico. Public reports and articles have identified some of those dealers by name.

120.    For example, a 2010 *Washington Post* article identified by name 12 dealers that sold the most guns recovered in Mexico and even included a graphic that made the point even more clear:



121.    Even when the U.S. national media spoon fed this information to Defendants they continued to use these dealers and did not cut off supplies or begin monitoring and supervising them. And as noted above distributors such as Defendant Interstate Sales, which has sold guns traced to crime scenes in Mexico, distribute guns throughout the U.S., including to dealers like these that traffic them to the cartels.

122.    Defendants regularly receive even more direct information about problem dealers. Trace requests from ATF and other agencies alert Defendants that guns they sell to specific distributors and dealers are being recovered at crime scenes in Mexico (the ATF tracing program

30

JA000077

extends to crime guns recovered in Mexico). Industry participants know that a high volume of crime-gun traces is a trafficking indicator, suggesting that a dealer is engaged in unlawful sales such as straw purchases. ATF, *Commerce in Firearms in the United States* at 25 (2000).

123.    Defendants can get trace data from ATF, and they can require that their dealers forward all trace requests to them. But rather than taking these steps to determine which dealers and distributors are supplying the cartels in Mexico, Defendants choose to remain willfully blind to the specific facts.

124.    In the 2003 trial, Judge Weinstein found as a fact that "relatively excessive numbers of traces to specific retailers or first purchasers is … cause for alarm by Manufacturer Defendants," and that no U.S. law "foreclosed [them] from closing off illegal flows of their guns to such retailers." *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 504 (E.D.N.Y. 2003). The Court of Appeals dismissed the defendants' appeal and refused to vacate Judge Weinstein's findings of fact even though defendants had prevailed on technical grounds. *NAACP v. A.A. Arms, Inc.*, No. 03-9354-cv Doc. 1537 (2d Cir. Aug. 30, 2004).

125.    Judge Weinstein further found that "the guns in the trace database are overwhelmingly crime guns (that is, recovered in connection with a crime)," that "sufficient information in the trace database has been made available to defendants and would have been made more extensively available to any that sought information," and that "trace information provides to each manufacturer, distributor and dealer—with some technical assistance—information that could be used to improve their distribution system to protect against criminals obtaining their guns."  271 F. Supp. 2d at 522.

126.    Defendants know that the ATF alone, without Defendants' own monitoring and disciplining their distribution systems, can barely make a start on preventing gun trafficking to

Mexico. A 2013 report from the U.S. Department of Justice Office of Inspector General (OIG) found that ATF inspected about only 11,000 of the 135,000 licensees each year. In 2019, ATF inspected about 10% of all licensees. Although 2020 posed novel challenges, ATF inspected a mere 5,827 licensees during this past fiscal year despite record-high gun sales. And the 2013 OIG report suggested that ATF had not implemented a mechanism to track and prioritize for inspection retail dealers it considers to be "high-risk."

127.    Judge Weinstein found, based on the testimony of former ATF officials, that "ATF lacked the ability to adequately regulate firearms transactions," including "particularly the retail dealers, which are a primary conduit of guns from the legal to the illegal market."  271 F. Supp. 2d at 521. He further found as fact that "the ATF is incapable of inspecting all but a tiny percentage of dealers, is restricted to one routine compliance inspection per year and cannot close corrupt dealers for many years even after notice of revocation, indictment and conviction." *Id.*

128.    Even in rare cases where ATF inspects a licensed retail dealer, licenses are rarely revoked, even when flagrant violations of U.S. federal law are uncovered. For example, *USA Today* and *The Trace* reported on an Illinois retail dealer that was allowed to stay in business after it received two warnings following inspections in 2009 and 2013 for repeatedly failing to conduct background checks or to comply with U.S. federal record-keeping requirements, and illegally selling to out-of-state residents. Court records tied that dealer to at least 12 guns traced to a trafficking ring suspected of smuggling narcotics into the U.S. from Mexico between 2013 and 2015. It was only after those guns were trafficked, and numerous other violations, that the dealer's license was finally revoked. "There's really no teeth to the laws, and gun dealers know that," a former ATF agent explained in the article. Brian Freskos et al, "After Repeated ATF

32

Warnings, Gun Dealers Can Count on Agency to Back Off; Sometimes Firearms Flow to Criminals," *USA Today* (May 26, 2021).

129.    Gun industry insider Robert Ricker confirmed that Defendants know that corrupt dealers retain their licenses because ATF is unable to effectively and promptly weed them out and revoke their licenses:

> The firearm industry … has long known that ATF is hampered in its enforcement efforts by inadequate resources and constraints in federal law on its ability to enforce current law against illegal and corrupt dealers. … Without independent action by all segments of the industry to address the flow of guns from corrupt dealers and gun shows into the illegal market, ATF will continue to fight a losing battle against illegal gun traffickers. *Ricker Declaration*, ¶13.

130.    This is not meant to criticize ATF or other U.S. government policies or activities. But it does demonstrate that Defendants know—or choose to be willfully blind to the fact—that some of their dealers violate the law, recklessly sell guns, and supply the cartels with guns. And Defendants exploit this lack of adequate enforcement to supply and profit from the criminal market.

131.    Defendants know that having a federal firearms license does not mean that the licensee obeys the law. Pretending otherwise is a fiction that Defendants use to falsely claim plausible deniability about their obligation to monitor and discipline their distribution chains.

132.    Judge Weinstein found as fact that "the industry knows that crime gun traces are indicators of problems at the dealer level and are adequate notice to all up-stream distribution partners of these problems," and that "the reason industry members gave for not addressing the clear dangers posed by unsupervised dealers causing widespread harm to communities was: 'if the industry took voluntary action, it would be admitting responsibility, and 'the concept that if

JA000080

you are proactive and take steps to remedy the problem, then you have recognized that you are responsible partially for the problem.'" 271 F. Supp. 2d at 521-522.

133.    Defendants know that ATF enforcement is not sufficient to stem the tide of their guns into Mexico. Their policies of supplying any licensed dealer ensure that they knowingly assist and facilitate those dealers' unlawful trafficking to Mexico.

**B.    Government and Media Reports Give Defendants Continual Notice That Their Distribution Systems Facilitate Gun Trafficking to Mexico.**

134.    Even without information from trace requests from law enforcement, Defendants are aware that they are routinely supplying guns trafficked to Mexico.

135.    In just the past ten years the problem of gun trafficking from the U.S. to Mexico has been documented in more than 3,000 news articles published in the U.S., in more than 100 academic studies, and in a multitude of government reports. These and other sources provide Defendants with compelling notice that their unlawful business practices continue to fuel gun violence in Mexico.

136.    "Cartels need guns to support their business," explained Scott Brown, special agent in charge of Homeland Security Investigations in Phoenix, in one published article. "When they find people that are either willing to flagrantly violate the law or skirt the law or not practice due diligence, that is enabling the cartels to be armed and to have a destructive impact both in Mexico and the U.S." Beth Warren, "DEA Supervisor Turned 'Pariah' Sold Assault Rifles to Sinaloa Cartel Associates," *Louisville Courier Journal* (Feb. 24, 2021).

137.    Among the U.S. Congressional and governmental reports documenting and publicizing the persistent problem of gun trafficking to Mexico are:

- House Committee on Homeland Security, *Combating Border Violence: The Role of Interagency Coordination in Investigations* (2009).
- Congressional Research Service, *Mexico's Drug-Related Violence*, R40582 (2009).

34

- Gov't Accountability Office, *Guns and Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning Coordination Challenges* (2009).

138.    United Nations and NGO reports similarly document and publicize the rampant trafficking of Defendants' guns into Mexico. See, for example: *Global Study on Firearms Trafficking 2020*, United Nations Office on Drugs and Crime (2020); Violence Policy Center, Cross Border Gun Trafficking, http://vpc.org/indicted/ (Nov. 10, 2020).

139.    So do numerous media studies and reports, such as:

- James C. McKinley, Jr., "U.S. Is Arms Bazaar for Mexican Cartels," *New York Times* (Feb. 25, 2009);
- Chris Baltimore, "Mexico Cartels Go Bargain Gun Shopping in Houston," Reuters (May 28, 2009);
- Chris McGreal, "How Mexico's Drug Cartels Profit from Flow of Guns Across the Border," *The Guardian* (Dec. 8, 2011);
- Seth Harp, "Arming the Cartels: The Inside Story of a Texas Gun-Smuggling Ring," *Rolling Stone* (Aug. 7, 2019);
- Kevin Sieff & Nick Miroff, "The Sniper Rifles Flowing to Mexican Cartels Show a Decade of U.S. Failure," *Washington Post* (Nov. 19, 2020), which noted that the trafficked weapons are being used to kill "record numbers of [Mexican] police officers—464 in the first nine months of 2020 alone."

140.    Gun trafficking from the U.S. into Mexico and into the hands of the drug cartels was a well-publicized problem even before 2005. See, for example, "U.S. Mother Lode of Firepower for World," Associated Press (March 31, 1994). At Mexico's urging, in 1997 the Organization of American States adopted a treaty designed to try to slow this trafficking. That same year President Clinton further acknowledged and publicized the problem by asking the U.S. Congress to increase military aid to the Government so it could buy guns to combat the drug cartels that were armed with Defendants' guns.

141.    Defendants demonstrated their awareness of the problem by *fighting* U.S. federal efforts to address it. Retailer customers buying multiple guns may well be trafficking, so U.S.

federal law requires dealers to timely inform ATF of multiple sales (sales of more than one gun over 5 business days) of handguns, by completing and submitting a multiple-sale reporting form. This provides ATF with timely information to investigate potential trafficking. But this requirement generally did not apply to long guns.

142.    A November 2010 report from the U.S. Department of Justice OIG, reviewing ATF's efforts to reduce the flow of illegal guns into Mexico, found that the then-existing multiple-sales reporting requirements for handguns "produce timely, actionable investigative leads for ATF" but noted that cartels operating in Mexico preferred military-style rifles not then subject to the U.S. federal reporting requirement. The OIG report concluded that this omission "hinders ATF's ability to disrupt the flow of illegal weapons to Mexico." U.S. Department of Justice Office of the Inspector General, *Review of ATF's Project Gunrunner* at 31 (Nov. 2010).

143.    ATF issued notice of an emergency rule that required licensed dealers operating in California, Texas, Arizona, and New Mexico to report multiple sales of certain assault rifles. FR Doc. 2010-31761. The proposed rule would not *prohibit* multiple sales of assault rifles, but would merely require the same *reporting* of multiple sales that already existed for handguns.

144.    The gun industry nevertheless tried to keep that information from law enforcement and to enable the trafficking to continue. Defendants' trade association sued to prevent enforcement of the rule. Its lawsuit was unsuccessful in blocking the reporting requirement. But the episode confirms Defendants' knowledge of the systematic gun trafficking to Mexico and of traffickers' preference for multiple sales. It also confirms that the gun industry prefers to supply and profit from that trafficking rather than help law enforcement put an end to it.

145.     Despite all this notice, Defendants continue to use their unmonitored and undisciplined distribution systems to supply military-grade assault weapons in the U.S., causing them to be smuggled across the border and used to arm criminal organizations and drug cartels in Mexico. The problem of Defendants' guns flowing into Mexico and arming the cartels only gains more attention, and becomes more lethal, every year.

**C.     Specific Incidents Give Defendants Continual Notice That Their Distribution Systems Actively Assist Trafficking to Mexico.**

146.     Authorities have repeatedly identified and recovered Defendants' guns in connection with notorious gun-trafficking rings in which Defendants' dealers supplied cartel traffickers. Defendants received notice of these incidents through ATF trace requests, news reports, and court filings. They are fully aware of their contribution to the epidemic of gun violence in Mexico and the scale of the problem they have created. Following are some illustrative examples.

147.     From March 2016 to December 2018 gun dealers sold to a trafficker 37,200 rounds of ammunition, 2,649 high-capacity rifle magazines, 120 body-armor plates, and 3 handguns—including 2 Colt pistols. He then smuggled them into Mexico during 87 border-crossings. "The defendant was directly involved with high level members of the Sinaloa cartel in Mexico… [His] offenses in this case are very serious," prosecutors stressed in court filings. *United States of America v. Marco Antonio Peralta-Vega*, No. 4:19-cr-00338 (D.  Ariz.), Government's Sentencing Memorandum at 3, filed June 4, 2021.

148.     In October 2017 gun dealers sold to another trafficker Defendants' assault rifles that are coveted by criminals and drug organizations in Mexico. These included a Smith & Wesson rifle and two Century Arms rifles—all destined for Mexico.

37

149.     From 2007 to 2008 Phoenix gun shop X-Caliber Guns sold more than 650 guns, mostly assault weapons including AK-47s, to straw purchasers recruited by a drug cartel. X-Caliber sold the guns after being told that the purchasers planned to sell them in Mexico, and even advised one purchaser to break up the purchases to avoid drawing suspicion. Several crime guns recovered in Mexico were traced back to X-Caliber, including: an assault rifle recovered after a Government raid of a drug-dealer safe house that left eight Mexican agents dead; three assault rifles recovered after members of a drug gang fired on Mexican authorities; a Century Arms WASR-10 and a diamond-encrusted Colt Super pistol recovered after the Nov. 2, 2008 killing of the Sonora police chief near the Arizona border; a Colt Super pistol seized in 2008 when Mexican special forces captured a top Sinaloa Cartel lieutenant; and three assault rifles recovered after federal police officers were fired on by the Beltran Leyva drug gang on July 2, 2008.

150.     From October 2015 to May 2016 dealer Ballistic Guns conspired with a former Tucson police officer to straw purchase and traffic guns into Mexico. They trafficked 35 guns, including 2 Barrett .50 caliber rifles, a Ruger rifle, and 9 Colt Super pistols. ATF agents intercepted one of the .50 caliber rifles at the border. Authorities stated that "evidence from the investigation established that these guns were sold to members from Mexico drug cartels and that the guns were intended for Mexico." Dylan Smith, "Tucson Firearms Dealer Gets 6.5 Years for Trafficking Guns to Mexican Cartels," *Tuscon Sentinel* (Mar. 19, 2018).

151.     From January to November 2003 a Mesquite, Texas dealer sold more than 150 guns to another trafficker for drug gangs in Mexico. In just a few weeks, the dealer sold to the trafficker a 9mm pistol, an AK-47, and nine AR-15 assault weapons. One of the guns was connected to the shooting of a police officer in Reynosa, Mexico.

38

152.    From 2006 to 2007 dealer Carter's Country in Spring, Texas supplied a trafficker with guns, including two Smith & Wesson rifles. One of the trafficked guns was reportedly used in the "Acapulco massacre" in 2006, when more than a dozen armed assailants stormed two offices of the state attorney general and executed four police officers and three secretaries. Years earlier a former employee of Carter's Country testified under oath that Carter's management repeatedly directed its employees to encourage straw purchases in order to avoid losing sales. The *Washington Post* later identified Carter's Country as a top supplier of crime guns to Mexico, with 2 of the top 12 stores in the U.S. selling the most crime guns recovered in Mexico.

153.    From July 2012 to September 2012 a dealer sold 19 guns to straw purchasers who were conspiring with a trafficker—a member of the "Duffle Bag Mafia." The guns included a Century Arms rifle. The trafficker's vehicle had 46 rifles hidden inside an auxiliary gas tank. He was part of a large-scale scheme to use straw purchasers to traffic the weapons into Mexico for use by Los Zetas.

154.    From August 2007 to September 2008 dealers sold 25 guns to a trafficker for a man known to her only as "*El Mano*." The majority of these guns were military-style AK-47 and AR-15 assault rifles, including a Century Arms WASR-10 rifle and a Colt pistol later found in the possession of gang members in Mexico.

155.    In 2007 Barry Clint Stuart, a federally licensed gun dealer, attended gun shows and sold guns "off paper" or "second hand." These guns, and others bought by straw purchasers, were then trafficked to Nazario Cavazos-Deluna's drug cartel. The trafficker was linked to 74 guns sold to the cartel. Stuart also helped the traffickers convert guns to fully automatic.

156.    On April 14, 2010 a U.S. federal jury convicted former F.B.I Special Agent John Thomas Shipley of dealing guns without a license, causing a gun dealer to maintain false

records, and making a false statement to federal authorities. The investigation that led to these charges began when ATF traced back to Shipley a Barrett .50 caliber rifle that was used during a shootout in Chihuahua, Mexico that resulted in the death of a Mexican Army captain and six drug cartel members.

157.    On February 15, 2011, Los Zetas hitmen in San Luis Potosí, Mexico attacked two U.S. ICE agents, one of whom was killed. ATF traced the weapon used in the assault to a trafficker who had bought it and 39 other guns—including a Century Arms shotgun—in the Dallas/Fort Worth area.

158.    On November 9, 2010, a trafficker and another man in a Wal-Mart parking lot in the Dallas area transferred two duffle bags containing 40 high-powered guns, including a Smith & Wesson revolver, a Century Arms pistol, and a Century Arms WASR rifle. The guns were destined for Los Zetas.

159.    Another prolific straw purchaser armed cartels with Glock pistols and AK-47s, buying specific guns in demand by the drug cartels. Several New Mexico dealers sold guns to this trafficker, including seven Glock pistols and a Ruger rifle. Two of the Glocks were later seized from Los Zetas in Mexico.

160.    From March 2006 to June 2007 10 gun dealers in Houston, Texas sold 336 weapons to straw purchasers acting on behalf of the Gulf Cartel in Mexico. Mexican authorities eventually recovered 88 of these guns, some at crimes scenes and others during narcotics searches. They had been used to kill 18 Mexican law enforcement officers and civilians.

161.    From February to November 2008 gun dealers sold to a ring of 10 straw purchasers in Mesa, Arizona. The straw sales of more than 100 assault rifles and other weapons

40

included 26 Colt Super pistols, 4 Colt pistols, a Smith & Wesson pistol, and 3 Century Arms rifles. The guns were trafficked to the Sinaloa Cartel in Mexico.

162.    From September 2009 to December 2010 dealers sold more than 700 guns to other straw purchasers in Arizona. A third of the recovered guns were found in Mexico. In 2011 the Center for Public Integrity reported that at least six Century Arms WASR-10 assault rifles acquired in straw purchases from a single Arizona gun dealer were recovered after gun battles between drug traffickers and police in Sinaloa in May 2008.

163.    In 2016 U.S. authorities busted another trafficking ring that operated in Laredo, Texas. Local gun dealers sold 36 military-style weapons to straw purchasers, including Beretta semi-automatic handguns and five Century Arms rifles. The guns were then trafficked into Mexico.

164.    In 2015 dealers throughout the Rio Grande Valley sold more than 100 guns, in straw purchases, to a trafficking ring in McAllen, Texas. The guns, all of which were trafficked to the cartels in Mexico, included a Colt Super pistol and 2 Century Arms rifles.

165.    A California ring was broken up in 2015 while trafficking guns to the Sinaloa Cartel. Their purchases included AK-47s, .50 caliber rifles, AR-15s, and Glock pistols. The cartel's gun broker was heard on wiretaps telling a co-conspirator that obtaining the guns in the U.S. was easy.

166.    To get a closer look at how the iron river of guns flows into Mexico, the *Arizona Daily Star* analyzed 32 weapons-smuggling criminal cases in federal courts in Tucson and Phoenix in 2018. The narratives included what some commentators call an "*operación hormiga*," or "ant operation," of quietly buying relatively small quantities of guns at a time and then smuggling them across the border.

41

167.    From June to January 2018 Tucson-area gun dealers sold 50 guns to 2 people who bought them on behalf of their heroin dealer. The guns included 13 Century Arms assault weapons (WASR-10 rifles and AK-type pistols).  A Century Arms assault rifle that one of the traffickers had bought in October 2017 was recovered in Mexico after a shootout between Mexican law enforcement and a cartel in La Paz, Baja California Sur.  Another person bought a Colt rifle for one of the traffickers' heroin dealer in March 2017, and that rifle was later recovered in Culiacan, Mexico.

168.    The *Arizona Daily Star* also documented that in December 2017 a Tucson dealer sold a Century Arms pistol to a 23-year-old woman who bought it at the request of her boyfriend. Hours later, he smuggled it through Nogales, Arizona into Mexico. It was used in a crime in Sinaloa less than two months later.

169.    From October 2017 to September 2018 large-box stores in Tucson and Green Valley, Arizona sold 108 high-powered rifles and pistols, in straw purchases, to another trafficker. Every few days for 11 months he cycled through different big-box stores, including 45 separate visits to 4 Walmart stores, to make the purchases. Criminals in Mexico gave him the purchase money and paid him $100 per purchase.  The sales included 19 Ruger rifles and pistols, a Smith & Wesson pistol, 8 Beretta rifles and pistols, and 5 Glock pistols.

170.    In several months spanning 2017 and 2018, gun dealers sold 225 AK-47 and AR-15 style assault rifles to a trafficker and six accomplices. The guns were trafficked to the Cartel del Noreste, a faction of Los Zetas. The $300,000 worth of guns included:

- 14 Century Arms rifles;
- At least 6 Smith & Wesson rifles;
- At least 5 Ruger rifles;
- At least 4 Barrett .50 caliber sniper rifles; and

42

- At least 3 Colt rifles.

ATF agents emphasized that AK- and AR-style rifles are "weapons of choice" of the cartels in Mexico and are "found to be destined for Mexico when purchased in bulk." *United States of America v. Jose J. Soto, et al*, No. 6:18-cr-00145-1 (S.D. Tex.), ECF 1 at 3-4, filed Dec. 5, 2018. ATF agents additionally spotlighted the Barrett 50-caliber rifle as a primary "weapon of choice" for the cartels in Mexico.

171.     From April to November 2018 Zeroed In Armory, a Houston-area dealer, sold to a trafficking ring's primary buyer more than 170 guns, including 76 AK-style rifles, 86 AR-style rifles, and 6 .50-caliber rifles, at least 2 of which were Barretts. He paid approximately $7,450 for each Barrett .50 caliber rifle and re-sold them for a $4,000 profit. In August 2018 Zeroed In Armory sold two Colt rifles to the trafficker in a multiple-sale transaction, and they were recovered two months later in connection with a crime in Nuevo Laredo.

172.     From April to August 2018 a Gonzales, Texas gun dealer sold to a trafficker 14 Century Arms rifles, a Barrett .50 caliber rifle, and 3 Ruger rifles. In November 2018, one of the Century Arms rifles was recovered in connection with a crime in Ciudad Mier, Tamaulipas, Mexico. In July 2018 a Dallas-area dealer sold to the trafficker a Barrett .50-caliber rifle and six Smith & Wesson rifles. A few months later he re-sold the Barrett rifle to a drug cartel for a $3,600 profit.

173.     In January 2018 an Academy Sports & Outdoors store in Victoria, Texas sold to the same trafficker a Colt rifle, which was recovered in July 2018 in connection with a crime in Miguel Aleman, Tamaulipas, Mexico. It was part of a 17-gun seizure by Mexican law enforcement, the other guns being AR- and AK- style rifles.

174.    In July 2018 an Academy Sports & Outdoors store in San Antonio, Texas made what the ATF termed "suspicious multiple sale transactions" with another trafficker. The trafficker bought two Ruger rifles.

175.    From December 2015 to March 2016 gun dealers sold 27 guns to a trafficker who bought them for the drug cartels in Mexico. On December 15, 2015 an Academy Sports & Outdoors store in Laredo, Texas sold to him two Beretta pistols. He returned to the store on February 24, 2016 for another Beretta purchase. On March 2, 2016, he was back at Academy Sports to buy two Smith & Wesson rifles. He returned to the store yet again two days later to buy two more Smith &Wesson rifles.

176.    A former employee of another Academy Sports & Outdoors store claimed that a supervisor directed him to create false gun transaction records by forging information on ATF forms. He asserts that he was wrongfully terminated when he refused and reported the unethical and criminal conduct up Academy's chain of command. These claims were summarized in a reported court decision, *Cleland v. Acad. Sports & Outdoors*, 2013 U.S. Dist. LEXIS 121012 (S.D. Miss. Aug. 26, 2013), vacated 2015 U.S. App. LEXIS 23492 (5th Cir. Jan. 15, 2015). Reports have identified Academy as one of the top 12 dealers selling the most crime guns recovered in Mexico.

177.    From April to August 2017 a Texas dealer sold 66 guns to another trafficker, including 13 Ruger pistols and 12 Smith & Wesson pistols. The trafficker made the purchases during five visits to various San Antonio gun shows, buying as many as 15 guns in a single transaction. Five of the semi-automatic pistols were recovered in Guadalajara, Jalisco, Mexico just 17 days after the trafficker bought them.

44

JA000091

178.    In February 2017 a criminal was indicted for trafficking guns into Mexico, including a Smith & Wesson rifle, a Century Arms rifle, and three Colt rifles.

179.    Another trafficker was recruited to transport multiple guns and large-capacity ammunition magazines into Mexico through Nogales, Arizona, including:

- One Smith & Wesson rifle;
- Three Colt rifles; and
- Two Century Arms rifles.

A U.S. prosecutor aptly wrote: "Mexico is relentlessly scarred by the violence of the illegal drug industry. . . . The kinds of weapons that the defendant intended to deliver to Mexico had zero purpose other than to facilitate the intimidation upon which this black market thrives. . . . " Government's Sentencing Memorandum, *United States v. Campos-Flores*, No. 4:17-cr-00159 (D. Ariz.), ECF No. 31 at 2, filed Oct. 12, 2017.  Another U.S. attorney later stated at the sentencing hearing that "these are not hunting guns . . . . This was to kill people." *Id.,* Transcript of Sentencing Proceedings, ECF No. 45 at 11, filed Nov. 20, 2017.

180.    In February 2016 another trafficker was indicted in Arizona for attempting to smuggle into Mexico multiple guns, including two Ruger pistols.

181.    A Laredo, Texas dealer sold five Beretta pistols to a trafficker during four separate trips to the store in a three-month period and two Colt Super pistols during separate visits less than a month apart. He continued to frequent the store for other gun buys, including two Smith & Wesson rifles in a same-day multiple purchase in March 2016.  Another Laredo dealer had sold him two Smith & Wesson rifles and three Beretta pistols in same-day multiple purchases two days earlier. And yet another Laredo dealer had previously sold him three Beretta pistols, two of them in the same purchase.

45

182.    From Spring 2015 to Winter 2016 gun dealers sold 68 assault rifles and 2 semi-automatic pistols to a 21-person trafficking ring that used straw purchases. Some of the guns were later recovered in Mexico and others were seized by authorities, including:

- At least 30 Century Arms guns in various models, including more than 10 rifles;

- 3 Smith & Wesson rifles; and

- A Barrett .50 caliber sniper rifle.

183.    In 2006 a Dallas-area trafficker was convicted of buying more than 100 assault rifles, 9mm handguns, and other high-powered weapons from U.S. gun dealers over several months. A pistol he bought in Dallas was used in a cartel gunfight near Reynosa, Mexico in which two Mexican federal police officers were shot.

184.    In just one month—from August to September 2011—Houston-area gun dealers sold 55 assault weapons to a trafficking ring using straw purchases. The sales included 44 Century Arms rifles and 3 Smith & Wesson rifles. The group often bought multiple assault weapons in same-day transactions, an obvious red flag indicating a gun trafficking scheme. A number of the guns were later recovered in Mexico.

185.    From 2009 through mid-2011 Texas gun dealers sold more than 50 guns—mostly AR-15 style assault rifles—to a Zapata, Texas-based trafficking ring. The weapons were smuggled to Los Zetas.

186.    In December 2011 two other traffickers were sentenced for recruiting straw purchasers to buy approximately 40 guns, particularly Colt "El Grito" Super pistols, which have gold engravings and commemorate Mexico's independence from Spain on September 16, 1810. At least one of the straw-purchased guns was recovered in Mexico.

187.    A San Ygnacio, Texas dealer sold straw purchasers two Century Arms rifles, among other assault weapons. The same dealer sold another straw purchaser a Smith & Wesson rifle and a Colt rifle (in addition to two other guns) on a single day in March 2010.

188.    A dealer in Roma, Texas sold a straw buyer four weapons on February 20, 2010, including a Smith & Wesson rifle, a Colt rifle, and a Ruger rifle.

189.    From June 2006 through at least October 2009 another trafficker masterminded the arming of La Familia, a drug cartel in Mexico. La Familia was at that time fighting the Gulf Cartel, rivals that used Los Zetas' organization to control narcotics supply routes. Among the guns that the trafficker successfully bought in the U.S. and sent into Mexico were a Barrett .50 caliber rifle, five Century Arms rifles, a Colt "El Jefe" Super pistol ("for the purpose of giving it as a gift to a boss in the La Familia"); six Colt rifles, and at least two Smith & Wesson handguns.

190.    In May 2020 U.S. Customs and Border Protection officers seized several hundred rounds of ammunition and a number of guns, including a Smith & Wesson pistol, as smugglers attempted to move them across the border in a pickup truck traveling from Del Rio, Texas into Mexico.

191.    From 2006 to 2009 a massive trafficking ring operated in California, moving the guns into Oaxaca, Mexico. A single gun dealer in Madera, California sold the group more than 400 guns, mostly Ruger rifles. They frequented the store dozens of times buying upwards of 26 Ruger rifles in a single transaction.

192.    Other examples include:

- In October 2018 a man in Kleberg County, Texas was apprehended taking to the U.S.-Mexico border a Century Arms rifle and a Ruger revolver;
- In April 2013 several dealers collectively sold 40 AK-47 assault-type guns to straw purchasers in the San Antonio area for transport to Mexico;

- In October 2020 three criminals were indicted for making multiple straw purchases in El Paso, Texas with intent to smuggle the guns into Mexico;
- In July 2019 three criminals were caught trafficking guns to Mexico after a gun dealer sold them a Barrett .50 caliber sniper rifle and four AK-47 assault rifles, and accepted a deposit for another Barrett rifle, in eight days;
- In August 2018 a Texas man was convicted of arranging for straw purchasers to buy 10 guns, 5 of which were later recovered in Mexico.

193.    Many of the dealers that supplied these guns were willing participants in the illegal trafficking. As Defendants well know, however, at most the traffickers would be prosecuted while the gun dealers would almost certainly remain free to sell more guns to more traffickers another day.

194.    Defendants' dealers that supply criminals in Mexico are not limited to states on the U.S.-Mexico border, or even the Southwest. One study found that from 2014 to 2018 more than 25% of U.S.-origin guns recovered in Mexico were traced to a state other than Texas, California, or Arizona.

195.    As noted at the outset of this Complaint, the Boston area has more than its fair share of distributors and dealers whose guns have been traced to crime scenes in Mexico. Defendant Interstate has had significant numbers of its guns traced to Mexico. At least 10 other Boston-area dealers had such traces. And traces reflect only a tiny fraction of guns that are trafficked into Mexico; authorities never recover or trace the vast majority of trafficked guns.

196.    Following are a few additional illustrative examples of Defendants' dealers outside of the border area that have supplied guns for use by criminals in Mexico.

197.    In 2020 a Kentucky man admitted that, while working as a DEA supervisor, he helped arm the Sinaloa Cartel with guns, including Colt rifles. He bought the assault rifles online from a licensed gun store in Lexington, Kentucky, then shipped them to Arizona where they

48

were being amassed with other guns for trafficking into Mexico. One of the guns was seized by border agents, but another made it into Mexico, where it was later seized.

198.    In 2018 police in suburban Illinois discovered an arsenal of guns in a storage locker, which turned out to be connected to a scheme to move hundreds of kilograms of cocaine across the border from Mexico. A dealer in Zion, Illinois had sold 20 Beretta pistols and a .50 caliber rifle to one of the conspirators. The gun shop owner noted to reporters, "If somebody walks in with a big pile of cash and all the stuff checks out and he passes the background checks it's like 'oh, this is cool!' I just made a huge sale you know?"

199.    Two Ohio gun dealers were charged with a conspiracy to resell Barrett sniper rifles to gangs in Mexico.

200.    In 2008 and 2009 two out-of-state traffickers bought 27 guns from 7 Nevada dealers, including types frequently used by drug cartels in Mexico such as civilian versions of military rifles and a .50 caliber sniper rifle.

201.    In a reported decision, *United States v. Carranza,* No. 2:10-CR-0532-RLH-GWF, 2011 WL 4007579, at *11 (D. Nev. Aug. 5, 2011), the court found that a suspected straw purchaser was properly arrested because of his

> cash purchase of eleven assault rifles within a period of six days, plus his
> inquiry about purchasing a $10,000  sniper rifle. . . . Five of the rifles were
> Century Arms 'AK-47' type rifles. [The agent] . . .  knew . . . that assault style
> rifles are in high demand by drug trafficking organizations in Mexico and also
> by persons in California where the sale of assault style rifles is prohibited.

202.    In May 2012 an Alabama trafficker pleaded guilty to scheming to buy military-grade weapons for Los Zetas. He had attempted to buy 20 Beretta 9mm pistols, 5 Colt rifles, and various AK-47 type rifles, to be smuggled across the Rio Grande.

49

JA000096

203.    Criminals in other parts of the U.S. have also been linked to trafficking guns to Mexico, including for example:

   a.   A Colorado man with 50 rifles (30 AR-15s and 20 AK-47s) was arrested while on his way to sell the guns to a conspirator who would smuggle them into Mexico.

   b.   An Alaska man was part of a network that trafficked guns into Mexico.

204.    These are provided simply as illustrative examples; they do not purport to catalogue all trafficking cases, but merely identify a small fraction of the public information that put Defendants on notice of the trafficking of their guns into Mexico.

205.    Each of these (and other) traffickers were supplied by dealers that the Defendants choose to use to sell their guns at retail, without any monitoring or standards to ensure that they are selling guns legally and responsibly.

206.    Each of these (and other) traffickers were supplied through business practices that Defendants choose to use when their guns are sold at retail, such as not employing screening to prevent straw sales, not limiting multiple sales, not limiting repeat sales, not screening before selling military-style weapons, not monitoring to prevent supplying traffickers and straw buyers, and not imposing any discipline or sanctions after violations are established.

207.    If Defendants used reasonable care or chose to fully comply with and enforce the law, Defendants would not sell their guns without reasonable measures, and the trafficking of Defendants' guns into Mexico would be significantly reduced or largely eliminated. But Defendants' response to this knowledge has been to continue to use these dealers and sales practices.

208.    Under the United States Supreme Court decision, *Direct Sales Co. v. United States*, 319 U.S. 703 (1943), and numerous other precedents and law, Defendants knowingly

50

violated the import laws of Mexico, the U.S. Gun Control Act, and other laws in acting as willful accessories to the unlawful sale, possession, and use of guns to, for, and by criminals in Mexico.

209.    They choose to continue to unlawfully supply the criminal market in Mexico—because it makes them sales and profit.

**D.    Notorious Violent Incidents Give Defendants Continual Notice That Their Guns Are Trafficked to Mexico.**

210.    Notorious incidents of gun violence in Mexico have provided yet further notice to Defendants that their deliberately chosen distribution practices arm the drug cartels and other criminals in Mexico. Defendants receive notice of these incidents through media reports and ATF trace requests.

211.    The media drew it plainly for them again in an easy-to-read graphic:



212.    A few examples make the point. In an event that made international news, on June 26, 2020 assassins disguised as road workers attacked Mexico City's police chief, Omar García-Harfuch. Mr. García-Harfuch was wounded but survived; two bodyguards and a bystander were

51

killed. Among the weapons used by the assassins were three Barrett .50 caliber sniper rifles, a

Smith & Wesson 9mm pistol, a Smith & Wesson 5.56mm caliber carbine, a Ruger 5.56mm

caliber rifle, and a Colt 5.56mm caliber carbine. This is a photo of the damage done to Mr.

García-Harfuch's car by these guns:



213.    A December 5, 2016 gun battle in Veracruz left 14 dead after armed criminals

ambushed state police officers. Police recovered a number of weapons at the scene, including at

least 12 AK-47s and a .50-caliber Barrett rifle.

214.    In September 2016 gunmen apparently linked to the Knights Templar cartel shot

down a helicopter belonging to a state attorney general's office using a Barrett .50 caliber rifle in

the Tierra Caliente region of Michoacan. The helicopter's pilot was killed along with three

officers.

215.    More than 2,000 of the assault weapons recovered in Mexico between 2006 and

March 2018 were produced and distributed by Defendant Colt, more than any other

manufacturer. Colt does not even try to hide its pandering to the criminal market in Mexico. Colt

52

produces three models of guns that it specifically targets to the Mexican market. These are the .38 caliber Super "El Jefe" pistol; the .38-caliber Super "El Grito" pistol; and the .38-caliber "Emiliano Zapata 1911" pistol. These models are status symbols and coveted by the drug cartels; they are smuggled into Mexico from the U.S. in volume.

216.    Colt's special edition .38 Super pistol is engraved with an image of the Mexican revolutionary Emiliano Zapata on one side of the barrel and a phrase attributed to him on the other: "It is better to die standing than to live on your knees." One of those pistols was used in 2017 to assassinate the well-known investigative journalist Miroslava Breach Velducea, who made it her life's work to uncover corruption, drug trafficking rings, and human rights violations.

217.    Ioan Grillo, author of *Blood Gun Money: How America Arms Gangs and Cartels* (2021), wrote that "[i]t was a cruel irony: An American gun embellished with an image of a Mexican freedom fighter was used to silence Mexico's freedom of speech." Ioan Grillo, "Slow the Iron River of Guns to Mexico," *New York Times* (2021).  This is a photo of the gun:



53

218.    The Gulf Cartel's Jose Luis Zuniga-Hernandez, aka "El Wicho," who had an extensive criminal past dating back to 1990, was arrested in October 2011 trying to flee Mexico with cocaine and money. Authorities seized from him a gold-plated, diamond-and-ruby-encrusted Colt .38 Super handgun that he had paid $57,000 to have custom made.

219.    In February 2021 the alleged recruiter of the Jalisco *Nueva Generación* Cartel (CJNG), one of the most dangerous criminal organizations in Mexico, was arrested in Mexico City. The recruiter, described by authorities as one of the main operators of the CJNG, was found armed with a Colt gun.

220.    April 2014, Jesus Alejandro "Comandante Simple" Leal, a long-time foot soldier of the Gulf Cartel, was captured in Reynosa. During his capture, authorities seized a Colt handgun and an AK-47. The capture set off a series of violent firefights and roadblocks throughout the city. In one of the firefights, Arnulfo Gomez Hernandez, a Mexican Federal Police officer, was shot and killed.

221.    Defendant Ruger's weapons have likewise figured in notorious incidents. Ignacio "Nachito" Villalobos was a member of *La Linea*, the enforcement wing of the Juarez Drug Cartel. He set up a gun-trafficking operation in the small village of Columbus, New Mexico across the border from Puerto Palomas, Chihuahua, Mexico.  He had the cooperation of certain local Columbus officials, including the town's mayor and police chief. They operated as co-conspirators in straw purchasing 400 guns to be smuggled into Mexico. These included nearly 200 AK-47 type pistols and at least 4 Ruger .45 caliber pistols. Two of those pistols were later recovered in Mexico, one of them at a murder scene in the Mexican state of Chihuahua.

222.    Several of Defendants' guns were used by Cartel *sicarios* (hitmen) in a shootout with the Mexican National Guard, the Mexican Army, and police officers engaged in a joint

54

operation in Culiacán, Mexico to arrest Ovidio Guzmán López, son of Joaquin "El Chapo" Guzmán, the now-imprisoned former leader of the Sinaloa drug cartel. The authorities briefly took Ovidio into custody.

223.    But cartel members arrived on the scene and achieved fire superiority having vehicles mounted with heavy machine guns and a number of Defendants' weapons. Cartel *sicarios* used one or more Barrett .50 caliber sniper rifles, a number of AK and AR-15 style assault rifles, and Beretta and Glock handguns.

224.    The heavily armed cartel blocked highways with armed convoys, set up roadblocks, and engineered a prison break in which 49 prisoners escaped. They also positioned gunmen outside the Mexican soldiers' homes and threatened to execute family members unless Guzmán was released. Violent attacks erupted throughout the city, causing many residents to either flee or lock themselves inside their homes. Eight people were killed and twenty wounded.

225.    Other high-profile incidents gave further notice to all of the Manufacturer Defendants that their guns are routinely trafficked into Mexico and used in violent episodes that kill, maim, terrorize, and degrade the quality of life for everyone in Mexico.

226.    Tragically, gun violence begets more gun violence as some private citizens take extreme measures to protect themselves and their communities. Defendants' guns are prominent players in this two-way private gun violence. In an interview, one Mexican man involved in the violence pointed to the words stamped on the barrel of a Colt Match Target assault rifle slung across the chest of a teenage fighter: "HARTFORD, CONN, U.S.A," and told the reporter, "We kill each other, and you send the bullets." Kate Linthicum, "Mexicans are killing each other at record rates. The U.S. provides the guns.," *Los Angeles Times* (Oct. 6, 2019).

JA000102

## VI.    DEFENDANTS ACTIVELY ASSIST AND FACILITATE TRAFFICKING OF THEIR GUNS TO DRUG CARTELS IN MEXICO.

227.    Despite this voluminous notice, Defendants have not instituted a single public-safety protocol in their distribution systems to detect and deter gun trafficking to Mexico. Defendants' choice to use distribution and sales policies that supply the cartels violates all of the obligations and duties they have undertaken as manufacturers and distributors of these weapons.

228.    Each Defendant's policy is to sell its guns to any and all Federal Firearms Licensees—anyone with a U.S. federal license to sell guns. The only other restrictions that Defendants have put on their distribution systems are *financial* requirements—strictures such as good credit and a prompt-payment history designed to safeguard the Defendants' bottom lines.

229.    Defendants have not implemented any *public-safety* requirements designed to safeguard the lives or quality of life of the millions of affected Mexican nationals. Defendants know that, without such restrictions, they are supplying, supporting, and assisting straw purchases and other unlawful transactions by which some gun dealers supply gun traffickers and other criminals in Mexico.

230.    Defendants know that military-style weapons, such as assault rifles and sniper rifles, are particularly sought after by the drug cartels who use them to devastating effect in Mexico. Defendants know that these guns are frequently supplied to the cartels through corrupt or irresponsible sellers and in bulk or repeat sales. Defendants' response to these facts has been to double down on the exact practices that they know supply the cartels with military-style arsenals. Defendants' choices have had the effect of maximizing rather than minimizing sales to the criminal markets.

231.    On July 16, 2009, the U.S. House of Representatives Committee on Homeland Security Subcommittee on Border, Maritime, and Global Counterterrorism held a hearing

concerning "Combating Border Violence: The Role of Interagency Coordination in Investigations." Testimony provided during the hearing by Special Agent Bill Newell established that "analysis of aggregate [crime gun] trace data can reveal trafficking trends and networks, showing where guns are being purchased, who is purchasing them, and how they flow across the border."

232.    Defendants long had access to this trace data and other information indicating that specific networks of distributors and dealers they were supplying were consistently channeling their guns—including, in particular, non-sporting assault rifles and machineguns—to the drug cartels in Mexico.

233.    Take, for example, Defendant Century Arms. Reports from ATF reveal that in a four-year period in the mid-2000s more than 500 Century Arms WASR-10 rifles initially purchased in the U.S. were recovered from crime scenes in Mexico. Century Arms received communications from the ATF or other law enforcement agencies with respect to trace requests on all or the overwhelming majority of those incidents. Those trace requests revealed that specific distributor and dealer networks were disproportionately associated with those guns. Century Arms nevertheless has continued to supply its guns to those distributors and dealers.

234.    All of the other Defendants have had access to trace data like that available to Century Arms, and those traces illustrated both a) the recovery of large quantities of Defendants' guns from crime scenes in Mexico and b) a disproportionate concentration of crime gun sales among specific distributor and dealer networks likely to be engaging in illicit transactions. The other Defendants, just like Century Arms, nevertheless continue to supply those distributors and dealers.

235.    All of the Defendants, as alleged below, knowingly violated their legal

obligations, directly and as culpable accessories to the violations committed by downstream

dealers and traffickers when selling guns to obvious straw purchasers or otherwise ineligible

purchasers.

236.    By continuing to supply those sellers, and choosing to use and profit from

reckless and unlawful sales practices without monitoring or discipline, Defendants participate

with those sellers in the unlawful trafficking of Defendants' guns into Mexico.

**A.    Defendants Actively Assist and Facilitate Trafficking Through Straw
Purchasing.**

237.    For many years, Defendants have sold tens of thousands of guns that have been

obtained by unauthorized and irresponsible persons in Mexico through straw purchasing. In one

law enforcement study, more than half of the guns subject to gun trafficking investigations had

been acquired as part of a straw purchase.

238.    Many of these purchases have occurred in circumstances that clearly indicated to

the gun dealer that the transaction was a straw purchase. Those purchases would not have been

made if Defendants required that their dealers be well-trained and committed to following the

law and their obligations to safely and responsibly sell guns. As a result, unauthorized and

irresponsible persons, including convicted felons, have obtained thousands of guns from these

sources, some of which thereafter have been used or will be used to injure the Government and

its citizens.

239.    Gun industry insider Robert Ricker explained almost 20 years ago that the gun

industry was well aware both that straw sales significantly supplied the criminal gun market and

that responsible sales practices could stop many of those sales, but the industry repeatedly

refused to implement those reasonable practices.

58

240.    Mr. Ricker explained:

During the entire time I represented gun industry through my work for the [trade association], it was widely recognized within the industry that straw purchases, often of large volumes of guns, were a primary avenue by which a relatively small number of federally licensed gun dealers supplied the criminal market. … It has long been known in the industry that many straw purchases or other questionable sales could be stopped by dealers who are adequately trained and schooled in preventing illegal activity.  However, without the proper training and a commitment to responsible business practices some dealers allow many straw sales to go forward, undetected by law enforcement authorities.  *Ricker Declaration*, ¶ 9.

241.    Judge Weinstein concluded as fact in *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 509 (E.D.N.Y. 2003), that "[a] substantial number of guns manufactured, imported or distributed by defendants were acquired by a straw purchase, [and] diverted to the illegal market."

242.    Straw purchasing is the most common method of trafficking guns into Mexico. Illegal diversion through straw purchasing has been common knowledge in the industry, and known by Defendants, for many years. It has been the subject of many ATF reports and newsletters and congressional hearings.

243.    Traffickers rely on licensed dealers. Traffickers prefer to buy guns in bulk, buying 2, or 10, or even 20 or more guns at one time. Licensed dealers have the desired inventory.

244.    A licensed dealer that knowingly makes a sale to a straw purchaser for trafficking into Mexico violates the law of Mexico on imports, the U.S. law on exports, and specific U.S. law on straw purchases, among other provisions. Defendants are aware that these laws do not deter a substantial number of sellers from engaging in straw purchases for trafficking into Mexico.

245.    Defendants could sharply limit straw sales by regulating their own distribution systems through prudent practices, as Judge Weinstein found. Four principal ways to stop

trafficking into Mexico are: (1) limiting sales of multiple guns; (2) mandatory background checks for secondary gun sales; (3) curbs on straw purchasers; and (4) a restriction on assault weapons sales.

246.     Defendants do not need legislation in order to make these reforms to their distribution systems. They could do it themselves; they choose not to.

247.     Defendants supply dealers with all the guns they can pay for, without any public-safety conditions, even if a gun dealer has been repeatedly found to have violated gun laws, has been indicted or its employees have had federal gun licenses revoked, or has repeatedly supplied cartels in suspicious and obvious sales to traffickers, including repeated bulk sales of assault rifles and sniper rifles.

248.     In addition to participating in violations of import and export laws, Defendants' failures to curb straw purchases bound for Mexico also encourages the violation of specific strictures on straw purchases. The straw purchaser fraudulently certifies on the ATF Form 4473, required for almost all guns purchases at a licensed dealer, that he or she is the actual purchaser of the gun.

249.     The dealer then separately, and falsely, certifies the sale as lawful on ATF Form 4473. A licensed dealer that falsely certifies sales to straw purchasers as lawful despite knowing that the buyers have falsely represented themselves on ATF Form 4473 violates various provisions of federal law (primarily, but not exclusively, of the GCA) either directly or by acting as an accessory to the straw purchaser. These provisions include, but are not limited to:

> a.  18 U.S.C. §§ 922(m), 924(a)(3)(A), which prohibit a dealer from making false entries in gun transaction records required by law. *See also* § 923(g) (records to be kept in accordance with regulations);

b. § 922(t)(1), which requires the dealer to verify the identity of the "transferee" (*i.e.* the actual intended recipient of the gun, rather than the straw purchaser) and to conduct a background check on that person (*see id.*);

c. §§ 3, 4, which prohibit anyone from affirmatively concealing a felony by a third party. *See also* § 924(a) (listing violations of the GCA as felonies);

d. §§ 922(a)(6), 924(a)(1)(A), which prohibit buyers from making false statements as to facts material to the lawfulness of the sale—such as the identity of the actual purchaser of the gun.

250.     Defendants chose to use dealers that engage in these statutory violations and to supply them with the guns that they transfer to criminals via unlawful transactions. Defendants did so despite, at minimum, willful blindness to red flags like those described above. Defendants thereby became culpable participants in these statutory violations. And they continue to do so.

**B.     Defendants Actively Assist and Facilitate Trafficking Through Multiple and Repeat Sales.**

251.     Guns are diverted to the illegal market in Mexico after being sold as part of a "multiple sale" in which the purchaser buys more than one gun at once over a limited period of time from a dealer. The buyer later transfers the guns to others who do not want to submit to a background check. Large multiple sales to one person by a single dealer are a further source of guns for the illegal market in Mexico, as are repeat sales in which traffickers return to stores for multiple purchases.

252.     Defendants regularly allow their guns to be sold by their dealers as part of multiple purchases and then diverted to the illegal market and subsequently trafficked into Mexico. Many of the multiple sales have occurred under circumstances that indicated or should have indicated to the dealers that the guns were destined for the unlawful market. As a result, unauthorized and irresponsible persons have obtained thousands of guns from these sources, some of which thereafter have been used or will be used to injure the Government and its citizens.

61

253.    The U.S. Congress and ATF for years have warned that making large volume sales is a high-risk practice and a means by which traffickers obtain guns to sell in illegal markets, including in Mexico. Defendants' response has been to rely more and more on repeat and bulk customers.

254.    Defendants have long known that they are supplying these traffickers, and they can stop it. For example, Ugo Beretta, president of the gun manufacturer that bears his name, concedes that it is "common sense" that dealers should not sell unlimited quantities of guns to individual customers. He had been under the impression that his company's management in America makes sure it does not allow dealers to engage in bulk sales because, he said, "the logic of the matter requires that this is what should be done." Allen K. Rostron, "Smoking Guns: Exposing the Gun Industry's Complicity in the Illegal Gun Market," Legal Action Project, Brady Center to Prevent Gun Violence (2003).

255.    Similarly, gun industry insider Robert Ricker explained:

The gun industry has long known that gun traffickers often acquire guns through multiple or large-volume purchases from licensed dealers.  Because of the inherently suspicious nature of such sales a special federal reporting requirement at the dealer level for multiple sales exists. Although the industry knows of the special reporting requirements, and that unscrupulous dealers fail to report many multiple sales, it has long been industry policy not to question or monitor such sales. … To my knowledge, however, the industry has taken no voluntary action to address this issue and more fully monitor large volume sales to individual buyers. *Ricker Declaration*, ¶8.

256.    Judge Weinstein concluded as fact in *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 509 (E.D.N.Y. 2003), that "[f]irearms manufactured, imported or distributed by defendants were acquired as part of a multiple purchase, [and] diverted to the illegal market."

257.    Defendants continue to use unrestricted multiple sales to sell their guns.  The trafficking of Defendants' assault weapons and other guns into Mexico, having been acquired through multiple purchases in the U.S., continues unabated.

### C.    Defendants Actively Assist and Facilitate Trafficking Through Kitchen-Table Sales.

258.    For many years, Defendants have sold thousands of guns to so-called "kitchen table" dealers (i.e., licensed dealers that do not sell guns from a retail store). These dealers sell guns from their homes—or unlawfully from parking lots or out-of-state gun shows—and do not invest in inventory tracking or security measures.

259.    Kitchen table dealers often operate via an online presence or virtual storefront. After receiving an order from a customer, the dealer in turn places an order with the manufacturer or distributor, who then ships the guns to the dealer's home. The dealer then sells from his house directly or ships the gun in the mail to another licensed dealer, where the customer picks up the gun.

260.    Through this process, kitchen table dealers simultaneously avoid the regulations and restrictions involved in storefront selling while still enjoying lower, wholesale prices. To receive a license to sell guns, they need only undergo the same process as any other dealer: pay the $200 fee, attach a photo, and submit to a fingerprint and background check.

261.    ATF found in 2000 that nearly a quarter (23%) of their licensed-dealer trafficking investigations involved kitchen table dealers. Many of these dealers, although federally licensed, are corrupt and sell guns without completing buyer background checks or complying with other reporting requirements. As a result, unauthorized and irresponsible persons have obtained thousands of guns from these sources, some of which thereafter have been used or will be used to injure the Government and its residents.

262.    More than a decade ago, Ruger's dealers asked it to stop supplying non-storefront dealers. Thus, Ruger knew that its own law-abiding, responsible gun dealers recognize that these dealers tarnish the reputation of gun sellers by irresponsibly and illegally supplying criminals.

63

But Ruger chose to cater to the irresponsible and law-breaking dealers, and continued to supply them, over the objections of the "good guys."

263.    The other Defendants know what Ruger knew.

264.    Despite this sordid record, Defendants have continued to provide a steady source of guns to these "kitchen table" dealers without attempting to control, monitor, or supervise their sales practices, thereby enabling the consistent flow of guns into Mexico.

### D.    Defendants Actively Assist and Facilitate Trafficking Through "Missing" Guns.

265.    In the U.S. a gun is stolen every two minutes. ATF and congressional reports have repeatedly warned the gun industry that thefts from manufacturers, distributors, dealers, and shipping companies are a source of supply for criminals. Yet for many years gun dealers have failed to provide adequate security for their premises, which has allowed criminals to steal weapons, some of which are then trafficked into Mexico and used to commit crimes.

266.    Defendants have failed to ensure that persons distributing their dangerous products have implemented adequate security to prevent these foreseeable thefts. A law enforcement study found that 25% of the guns in illegal gun trafficking investigations in the western U.S. had been stolen from licensed dealers.

267.    Defendants are aware that dealers are prime targets for burglaries and robberies. Between 2012 and 2016, burglaries of licensed gun dealers increased by 48% and robberies of licensed gun dealers increased a staggering 175%.

268.    In addition to actual stolen guns, dealers also "lose" guns. It has been reported that between 2004 and 2011 ATF discovered nearly 175,000 guns missing from dealer inventories *just during compliance inspections*. These weapons could be stolen, illegally sold

64

"off the books" without proper documentation, misplaced, or sold to the black market. Some of these weapons are then trafficked into Mexico.

269.    Unscrupulous dealers choose not to implement simple anti-theft measures because their absence enables the dealers to falsely claim that guns that are unaccounted for were stolen, when the dealers actually sold them off the books.

270.    In 2017 ATF reported that around 18,700 guns are stolen or definitively lost from licensed dealers each year. Dealers have failed to take the necessary precautions and safety measures, so unauthorized and irresponsible persons have obtained thousands of guns from these sources, some of which thereafter have been used or will be used to injure the Government and its residents.

271.    Judge Weinstein concluded as fact in *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 509 (E.D.N.Y. 2003), that "[f]irearms manufactured, imported or distributed by defendants were diverted into the illegal market through theft from a retailer, [and] diverted to the illegal market."

**E.    Defendants Actively Assist and Facilitate Trafficking Through Gun Shows.**

272.    Gun shows are a significant source of guns for criminals, who in turn traffic these guns directly or indirectly to Mexico.

273.    Gun show sales by non-licensed sellers to private citizens constitute a loophole for guns to be sold without a Brady background check; they are therefore a ready source of supply to criminals. Defendants are fully aware of this loophole.

274.    Although a licensed dealer selling at a gun show must comply with the same regulations that apply to a sale at a business establishment, sellers at gun shows are known to sometimes evade or violate laws and supply gun traffickers. ATF and the U.S. Department of

Justice have advised the gun industry that gun shows are an important source of guns for criminals.

275.    ATF officials have found that gun shows are a source of a sizeable number of guns smuggled into Mexico, as they are virtually unregulated and occur 4,000 times per year across the U.S., with an average of 2,500 to 5,000 people attending each. One study showed that the prevalence of gun shows in a state has a strong relationship to the number of guns trafficked from that state to Mexico. If the state does not require background checks at gun shows, it is over 2.5 times more likely to export crime guns than states that do have this requirement.

276.    "Gun-show cowboy" dealers purchase large quantities of guns from distributors and then re-sell them at gun shows on a "cash and carry" basis. They accomplish this by pretending to be an unlicensed seller who is not subject to the background check requirements and other legal rules that apply to licensed dealers. This phenomena has been chronicled in Congressional hearings as far back as 1993 when the head of a gun-dealer trade association testified that purchasers at gun shows "include the entire spectrum of the criminal element," including felons, gangs, underage youth, buyers for underage youth, and multi-state gun runners, and that "[t]here are very few in this country who want a gun for illicit purposes who do not know that they can get anything they want at the gun shows." Federal Firearms Licensing: Hearing Before the Subcommittee on Crime and Criminal Justice of the Committee on the Judiciary House of Representatives, 103rd Cong., 1st Sess. 99 (June 17, 1993).

277.    Judge Weinstein concluded as fact in *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 504 (E.D.N.Y. 2003), that "[f]irearms manufactured, imported or distributed by defendants were acquired at a gun show, [and] diverted to the illegal market."

66

### F. Defendants Actively Assist and Facilitate Trafficking by Designing and Marketing Their Rifles as Military-Style Assault Weapons.

278.    Defendants' design and marketing of their weapons exacerbate their reckless and unlawful distribution policies. Defendants design and market their guns as weapons of war, making them particularly susceptible to being trafficked into Mexico.

279.    It has long been foreseeable and expected that Defendants' marketing of their guns as weapons of war would lead to their trafficking to the cartels in Mexico and to increased homicides and other massive damage to the Government. The Government's injury is the foreseeable result of Defendants' conduct.

### 1. Defendants design their guns as military-style assault weapons.

280.    Military-style weapons are useful for killing large numbers of people in a short amount of time, taking on well-armed military or police forces, and intimidating and terrorizing people. The Manufacturer Defendants designed their assault weapons to be effective people-killing machines.

281.    For more than 25 years law enforcement has called for the Defendants to curtail and strictly oversee the sales of military-style weapons to civilians, including calls from:

   a. the Chief of Police of the Los Angeles, who decried the "proliferation of military assault weapons in the hands of criminals and crazies;"

   b. the National Association of Police Organizations, which noted that "the availability of, and access to, assault weapons by criminals has become so substantial that police forces are being forced to upgrade the weapons supplied to police officers merely as a matter of self-defense and self-preservation;"

   c. the International Brotherhood of Police Officers, which asked for "curb[s] [on] proliferation of military-style assault weapons that have no legitimate sporting purpose;"

   d. the then-Chief of the Milwaukee Police Department—a member of the Police Executive Research Forum, the International Association of Chiefs of Police, and the Major City Chiefs Association—who noted that "[a]ssault weapons

are not built for sportsmen . . . . They are designed to quickly, easily, and efficiently cause lethal wounds to human beings;"

e.  the International Association of Chiefs of Police which concluded that "Semi-Automatic assault weapons are routinely the weapons of choice for gang members and drug dealers . . . and, are all too often used against police officers;" and

f.  numerous other police organizations.

282.    The civilian assault weapons that Defendants make and sell originated from military weapons developed in the mid-20th century. In the 1950s, in response to the U.S. military's determination that it wanted a lighter weapon that was more lethal and had a larger ammunition capacity, the AR-15 was developed. The AR-15 allowed for rapid fire and reloading. The U.S. military adopted it for use in the Vietnam War and dubbed it the M-16. ArmaLite sold the rights to the weapon to Colt.

283.    Colt designed the version that it sells in the non-military commercial market to look and feel like a genuine military weapon. Colt's civilian version, the "ArmaLite Rifle-15 Sporter," can fire in only semi-automatic mode, but otherwise it is physically identical to the M-16.

284.    Once Colt's patent expired, other gun manufacturers produced and sold their own AR-style weapons. Defendants' marketing has made these weapons proliferate in civilian markets today. Predictably, because they look and function so similarly to the M16, they are one of the popular weapons trafficked to Mexico.

285.    Assault weapons have key features that distinguish them from traditional sporting rifles, such as the capacity to lay down a high volume of fire over a wide killing zone. This "hosing down" of an area is better suited for military combat than sporting guns. And civilian assault weapons have much less recoil than traditional sporting guns, facilitating quicker pulls of the trigger.

286.    Law enforcement has consistently noted the danger that assault weapons pose to public safety:

- ATF: assault weapons "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes;"

- U.S. Department of Justice expert: "attacks with semi-automatics – including assault weapons – result in more shots fired, more persons hit, and more wounds per victim than do attacks with other guns;"

- Boston Police Commissioner: "This [weapon] can lay down a lot of fire in an urban area where there is basically no cover from it. You can conceal yourself from these weapons, but they'll rip through your car. They'll rip through a telephone pole. They can rip through just about anything in an urban environment;"

- Montgomery, Alabama Sheriff: "[T]here's only one reason for owning a gun like that—killing people. There's no other use other than to kill people. That's all they're made for."

287.    The danger posed by these weapons is compounded by the criminals using them. Numerous officials noted that assault weapons are the "weapon of choice" for drug traffickers, gangs, and terrorists. An ATF analysis of guns traced to crime showed assault weapons "are preferred by criminals over law abiding citizens eight to one." ATF, *Assault Weapons Profile* 19-20 (1994). This criminal preference for assault weapons shifts the balance of power to the lawless, exposing law enforcement officers to far greater danger.

288.    Defendants design their assault rifles so they can accept large-capacity ammunition magazines that can hold 20, 30, even 75 or 100 rounds that can then be fired without reloading. Defendants' assault rifles, especially when coupled with large capacity magazines, enable military-style assaults in which many rounds can be fired in seconds.

289.    Even when not modified to fire automatically, the assault weapons that Defendants market to civilians can approach the rate of fire of automatic weapons. Comparing the rate of fire between automatic and semi-automatic weapons, one court stated, "[T]he

69

automatic firing of all the ammunition in a large-capacity thirty-round magazine takes about two

seconds, whereas a semi-automatic rifle can empty the same magazine in as little as five

seconds." *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017). The court described this difference

in rate of fire as "nearly identical." *Id.* at 136. Another court concurred, noting that "semi-

automatics still fire almost as rapidly as automatics." *Heller v. D.C.,* 670 F.3d 1244, 1263 (D.C.

Cir. 2011).

290.    As Defendants know (or choose to willfully ignore), there are several readily

available ways for an assault weapon user to achieve even greater rates of fire. Methods include,

but are not limited to:

   a. A "gat crank" bolted to an AR-15's trigger well, which allows a shooter to fire
      multiple shots with each turn of the crank;

   b. A bump stock that replaces the stock (these accessories were banned during
      the Trump administration, but the ban is being challenged in courts and at
      least one court has struck it down);

   c. "Hell-fire" triggers;

   d. "Pull and release" triggers; and

   e. Bump firing, which uses the recoil of the gun to fire automatically or virtually
      automatically without modification (explanations for how to use this
      technique are easily available on You Tube and elsewhere).

291.    An AR-15 can be modified by drilling a few holes and widening the inside of its

frame to accept an M-16 auto-sear. M-16 auto-sears are available for sale online. Once the auto-

sear is installed, the AR-15 is capable of automatic firing. Although this modification is

outlawed, Defendants' chosen design nevertheless makes it feasible.

292.    Defendant Barrett's .50 caliber sniper rifle is a weapon of war. Barrett touts itself

as the world leader in large-caliber rifle design and manufacturing. The company was established

when Ronnie Barrett designed a .50 caliber shoulder-fired rifle, which he patented as an anti-

armor gun in 1987. He described the rifle in his patent claim as a "shoulder-fireable, armor-penetrating gun."

293.    In 1999, the U.S. Government Accountability Office reported that Barrett's .50 caliber rifles were linked to criminal misuse "with a nexus to terrorism, outlaw motorcycle gangs, international and domestic drug trafficking, and violent crime." Gov't Accountability Office, *Criminal Activity Associated with .50 Caliber Semiautomatic Rifles* 2 (1999).

294.    Unsurprisingly, the exceptionally lethal .50 caliber rifle is regularly trafficked into Mexico to arm violent drug cartels.

295.    According to a 1985 Secret Service report, "large caliber long range weapons pose a significant threat for U.S. National Command Authority figures." The report warned that .50 caliber rifles are more accurate than shoulder-fired antitank rockets and, if used against aircraft, are immune to electronic counter measures. They also can be used effectively from places of concealment, outside the scope of normal security measures, against personnel, aircraft, lightly armored vehicles, and buildings.

296.    Defendant Barrett's .50 caliber sniper rifle shoots rounds that are 5 to 10 times larger than those fired by semi-automatic models, including the AR-15 and AK-47. Given the range and power of a .50 caliber Browning Machine Gun round, a rifle chambered to fire this round can be used to take down slow- or low-flying aircraft, punch holes in pressurized chemical tanks, or penetrate lightly armored vehicles—such as those used by law enforcement and protective limousine services.

297.    A U.S. Army News Service article summarized the capabilities of the Barrett .50 caliber long range sniper rifle: "The M-107 enables Army snipers to accurately engage personnel and material [sic] targets out to a distance of 1,500 to 2,000 meters respectively. . . . The weapon

is designed to effectively engage and defeat materiel targets at extended ranges including parked aircraft, computers, intelligence sites, radar sites, ammunition, petroleum, oil and lubricant sites, various lightly armored targets and command, control and communications." Violence Policy Center, *Clear and Present Danger: National Security Experts Worry About the Danger of Unrestricted Sales of 50 Caliber Anti-Armor Sniper Rifles to Civilians* (2005).

298.    A 2003 U.S. Army handbook, *A Military Guide to Terrorism in the Twenty-First Century*, specifically identifies Barrett's .50 caliber sniper rifle as a potential terrorist weapon. Its buyers have included representatives of Osama bin Laden, the Irish Republican Army, and assorted militia groups. An ATF agent acknowledged that Barrett's .50 caliber sniper rifle has become one of the drug cartels' "guns of choice."

299.    For example, the cartels have used Barrett rifles to shoot down helicopters, such as in this scene:



300.    Defendant Century Arms designs its WASR-10 assault rifles as military weapons, knowing that they are a preferred gun for drug cartels in Mexico. Century Arms' WASR-10 is a variant of the Romanian AK-47 assault weapon.

301.    Romarm, S.A. manufactures and exports from Romania, for shipment to Century Arms in the U.S., stripped-down versions of WASR-10 assault rifles that lack features that might bar them under 18 U.S.C. § 925(d)(3), which prohibits the importation into the U.S. of weapons that are not "suitable for or readily adaptable to sporting purposes."

302.    Romarm, S.A. ships the rifles to Century Arms with the intention that Century Arms will disassemble the imported guns and then reassemble them while (1) reintroducing a number of non-sporting features with primarily military applications but also (2) replacing a number of the foreign-manufactured parts with American-made parts.

303.    Century Arms performs the disassembly and reassembly before distributing WASR-10 rifles, either directly or through intermediary distributors, to gun dealers throughout the U.S., including to dealers with a history of trafficking the military-style weapons into Mexico.

304.    Defendant Century Arms' disassembly and reassembly process tries to undermine U.S. federal gun importation laws by exploiting an ATF regulation that suggests that the "sporting purposes" test of 18 U.S.C. § 925(d)(3) does not apply if the completed guns have ten or fewer imported parts. *See* 27 C.F.R. § 478.39(a).

305.    Under the plain language of 18 U.S.C. § 922(r), however, it is illegal to assemble any semi-automatic rifle that (a) incorporates *any* foreign-made parts and (b) includes features rendering it not suitable for "sporting purposes." Century Arms knowingly violates § 922(r) by supplying WASR-10 rifles to the public after modifying them in accordance with the scheme described above.

306.    Regardless of the violation of the U.S. importation statute, Century Arms engages in these practices with full awareness that its WASR-10 is one of the preferred weapons of the

73

JA000120

cartels in Mexico in part because of the non-sporting features and attributes that Century Arms incorporates into the weapons.

307.    Defendants Colt, Smith & Wesson, and Ruger, with respect to their AR-15 style weapons, and Century Arms with respect to its AK-47 style weapon, violate another U.S. federal statute—a ban on the sale of machine guns.

308.     Defendants' AR-15 and AK-47 style guns are illicit "machinegun[s]" even if sold to initially fire semi-automatically. In ATF's language, they "possess design features which facilitate full automatic fire by a simple modification or elimination of existing component parts."

309.    Defendants specifically design these weapons so that persons with minimal financial resources and little-to-no technical expertise can easily modify them to be fully automatic, including by simply:

  a.  replacing the manufacturer-installed sear system inside the gun (which enables semi-automatic fire) with a third-party sear system which enables automatic fire;

  b.  shaving down part of the manufacturer-installed sear system to change the way it functions; or

  c.  attaching an external device such as a "bump stock" or trigger crank to the gun.

310.    Defendants sold guns susceptible to these or similar modifications to the general public and thereby either directly or through intermediaries violated § 922(b)(4).

311.    A significant number of Defendants' guns are modified to fire fully automatically for use by criminals in Mexico. Mexican authorities estimated in 2009 that 30% of seized AK-47 assault rifles had been modified to be fully automatic. A 2010 ATF analysis confirmed that conclusion. And a U.S. Government Accounting Office report found that "the guns of choice for

74

drug traffickers are high caliber assault rifles, such as AK type and AR 15 type, which are available for purchase in the United States and which can be converted to fully automatic fire (i.e., converted into machine guns)." Gov't Accountability Office, *Firearms Trafficking: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain* (2016).

312.    Defendants' design and sale of guns that can be easily modified to fire automatically causes them to be sought after by, and trafficked to, the cartels. The cartels then use them in Mexico with maximum killing efficiency, at a rate of fire that does not belong outside of a battlefield.

313.    Defendants knowingly violated U.S. federal guns laws by selling and marketing machine guns—guns that can be easily modified to fire automatically—to the general public, without complying with the strictures of the National Firearms Act and § 922(b)(4). Defendants commit these violations with full awareness that their weapons' susceptibility to being modified to fire automatically makes them particularly attractive to the drug cartels in Mexico.

314.    Defendants could limit their sales of these military-style assault weapons to military and perhaps some law enforcement units. They do not.

315.    Defendants could restrict the sale of these weapons to purchasers with a legitimate need for them. They do not.

316.    Defendants could prevent the multiple or repeat sales of these weapons, to prevent trafficking to the drug cartels. They do not.

317.    Defendants could make guns to not accept high-capacity magazines that exacerbate the danger of assault weapons. They do not.

318.     Instead, Defendants indiscriminately supply the civilian market, knowing that they are supplying these weapons of war to gun traffickers who will use them for criminal and destructive purposes in Mexico.

### 2.    Defendants market their guns as military-style assault weapons.

319.     Defendants have refused to heed law enforcement's warnings of the heightened dangers of assault weapons. They have instead increased production of military-style weapons, advertised their usefulness in battling the police and military, sold them unrestrictedly to the general public, and implemented no measures to prevent trafficking to drug cartels and other criminals in Mexico.

320.     Defendants have vastly increased production and sales of assault weapons. In 1990, before the U.S. federal ban on sales of assault weapons, 74,000 assault rifles were produced or imported annually for sale in the U.S.; in 2006, two years after the ban expired, the number of these rifles sold annually in the U.S. jumped to 398,000; by 2016, more than 2.3 million new weapons in the style of the AR-15 were sold annually to the U.S. civilian market.

321.     Defendants have aggressively promoted the sale of assault weapons in an unsafe manner. In its Annual "How to Sell Issue" in 2013, gun-industry trade magazine *Shooting Sports Retailer* noted that experienced hunters would "likely be put off by the military-esque attitude and marketing" of tactical assault weapons. But the magazine explained that "the tactical coolness factor does, on the other hand, attract a lot of first-time gun buyers . . . Unlike many of the hunting demographic, these potential buyers will likely be interested only in tactical guns, and the military-ish looks and features will be a big selling point with them. . . ." "Selling Tactical," *Shooting Sports Retailer* (July/August 2013).

76

322.    Manufacturer Defendants' marketing materials routinely show their assault weapons being used by military personnel or positioned near individuals wearing what appear to be military or law enforcement uniforms or gear. The accompanying text often resembles oaths taken by military or law enforcement personnel, implying that Defendants' products are selected or chosen by these groups; Defendants reinforce this association with pictures of American flags.

323.    Smith & Wesson's then-CEO candidly discussed in an investor call the importance of capitalizing on this "halo effect," by which the company attempts to leverage police and military associations to enhance the credibility and thus the sales of its guns to the civilian market.

324.    Defendant Smith & Wesson's marketing campaign falsely and misleadingly associates its "civilian" products with the U.S. military and law enforcement. Its advertisements repeatedly emphasize its weapons' ability to function in combat-like scenarios and quickly dispatch a large number of perceived enemies with a torrent of fire. Examples of Smith & Wesson's marketing to the general public include:




JA000124

325.    Defendant Colt similarly markets its "civilian" products as military weapons. It markets a "civilian" assault rifle as the "Trooper" and touts that another "shares many features of its combat-proven brother" and enables the consumer to "accomplish any mission." Examples of Colt's marketing to the general public include:

## FEATURED M4 CARBINE SERIES



### COLT M4 TROOPER 5.56MM 16"

The Colt Trooper® Patrol Carbine is a modernized, pro-quality Modern Sporting Rifle based on Colt's legendary M4 platform. It features a new Centurion Arms M-LOK® capable free-floated forend developed just for the Trooper®, and offers a great starting point for your next advanced carbine. It's offered in 5.56 x 45 NATO, and features a 16.1" barrel and a 13" M-LOK® capable Centurion Arms forend with a Picatinny rail at 12 o'clock, and M-LOK® mounting slots at 3, 6, and 9 o'clock. It features a standard M4 buttstock and an A2 pistol grip, and comes with a 30-round Magpul® P-MAG® Magazine.



### COLT M4 CARBINE

UPC: 098289019332
Model: LE6920 M4 Carbine
SKU: LE6920

Throughout the world today, Colt's reliability, performance, and accuracy provide our Armed Forces the confidence required to accomplish any mission. Colt's LE6920 series shares many features of its combat-proven brother, the Colt M4.

Ships with Magpul MBUS (no carry handle) and a 30-round Magpul PMAG.

326.    Defendant Barrett markets its "civilian" .50 caliber rifle as a weapon of war. In a promotional brochure, Barrett states: "With confirmed hits out to 1800 meters, the Barrett model 82A1 is battle proven."

327.    Barrett routinely emphasizes the military utility and applications of its weapons, intentionally appealing to buyers like the drug cartels that want them for exactly the military-

78

style assaults depicted in Barrett's ads. In marketing its MRAD sniper rifle, Barrett touts,

"Crushing force that adapts to a wide range of needs without sacrificing performance, the Barrett

MRAD is a real monster in every sense." By labeling its MRAD SMR a "Single Mission Rifle"

and emphasizing that it "transforms the military platform" for civilian use, Barrett is clearly

appealing to buyers interested in engaging in offensive, military-style combat "missions."

Examples of Barrett's marketing to the general public include:



328.     Similarly, Defendant Century Arms emphasizes that its WASR-10 gun is based

on a design used by "Romanian ranger teams" and even markets one model of the WASR-10 gun

with the word "Paratrooper" included in the gun's name. In using the phrase "Eat more ammo!"

to market its weapons to the general public, Century Arms highlights the ability of its rifles to

fire ammunition quickly. This marketing approach would have no appeal to lawful civilian users,

for whom burning through ammunition quickly would be wasteful and expensive. It does,

however, appeal to those with violent, criminal intent, like drug traffickers. Examples of Century

Arms' marketing to the general public include:



329.    Defendant Glock also routinely markets the military-like applications for the guns that it markets to the general public. It often advertises the "tactical" use of its guns by people clad in military dress and associates its guns with use by the police. Examples of Glock's marketing to the general public include:



330.    On its webpage designed to sell to the general public, Defendant Interstate Arms expressly markets itself as selling "military-style" weapons:



331.    Defendants know that these marketing techniques are disproportionately likely to motivate and attract dangerous individuals who harbor militaristic ambitions or want to attack large numbers of people. It is the perfect message for drug cartels and other criminals who want to do battle with the military and police in Mexico.

332.    Defendants allow their military guns to be sold to any "legal" purchaser 18 years or older, in any quantity they can pay for, knowing that their distribution policies enable the guns to be easily trafficked to Mexico.

### 3. Defendants know that their military-style weapons are the cartels' weapons of choice.

333.    Defendants are well aware that assault rifles and sniper rifles are the weapons of choice for violent cartels in Mexico, that they are routinely trafficked over the U.S. border into Mexico, and that both the Mexican and U.S. governments struggle to prevent the diversion.

334.    Military-style weapons are widely known as the drug cartels' weapons of choice, even though they are not lawfully sold anywhere in Mexico. AR-15 rifles, AK-47 rifles, and .50 caliber sniper rifles are among the most sought-after guns by traffickers. According to both Mexican and U.S. officials, the popularity of AK-47s and AR-15s has greatly increased among cartels since the expiration of the U.S. federal assault-weapons ban in 2004.

335.    Defendants have known for decades that they were supplying the cartels with these police-killing and people-killing machines. As early as 1999, a U.S. federal investigation was targeting the movement of .50 caliber semi-automatic rifles from the U.S. to Mexico for use by drug cartels. Similarly, the Assistant Director of ATF's Office of Field Operations testified in the U.S. Congress on February 7, 2008 that "drug trafficking organizations have aggressively turned to the U.S. as a source of guns . . . includ[ing] the Barrett 50-caliber rifle, the Colt AR-15 .223-caliber assault rifle, [and] the AK-47 7.62-caliber assault rifle and its variants," among others. *Money, Guns, and Drugs: Are U.S. Inputs Fueling Violence on the U.S.-Mexico Border?*, Hearing before the Subcommittee on National Security and Foreign Affairs of the Committee on Oversight and Government Reform, 111th Congress (2009). A 2009 Government Accountability Office report found "a large proportion of the guns fueling Mexican drug violence originated in the United States, including a growing number of increasingly lethal weapons." Gov't Accountability Office, *Firearms and Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning Coordination Challenges* at 38 (2009).

336.    The cartels covet these assault weapons because Defendants have designed them to be particularly lethal and easily modified into machine guns. Predictably, many of Defendants' guns recovered at crime scenes in Mexico had in fact been modified to fire in a fully automatic mode.

337.    ATF also reported in 2009 that the cartels seek pistols able to accommodate magazines that hold over 10 rounds and large cartridges that can pierce bulletproof vests. All of the Manufacturer Defendants make guns that can hold large capacity magazines of over 10 rounds, and most or all make guns that can use cartridges that can pierce body armor, including

82

Defendant Barrett's .50 sniper rifle, and guns made by Beretta, Colt, Century Arms, Smith & Wesson, and Ruger.

338.    It has been evident for decades that Defendants' distribution policies deliver a consistent flood of assault weapons to the cartels. For example:

a.    In 2008, about one-quarter of guns found to have been trafficked from the U.S. were a type of AR-15 or AK-47.

b.    Defendants Barrett and Colt topped the list in a 2008 ATF presentation identifying drug cartels' weapons of choice in Mexico. The list included Barrett's .50 caliber rifles and Colt's .38 Super pistols and its .45 pistols.

c.    In 2009, Mexican officials seized more than 4,400 AK-47 and AR-15 rifles.

d.    A 2009 report cited an independent investigation listing the six most sought-after guns by drug cartels in Mexico, including Defendant Colt's AR-15 .223 caliber assault rifle.

e.    For the period December 2006 – August 2010, the top two U.S.-sourced guns recovered in Mexico were the AK-47 and AR-15. These two types of guns comprised 50,000 of the 85,000 crime guns recovered during that period in Mexico.

f.    The AK-47 and the AR-15 remained the first and second-most commonly trafficked guns recovered in Mexico from 2009-2012.

g.    In 2011 Hearst conducted a study of 44 U.S. gun trafficking cases involving 165 criminal defendants and 1,585 guns trafficked to Mexico. The most common types of guns found included Defendant Colt's Super .38 pistol and Defendant Century Arms' Draco 7 pistol.

h.    Another study examined 21 U.S. prosecutions from February 2006 to February 2009 for gun trafficking to Mexico, accounting for 1,700 guns. Of these, the makes and models of 492 guns were revealed in court documents. Defendant Barrett's .50 caliber armor-piercing sniper rifle again made the top of the list.

339.    The same trends continue today. Hundreds of high-caliber weapons have turned up at crime scenes in Mexico throughout the past decade. The Mexican Army recovered 554 .50-caliber guns from 2010 to 2018. Of those, 496 were rifles, 227 of which were made by Barrett.

83

340.    Between 2006 and March 2018 the Mexican military recovered some 66,000 guns at crime scenes. Of those for which the make and caliber were recorded, more than 12,000 were assault weapons. More than 2,000 of those were manufactured by Defendant Colt—the most of any manufacturer. Notably, these military-style weapons represent a much smaller percentage of crime guns in the U.S.

### 4.    Defendants' reckless marketing of these weapons is unlawful.

341.    Defendants' design and marketing of these weapons of war, combined with their refusal to monitor and discipline their distribution systems, violates the many strictures alleged above. Defendants' design and marketing of these weapons is also independently unlawful under certain U.S. states' laws.

342.    By way of example only: Smith & Wesson violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A ("Chapter 93A"), through marketing that emphasized the ability of civilians to misuse Smith & Wesson assault rifles in unlawful, military-style attacks and encouraged such misuse.

343.    Smith & Wesson primarily manufactures, markets, and distributes AR-15-style assault rifles like the Smith & Wesson M&P 15 from a base of operations in Massachusetts. It is thus subject to Chapter 93A, which prohibits immoral or reckless advertising inducing unlawful or dangerous misuse of products, even when harms resulting from the unlawful marketing are felt outside of Massachusetts.

344.    Smith & Wesson knowingly violated Chapter 93A by marketing products, including AR-15 style rifles like the Smith & Wesson M&P 15, to the civilian market in ways that highlighted their efficacy for civilians wanting to carry out unlawful military-style combat missions and that encouraged and promoted the misuse.

84

345.    Smith & Wesson did so knowing that its marketing would motivate and attract criminal users—including the cartels—to select and misuse its products in unlawful acts of violence. Smith & Wesson intentionally emphasized the ability of its products to rapidly dispatch large numbers of opponents in armed combat, appealing especially to criminals like the cartels who want to outgun and defeat law enforcement or military forces.

346.    For example, Smith & Wesson uploaded onto its YouTube channel a video endorsement of its M&P 15 T model rifle from a professional shooter who described using the weapon to establish a "world record" in speed shooting involving ten shots fired into four different targets in 1.59 seconds.

347.    Smith & Wesson published the advertisement noted above for an M&P 15 rifle and emphasized that it lets you "[k]ick [b]rass" by "[b]urn[ing] through all the ammunition you want." Smith & Wesson repeatedly emphasized through branding, including the "M&P" or "Military and Police" designation, that its products are capable of being deployed in combat-like scenarios.

348.    Similarly, Colt violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a et seq. ("CUTPA"), through marketing that emphasized the ability of civilians to misuse Colt assault rifles in unlawful, military-style attacks.

349.    Colt primarily manufactures, markets, and distributes semi-automatic assault rifles like its Colt M4 Carbines from a base of operations in Connecticut. It is thus subject to CUTPA, which prohibits immoral or reckless advertising inducing unlawful or dangerous misuse of products, including when the harms resulting from the unlawful marketing are felt outside of Connecticut.

85

350.    Colt knowingly violated CUTPA by marketing products like its semi-automatic assault rifles to the civilian market in ways that highlighted their efficacy for civilians wanting to carry out unlawful military-style combat missions and that encouraged and promoted the misuse.

351.    For example, as noted above Colt specifically labels its products with militaristic terms like "Trooper" and "Patrol" to increase the viewer's association of its products with military-style combat. As also noted above, Colt's advertising emphasizes that its assault rifles have many features identical to Colt weapons used by military forces.

352.    It was economically feasible for Defendants to market their products in ways that did not unreasonably emphasize features, functions, and applications that were likely to especially attract and motivate criminal users, including the cartels. Defendants flagrantly breached their duty to avoid this dangerous and inflammatory marketing.

### G.    Defendants Actively Assist and Facilitate Trafficking by Designing Their Guns to Allow Use by Unauthorized Persons.

353.    Defendants magnify the dangers that their distribution and marketing systems create by designing guns that are easily transferrable to the criminal market in Mexico. Defendants have known for decades that they could include safety features to prevent the unauthorized use of their guns.

354.    Using these safety features would not diminish the utility of their guns for law-abiding, authorized users, but it would make them less attractive to criminals and gun traffickers in Mexico and protect law enforcement and Mexican families. It was both commercially and technologically feasible for Defendants to install these design safeguards in their guns.

355.    Defendants' guns are defective and unreasonably dangerous in that, among other things, they enable any person who gains access to them to fire them. The absence of safety

features precluding unauthorized users facilitates unlawful transfers and trafficking of these guns to Mexico where they have been used to perpetrate tens of thousands of homicides.

356.    Defendants were, at all relevant times, aware of the inherent and unreasonable dangers in the design of their guns and knew that they could be made and sold with the means to prevent firing by unauthorized users. Defendants knew of the need for design features to inhibit the trafficking of guns, straw purchases, the reuse of stolen weapons, and other access by unauthorized users. They further knew that, without the aid of additional safety features, it was reasonably foreseeable that their guns would fall into the hands of unintended users resulting in tragic, preventable shootings—including shootings with guns trafficked into Mexico.

357.    The technology for safety features that permit only authorized users to operate a gun has long been available to Defendants. One manufacturer, Taurus, has been selling handguns with integral locks since 1997. As touted on the manufacturer's website, the Taurus Security System is "[for] those with concerns about unauthorized use of their Taurus gun," and "renders the gun inoperable by the use of a special key."

358.    Defendants could also have developed and used more sophisticated safety features that employ biometric, radio frequency, or magnetic technologies that would enable only recognized users to fire the gun. Inventors have created such devices since at least the 1970's. A 17-year-old from Boulder, Colorado developed a smart handgun in 2016 that fires only when a finger it recognizes is on the grip.

359.    Defendant Smith & Wesson agreed to include these safety features in its guns. In the 2000 Agreement, Smith & Wesson promised to the U.S. government and several U.S. cities to, among other reforms, develop "smart guns" that could be fired only by the owner. But Smith & Wesson reneged on that promise.

87

360.    Defendants are fully aware that these safety features could, and would, prevent shootings that cause injury and death. This includes preventing instances where weapons are stolen by thieves or are sold in the criminal market in Mexico. Smith & Wesson's chief executive officer at the time of the 2000 Agreement admitted that these safety measures could save lives.

361.    The Government and its citizens are continually put at risk and victimized by Defendants' unreasonably dangerous products. People in Mexico have been grievously injured or killed because Defendants sell their guns without safety features that would prevent shootings by unauthorized users and the trafficking of those unsafe guns into Mexico.

362.    Defendants purposefully and intentionally engage in this conduct knowing full well that Mexican residents, police officers, and military personnel will foreseeably fall victim to death or serious injuries caused by the actions of unauthorized users of Defendants' guns. It was reasonably foreseeable that the Government would be forced to bear substantial expenses as a result of Defendants' conduct.

### H.    Defendants Actively Assist and Facilitate Trafficking by Designing Their Guns to Enable Defacement of Serial Numbers.

363.    To evade detection and investigation by law enforcement, criminals and the traffickers who supply them often obliterate or deface the serial numbers on guns.

364.    Guns without serial numbers cannot be effectively traced to the last retail purchaser, and therefore can create a "cold trail" when law enforcement recovers a gun at the crime scene. Guns without serial numbers are therefore more attractive and marketable on the criminal market. Defendants know or choose to be willfully blind to these facts.

365.    Defendants can make guns whose serial numbers cannot be obliterated or defaced, or guns in which a hidden serial number will be hard or impossible for the criminal to detect. For

88

example, years ago Beemiller d/b/a Hi Point Guns began including a second hidden serial number on some guns. In the 2000 Agreement, Smith & Wesson committed to the U.S. federal government that it would likewise include these features.

366.    Many of Defendants' guns have been trafficked to Mexico and recovered with obliterated or defaced serial numbers. Defendants nevertheless refuse to include non-defaceable or hidden serial numbers on all of their guns. This deliberate decision further facilitates, enables, and assists in the trafficking of their guns to Mexico.

**I.    Defendants Actively Assist and Facilitate Trafficking by Refusing to Implement the Reforms They Know Are Necessary.**

367.    Defendants well know what reforms to their distribution systems are needed to prevent trafficking of their guns into Mexico. They simply choose to repudiate the reforms, and to continue supplying the cartels, in order to maximize their sales and profits.

368.    For example, in 1999 Ruger adopted a policy prohibiting its distributors from selling to any dealers not selling "exclusively" from their retail stores. The policy prevented Ruger dealers from selling at gun shows, which Ruger stated "will help ensure compliance with laws." But after a laudatory *Denver Post* editorial generated criticism, Ruger issued a "clarification" that repudiated the new policy and claimed it was not meant to affect dealers selling at gun shows.

369.    In the 2000 Agreement Defendant Smith & Wesson agreed to reform its distribution practices by selling only through authorized distributors and authorized dealers that:

    a.   Commit to a standard of conduct to make every effort to eliminate sales of guns that might lead to illegal gun possession or misuse by criminals and other prohibited persons ("suspect guns sales"). Suspect gun sales include sales made to straw purchasers, multiple sales of handguns without reasonable explanation (excluding sales to licensed dealers), and sales made to any purchaser without a completed background check.

89

b.  Make no sales at gun shows unless all sales by any seller at the gun show are conducted only upon completion of a background check.

c.  Maintain an inventory tracking plan.

d.  Implement a security plan for securing guns, including guns in shipment.

e.  Not sell ammunition magazines that are able to accept more than 10 rounds.

f.  Require all employees to attend annual training that includes how to recognize straw purchasers and other attempts to purchase guns illegally; how to recognize indicators that guns may be diverted for later sale or transfer to those not legally entitled to purchase them; how to respond to those attempts; and the safe handling and storage of guns.

g.  Not complete any transfer of a gun before receiving notice from the National Instant Check System that the transferee is not a prohibited person under the Gun Control Act.

h.  Verify the validity of a licensee's federa1 firearms license before transferring a gun to that licensee.

i.  Forgo any transfer of a gun to a licensee if the dealer or distributor knows the licensee to be under indictment for violations of the Gun Control Act or any violent felony or serious drug offense as defined in 18 U.S.C. § 924(e)(2).

j.  Transfer guns only to individuals who have demonstrated that they can safely handle and store guns.

k.  Limit multiple handgun sales.

l.  Not market any gun in a way that would make the gun particularly appealing to criminals, such as advertising a gun as "fingerprint resistant."

m.  Refrain from selling any modified or sporterized semi-automatic assault pistol of a type that cannot be imported into the U.S.

n.  Terminate dealers that sell a disproportionate number of crime guns unless there is a satisfactory explanation and proposal.

o.  Cooperate fully with law enforcement and regulators to eliminate illegal guns sales and possession.

p.  Dedicate one percent of annual gun revenues to a trust fund for a public information campaign about the risk of gun misuse, safe storage, and the need to dispose of guns responsibly.

q.  Make safer guns, including a second "hidden" serial number and an internal locking device (to prevent unauthorized use), and to invest in "smart" authorized-user technology.

r.  Stop selling large capacity magazines, or pistols that can accept them.

90

       s.  Include prominent warnings about the risks of guns and accidental shootings when guns are improperly stored.

       t.  Not sell guns that can be readily converted to an illegal gun or that are resistant to fingerprints.

370.    The Smith & Wesson 2000 Agreement was an acknowledgement that gun manufacturers can and should sell, market, distribute, and design guns to prevent their trafficking to criminal markets.

371.    Then Smith & Wesson—alone against the rest of the industry—faced a boycott. Smith & Wesson received the message that it would be financially punished if it strayed from the industry line of selling guns without standards, restrictions, or any measures to prevent supplying the criminal market. So Smith & Wesson ultimately disregarded its obligations under the 2000 Agreement.

372.    In the years since the 2000 Agreement, no gun manufacturer or distributor has adopted any of the terms or practices in it. In the years since the U.S. Department of Justice specifically called on gun manufacturers and distributors to implement similar reforms to fulfill their legal responsibilities, no gun manufacturer or distributor has heeded those requests.

373.    Gun industry insider Robert Ricker explained in 2003: "It would greatly reduce gun crime if the companies, the manufacturers and distributors could take the information that ATF is willing to share with them [gun trace data] and zero in on those problem areas. … You would be able to weed out the bad apples."

374.    Defendants are also aware of the findings made against them by Judge Weinstein in *NAACP v. AcuSport, Inc.,* 271 F. Supp. 2d 435 (E.D.N.Y. 2003). The court concluded that "[p]rivate manufacturers and distributors of handguns have failed to take minimum circumspect steps to limit leakage of their guns into criminal hands." *Id.* at 453. He concluded as fact that

"[p]laintiff's proposals for changes in the marketing and distribution of guns would reduce the illegal market in guns and the [consequent] injuries." *Id.* at 510. In particular:

"Manufacturing and distribution agreements that are readily entered into by defendants would have a substantial effect in reducing the illegal flow of firearms …." *Id.*

"If some defendant had provided employee training for employees and others in the primary legitimate merchandising chain, many guns would not have found their way illegally into" the illegal secondary market. *Id.*

"If defendants had studied available trace request data and acted upon it to better control its downstream customers, they could have used the information to prevent fear and injury to [the affected population]. This information was and is available to defendants." *Id.*

"[T]here was a statistically significant relationship between the number of certain distribution oversight practices followed by a manufacturer and its ratio of trace share to market share…" *Id.* at 513.

"[T]here is a significant relationship between certain characteristics of dealers— e.g., selling guns later recovered with an obliterated serial number—and dealer's trace rate (traces divided by sales)." *Id.* at 514.

"[M]anufacturers that have the following practices have smaller crime gun ratios: requiring evidence of a storefront, having an authorized dealer program, maintaining records of sales to individual dealers, visiting dealers frequently, commissioning market studies, maintaining distributor agreements, imposing controls over how the product is advertised and inquiring about inventory level of distributors." *Id.* at 522.

"There are indicators other than amount of sales which lead to the conclusion that a particular dealer's guns would be more likely to be in the hands of criminals. The dealer indicators related to crime gun flows are: (1) out of state traces; (2) obliterated serial number traces; (3) multiple traces for the same purchaser; (4) multiple traces for the same purchaser and the same dealer; (4) multiple sales forms; (5) traces from multiple sales form guns; (6) record keeping problems; (7) multiple licenses at same location; and (8) bypassed geographically closer dealers to seller—i.e., the purchaser for illegal use goes out of his way geographically to buy from retailers with a poor record for crime gun traces." *Id.* at 522-523.

92

The "mechanisms that could have been employed by defendants—using their existing marketing infrastructures— to prevent 'diversion' or guns being acquired by persons prohibited from owning or possessing guns" include "requiring dealers and distributors to report the number of trace requests upstream to manufacturers and distributors; development of a management code that would establish standards of conduct on the part of members of the distribution system, including guidelines regarding sales to types of dealers, such as stocking dealers with storefront establishments; requiring minimum inventory; imposing liability insurance standards; limiting sales at gun shows; limiting multiple sales; limiting how the consumer gun transaction can be conducted to insure security; education and training of dealers; and monitoring dealers through visitation and other regular interaction." *Id.* at 523

"Relatively excessive numbers of traces to specific retailers or first purchasers is … cause for alarm by Manufacturer Defendants who are not foreclosed from closing off illegal flows of their guns to such retailers." *Id.* at 504.

"The likelihood of wrongdoing is substantially enhanced when certain practices by Manufacturer Defendants are followed and certain precautions not taken by Manufacturer Defendants." *Id.* at 504-505.

"It is appropriate for a manufacturer to undertake to control its customers by contract and supervision to reduce the probability that they will be sources of guns for criminals." *Id.* at 506.

"ATF lacks sufficient resources to conduct focused inspections and investigations of many dealers who may be violating gun laws." *Id.*

"Analysis of the [tracing] data demonstrated that more prudent merchandising programs by Manufacturer Defendants could have substantially reduced guns flowing into criminal hands, used in many murders and injuries which could have been avoided by Manufacturer Defendants' more prudent merchandising." *Id.* at 504.

"When a relatively large number of traces are determined by Manufacturer Defendants to be attributable to particular retailers, prudent Manufacturer Defendants can take steps to ensure that their guns are not too easily falling into criminals' hands." *Id.*

375.     Defendants have done the opposite of what they know is needed to minimize the flow of guns to criminals in Mexico. Among other things, they have increased production and

93

sales of military-style assault weapons and high-capacity magazines; increased marketing attractive to criminals; continued to use dealers and practices that arm criminals in Mexico; and fought to evade accountability for supplying criminals and facilitating gun violence.

376.    For decades, Defendants knew or choose to be willfully blind to the fact that their business practices supply the unlawful market in guns in Mexico. As a direct and foreseeable result of Defendants' irresponsible conduct, Defendants arm unauthorized and irresponsible persons who wreak havoc and injure and kill people and cause other substantial harm in Mexico.

## VII.    DEFENDANTS ACTIVELY ASSIST AND FACILITATE THE UNLAWFUL TRAFFICKING BECAUSE IT MAXIMIZES THEIR SALES AND PROFITS.

### A.    Defendants Intentionally Created and Use a Distribution System that Aids Sales to the Criminal Market.

377.    Manufacturer Defendants enjoy exclusive discretion in their methods of distribution and choice of the distributors and dealers to which they sell. They can limit product access to responsible dealers and consumers. They can implement appropriate and prudent distribution practices. They simply choose not to do so.

378.    Manufacturer Defendants generally use a three-tier distribution: (1) manufacturers sell guns to distributors, (2) distributors then sell guns to retailers, and (3) retailers sell guns to civilian purchasers. This system is not required by law. Manufacturers could sell guns through their own dealerships (and they sometimes have) or maintain in-house distribution departments that sell to dealers (some do, for some sales). But they choose not to.

379.    Manufacturer Defendants could alternatively use a three-tier distribution system while allowing their guns to be sold by only authorized dealers that maintain minimum standards of responsible conduct and provide information to the manufacturers that would enable them to assess if their guns are being sold legally and carefully. But they choose not to.

380.    When responsible, law-abiding industries are concerned about problems in the sales or distribution of their products, they do something about it. Defendants can monitor and control their distribution system—and they do, when it makes them money.

381.    One example: years ago, Defendant Beretta sought to protect its foreign sales representatives' business by discouraging U.S. dealers from selling guns abroad. So Beretta wrote to at least one of its distributors with a list of factors that would indicate that a dealer might be making unauthorized international sales, such as "the size of the order, past history of the particular dealer, the size and nature of the order relative to normal buying practices of the dealer, et cetera." Beretta admitted this was done to "control the distribution process."

382.    Defendants have long known they can impose similar controls to prevent dealers from supplying the criminal market. They choose not to.

383.    Defendants do not live on another planet in which they are sheltered from news of their corrupt dealers, the trafficking of their guns into Mexico, and the devastating damage suffered by the Government and its people. They simply choose to act as if they are blind—willfully blind—to those facts.

384.    Defendants have affirmatively and deliberately chosen to maintain their supply chain to the cartels, and refused calls for reform, because, from the perspective of their bottom lines, their distribution systems are huge successes. Their supply of guns to the criminal market in Mexico is a feature, not a bug.

**B.    A Substantial Portion of Defendants' Sales and Profits Come From Guns Trafficked to Mexico.**

385.    Defendants have long known that the criminal market in Mexico is a significant source of revenue and profit for them.

386.    In 2003, Northeastern University criminologist James Fox estimated that 9.55% of handguns produced in 1997 and 25.51% of handguns produced in 1991 were used in crimes by the end of 2001 (the study was not limited to crimes in Mexico). That is a conservative estimate, as it does not include the thousands of crimes of illegal gun possession. Other analyses have shown that 18% of handguns sold in 1990 were in the hands of violent criminals or used in violent crimes by 2000.

387.    Defendants know that many of their guns are headed for the criminal market, either immediately or after some time, and they know that means significant money for them. And they act accordingly to maximize that revenue and profit.

388.    Visiting Mexico City while campaigning for president in 2016, U.S. President Donald Trump stated that "[n]o one wins in either country" when "illegal weapons and cash flow from the United States into Mexico." But that is not true—illicit weapons trafficking to Mexico creates immense profit for Defendants and other gun manufacturers and dealers.

389.    Based on the estimates described above, the value of guns trafficked from the U.S. into Mexico is now well more than $250 million annually (calculated at the original sales price). The annual value of *these Defendants'* guns trafficked into Mexico is well more than $170 million.

390.    These are estimates; the actual profits and revenues reaped by Defendants from supplying criminals in Mexico may be even greater. What is certain is that criminals in Mexico are a significant market for Defendants, which explains Defendants' business decisions to keep supplying them.

391.    The illicit trafficking to Mexico and the immense profits to be made have resulted in a substantial increase in the number of gun stores populating the border areas. In 2010, there

were 8,354 licensed dealers in California, Texas, New Mexico, and Arizona. By 2019 more than 1,569 new licensed dealers had set up shop in those states, while nationwide the number of dealers is declining. Border-state gun dealers now sell twice as many guns as dealers in other areas of the country.

392.    The Government has long recognized and long criticized the build-up of gun dealers along the border. In January 2008, Mexican Ambassador Arturo Sarukhán criticized the availability of weapons along the border: "Between Texas and Arizona alone, you've got 12,000 gun shops along that border with Mexico."

393.    Thirteen years later, Fabian Medina Hernandez, former chief of the Office of the Ministry of Foreign Affairs of Mexico echoed the same outrage: "I don't know that they have as many McDonald's restaurants as they have gun stores there." (As of 2017 there were approximately 50,271 more gun stores than McDonald's in the United States.) A chart showing the change in licensed dealers from 2010 to 2019 is reproduced here:



(Source: ATF Data)

97

394.    This black-market financial boon is not limited to Defendants' sales to dealers along the southwestern border. Research from the University of San Diego estimates that nearly *half of all U.S. gun dealers* profit from illegal arms trafficking from the U.S. into Mexico. Defendants and other gun manufacturers and dealers managed to grow this segment of the gun market even while the number of gun owners (not guns) in the U.S. decreased.

395.    For many dealers, the unlawful flow of arms into Mexico has been their economic lifeblood. The University of San Diego researchers estimate that, without the demand for weapons trafficking into Mexico, roughly 47% of licensed gun dealers would go out of business. The spillover effect on the Manufacturer Defendants would be substantial because they would lose significant legitimate sales and profits in addition to those generated by the trafficked products.

## VIII.   THE GOVERNMENT HAS TAKEN REASONABLE MEASURES TO TRY TO PROTECT ITSELF FROM DEFENDANTS' UNLAWFUL CONDUCT.

396.    The Government has—for decades—enacted numerous laws and policies aimed at limiting the number of both legal and illegal gun ownership within the nation. Defendants' conduct directly undermines these efforts and the Government's ability to structure and govern Mexican society.

### A.    The Government Has Significantly Restricted the Lawful Ownership and Use of Guns Within Mexico.

397.    Mexico has stringent gun laws, enacted solely at the federal level, in which private gun ownership is closely monitored, regulated, and restricted. *See Ley Federal de Armas de Fuego y Explosivos* [LFAFE] *Artículo 2°*, *Diario Oficial de la Federación* [DOF] 11-1-1972, *últimas reformas* DOF 12-11-2015 (Mex.). The United Nations has called these laws among the most restrictive in the world. And Mexico remains an insignificant player in the manufacturing and production of guns.

98

398.    The Ministries of Internal Affairs and National Defense control all guns nationwide. The LFAFE mandates that all guns in the nation be registered with the Federal Arms Registry. LFAFE significantly limits the private possession of guns, prohibiting, for example, semi-automatic pistols with a caliber greater than .380 and all guns using the .223 caliber round, commonly used in AR-style rifles.

399.    Applicants for gun permits must prove their need to carry weapons as well as their prior history of honesty and prudence, with the testimony of five persons well known to the authority. A photo of a Mexican Gun Registration Card is reproduced here:



400.    Citizens who pass the background check receive a one-year permit. Applicants must be members of a "shooting club" and are limited to purchasing and owning one handgun. This handgun is available for self-defense only and must be kept inside the home.

401.     Moreover, guns are available from only one dealer and store in the entire country—the UCAM (*Unidad de Comercialización de Armamento y Municiones*). The store is located in Mexico City and is owned, operated, and heavily guarded by the Mexican military. The store sells on average just 38 guns a day to civilians.

402.    Again, the media has provided Defendants with this information in easy-to-read graphics, reproduced here:

99



403.    Lawful civilian gun ownership in Mexico is therefore extremely rare. In 2013 only 3,140 private citizens in Mexico (2.6 per 100,000 population) possessed a valid weapon permit. In the five-year period between 2013 and 2018, the Government issued only 218 additional gun licenses.

**B.    The Government Has Implemented Many Other Programs to Try to Blunt the Effects of Defendants' Conduct.**

404.    Both the United States and Mexico have undertaken measures to try to stem the flow of illegal weapons into Mexico, some of them at the highest levels of government. In 2007, for example, the United States and Mexico announced the Mérida Initiative, a package of U.S. assistance for Mexico and Central America. As part of the emphasis on "shared responsibility" the Government pledged to tackle crime and corruption, and the U.S. government pledged to address domestic drug demand and the illicit trafficking of guns to Mexico.

405.    Among its objectives, the Mérida Initiative set out to develop a secure and competitive "21st Century Border" that would ensure the efficient and legitimate flow of goods

and people, while guaranteeing the safety of citizens and interrupting the flow of drugs,

weapons, and other contraband.

406.    From March 31 to April 3, 2009, the "Binational Conference on Arms Trafficking

between Mexico and the United States" was held, with the participation of the heads of the

Attorney General's Office and the Secretary of the Interior for Mexico; and on behalf of the U.S.

Government, the Secretary of Homeland Security and the Attorney General. Among the

agreements reached at the meeting in Mexico was the creation of a working group called

"Subgroup on Attention to Arms Trafficking within the framework of the Merida Initiative,"

which worked within the Interagency Coordination Group for the Prevention and Control of

Trafficking in Firearms, Ammunition and Explosives.

407.    Other joint Mexico/U.S. efforts have included: (1) investigating individuals

responsible for illicit guns trafficking; (2) coordinating law enforcement efforts in gun cases and

violent crime; (3) training U.S. and Mexican law enforcement officials to identify gun

traffickers; and (4) tracing all guns to identify traffickers, trends, patterns, and networks. Among

the results have been increases in ATF traces of guns recovered in Mexico, cases initiated and

referred to prosecutor to the U.S. Attorneys' Offices, and inspections of U.S. gun dealers.

408.    For decades, U.S. Customs and Border Protection, the Mexican Federal Police

and the Secretary of National Defense, have performed "mirror operations," through which

Mexican and American authorities patrol the border. Although their main purpose is to tackle

human smuggling, these operations are useful to dissuade the illegal activities of organized crime

at the border, including gun trafficking.

409.    In 2010, the Mexican Attorney General's Office and the U.S. agreed to allow

Mexico access to the e-Trace Firearms Tracing System, which provides information on firearms

secured in Mexico (model and serial number), as well as the first purchaser (name, date, and place of birth) and the place where it was acquired (city, state, and gun shop).

410.    Mexico has also worked with U.S. state governments to curb arms trafficking. In March 2013, a working meeting was held with five U.S. state attorneys general (California, Colorado, Idaho, Nevada, and New Mexico), in which the issue of arms trafficking, among others, was discussed.

411.    In May 2019, the Government spoke with U.S. authorities, such as U.S. Customs and Border Protection, on ways to reduce arms trafficking, among other border security issues.

412.    The Government's officials regularly meet with representatives from ATF, the U.S. Department of Homeland Security, U.S. Customs and Border Protection, the U.S. Department of State, and the International Narcotics and Law Enforcement Bureau, within the framework of the Arms Trafficking Subgroup of the U.S.-Mexico High-Level Security Group.

413.    On January 30, 2020, a joint strategy between Mexico and the United States to seal the borders and reduce arms trafficking was made public; the Government highlighted the participation of the Mexican Ministry of Public Administration, through its Internal Control Bodies, to provide permanent support to its anti-corruption program.

414.    At the multilateral level, at the II Session of the Group of Governmental Experts of the Multilateral Evaluation Mechanism held from September 24 to October 5, 2007, in Washington, D.C., and at the 42nd Session of the Inter-American Drug Abuse Control Commission, held from November 27 to 30, 2007 in Santa Marta, Colombia, the Government urged greater international attention to the links between illicit arms trafficking and illicit drug trafficking.

415.    Within the United Nations, the Government continued the work of the United Nations Program of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in All Its Aspects, including at the Latin American and Caribbean Preparatory Meeting for the III Biennial Meeting of States (Bogota, Colombia, June 2008). At the 51st Regular Session, the Commission on Narcotic Drugs adopted a resolution presented by Mexico on "Links between drug trafficking and firearms trafficking," with the purpose of promoting recognition by the international community of the growth of this phenomenon, as well as the importance of improving controls on the manufacture, import and export of firearms and ammunition.

416.    The Government ratified the Inter-American Convention against the Illicit Manufacturing and Trafficking of Firearms, Ammunition, Explosives and Other Related Materials (CIFTA) of the Organization of American States, the purpose of which is to prevent the illicit production and trafficking of arms in the region. By proposal of Mexico, an Advisory Committee for CIFTA was created in which experts study and present proposed approaches to the illicit trafficking of weapons in the region.

417.    Between September 2008 and June 2009, the Attorney General's Office, through the Inter-American Committee against Terrorism (CICTE) and CIFTA, promoted the creation of a Hemispheric Firearms Registry and participated in the preparation of the CIFTA Model Legislation Project.

418.    In March 2015, Mexico and the Government of the Republic of Guatemala signed the Protocol on Cooperation to Prevent and Combat the Illicit Manufacturing of and Trafficking in Firearms, their Parts and Components, Ammunition and Explosives.

419.    In 2019 and 2020, the Government promoted the security cooperation agenda with the U.S. and Canada, which includes combating arms trafficking. During the two years, the Government held 19 high-level bilateral meetings, which included meetings with the U.S. Attorney General on December 5, 2019, and January 16, 2020.

420.    Mexico is also part of the United Nations Arms Trade Treaty (ATT). The treaty's goals are to establish common international standards to better regulate the international trade of conventional weapons, eliminate the illicit trafficking of conventional arms, and prevent their diversion. In 2015, Mexico hosted the First Conference of the Parties.

421.    In August 2020, Mexico participated in the Sixth Conference of the States Parties to ATT, and as a result of the Government's proposal, the parties established a forum for the exchange of information on cases of arms diversion.

422.    On May 16, 2019, at the tenth edition of the Mechanism for Consultations on New and Traditional Security Issues Mexico-Canada held in Ottawa, Canada, arms trafficking was addressed.

423.    On December 5 and 6, 2019, officials from the Mexican Ministry of the Navy participated in the IV Meeting of the North American Drug Policy Dialogue, held in Washington, D.C. and attended by delegations from the governments of Mexico, the U.S. and Canada. The participants addressed cooperation agreements to combat drug and arms trafficking affecting the region, as well as its illicit financing.

424.    Mexico is also a party to the United Nations Convention against Transnational Organized Crime (Palermo Convention) and its three protocols. In July 2020, Mexico chaired the Working Group on Firearms of the Protocol. Based on the work carried out in the Working Group, Mexico presented a Resolution during the Conference of the Parties of the Palermo

Convention held in October 2020 in Vienna, Austria. The document seeks to strengthen the capacity to respond to emerging threats, including arms trafficking on the deep web, in addition to strengthening the inclusion of databases, marking, and registration of weapons.

425.    Also, the Office of the General Attorney has a cooperation agreement with Eurojust to receive assistance and technical-legal support on matters related to gun trafficking. It also has a cooperation agreement with Europol that provides assistance to State Attorneys and Public Safety Authorities at the federal, state, and municipal level.

426.    Mexico participates in the cooperation programs that the European Union offers to 18 Latin American countries to provide training and assistance of experts in order to combat organized crime.

427.    The Government's unilateral strategic initiatives are also ongoing. During the Administration of President Andrés Manuel López Obrador, the Government deployed its Joint Action Strategy to Curb the Illicit Flow of Arms on the Northern Border, coordinated by the Secretary of Security and Citizen Protection, with the participation of other federal law enforcement agencies—the Attorney General's Office, the Tax Administration Service, the Secretary of National Defense, the Secretary of the Navy, and the National Guard. Its main objectives are to curtail the capabilities of organized crime groups and strengthen Mexico's technological capabilities to deal with arms trafficking.

428.    The Strategy also includes a scheme to fight arms trafficking on the northern border, based on inspections carried out by the Tax Administration System (SAT) at six customs crossings (Tijuana, Baja California; Nogales, Sonora; Ciudad Juarez, Chihuahua; Nuevo Laredo, Tamaulipas; Reynosa, Tamaulipas; and Matamoros, Tamaulipas), through peripheral security. In

105

addition, the Ministry of National Defense participates in joint inspections with SAT in 15 other customs offices.

429.    To further improve national security, on July 17, 2020, President López Obrador instructed the Armed Forces to take over the country's border and interior customs. The Secretary of National Defense, the Mexican Army, will have a presence in the 21 border customs, the Secretary of the Navy in the 17 maritime customs, and in the future it will be defined who will guard the 11 inland customs. This initiative, in addition to reducing tax evasion, seeks to combat the illicit trafficking of arms, ammunition, explosives, drugs, and hydrocarbons. The activities carried out by the military in customs include their integral administration, the security of the facilities, and vehicle and merchandise inspections, among others.

430.    Periodically, the Government carries out Firearms Exchange campaigns through which the federal, state, and local governments, together with the private sector, purchase firearms from citizens in exchange for economic incentives or household items. Likewise, the Government carries out Federal Firearms Registration campaigns through which it verifies the registration of firearms and carries out extraordinary inspections in Military Zones.

431.     To stop arms trafficking, the Government created the Inter-Institutional Coordination Group for the Prevention and Control of Firearms, Ammunition and Explosives Trafficking, which met several times a year: for example, between September 2007 and June 2008, the Technical Subcommittee held 128 inter-secretariat meetings with national and international agencies; from September 2010 to June 2011, it held 15 meetings; between September 2011 and June 2012, it held 16 meetings.

432.    On several occasions, the Group carried out actions in collaboration with the United States: in November 2016 and March 2017, the Binational Meetings of the Interagency

106

JA000153

Group for the Prevention and Control of Firearms Trafficking were held in Mexico City to review cooperation issues between Mexico and the United States; on October 5, 2019, in coordination with the U.S. government, the Group held the Mexico-US Bilateral Workshop entitled "Dismantling the Tools of Transnational Crime-Arms Trafficking and Money Laundering."

433.    These efforts and many more—those of the Government and of the U.S. authorities—have been unable to stem the flood of guns resulting from Defendants' persistent, deliberate, and continual conduct. The Defendants, not the Government, have the authority to structure and monitor Defendants' distribution chains. The Defendants, not the Government, have the ability to use real-time sales data and other indicia to detect sales patterns reflecting suspect sales. The Defendants, not the Government, have the authority to discipline distributors and dealers that sell to straw purchasers and otherwise supply traffickers. The Government will continue to do all that it can. But the Defendants must act on the information and authority that only they have.

## IX.    DEFENDANTS CAUSE MASSIVE INJURY TO THE  GOVERNMENT.

### A.    Defendants Have Flooded Mexico with Their Guns.

434.    Defendants collectively account for nearly half of all crime guns recovered in Mexico. From January through May 2020, Defendants accounted for the following percentages of all recovered guns: Smith & Wesson 9.9%; Barrett 2.3%; Beretta 5.8%; Century Arms 6.2%; Colt 10.8%; Glock 6.7%; and Ruger 6.2%.

435.    While Defendants collectively account for 47.9% of all crime guns recovered in Mexico, they account for about 68.4% of the recovered crime guns that originated in the U.S. (A relatively small number of crime guns come from outside the U.S.).

107

436.    The number of Defendants' guns annually *recovered* at crime scenes in Mexico vastly understates the number that are *trafficked* into Mexico; authorities recover only a small fraction of trafficked guns.

437.    Researchers have estimated that nearly 2.2% of all guns manufactured in the U.S. are trafficked into Mexico. At the current gun-production rate in the U.S.—39,695,315 in 2020— this would equate to a staggering 873,000 guns currently trafficked annually into Mexico from the U.S. A more conservative estimate of a half million guns trafficked from the U.S. into Mexico every year is still massive.

438.    A fair estimate of the number of Defendants' guns annually trafficked into Mexico is given by applying their percentage of U.S.-origin recovered guns (about 68.4% collectively) to the conservative and higher figures for total U.S.-origin trafficked guns (500,000 and 873,000 respectively). Thus, between 342,000 and 597,000 of Defendants' guns are likely trafficked into Mexico every year.

439.    Mexico and the United Kingdom have similar regulations on legal gun ownership. Both countries keep a centralized record of gun owners, require character references for gun purchasers, and mandate some interaction with police in the license-application process. Despite these similar regulations, however, the nations have vastly different numbers of *illegal* guns. According to one analysis, in 2017 the UK had about one million unregistered guns; Mexico had more than 13.5 million.

440.    The connection between Defendants' unlawfully trafficked guns and the predictable but horrendous consequences in Mexico is undeniable. Defendants and other U.S.-based gun manufacturers took advantage of the expiration of the U.S. assault-weapons ban in 2004 to significantly increase their output of guns, particularly of assault weapons.

Contemporaneously, illegal gun ownership per capita in Mexico increased tenfold and the homicide rate increased accordingly. From 2004 to 2008 the homicide rate in Mexico increased by 45%.

441.    The chart below shows these two intertwined trends—Defendants' increased gun production and the concomitant increased gun-homicide rate in Mexico—as assault weapons like Defendants' WASR-10 and AR-15s became more prevalent.



442.    No nation other than Mexico experienced a similar homicide surge during this period.

443.    The connection between gun trafficking from the U.S. and gun homicides in Mexico is further evidenced by the correlation between the increase in gun production in the U.S. and the percentage of homicides in Mexico committed with a gun. The percentage of

109

homicides in Mexico committed with a gun rose from 25% in 2004 to more than 69% in 2018. The increased percentage of homicides by gun was contemporaneous with the increased gun production in the U.S. beginning in 2005 with the expiration of the U.S. assault-weapons ban, as this chart shows:



444.    The increased homicides in Mexico were driven in large part by the increased production in the U.S. specifically of assault weapons—and the trafficking of them into Mexico. This chart shows the relationship between the number of rifles manufactured in the U.S. and the number of homicides in Mexico:

110



445.     The empirical connection between Defendants' trafficked guns and the

devastating effects in Mexico is confirmed by many qualitative measures. For example, in the

mid-2000s Mexico experienced:

    a.   an increase in gun-related crimes such as extortion and kidnapping;

    b.   the assassination of the first Mexican mayor killed—gunned down in northern Mexico—by a drug cartel;

    c.   the advent of cartels using high-caliber weapons;

    d.   the first killing of a member of the Mexican army by cartels, with the number of such attacks quickly accelerating (for example, northern Tamaulipas (bordering Texas), reporting one attack in 2007 but a total of 42 by 2011);

    e.   a dramatic increase in mass shootings and criminal attacks on public figures, with 90 attacks in 2011.

111

**B.   Defendants' Unlawful Conduct Has Caused Massive Injury.**

446.    The nature and magnitude of Defendants' unlawful conduct has inevitably inflicted massive injury on the Government. It was foreseeable to Defendants that choosing to recklessly and unlawfully distribute and market their guns, without monitoring or discipline, would harm the Government by facilitating the trafficking of guns into Mexico.

447.    The Government has had to spend vast funds on a wide range of services to fight the effects of Defendants' unlawful conduct. The epidemic of violence that Defendants have created has strained the Government's resources, including by causing the Government to incur substantial and unusual costs for providing, for example, extraordinary health care, law enforcement and military and services, criminal justice administration, public assistance, and other social services and public programs.

448.    The Government's injuries include, but are not limited to:

a.   Losses caused by the decrease in funding available for other public services because the funds were diverted to services designed to address the effects of Defendants' conduct;

b.   Costs of providing healthcare and medical care;

c.   Costs of additional and specialized training for military and police;

d.   Costs associated with the deaths of and substantial injuries to police and military personnel;

e.   Costs of mental-health services, treatment, counseling, rehabilitation services, and social services to victims and their families;

f.   Costs of law enforcement and public safety relating to the gun-violence epidemic, including but not limited to attempts to stop the flow of trafficked guns, to arrest and prosecute the criminals who use those guns, to prevent the epidemic from spreading and worsening, and to deal with the escalating levels of crimes caused by the increased availability of trafficked guns;

g.   Costs of the increased burden on the Government's judicial system, including increased security, increased staff, and the increased cost of adjudicating

112

criminal matters due to the escalating levels of crime caused by Defendants' conduct;

h.  Costs of providing care for children whose parents were victims of Defendants' conduct;

i.  Losses from the decreased efficiency and size of the working population in Mexico;

j.  Losses from the diminished property values in the communities affected by Defendants' conduct;

k.  Losses from decreased business investment and economic activity;

l.  Losses incurred by the Government acting in its commercial capacity, including from armed attacks on employees of state-owned enterprises and compensation paid to such victims.

449.  The Government has been forced to expend massive amounts of resources to address the foreseeable and widespread epidemic of gun violence flowing from Defendants' unlawful misconduct. Examples of these losses follow.

### 1.    Death and destruction

450.  Mexico is experiencing growing levels of gun violence and suffering from civilian gun deaths at one of the highest rates in the world. Before the dramatic increase in gun production in the U.S (including by Defendants) beginning in late 2004, the annual number of homicides in Mexico had been on the decline, including fewer than 2,500 committed with a gun in 2003.

451.  But the sharp increase in gun sales in the U.S. resulted in a 10-fold increase in gun-related homicides in Mexico, rising to about 23,000 in 2019. In 1997 only 15% of homicides were committed with a gun; by 2021 that figure had increased to 69%.

452.  Despite the Government's rigorous gun control laws and policies, and despite having only one gun store in the entire nation, the years from 2007 to 2019 saw more than 180,000 homicides committed with guns in Mexico.

113

453.    Mexico has the third most gun-related deaths in the world. Murders are the leading cause of death in Mexico among teenagers and young adults between 15 and 19 years of age.

454.    The Council on Foreign Relations estimates that as many as half of homicides in Mexico are attributable to the drug cartels and other organized gangs. Two-thirds of crime guns recovered in Mexico belonged to two of the most pitiless cartels, the Gulf Cartel and Los Zetas. Leading up to Mexico's 2018 presidential elections the drug cartels killed at least 130 candidates and politicians.

455.    The overwhelming majority of these deaths were caused by guns trafficked from the U.S.—including many weapons designed, marketed, distributed, and sold by Defendants. A gun manufactured in the U.S. is more likely to be used to murder a Mexican citizen (17,000 in 2019) than an American citizen (14,000 in 2019). And Mexico has only 40% of the population of the U.S. and only one gun store.

456.    The magnitude of these deaths is so extensive that, beginning in 2005, it significantly affected the life expectancy of all Mexicans. While life expectancy increased by approximately .5 years throughout Mexico from 2000 to 2005, it decreased by about the same amount from 2005 to 2010, as reflected in this chart:

114



As of 2005, the violence generated by arms trafficking was reflected in a decrease in life expectancy in all states.

457.    Since 2010, in this age of technical and medical progress, life expectancy in Mexico has continued to decrease.

458.    The federal police and military in Mexico have been among the victims in the horror story that Defendants have written. From 2006 to 2021, guns were used to kill at least 415 members of the Mexican Federal Police or National Guard, and to wound at least 840 more. The vast majority of these guns were trafficked from the U.S.

459.    From March 2009 to March 2021, U.S.-origin guns were used to kill 25 members of the Mexican military and to wound another 84.

460.    Some of the incidents involving the military in the last four years are all-too representative. May 20, 2017: a Smith & Wesson AR-15 was used to kill one soldier. December 10, 2017: four Barrett rifles were used to kill one soldier and wound three others.

461.    August 15, 2018: eight Barrett .50 caliber sniper rifles were used to wound one soldier. August 24, 2018: a Colt AR-15 was used to kill one soldier. October 28, 2018: a Beretta pistol was used to wound one soldier.

462.    January 9, 2019: three Century Arms rifles were used to kill a soldier. February 21, 2019: two Colt pistols were used to kill one soldier and wound another. March 5, 2019: a

115

Barrett .50 caliber sniper rifle was used to wound one soldier. March 9, 2019: a Barrett .50 caliber sniper rifle was used to wound one soldier. April 2, 2019: a Barrett .50 caliber sniper rifle was used to wound two soldiers. November 14, 2019: three Barrett .50 caliber sniper rifles were used to kill two soldiers and wound two others.

463.    July 19, 2020: a Barrett .50 caliber sniper rifle was used to wound one soldier. September 14, 2020: a Colt AR-15 was used to wound a soldier.

464.    Defendants' conduct has visited destruction on property as well as lives. For example, from 2013 to 2020 U.S.-origin guns were used to cause more than $41 million in damage to fifteen Mexican military aircraft. In just two years from 2019 to 2021 the Mexican Federal Police and National Guard incurred damage to an aircraft and 30 vehicles in armed assaults with guns. In the last decade they incurred additional millions of dollars in damage to security equipment.

### 2.    Economic harm

465.    Defendants' conduct has also inflicted enormous economic harm on the Government. In 2019 more than 3.9 million crimes in Mexico were committed with a U.S.-origin gun. About 161,000 of those crimes were committed against businesses.

466.    The Institute for Economics & Peace's *Mexico Peace Index 2020* estimates that the economic impact of violence in Mexico in 2019 was 4.7 trillion pesos, or $238 billion. This is equivalent to 21.3% of Mexico's gross domestic product (GDP); on a per capita basis, it is approximately five times the average monthly salary in Mexico.

467.    These costs include: direct costs incurred by the victim, the government, and the perpetrator; indirect costs, including physical and psychological trauma, lost future income, and

JA000163

the impact of fear; and a multiplier effect that calculates the additional economic activity that would have accrued if the direct costs of violence had been avoided.

468.    Homicides comprised 48% of this impact ($114 billion), the vast majority of which (69.3%) were due to gun violence; violent assaults with a firearm imposed significant additional costs. The report documents that "[t]he rise in gun violence has . . . been driven by the illegal import and sale of firearms from the United States."

469.    Another study estimates the Government's costs of trying to prevent the escalating gun violence to be more than 1.5% of GDP.

470.    In addition, although immigration from Mexico to the U.S. has declined substantially over the last decade, the drug violence perpetrated with trafficked weapons nevertheless causes Mexicans to leave their homes to seek out security in the U.S.

471.    From 2006 to 2010 an estimated 264,000 Mexican citizens fled their homes as a result of drug-cartel violence. Migration outflow was higher in border cities where homicide rates were highest and drug-related violence most prevalent. Juárez, for example, lost about 11% of its population while Reynosa lost 9%, Tijuana 6%, and Matamoros 4%. According to one study, each one-point increase in the rate of drug-related homicides per 100,000 inhabitants is correlated with 6.34 Mexicans fleeing their county of residence.

472.    Another study found a similar correlation between homicides rates and migration outflow. Looking at the outflow of migrants from the Mexico to the U.S between 2007 and 2012, the study concluded that, while migration decisions are sensitive to both local violence and transit violence, "the net effect of the drug violence in Mexico has been to increase migration to the United States." Sandra Orozco-Aleman & Heriberto Gonzalez-Lozano, *Drug Violence and Migration Flows: Lessons from the Mexican Drug War*, 52 J. Human Res. 717 (Summer 2018).

473. Even beyond all of these losses, Defendants' unlawful conduct has substantially reduced the overall quality of life in Mexico. Living with the fear of fire from Defendants' guns, and hearing and experiencing that gun violence, diminishes countless aspects of Mexican life—psychological, educational, social, and cultural, as well as economic. To take only one example, in 2020 more than 40% of people in Mexico under the age of 18 heard or saw frequent gunfire.

474. Defendants have undermined the social policy, in addition to the aspirations, of the Government of Mexico and its people. The Government bears many direct and indirect costs from these harms, including those identified above. Given their share of guns trafficked into Mexico, the Defendants are responsible for close to half of these losses.

### 3.    Not statistics

475. Defendants' deliberate conduct that floods Mexico with their guns causes untold harm to the Government. Some of those damages are outlined above. Were it not for Defendants' wrongful conduct, there would be far fewer guns in Mexico, and far fewer guns in the hands of the cartels. There might still be snakes—in the form of criminal organizations—but they would have far less venom to inflict harm.

476. Life in Mexico would be a far different place if that were so—a safer place, a place in which fewer tax dollars would be spent on preventing and responding to violence and drug trafficking, and more could be spent on education, social services, and other efforts to positively improve lives.

477. Everyday existence for the Mexican people would be far different if life could be led without dangers and threats from the armed cartels—less fear, more freedom to gather together and enjoy life.

478.    And without the Defendants' supply of crime guns, the less-armed cartels could be controlled and stopped far more easily and effectively. That would help stem the drug trade that kills not only Mexicans but people in other nations, including the United States. And it would reduce the violence that the cartels spread north of the border.

479.    Defendants' wrongful conduct also ends lives, extraordinary and wonderful lives of Mexicans from every walk of life, as illustrated by a small sampling of the tens of thousands of lives lost as a result of Defendants' deliberate conduct.

480.    Cristina Roman's husband owned a small used-car dealership in Ciudad Juarez. He and his wife had three young sons. In May 2010, he was assaulted in his home and kidnapped by individuals, assumed to be in either Los Zetas or the Sinaloa Cartel, while Cristina and her sons hid. Despite Cristina and her husband's brother paying a ransom, her husband was killed and his body thrown into the street.

481.    Manuel, Cristina's father, also lived in Ciudad Juarez. After gunmen showed up at his door to ask for Cristina's whereabouts in 2011, Manuel was kidnapped, never seen again, and is presumed dead.

482.    Gerardo Heath was a 15-year-old football player living in Allende, Mexico, a small ranching town near the border with Texas. On Friday, March 18, 2011, he was hanging out with friends near his home while his mother, Claudia Sanchez, packed for his football game in San Antonio the next morning. Gerardo asked his mother if he could go out with his friends; after initially refusing, she told him yes, but not to be back late. He put on the new clothes his family had recently given him for his birthday.

483.    But Gerardo never came back, having been swept up in a spree of killings in Allende that were carried out by Los Zetas during several weeks in March 2011.

JA000166

484.     Noé Isauro Beltrán was a 39-year-old man living in Culiacán, Mexico. He had three daughters with his wife Rocío and worked at an auto repair shop. In October 2019, during an attack in Culiacán conducted by the Sinaloa Cartel to free the son of "El Chapo," Beltrán was killed as he tried to close the repair shop's shutters to protect himself and others.

485.     During the same incident, José Arturo and José Nicolás, two young workers at a furniture store, were returning from a furniture delivery when they were caught in the gunfire. Both died at the scene. Eduardo, a 32-year-old policeman, died after 100 bullets hit his car.

486.     Christina Marie Langford Johnson, Dawna Langford, and Rhonita Miller were Americans living in Mexico in 2019. They were all members of the Mormon church and had moved to Mexico many years before. They each had children and lived in the state of Sonora.

487.     On the morning of November 4, 2019, the women were driving in separate vehicles with their children to meet relatives in the neighboring state and Phoenix, Arizona. Gunfire ripped into each of the vehicles, killing Johnson, Langford, and Miller, along with six of their children. Authorities suspect that members of the Juarez Cartel, engaged in a dispute with the rival Sinaloa Cartel, were responsible for the killings.

488.     Fernando Ruiz was a 19-year-old plumber and bricklayer living in the Mexican border city of Reynosa. He was working to pay for his studies. In June 2021 he was outside fixing a drain when members of the Gulf Cartel began a city-wide shooting spree. Fernando and his companions were shot just as they tried to take cover in somebody's home.

489.     In December 2016, in the municipality of Jesús Carranza, there were several armed clashes between criminal groups and the Army, Navy, and state police over three days, which left 20 dead.

JA000167

490.     On March 9, 2019, an armed commando of the Santa Rosa de Lima Cartel attacked a bar in Salamanca, Guanajuato. Neighbors described it as a "massacre," as the attackers fired indiscriminately against customers, waiters, and workers. According to witnesses, the attack took less than two minutes. Some media linked the attack to the launch, two weeks earlier, of an operation of the Federal Government to combat fuel theft with the support of the Navy, Federal Police, and state police. After the attack, the inhabitants of Salamanca reportedly started a self-imposed curfew.

491.     On October 14, 2019, a commando of 37 police officers was serving a warrant. Around 30 members of the New Generation Jalisco Cartel —one of the deadliest in the country— ambushed them. An officer who survived explained that the criminals had automatic weapons and that their firepower was far superior to that of the police. The media described the images as Dantesque: two police vehicles set on fire, the others left with threatening messages by the cartel, dead police officers lying on the ground, some of them burned, shell casings everywhere.

492.     In November 2019, in Villa Unión, Coahuila, four municipal, state, and federal law enforcement officers were killed during a confrontation with the Noreste Cartel. Seventeen other people were also killed.

493.     During the June 26, 2020 attempt to assassinate Mexico City's police chief, referred to above, bystander Gabriela Gómez was killed. Gaby, as she was called, was a 26-year-old mother of two daughters, a wife, a sister, and daughter. She had been traveling with her husband, sister, and sister-in-law in her car, on their way to their food stand at a subway station.

494.     At six o'clock in the evening on July 1, 2020, a commando of ten vehicles arrived at the "*Recuperando mi Vida*" rehabilitation center in Irapuato, Guanajuato. After threatening the

121

workers and telling them to leave, the intruders forced 30 residents to the floor. According to the state Attorney General's Office, seven men with long guns perpetrated the massacre. The mothers of the residents were among the first to arrive. Marina, Rodrigo's mother, kept shouting "I brought you here so you could get fixed, not die." She asked the police to let her in to find her son, not yet certain that he was one of the deceased. From December 2019 to July 2020, six armed attacks were registered against rehabilitation centers in Irapuato.

495.    On the night of September 1, 2020, in Cuernavaca, Morelos, an armed group opened fire on those attending the funeral of a motorcyclist. The attackers used high-caliber weapons. The attack left 9 dead, including several minors, as well as 13 wounded. Diego Miranda, 15, one of the deceased, was considered a promising young soccer player; he had been invited to a tryout for the basic forces of the popular team Cruz Azul.

496.    On March 1, 2021, a commando of armed men killed 10 construction workers while they were waiting for their wages on the sidewalk in Tonala, Jalisco. Subsequently, a minor was found dead, hit by bullets inside his home. Additionally, a woman and a 14-year-old minor were seriously wounded. "Why did they do this to us?" asked a boy lying on the floor, bleeding and waiting for the ambulance to arrive. The attack was carried out with long weapons; at the crime scene, authorities found more than 70 spent cartridges.

497.    On March 18, 2021, eight state police officers—Alejandro Lovera Hernandez, Guillermo Torres Mixteco, David Pedroza Guadarrama, Martin Solares Morales, Ernesto Mondragon Ramírez, Juan Dario Mesas Morales, Victor Manuel Garcia Vazquez, and Mauricio Rodríguez Zarate—were killed in an attack by the *Familia Michoacana*. They were ambushed in the municipality of Coatepec de Harinas.

122

498.     On April 22, 2021, in the port of Acapulco, Guerrero, a group of men armed with AK-47 rifles broke into a public bus depot. They shot and murdered a 70-year-old security guard. The other guard, Francisco Gerardo Estrada Cruz, 24 years old, died a day later at the hospital.

499.     On May 10, 2021, at a local restaurant-bar in Jocotepec, Jalisco, in broad daylight, an armed group descended from a van and opened fire without saying a word. It took them a couple of minutes to kill five people, two of them minors, a 16-year-old, and a boy between 12 and 13 years old.

500.     On July 2, 2021, in Omealca, Veracruz, two minors were killed in a shooting between police forces and a group of criminals, allegedly belonging to the New Generation Jalisco Cartel. The young men, aged 13 and 15, were washing a car in their front yard during the confrontation.

501.     On July 17, 2021, an armed group shot at people gathered at a family reunion in Panuco, Zacatecas. The attack killed eight and wounded seven. The Colegio de Bachilleres high school published the obituary of its student Jesus Velazquez Miranda, 16, who was killed along with his parents, Adan and Rosario.

502.     For six days, from July 21 to 27, 2021, residents of the town of Magdalena de Kino, Sonora, reported gunshots in different parts of the town. Many of them posted videos on social networks: in one, gunshots are heard while people pray, lying on the floor of a church; in another, with the caption "Magdalena, no man's land," people in the street start running when they hear the gunshots. The siege ended after members of the state police, the National Guard, and the Secretary of National Defense intervened.

JA000170

503.    Several shootings and violent clashes on Friday July 23, 2021, left 16 dead across different areas in the state of Zacatecas. An armed group shot at a car several times, murdering the three people inside, a man and two minors. Another attack was reported in the same area; another car had been shot, killing a man and a child. On the same day, a man was taken out of his home and murdered on the road. Armed violence reached the state's capital too, as at least four young men were shot inside a barber shop. Simultaneously, two other men were being shot a few blocks away.

504.    On July 26, 2021, in Salto, Jalisco, police officer Maricruz Pérez Partida, 32 years old, was shot and killed along with her father, her uncle, and a neighbor, as they were leaving her house and walking to a car. Pérez served as sector chief at the local police station. She was a mother of three.

505.    Shortly after noon, on June 18, 2021, in Reynosa, Tamaulipas, armed individuals in several vehicles shot at pedestrians in several neighborhoods of the city. The authorities considered it an indiscriminate attack against civilians, which killed at least 15 people, including a bus driver, a nursing student, a family, and a group of construction workers. Fernando Ruiz was one of them. He agreed with his stepdad to work on construction to pay for his studies; he wanted to become a nurse. Olga Ruiz described how after hearing gunshots, her stepdad told her brother and his co-workers to take refuge inside a house, but the bullets hit them before they could hide. After news of the attack spread, Pope Francis sent prayers and his condolences to the families of the deceased.

## X.    CLAIMS FOR RELIEF

*"Why are deadly weapons being sold to those who plan to inflict untold suffering on individuals and society? Sadly, the answer, as we all know, is simply for money: money that is drenched in blood, often innocent blood. In the face of this shameful and culpable silence, it is our duty to confront the problem and to stop the arms trade."*

**-- Pope Francis**

### COUNT ONE
### (NEGLIGENCE)

506.    The Government hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

507.    Defendants had a duty to exercise ordinary and reasonable care in designing, manufacturing, marketing, advertising, promoting, distributing, supplying, and selling their guns in order to reduce the risk that their guns would be trafficked into Mexico.

508.    Defendants knew or chose to be willfully blind to the fact that their design, marketing, and distribution of guns posed a serious risk of harm to people in Mexico and to the Government, but they nevertheless continued to sell their guns without exercising reasonable care.

509.    Defendants' negligence caused the actual injuries alleged above. That negligence is the proximate cause of the epidemic of gun-trafficking into, and gun violence within, Mexico.

510.    As a foreseeable and proximate result of Defendants' negligence, the Government has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, and other services, as well as other extensive economic losses.

## COUNT TWO
## (PUBLIC NUISANCE)

511.    The Government hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

512.    In 2003, Judge Weinstein in *NAACP v. AcuSport, Inc*. concluded that there is "reliable evidence of an industry-wide connection between the legal market and the illicit market that constitutes a public nuisance nationally and in New York State and City. Diversion from the legal to the illegal markets through imprudent marketing cause[s] a large part of this diversion." 271 F. Supp. 2d at 521. The same is true here.  Defendants cause a public nuisance under applicable law.

513.    Defendants' conduct arms criminals, constituting a dangerous threat to the public.

514.    Defendants design, market, distribute, promote, and sell guns with reckless disregard for human life and for the peace, tranquility, and economic well-being of the Mexican public. They have knowingly refused to monitor and discipline their distribution systems, making their guns easily available to anyone intent on crime. Defendants knew or chose to be willfully blind to the fact that they facilitate and encourage easy access by persons intent on murder, mayhem, or other crimes, including illegal purchasers who foreseeably traffic the guns into Mexico. Defendants' conduct has thereby created and contributed to a public nuisance by unreasonably interfering with public safety and health and undermining Mexico's gun laws, resulting in the specific and particularized injuries suffered by the Government.

515.    The Government and its residents have a common right to be free from conduct that creates unreasonable risk to the public health, welfare, and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

516.    Defendants intentionally and recklessly design, market, distribute, and sell guns that Defendants know, or reasonably should know, will be obtained by persons for criminal purposes, causing tens of thousands of their guns to be possessed and used in Mexico illegally. Defendants cause an elevated level of crime, death, and injuries to Mexican residents, and a higher level of fear, discomfort, and inconvenience to the residents of Mexico.

517.    As a result of the continued use and possession of many of these guns, residents of Mexico will continue to be killed and injured by these guns, and the public will continue to fear for their health, safety, and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

518.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety, and welfare of the residents of Mexico, creating an atmosphere of fear that tears at the residents' sense of well-being and security. The Government has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

519.    As a foreseeable and proximate result of Defendants' conduct, the Government has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, and other services, as well as other extensive economic losses.

## COUNT THREE
### (DEFECTIVE CONDITION—UNREASONABLY DANGEROUS)

520.    The Government hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

521.    The guns manufactured and supplied by Manufacturer Defendants were defective in design or formulation in that, at the time they left the Manufacturer Defendants' control:

127

JA000174

a. they were unreasonably dangerous to the purchasers and to others against whom they were likely to be used;

b. the foreseeable risks to the purchasers exceeded the benefits associated with their design or formulation;

c. they were more dangerous than an ordinary consumer would expect when used in their intended or reasonably foreseeable manner;

d. a reasonably prudent manufacturer or distributor, being fully aware of the risks posed, would not have placed the product on the market;

e. they did not conform to the representations of Manufacturer Defendants that the guns, when distributed by Defendants, were safe for use by purchasers;

f. they failed to employ alternative designs, which were readily available and feasible, that would prevent the weapons from being fired by unauthorized users;

g. they were designed to be readily converted into machineguns operable in fully automatic mode;

h. they were designed to try to evade U.S. restrictions on military-style assault weapons; and

i. they were designed to enable the obliteration or defacement of serial numbers.

522.    As a foreseeable and proximate result of the defective condition of the guns manufactured and supplied by Manufacturer Defendants, the Government has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, and other services, as well as other extensive economic losses.

**COUNT FOUR**
**(NEGLIGENCE PER SE)**

523.    The Government hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

524.    Defendants violated statutory duties, the Government is within the class intended to be protected by the statutes, the statutory violations are a proximate cause of the Government's injury, and the Government's injuries are of the type against which the statutes are designed to protect.

128

JA000175

525.    Defendants breached the duties they owe to the Government by, among other things, failing to monitor and discipline their distribution systems so as to prevent or reduce the trafficking of their guns into Mexico. In so doing, all Defendants acted with actual malice.

526.    As a foreseeable and proximate result of Defendants' conduct, the Government has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, and other services, as well as other extensive economic losses.

## COUNT FIVE
## (GROSS NEGLIGENCE)

527.    The Government hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

528.    Defendants were negligent as described in detail above.

529.    Defendants' active facilitation of the trafficking of guns into Mexico, and their other reckless and unlawful conduct described in detail above, led to the epidemic of gun violence in Mexico and has strengthened the cartels. Defendants' reckless and unlawful conduct has caused tens of thousands of deaths and cost many billions of dollars in harm—circumstances that constituted an imminent or clear and present danger amounting to more than normal and usual peril.

530.    Defendants in fact knew of the imminent danger that their conduct posed to the Government.

531.    Defendants were aware of the devastating and dangerous consequences of failing to monitor and discipline their distribution systems, of facilitating the unlawful trafficking of guns into Mexico, and of engaging in the other unlawful conduct described in detail above. Defendants nevertheless continued, and continue today, to engage in all of that conduct,

129

JA000176

demonstrating their conscious disregard of the consequences of their actions. Defendants'
conduct was so reckless and wanting in care that it constituted a conscious disregard of and
indifference to the life, safety, and rights of persons in Mexico and of the Government.

532.    As a foreseeable and proximate result of Defendants' gross negligence, the
Government has suffered actual injury and damages including, but not limited to, significant
expenses for police, emergency, health, prosecution, corrections, and other services, as well as
other extensive economic losses.

**COUNT SIX**
**(UNJUST ENRICHMENT AND RESTITUTION)**

533.    The Government hereby repeats and incorporates by reference each preceding and
succeeding paragraph as though fully set forth herein.

534.    Manufacturer Defendants have reaped enormous profits and gains from the sale of
their guns that have foreseeably been trafficked into Mexico.

535.    Those sales have resulted in enormous increases in the Government's
expenditures, including but not limited to the following areas: medical care, police
investigations, emergency personnel, public health resources, human services, courts, prisons,
and related expenses.

536.    The Government has also been negatively affected by Defendants' sales due to
the decrease in property values throughout Mexico, loss of businesses, difficulty in developing
the economy and society of Mexico, and loss of substantial productivity.

537.    Defendants undertook the wrongful conduct for the purpose of increasing the
sales and profits, while at the same time avoiding responsibility for the massive costs caused by
those sales, shifting those costs to the Government and its citizens.

538.     Defendants have, without justification, unjustly refused and failed to pay for the consequences of their unreasonable conduct and, as a result, the Government has been required to pay for the associated costs resulting from Defendants' reckless and unlawful conduct.

539.     The Government's expenditure of substantial sums to pay for the associated costs resulting from the use of guns that Defendants sold for enormous profit by Defendants has unjustly benefited and enriched Defendants at the Government's expense, to its detriment.

540.     By virtue of the foregoing, the Government has incurred expenses that, in law, equity and fairness, ought to have been borne by Defendants. Defendants have unjustly enriched themselves at the Government's expense.

541.     As a foreseeable and proximate result of Defendants' conduct, the Government has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, and other services, as well as other extensive economic losses.

**COUNT SEVEN**
**(VIOLATION OF CUTPA)**

542.     The Government hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

543.     Defendant Colt violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a et seq. ("CUTPA"), by marketing that emphasized the ability of civilians to use Colt assault rifles in unlawful, military-style attacks.

544.     Colt knowingly violated CUTPA by marketing products like its semi-automatic assault rifles to the civilian market in ways that highlighted their efficacy for civilians wanting to carry out unlawful military-style combat missions and that encouraged and promoted that misuse. For example, as noted above Colt specifically labels its products with militaristic terms

131

like "Trooper" and "Patrol" to increase the viewer's association of Colt's products with military-style combat.

545.    Colt knew that its marketing and advertising would attract persons and organizations that intended to use Colt's products to battle against the military and police, including the military and police in Mexico.

546.    Colt further knew that its products would be trafficked into Mexico for use by the drug cartels there. Colt knew that its products, and its marketing of those products, created an unreasonable risk of physical injury to persons in Mexico.

547.    Colt's conduct in producing and marketing its military-style assault weapons is a knowing violation of CUTPA, and those violations were a substantial factor in causing the injuries that the Government has sustained.

548.    As a foreseeable and proximate result of Defendants' conduct, the Government has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, and other services, as well as other extensive economic losses.

## COUNT EIGHT
### (VIOLATION OF MASS. G. L. c. 93A)

549.    The Government hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

550.    Defendant Smith & Wesson violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A ("Chapter 93A"), by marketing that emphasized the ability of civilians to use Smith & Wesson assault rifles in unlawful, military-style attacks.

551.    Smith & Wesson knowingly violated Chapter 93A by marketing products like its semi-automatic assault rifles to the civilian market in ways that highlighted their efficacy for

132

civilians wanting to carry out unlawful military-style combat missions and that encouraged and promoted that misuse. For example, as noted above Smith & Wesson uses the "M&P" or "Military and Police" designation, emphasizing that its products are capable of being deployed in combat-like scenarios. And its marketing highlights the ability of its products to rapidly dispatch large numbers of opponents in armed combat, appealing especially to criminals like the cartels.

552.   Smith & Wesson knew that its marketing and advertising would attract persons and organizations that intended to use Smith & Wesson's products to battle against the military and police, including the military and police in Mexico.

553.   Smith & Wesson further knew that its products would be trafficked into Mexico for use by the drug cartels there. Smith & Wesson knew that its products, and its marketing of those products, created an unreasonable risk of physical injury to persons in Mexico.

554.   Smith & Wesson's conduct in producing and marketing its military-style assault weapons is a knowing violation of Chapter 93A, and those violations were a substantial factor in causing the injuries that the Government has sustained.

555.   The Government engages in trade or commerce and therefore may recover its losses under Section 11 of Chapter 93A.

556.   As a foreseeable and proximate result of Defendants' conduct, the Government has suffered a loss of money or property, including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, and other services, as well as other extensive economic losses.

**COUNT NINE**
**(PUNITIVE DAMAGES)**

557.   The Government hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

133

JA000180

558.    All of Defendants' acts and omissions stated above were willful and malicious, evidenced a conscious disregard for the rights and safety of other persons, and had a great probability of causing substantial harm.

559.    As a direct and proximate result of Defendants' conduct, the Government has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, and other services, as well as other extensive economic losses.

560.    Defendants' unconscionable conduct warrants an assessment of exemplary and punitive damages in an amount appropriate to punish Defendants and set an example that will deter similar conduct in the future.

## XI.    DEMAND FOR JUDGMENT

WHEREFORE, the Government respectfully demands that this Court:

a.    Enter joint and several judgments against the Defendants and in favor of the Government;

b.    Enter injunctive and equitable relief against the Defendants requiring them to:

    1.    Abate and remedy the public nuisance they have created in Mexico;

    2.    Create and implement standards sufficient to reasonably monitor and discipline their distribution systems;

    3.    Incorporate all reasonably available safety mechanisms into their guns, including devices to prevent use of those guns by unauthorized users; and

    4.    Fund studies, programs, advertising campaigns, and other events focused on preventing unlawful trafficking of guns;

c.    Enter an injunction against the Defendants requiring them to take all necessary action to abate the current and future harm that their conduct is causing and would otherwise cause in the future in Mexico;

d.    Award damages to the Government in an amount to be determined at trial;

e.    Award civil penalties to the Government as permitted by law;

f.    Award to the Government restitution and disgorgement of Defendants' profits.

g.  Award punitive damages to the Government in an amount to be determined at trial, and sufficient to punish Defendants or deter them and others from continuing or repeating their unlawful conduct;

h.  Award to the Government pre-and post-judgment interest as permitted by law;

i.  Award the Government its costs of suit, including reasonable attorneys' fees, as provided by law; and

j.  Award such further and additional relief as the case may require and the Court may deem just and proper.

Dated: August 4, 2021                              Respectfully submitted,

<u>s/ Steve D. Shadowen</u>                         <u>s/ Jonathan E. Lowy</u>
Steve D. Shadowen (*pro hac vice* pending)         Jonathan E. Lowy (*pro hac vice* pending)
Nicholas W. Shadowen *(pro hac vice* pending)      BRADY
SHADOWEN PLLC                                       840 First Street, N.E. Suite 400
1135 W. 6th Street, Suite 125                       Washington, DC 20002
Austin, TX 78703                                    Phone: 202-370-8104
Phone: 855-344-3298                                 jlowy@bradyunited.org
sshadowen@shadowenpllc.com
nshadowen@shadowenpllc.com

<u>s/ Richard M. Brunell</u>
Richard M. Brunell (BBO# 544236)
SHADOWEN PLLC
1135 W. 6th Street, Suite 125
Austin, TX 78703
Phone: 855-344-3298
rbrunell@shadowenpllc.com

135

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Estados Unidos Mexicanos | Smith & Wesson Brands, Inc., Barrett Firearms Mfg., Inc., Beretta USA Corp., Beretta Holdings, SPA, Century Arms, |

**(b)** County of Residence of First Listed Plaintiff    Mexico
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Springfield, MA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Steve D. Shadowen, Shadowen PLLC
1135 W. Street, Suite 125
Austin, Texas 78703, 855-344-3298

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [x] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product    Product Liability | |    28 USC 157 |    3729(a)) |
| [ ] 140 Negotiable Instrument |    Liability   [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &    Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
|    & Enforcement of Judgment |    Slander    Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'    Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted |    Liability   [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
|    Student Loans | [ ] 340 Marine    Injury Product | |    New Drug Application | [ ] 470 Racketeer Influenced and |
|    (Excludes Veterans) | [ ] 345 Marine Product    Liability | | [ ] 840 Trademark |    Corrupt Organizations |
| [ ] 153 Recovery of Overpayment |    Liability   **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
|    of Veteran's Benefits | [ ] 350 Motor Vehicle   [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards |    Act of 2016 |    (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle   [ ] 371 Truth in Lending |    Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract |    Product Liability   [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** |    Protection Act |
| [ ] 195 Contract Product Liability | [x] 360 Other Personal    Property Damage |    Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise |    Injury   [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury -    Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) |    Exchange |
| |    Medical Malpractice |    Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights   **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee |    Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff |    Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/    Sentence | |    or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability |    Accommodations   [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -   [ ] 535 Death Penalty | |    26 USC 7609 |    Act/Review or Appeal of |
| |    Employment   **Other:** | **IMMIGRATION** | |    Agency Decision |
| | [ ] 446 Amer. w/Disabilities -   [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of |
| |    Other   [ ] 550 Civil Rights | [ ] 465 Other Immigration | |    State Statutes |
| | [ ] 448 Education   [ ] 555 Prison Condition |    Actions | | |
| |   [ ] 560 Civil Detainee - | | | |
| |    Conditions of | | | |
| |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
17 USC 1332(a)(4)

Brief description of cause:
Unlawful gun sales practices

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
August 4, 2021

SIGNATURE OF ATTORNEY OF RECORD
/s Richard Brunell

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JA000183

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)   Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc., et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

   [ ]   I.   160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

   [ ]   II.  110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

   [x]  III. 120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.
        *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                      YES [ ]      NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
                                                      YES [ ]      NO [X]
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                      YES [ ]      NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                      YES [ ]      NO [ ]

7. Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).
                                                      YES [ ]      NO [X]

   A.   If yes, in which division do all of the non-governmental parties reside?
        Eastern Division [ ]          Central Division [ ]          Western Division [ ]

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
        Eastern Division [X]          Central Division [ ]          Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)
                                                      YES [ ]      NO [ ]

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S OR PRO SE'S NAME**   Steve D. Shadowen
**ADDRESS**   1135 W. 6th Street, Suite 125, Austin, Texas 78703
**TELEPHONE NO.**   855-344-3298
**EMAIL ADDRESS**   sshadowen@shadowenpllc.com

**(CategoryForm6-2021.wpd )**

JA000184

# Exhibit 2

Case 1:21-cv-11269-FDS   Document 108-2   Filed 01/31/22   Page 2 of 35

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ESTADOS UNIDOS MEXICANOS,<br><br>     Plaintiff,<br><br>vs.<br><br>SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS MANUFACTURING, INC.; BERETTA U.S.A. CORP.; CENTURY INTERNATIONAL ARMS, INC.; COLT'S MANUFACTURING COMPANY LLC; GLOCK, INC.; STURM, RUGER & CO., INC.; WITMER PUBLIC SAFETY GROUP, INC. D/B/A INTERSTATE ARMS,<br><br>     Defendants. | Case No.: 1:21-cv-11269-FDS |

# PLAINTIFF'S FIRST EXPERT REPORT ON THE TORT LAW OF MEXICO

## January 31, 2022

1

## I.   SCOPE OF ASSIGNMENT

1.      We, José Ramón Cossío-Díaz, Juan Carlos Marín G. and Roberto Fernández del Valle M., being over 18 years of age, declare as follows under penalty of perjury.

2.      We have been asked by counsel for Plaintiff Estados Unidos Mexicanos to provide our initial views on the broad outlines of, and some specific topics within, the law in Mexico involving the negligence of one party causing harm to another, the subject known in the United States as tort law. We understand that this case is in its early phases, and the issues are likely to be refined as the case proceeds. We reserve the right to provide further or more particuar opinions and analyses as the matters warrant.

## II.   QUALIFICATIONS AND REMUNERATION

3.      I, José Ramón Cossío-Díaz, was a Judge of the Supreme Court of Justice of Mexico from December 1, 2003 to November 30, 2018. From that position I had the opportunity to analyze and resolve a wide variety of cases, given the broad powers of the Mexican Supreme Court. Thus, for example, matters of human rights, criminal and civil law, civil liability, contracts, administrative responsibilities or corruption, among many others. Between 1995 and 2003 I served as a Dean of the Law School at the Instituto Tecnológico Autónomo de México. I belong to several academic, scientific and professional associations both in Mexico and abroad. I hold a law degree from the Universidad de Colima, Masters degrees from the Center of Constitutional Studies of Madrid and from the Universidad Nacional Autónoma de Mexico as well as a JSD from the Univesidad Complutense of Madrid.

4.      As Exhibit A, I attach an updated version of my curriculum vitae and list of notable representations and the matters in which I have recently testified.

5.      I, Roberto Fernández del Valle M, am a lawyer, with more than 20 years of experience representing clients during trials on compliance with different types of contracts, class actions, conflicts between shareholders, civil liability, real estate matters, recovery of past due portfolios, as well as pain and suffering matters, mediation and arbitration processes, among others. As a professor, I teach civil obligations at the Universidad Iberoamericana. I am licensed to practice Law in Mexico.

2

6.      As Exhibit B, I attach an updated version of my curriculum vitae and list of notable representations and the matters in which I have recently testified.

7.      I, Juan Carlos Marín G., am currently a Law Professor and published author. Since 2002 I teach Civil Law and Civil Liability at the *Instituto Tecnológico Autónomo de México* (, 2002-2017) and *Tecnologico de Monterrey* (TEC, 2018- to date). I have participated in projects regarding civil liability for damages to free competition, environmental damages and others, involving Government, International Organizations and the private sector. I am the author of books regarding patrimonial liability of the State (2004), injunctive relief in civil proceeding (2004) and Tort liability in the United States (2013). I hold a law degree from *Universidad de Chile* and a J.D. from *Universidad Carlos III de Madrid*.

8.      As Exhibit C, I attach an updated version of my curriculum vitae and list of notable representations and the matters in which I have recently testified.

9.      We are each being compensated at the rate of $200 per hour for time spent. Our fees are not in any way contingent on the outcome of this litigation.

## III.   MATERIALS CONSIDERED

10.      In preparing this report, we considered the Plaintiff's Complaint dated August 4, 2021, and we considered and relied on the legal materials that we cite in this report.

## IV.   ANALYSIS

### Introduction

11.      Mexico, like the rest of the Latin American countries, began building its own legal framework once emancipation from Spain was achieved. As was common to these countries, the first laws passed in the first half of the 19th century were related to the form of government that the new nation would adopt. The codification of substantive laws -civil, criminal, and commercial- as well as procedural laws -civil and criminal- was reserved for the second half of the century.

3

12. Regarding civil codification, despite some attempts developed in certain states of the Mexican nation, the first Code that the country had was the Civil Code of the Federal District and Territory of Baja California of 1870, reformed in 1884. This legislation had as its direct antecedent, as it could not be otherwise, the old peninsular law that had governed the Viceroyalty of New Spain for almost three hundred years, the French civil law contained in the Code of 1804 and the draft Civil Code of García Goyena.

13. In the twentieth century, as a result of the revolutionary changes that the country underwent at the beginning of that century, a new Civil Code was enacted in 1928 and became effective in 1932. This Code was originally called the Civil Code for the Federal District in common matters and for the entire Republic in federal matters.

14. In 1999, however, with the amendments made to the constitutional text, the Legislative Assembly of the then Federal District was given the power to legislate on civil matters. As a result, in 2000, the Civil Code of 1928 was renamed as the Civil Code for the Federal District. In this same year, by Congress decree, at the federal level, the Civil Code of 1928 was renamed as the Federal Civil Code (FCC).

15. What was a single Code from 1928 to 1999, became two different Codes as of 2000. In this report we will refer to the last of the aforementioned Codes.

**Tort Liability**

16. This report analyzes aspects of the tort liability system in force in Mexico.

17. Traditionally, it has been understood that a person is liable when they are subject to the obligation of repairing the damage suffered by another one.[1] In civil law, this obligation is fulfilled through the compensation of damages for the harm and injury suffered. The object of the civil liability action consists in the monetary reparation of those damages and injuries, so that their economic consequences are ultimately borne by the person who causes them.

18. The models of attribution of liability that have traditionally coexisted in this matter are two: (i) liability for negligence -called in Mexico subjective liability- which makes the party that causes the damage liable on condition that the latter has acted with fault or fraud; and

---

[1] Fausto Rico A.; Patricio Garza V.; and Mischel Cohen C. Tratado teórico práctico de derecho de obligaciones. Porrúa. Mexico. 2015, p.691. What the authors understand as civil liability in the strict sense.

(ii) strict or objective liability, which establishes the obligation to repair any damage that occurs in the exercise of a certain risky activity, regardless of the diligence used.[2]

19.     Both models of attribution have been included in Mexican civil legislation. Indeed, the FCC −which regulates this matter in Chapter V (Obligations arising from unlawful acts), Title One (Sources of Obligations), Articles 1910 to 1934 bis− regulates both the so-called subjective or fault-based liability system and the objective or risk-based liability system.

20.     The first is provided for in Article 1910: "Whoever, acting unlawfully or against good customs, causes damage to another, is obliged to repair it, unless he proves that the damage was caused as a consequence of fault or inexcusable negligence of the victim."

21.     The second is provided for in article 1913: "When a person makes use of mechanisms, instruments, devices or substances dangerous by themselves, by the speed they develop, by their explosive or inflammable nature, by the energy of the electric current they conduct or by other analogous causes, they are obliged to respond for the damage they cause, even if they do not act unlawfully, unless they prove that such damage was caused by the fault or inexcusable negligence of the victim."

22.     The former relies on the idea of fault (wrongfulness) as the basis of tort liability, while the latter is based on the idea of risk associated with the use of mechanisms, instruments, devices, or substances that are dangerous in themselves.

---

[2] The Supreme Court has stated: "Civil liability entails the obligation to compensate for damages caused by a breach of the obligations assumed (contractual source) or by virtue of a wrongful act or risk created (non-contractual source); hence, if possible, the repair of the damage should consist of the establishment of the situation prior to it, and when this is impossible, in the payment of damages. Now, tort liability may be of a nature: 1) objective, derived from the use of dangerous objects that create a state of risk for others, regardless of the fact that the agent's conduct was not negligent, and that he did not act unlawfully, which is based on an element outside the conduct; or 2) subjective, which derives from the commission of an unlawful act that, for its configuration requires an unlawful, negligent and harmful conduct." Amparo directo 16/2012. July 11, 2012. Five votes of the ministers Jorge Mario Pardo Rebolledo, José Ramón Cossío Díaz, Guillermo I. Ortiz Mayagoitia, Olga Sánchez Cordero de García Villegas, and Arturo Zaldívar Lelo de Larrea; Justices José Ramón Cossío Díaz, Olga Sánchez Cordero de García Villegas and Arturo Zaldívar Lelo de Larrea reserved their right to cast a concurring vote. Speaker: Jorge Mario Pardo Rebolledo. Secretary: Rosa María Rojas Vértiz Contreras. Digital Record: 2005542. Instance: First Chamber. Tenth Epoch. Subject Matter(s): Civil. Thesis: 1a. LII/2014 (10th.). Source: Gazette of the Judicial Weekly of the Federation. Book 3, February 2014, Volume I, page 683. Type: Isolated.

23.    In this report we will focus on the system of subjective liability.[3]

**Elements of Subjective Civil Liability**

24.    Subjective liability is the most widespread model of attribution of liability in modern law. In Mexican law it constitutes the general rule, so that it is applicable to all cases that are not governed by a different special rule and that do not fall within the scope of strict civil liability. It should be noted that the tort liability system in Mexico followed the tradition of French law by establishing a general liability clause for negligent acts by the tortfeasor. Unlike in U.S. law, there are no different categories of torts in the Mexican legal system.

25.    The elements that make up this civil liability system are the following: (i) that there is an action or omission committed with fault (in a broad sense that includes negligence and willful misconduct); (ii) that it produces damage; and (iii) that there is a causal relationship between that action or omission and the damage produced.

26.    These elements must be proven, as a general rule, by the person claiming damages in the respective civil liability suit[4].

---

[3] Therefore, neither the strict civil liability (art. 1913), nor the subjective liability for the acts of others (vicarious liability) provided for in articles 1919 to 1928 of the FCC, nor the subjective liability for the acts of things regulated in articles 1929 to 1933 of the FCC will be the object of this report.

[4] This has also been pointed out by the courts in Mexico: "The damage can be pecuniary or moral, although both types can concur when produced by the same event, for example, in the case of physical injuries, and its accreditation requires, in the case of medical civil liability, the proof that the injuries were produced and it was the injurious behavior of the medical professional that caused the violation of physical integrity, that is to say, the existence of a causal link between one and the other. Thus, the general rule that governs in this matter is applied, enunciated by the doctrine and the first part of article 1910 of the Civil Code for the Federal District, whose text shows the behavior, when referring to the wrongful act, the damage, and the causal relationship, when pointing to the person responsible for the damage and the conduct of the latter as the cause of that injury. If these three elements are not met, the claim for civil liability, whether contractual or non- contractual, for damage arising from the exercise of the medical activity can in no way be successful. The demonstration of these elements does not escape the general rules of evidence provided for in Articles 281 and 282 of the Code of Civil Procedures for the Federal District. Thus, the plaintiff who claims that the damage was caused by the doctor must prove the harm and the fault of the professional, as well as the causal link between the two [...]". FOURTH COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT. Amparo directo 812/2010. Alfredo Soto Rodríguez. February 11, 2011. Unanimous vote. Speaker: Francisco J. Sandoval López. Secretary: Raúl Alfaro Telpalo. Digital record: 160354. Instance: Collegiate Circuit Courts. Tenth Epoch. Subject Matter(s): Civil. Thesis: I.4o.C.329 C (9th.). Source: Semanario Judicial de la Federación: Judicial Weekly of the Federation and its Gazette. Book III. January 2012, Volume 5, page 4605. Type: Isolated.

6

## Action or Omission Committed with Fault

27.     The reason for attributing liability to a third party in a fault-based system lies in the fact that the damage has been caused by its faulty action or omission (unlawful in the terms of Art. 1910), i.e., it has been the result of an action or omission that breaches a standard of care.

28.     The FCC does not define the concept of fault. The doctrine has had no problem in establishing that the standard of care, i.e., the level of care expected of a person, is based on the figure of the "reasonable man"; the "good father of a family" −inspired by the figure of the *pater familias* in Roman law− or the "diligent person."

29.     In this case, the conduct of the person who caused the damage is compared with that which could be expected of the "diligent person," to establish whether his action was negligent or not.

30.     The standard of care may be established by Congress through the codification of rules of conduct aimed at avoiding accidents (as occurs with the Traffic Regulations of Mexico City), or it may be the result of a non-legislated rule, defined by the judges resorting to good customs or the general principles of law (art. 19 and 1910 FCC).

31.     If the action of the party causing the damage infringes a general rule (Law or Regulation), the fault is considered proven by the mere violation of the general rule. This is known in doctrine as fault per se.

32.     Fault in tort liability in Mexico is generally not graded, except when it refers to the fault of the victim, as an element that serves to exonerate the defendant from paying damages. This is a qualified fault. The Congress speaks of inexcusable fault of the victim (art. 1910 FCC).

33.     Although, as we have stated, as a general rule, fault is not graded in tort liability in Mexico, Congress takes into account the actions of the person causing the damage to eventually increase the amount of the compensation for moral damages in accordance with the provisions of article 1916, fourth paragraph.[5]

---

[5] "The amount of the compensation shall be determined by the judge taking into account the injured rights, the degree of responsibility, the economic situation of the responsible party, and that of the victim, as well as the other circumstances of the case". (Emphasis added).

7

## Damage: concept, principles, and types of damage.

34.    <u>Concept.</u> Damage may be understood as any detriment or impairment to the estate of a person, whether in his possessions, his person, or his feelings. Damage is a *sine qua non* requirement of civil liability. This is translated into the following principle: without damage there is no possible compensation. In the tort law of Mexico, any person or legal entity that has suffered damage may bring a viable tort claim. This includes governmental entities.

35.    The fundamental principle governing damages —particularly the so-called pecuniary damage— is that of full reparation. This principle is even enshrined in the country's Constitution.[6]

36.    The aforementioned principle has been applied by the Supreme Court to declare unconstitutional certain restrictions that Congress had established in the area of compensation for damages.[7]

---

[6] Article 20. "The criminal process shall be accusatory and oral. It shall be governed by the principles of publicity, contradiction, concentration, continuity, and immediacy. [...]. C. Rights of the victim or injured party: [...]. IV. That the damage be repaired. In appropriate cases, the Public Prosecutor's Office shall be obliged to request reparation for the damage, without prejudice to the possibility that the victim or injured party may request it directly, and the judge may not absolve the convicted person from such reparation if he has issued a conviction." To this effect, it has been ruled: "The right to full compensation is a substantive right, whose extension must be protected in favor of the governed, and which should not be restricted unnecessarily. Therefore, a compensation limited to ceilings or rates by Congress is not fair, because it is the judge who must quantify it based on criteria of reasonableness, since he is the one who knows the particularities of the case and, therefore, can determine it with justice and equity. Consequently, the integral reparation of the damage, in the cases of compensation, must contain the qualifiers of sufficient and fair, so that the affected party can meet all his needs, in a way that allows him to lead a dignified life." (Emphasis added). THIRD COLLEGIATE COURT OF THE TWENTY-SEVENTH CIRCUIT. Amparo directo 171/2017. Roberto Carlos Ramírez Pérez and another. November 15, 2017. Majority of votes. Dissenting: Selina Haidé Avante Juárez. Speaker: Jorge Mercado Mejía. Secretary: Dulce Guadalupe Canto Quintal. Digital record: 2017315. Instance: Collegiate Circuit Courts. Tenth Epoch. Subject Matter(s): Constitutional, Civil. Thesis: XXVII.3o.66 C (10a.). Source: Gaceta del Semanario Judicial: Gazette of the Judicial Weekly of the Federation. Book 55. June 2018, Volume IV, page 3189. Type: Isolated.

[7] This was the case, for example, with the cap on lost profits due to the death of the victim in the Civil Code of the State of Querétaro. Amparo directo en revisión 5826/2015. June 8, 2016. Unanimity of four votes of justices Arturo Zaldívar Lelo de Larrea, Jorge Mario Pardo Rebolledo, Norma Lucía Piña Hernández, who reserved her right to formulate a concurring vote, and Alfredo Gutiérrez Ortiz Mena. Absent: José Ramón Cossío Díaz. Speaker: Arturo Zaldívar Lelo de Larrea. Secretary: Arturo Guerrero Zazueta. Digital Record: 2018641. Instance: First Chamber. Tenth Epoch. Subject Matter(s): Constitutional. Thesis: 1a. CXCVI/2018 (10th.). Source: Gazette of the Judicial Weekly of the Federation. Book 61. December 2018, Volume I, page 288. Type: Isolated.

37.     The classification of damages is divided into two main categories: (i) material or patrimonial damages, on the one hand; and (ii): moral or extra-patrimonial damages, on the other.[8]

**Material or Pecuniary Damage.**

38.     Material damage is further subdivided into: a) consequential damage, on the one hand; and loss of profits −lucrum cessans− on the other.

39.     a) Emerging damage: emerging damage −or simply damage in Mexican law− is defined in Art. 2108 of the FCC: "Damage is understood as the loss or impairment suffered in the estate due to the failure to comply with an obligation." It is the effective loss suffered by the estate of a person.

40.     For example, if someone negligently damages a vehicle or injures a person's arm, the cost of repairing the vehicle and the injuries sustained constitute consequential damages.

41.     b) Loss of profits −lucrum cessans− known as loss in Mexican civil law. It is the benefit that the estate of a person ceased to receive as a consequence of the unlawful activity carried out by the other party. It is provided for in Art. 2109: "The deprivation of any lawful gain, which should have been obtained with the fulfillment of the obligation, is considered a loss."

42.     In the above examples, assume that the damaged vehicle was a cab, and the injured person was a street vendor. Both were unable to work for two weeks. This time without income for the cab driver and for the peddler constitutes the loss of earnings or loss that should be compensated.

---

[8] For example: Amparo directo en revisión 5490/2016. March 7, 2018. Five votes by Ministers Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, who reserved his right to formulate clarifying vote, Jorge Mario Pardo Rebolledo, Alfredo Gutiérrez Ortiz Mena, and Norma Lucía Piña Hernández, who voted with the sense, but with a caveat in the considerations. Speaker: Arturo Zaldívar Lelo de Larrea. Secretary: Ana María Ibarra Olguín. Digital record: 2018606. Instance: First Chamber. Tenth Epoch. Subject Matter(s): Civil. Thesis: 1a. CCXXI/2018 (10th.). Source: Gazette of the Judicial Weekly of the Federation. Book 61. December 2018, Volume I, page 281. Type: Isolated.

43.     Both categories must be compensated in accordance with the principle of full reparation referred to above.[9]

**Moral or Non-Pecuniary Damages.**

44.     Art. 1916 FCC defines moral damages as follows: "Moral damage is understood as the affectation that a person suffers in his feelings, affections, beliefs, decorum, honor, reputation, private life, physical configuration and appearance, or in the consideration that others have of himself. Moral damage shall be presumed to have occurred when the freedom or physical or psychological integrity of persons is unlawfully violated or impaired."

45.     It is a category that has had an enormous development in recent years in the country. Since 2013, the jurisprudence has recognized the figure of punitive damages that we will analyze below.

46.     In the absence of a market that allows us to have certainty as to how this damage is valued, the legal systems have developed various criteria for its compensation. The most widely accepted is the one that states that moral damages must be compensated according to the principle of equity. The judge in each case is in charge of assessing this damage in accordance with the aforementioned principle.

47.     In the case of Mexican law, as we have already mentioned, Congress established in the fourth paragraph of Article 1916 FCC the criteria according to which the compensation

---

[9] Thus: "The Inter-American Court of Human Rights established that integral reparation of the damage implies the reestablishment of the previous situation and the elimination of the effects produced by the violation, as well as compensation for the damage caused. In this sense, it pointed out that "material damage" implies the loss or detriment of the victim's income, the expenses incurred due to the facts and the consequences of pecuniary nature that have a causal link with the consequent facts, which includes, on the one hand, the loss of earnings, which refers to the loss of income of the direct or indirect victim and, on the other hand, the consequential damage, which includes the payments and expenses incurred by the victim or his family members. Therefore, to quantify the amount of the compensation for material damages derived from the patrimonial responsibility of the State, which corresponds, for example, to a person who had a limb amputated because of the irregular administrative activity of the State, the loss of earnings and the consequential damages must be taken into consideration." FOURTH COLLEGIATE COURT IN ADMINISTRATIVE MATTERS OF THE FIRST CIRCUIT. Amparo directo 418/2017. Inés Georgina Lledias Velasco and another. 28 June 2018. Unanimous vote. Speaker: Jean Claude Tron Petit. Secretary: Aideé Pineda Núñez. Digital record: 2018207. Instance: Collegiate Circuit Courts. Tenth Epoch. Subject Matter(s): Administrative. Thesis: I.4o.A.136 A (10a.). Source: Gaceta del Semanario Judicial: Gazette of the Judicial Weekly of the Federation. Book 59. October 2018, Volume III, page 2484. Type: Isolated.

must be quantified. This quantification is monetary, as indicated in the second paragraph of the same provision.[10]

48.     The courts in Mexico have applied international law criteria when making reparations for moral damages.[11]

## Punitive Damages.

49.     As indicated above, the figure of punitive damages is of recent reception in Mexican law. Its consecration is the result of the action of the Supreme Court based on art. 1916 of the Civil Code (CC) of Mexico City,[12] similar in this part to the FCC.

---

[10] Art. 1916: "[...] When an unlawful act or omission produces moral damage, the person responsible shall have the obligation to repair it by means of a monetary indemnity, regardless of whether material damage has been caused, both in contractual and non-contractual liability. The same obligation to repair the moral damage will have the person incurring in strict liability according to articles 1913, as well as the State and its public servants, according to articles 1927 and 1928, all of them of the present Code."

[11] It has been ruled in this aspect: "The jurisprudence of the Inter-American Court of Human Rights has specified that the payment of compensation for moral damages must include the loss or impairment suffered in the patrimony, feelings, affections, private life or other elements that make up the moral aspect of the economic dependents or beneficiaries of the victim, as well as the funeral expenses incurred, the expenditures made to try to restore health conditions and others, which only the circumstances of the case can determine and which are a direct and immediate consequence of the commission of the event. In other words, the human right to compensation for moral damages in case of loss of human life must imply an integral restitution in favor of the dependent family members, because in terms of Article 63, numeral 1, of the American Convention on Human Rights, if there is the violation of a human right, it arises the guarantee of compensation; however, in the case of the right to life, *restitutio in integrum* is not possible so that it is necessary to seek alternative forms of reparation in favor of the victims' family members and dependents, such as monetary compensation. Consequently, this compensation refers firstly to the damages suffered and these include both material and moral damages, and in order to reach an adequate amount for the damages suffered by the victims, the following parameters must be taken as a starting point: a) Correspond to each one of the families of the victims; b) Consider the age of the victims at the time of their death and the years they lacked to complete their life expectancy and the income they obtained based on their real salary; and, c) In the absence of real salary, or of the respective information, on the minimum monthly salary in force in the country, but estimating the real economic and social situation for the calculation of the compensation." THIRD COLLEGIATE COURT OF THE TWENTY-SEVENTH CIRCUIT. Amparo directo 171/2017. November 15, 2017. Majority of votes. Dissenting: Selina Haidé Avante Juárez. Speaker: Jorge Mercado Mejía. Secretary: Dulce Guadalupe Canto Quintal. Digital record: 2017736. Instance: Collegiate Circuit Courts. Tenth Epoch. Subject Matter(s): Civil. Thesis: XXVII.3o.68 C (10a.). Source: Gaceta del Semanario Judicial: Gazette of the Judicial Weekly of the Federation. Book 57. August 2018, Volume III, page 2651. Type: Isolated.

[12] It ruled: "The punitive nature of the reparation of the damage is derived from a literal and teleological interpretation of Article 1916 of the Civil Code for the Federal District. Said article provides that in the determination of the "compensation," the injured rights, the degree of liability and the economic situation of the responsible party, among other circumstances, must be evaluated. Thus, the judge must not only consider in his sentence those aspects necessary to erase, as far as possible, the damage suffered by the victim, but there are also aggravating factors that must be considered in the amount of the compensation. As can be seen,

50.    In comparative law, the development of tort liability, in several countries, has been the responsibility of judges rather than of the Congress.

51.    The clearest example in this respect is that of the Court of Cassation in France which, based on only five articles of the Civil Code (art. 1382 to 1386, original), which created one of the most relevant sources of obligations in France, together with contractual liability, to which the French Civil Code devoted many more provisions.

52.    Something similar has happened in Mexico. For a long time, tort liability was of lesser importance than contractual liability as a source of obligations. In the last twenty years, however, it has undergone a vertiginous development. This development has been the responsibility of the courts, particularly the Supreme Court.

53.    The figure of punitive damages is framed, precisely, in the aforementioned development.

54.    The First Chamber of the Supreme Court of Justice of the Nation has conceptualized the figure of punitive damages as part of the right to fair compensation in civil law cases, which requires that the respective amount includes a component to compensate the victim's need for justice and punishes the responsible party according to its degree of fault, and another that sets a precedent that discourages similar conduct in future cases.[13]

---

this concept does not only seek to repair the damage to the victim's feelings, but also allows the degree of responsibility of the person who caused the damage to be assessed. Such conclusion is also derived from the legislative background that gave rise to the reform published in the Official Gazette of the Federation on December 31, 1982." Amparo directo 30/2013. J. Ángel García Tello et al. February 26, 2014. Five votes by Ministers Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, who cast a concurring vote, Alfredo Gutiérrez Ortiz Mena, Olga Sánchez Cordero de García Villegas and Jorge Mario Pardo Rebolledo, who cast a concurring vote. Speaker: Arturo Zaldívar Lelo de Larrea. Secretary: Ana María Ibarra Olguín. Amparo directo 31/2013. Admivac, S.A. de C.V. February 26, 2014. Four-vote majority of justices Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, Alfredo Gutiérrez Ortiz Mena and Olga Sánchez Cordero de García Villegas. Dissenting: Jorge Mario Pardo Rebolledo, who formulated a dissenting opinion. Speaker: Arturo Zaldívar Lelo de Larrea. Secretary: Ana María Ibarra Olguín. Epoch: Tenth Epoch. Record: 2006959. Instance: First Chamber. Type of Thesis: Isolated. Source: Gaceta del Semanario Judicial: Gazette of the Judicial Weekly of the Federation. Book 8. July 2014, Volume I. Subject Matter(s): Civil. Thesis: 1a. CCLXXI/2014 (10th.). Page: 143.

[13] He stated: "Compensation for damages achieves fundamental objectives in terms of social retribution. In the first place, by imposing on the responsible party the obligation to pay compensation, the victim obtains the satisfaction of seeing his or her desire for justice fulfilled. Thus, through compensation, the victim can see that the damage caused to him/her also has adverse consequences for the tortfeasor. On the other hand, compensation has a deterrent effect on harmful conduct, which will prevent future unlawful conduct. Thus, such a measure

55. The Supreme Court has also stated that punitive damages do not constitute an unjust enrichment for the recipient.[14]

56. It cannot be ignored that this figure of punitive damages is not native to Civil Law countries, such as Mexico, and that it has been the object of important criticism in these countries. In the case of Mexico, it is desirable that Congress regulates it thoroughly to consolidate a figure that, in certain cases, can be of enormous help to the victim of a wrongful act. In accordance with the current recognition doctrine of punitive damages in Mexico, it is possible to argue that the Government may sue for this type of damages if the requirements set by the Supreme Court are met, specifically, to get the person who has committed the wrongful act to take all the necessary measures to avoid the repetition of the damages that his wrongful conduct caused (as a deterrent effect of this type of damages).

**Causation.**

57. The requirement of causation refers to the relationship between the event for which liability is incurred and the damage caused.

---

fulfills a double function, since individuals will avoid causing harm to avoid having to pay compensation and, on the other hand, it will be economically convenient to bear all the expenses necessary to avoid causing harm to others. This aspect of tort law is known as "punitive damages" and is part of the right to "just compensation." Amparo directo 30/2013. J. Ángel García Tello et al. February 26, 2014. Five votes by Ministers Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, who cast a concurring vote, Alfredo Gutiérrez Ortiz Mena, Olga Sánchez Cordero de García Villegas and Jorge Mario Pardo Rebolledo, who cast a concurring vote. Speaker: Arturo Zaldívar Lelo de Larrea. Secretary: Ana María Ibarra Olguín. Amparo directo 31/2013. Admivac, S.A. de C.V. February 26, 2014. Four-vote majority of justices Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, Alfredo Gutiérrez Ortiz Mena and Olga Sánchez Cordero de García Villegas. Dissenting: Jorge Mario Pardo Rebolledo, who formulated a dissenting opinion. Speaker: Arturo Zaldívar Lelo de Larrea. Secretary: Ana María Ibarra Olguín. Epoch: Tenth Epoch. Record: 2006958. Instance: First Chamber. Type of Thesis: Isolated. Source: Gaceta del Semanario Judicial: Gazette of the Judicial Weekly of the Federation. Book 8. July 2014, Volume I. Subject Matter(s): Civil. Thesis: 1a. CCLXXII/2014 (10th.). Page: 142.

[14] He pointed out: "A compensation that considers not only the damage suffered, but also the degree of responsibility of the tortfeasor, does not unjustly enrich the victim. In fact, unjust enrichment presupposes that there is no legitimate cause for enrichment, and in this case the compensation is fully justified by the right to fair compensation. Such right orders that all persons who suffer damages be fully compensated, therefore, if by considering the degree of responsibility of the tortfeasor, the victim is fully compensated, such compensation will be fully justified." Amparo directo 30/2013. J. Ángel García Tello and another. February 26, 2014. Five votes by Ministers Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, who reserved his right to formulate a concurring vote, Alfredo Gutiérrez Ortiz Mena, Olga Sánchez Cordero de García Villegas, and Jorge Mario Pardo Rebolledo, who reserved his right to formulate a concurring vote. Speaker: Arturo Zaldívar Lelo de Larrea. Secretary: Ana María Ibarra Olguín. Digital Record: 2006805. Instance: First Chamber. Tenth Epoch. Subject Matter(s): Civil. Thesis: 1a. CCXLIV/2014 (10th.). Source: Gazette of the Judicial Weekly of the Federation. Book 7. June 2014, Volume I, page 453. Type: Isolated.

13

58.     The rules of the FCC relating to subjective civil liability do not contain an express reference to this element, although they imply it. Thus, Art. 1910 addresses cases where a person who, acting unlawfully or against good customs, causes damage to someone else. This provision assumes that there is a necessary causal link between the wrongful act and the damage.[15]

59.     In the context of rules addressing the general effects of obligations, Art. 2110 provides that: "Damages must be the immediate and direct consequence of the non-performance of the obligation, whether they have been caused or must necessarily be caused."

60.     Although the rule reflects the perspective of contract law, doctrine and jurisprudence have concurred that it also applies to tort liability.[16]

61.     There are several theories that attempt to explain this third requirement of civil liability. The two most important are: (i) the doctrine of equivalence of conditions, or *conditio sine qua non*; and (ii) the doctrine of adequate cause.

---

[15] In this regard, the Supreme Court has said: "In cases of domestic violence it must be shown that the psychological damages that the victim suffered or will suffer and the economic costs that she assumed or will assume in the future, derive precisely from the domestic violence committed by the aggressor. Thus, to prove subjective civil liability, it must be proven that the pecuniary and non-pecuniary damages are a consequence of the unlawful act that is being sued." Amparo directo en revisión 5490/2016. March 7, 2018. Five votes by Ministers Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, who reserved his right to formulate clarifying vote, Jorge Mario Pardo Rebolledo, Alfredo Gutiérrez Ortiz Mena, and Norma Lucía Piña Hernández, who voted with the sense, but with caveat in the considerations. Speaker: Arturo Zaldívar Lelo de Larrea. Secretary: Ana María Ibarra Olguín. Digital record: 2018872. Instance: First Chamber. Tenth Epoch. Subject Matter(s): Constitutional, Civil. Thesis: 1a. CCXXIV/2018 (10th.). Source: Gazette of the Judicial Weekly of the Federation. Book 61. December 2018, Volume I, page 474. Type: Isolated.

The Supreme Court has also stated: "In order to establish civil liability for bullying suffered by a minor, the following must be corroborated: (1) the existence of bullying; (2) the physical or psychological damage; and (3) the causal link between the bullying and the damage. When the school is sued, it must also be proven (4) the negligence of the school. Now, to prove the causal link between the defendant's conduct and the damage caused to the plaintiff, it is necessary that the damage experienced is a consequence of the agent's conduct. Otherwise, liability would be imposed on a person who has nothing to do with the damage caused. In this sense, if liability is claimed for bullying by students or teachers, the causal link between the bullying and the physical or mental harm to the victim must be proven. On the other hand, liability for negligence will be proven when it is shown that compliance with their duties of care would have prevented the infringement of the rights of the minor." Amparo directo 35/2014. May 15, 2015. Unanimity of four votes of Ministers Arturo Zaldívar Lelo de Larrea, Jorge Mario Pardo Rebolledo, who cast a concurring vote, Olga Sánchez Cordero de García Villegas, and Alfredo Gutiérrez Ortiz Mena, who cast a concurring vote. Absent: José Ramón Cossío Díaz. Speaker: Arturo Zaldívar Lelo de Larrea. Secretary: Ana María Ibarra Olguín. Digital Record: 2010339. Instance: First Chamber. Tenth Epoch. Subject Matter(s): Constitutional, Civil. Thesis: 1st. CCCXXXV/2015 (10th.). Source: Gazette of the Judicial Weekly of the Federation. Book 24. November 2015, Volume I., page 955. Type: Isolated.

[16] See Fausto Rico A., Patricio Garza V. and Mischel Cohen C. Tratado teórico práctico de derecho de obligaciones. Porrúa. Mexico. 2015, p.703.

14

62.     The first is a theory that embodies the general requirement that the act for which liability is sought is a necessary condition of the damage. This is crystallized in Art. 1910 when it refers to the person who wrongfully *causes* damage to another.

63.     But just because a condition is *necessary* for a harm to occur does not entail that it is also *sufficient*, i.e., that it can cause harm without the intervention of other causes.

64.     Usually, several causes are involved in the materialization of a tort. According to this first doctrine all the conditions of the wrongful act are considered as equivalent in producing the damage because individually they are all necessary for its materialization.

65.     Although the doctrine of equivalence of conditions has been criticized because it does not distinguish between the different causes that may produce damage, it expresses well the most elementary fact of linking the negligent conduct with the damage. Without this necessary link there is no reason to attribute any responsibility to the party who is charged with civil liability to provide reparations.

66.     As abovementioned, the fact that a condition is necessary to produce damages does not mean that it is a sufficient condition of the damage. In general, whoever produces a damage is not liable for the remote consequences of it (art. 2110). For this reason, the theory of equivalence of conditions must be complemented by means of a normative judgment that makes it possible to *legally* attribute the damage to the faulty act. This is the scope of the doctrine of adequate cause.

67.     The doctrine of adequate cause seeks to establish whether under an expected course of events the faulty act is likely to produce the damage. Therefore, this doctrine excludes liability if the events that are triggered follow an abnormal or extraordinary course to that imposed by the negligent act. The underlying idea of this theory is pre-visibility. This theory discards causes that are not foreseeable or probable to cause the damage (foresight test).[17]

---

[17] Comparative doctrine has pointed out that: "The defendant's conduct is the cause of the harm suffered by the victim if, ex ante, the causation of the harm was foreseeable - not very improbable -. But jurists have never agreed which is an adequate degree of probability under the law -between 0 and 1-; and they have always disagreed as to whether the judgment on probability should consist on a purely subjective prognosis -similar to that carried out in the analysis of malice and fault-, in other words, an analysis that evaluates if an outcome was avoidable or, in the contrary, if the prognosis should be objectively done by an specialized agent that would determine the probability of having certain outcome. Often, these two points of view combine and the

68.    The courts in Mexico have embraced the theory of adequate causation.[18]

69.    For example, the courts in Mexico have concluded that adequate cause "has to do with the reasonable foreseeability and the causally relevant factors. Through probability or reasonable foreseeability, it is possible to objectively impute the damage to the conduct of the person to whom liability is attribute."[19] In the same case, the court concluded that the evidentiary burden is first on the claimant to prove a causal link between the negligent act and the injurious effect. Then the tortfeasor must "prove the force majeure or the fortuitous event"—that some

---

interrogation becomes now "What should we expect from a person given their role in society." Pablo Salvador y Antonio Fernandez. "Causalidad y responsabilidad". 3a ed. Indret. Barcelona. 2006, p.8.

[18] "When a passenger on board a public transportation vehicle suffers a fall that causes him an injury, it can be attributed to the conduct of the driver, to an act of a third party or to the victim himself. Due to this plurality of causes, the legal operator must look for the one that is adequate, efficient or decisive, according to the theory of adequate causation, which is based not on the necessary consequence, but on the probable consequence, the statistically probable result of a certain causal antecedent, or that this is, by itself, sufficient to produce that result; as well as the criterion of the objective imputation that, according to the rule of the degree of proximity of the cause of the damage, has to do with the reasonable foreseeability and the causally relevant factors. Through probability or reasonable foreseeability, it is possible to objectively impute the damage to the conduct of the person to whom liability is attributed, which is compatible with the case of a person who suffers a fall in a bus providing public passenger transportation service and maintains that the conduct of the operator was the cause of the harmful event. This is so, due to the existence of a legal presumption *iuris tantum*, which serves as support of the adequate cause and the objective imputation to the driver, in the case of damages to passengers, established in article 2647 of the Civil Code for the Federal District, which refers to the damage caused to persons by the defective conduct in the handling of the drivers, and for which the carrier must respond, who can only prove against such presumption by demonstrating force majeure or fortuitous event. The legal presumption will lead to infer that, upon proof of the damage suffered by a passenger, it is attributable to the driver the defective conduct in the handling of the vehicle and to this as an adequate cause of the damage, unless proof of any of the exclusions mentioned. From the above, a distribution of evidentiary burdens is derived, in which it corresponds to the passenger, to prove the conduct, the damage and the causal link between both, but it is enough to prove the affectation to have presumably proven the conduct and the causal relationship; and, to the carrier, to prove the force majeure or the fortuitous event, among which other possible causes of the damage different to the estimated adequate or efficient one can be located, based on the observation of the experience and the legal provision. It is also feasible for the latter to prove the inexcusable fault of the victim, since, unlike the contractual duty of the employer, the driver incurs in tort liability in terms of article 1913 of the Civil Code, since he is not part of the contractual relationship of transportation, so that if this possibility exempts the driver from liability, it may also do so with respect to the person obliged to respond for the acts of others, that is, the carrier". FOURTH COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT. Amparo directo 332/2012. Rubén Darío Morales Reyes. May 31, 2012. Unanimous vote. Speaker: Francisco J. Sandoval López. Secretary: Raúl Alfaro Telpalo. Amparo directo 333/2012. Grupo Nacional Provincial, S.A. Bursátil. May 31, 2012. Unanimous vote. Speaker: Francisco J. Sandoval López. Secretary: Raúl Alfaro Telpalo. Digital record: 2001748. Instance: Collegiate Circuit Courts. Tenth Epoch. Subject Matter(s): Civil. Thesis: I.4o.C.9 C (10a.). Source: Semanario Judicial de la Federación: Judicial Weekly of the Federation and its Gazette. Book XII. September 2012, Volume 3, page 1966. Type: Isolated. (Emphasis added).

[19] Idem.

unforeseeable event intervened to cause the injury.[20] Like all cases of causation, the determination of adequate cause depends on the particular facts of the case.

70.     Also important is the relationship between the magnitude of the harm caused and the cost to the tortfeasor of taking care not contribute to the harm. "As in every adequate cause case, we must take into account the objective probability and the costs that the tortfeasor would have had to calculate such probability: only those risks that are very expensive to anticipate and foresee should be excluded from responsibility."[21]

71.     Mexican doctrine has also accepted this conception of adequate cause. Bejarano Sánchez, referring to this issue, points out that "situations do not occur in life with the simplicity that is conceptually presented; the concatenation of facts, the weaving or combination of conducts or events that precede an injurious effect, are usually complex."[22]

72.     As it can be seen from a natural perspective, the theory of equivalence of conditions is the only one that explains the scope of Art. 1910 when it refers *to causing damage to another*. From a normative perspective, however, it is the theory of adequate cause that best explains the meaning of the Art. 2110 reference to "immediate and direct consequence" of the non-performance of an obligation. The issue must be assessed in each specific case, according to which the act or conduct was sufficiently foreseeable in order to consider that the harmful effect was caused by it.

73.     There is no rule in Mexican positive law (statute or precedent) that prevents a finding of adequate cause when a third party committed a criminal act. If the tortfeasor could foresee that such a criminal act might occur, then his negligence may still be the adequate cause. Depending on the circumstances of the particular case, failing to guard against a third party's criminal act may be what makes the tortfeasor's conduct negligent. For example, the court

---

[20] Causality being determined according to the facts of each case, is nothing more than the necessary assessment performed by judges in every civil liability trial being adjudicated according to the facts proven by the parties.

[21] Pablo Salvador y Antonio Fernández. "Causalidad y responsabilidad." 3ª ed. Indret. Barcelona. 2006, p. 10.

[22] Manuel Bejarano Sánchez. Obligaciones civiles. 6ª ed. Oxford. México. 2010, p. 256.

concluded that a bus company may be liable for a shooting that occurred inside a bus where the bus company failed to check whether passengers were boarding the bus with guns.[23]

74.　Similarly, there is no rule in Mexican positive law (statute or precedent) that prevents a finding of adequate cause based on the number of steps or links in the chain of causation. The issue is one of fact based on the circumstances of the particular case. Neither is there any rule that prevents a claimant from claiming that he was also injured by conduct that first, or more immediately, injured another person.

**Several Defendants Causing Damage.**

75.　In the Mexican civil liability system, when several persons concur with their action or omission in the materialization of a damage, there is a rule of solidarity among them with respect to the victim of the tort.

76.　Article 2117 of the FCC establishes to this effect: "Persons who have jointly caused damage are jointly liable to the victim for the reparation to which they are obliged in accordance with the provisions of this Chapter."

77.　What is called a "passive joint liability" is regulated in art. art. 1987. "In addition to joint liability, there will be active joint liability when two or more creditors have the right to demand, each one on its own, the total performance of the obligation; and passive joint liability

---

[23] Article 127 of the Ley de Vías Generales de Comunicación establishes, as applicable, that the permit holders of the public transportation service have the duty to protect the passengers and their belongings from the risks that they may suffer due to the rendering of the service, from the moment they board until they disembark from the vehicle. This provision does not specify what should be understood by risks passengers may suffer due to the service it does not indicate whether such risks may derive from mechanical failures of the vehicle, or from the lack of care or negligence of the driver or of the passenger transportation company only. Therefore, if the precept does not limit the term "to protect the passengers from the risks that they may suffer due to the rendering of the service", the judge cannot do so. Therefore, if the bus company does not demonstrate that it has checked the passengers at the moment of boarding, it is responsible for the risks and damages caused by the shooting of a firearm inside the bus, due to its negligence and lack of care that result in the lack of security to the passengers; especially since in the case of federal public passenger service, it is a practice and custom to check the users of the service at the moment of boarding, as robberies and other crimes have increased in the buses, ". EIGHTH COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT. Amparo directo 677/2014. January 21, 2015. Majority of votes. Dissenting: Abraham S. Marcos Valdés. Speaker: Ma. del Refugio González Tamayo. Secretary: José Antonio Franco Vera. Digital record: 2009530. Instance: Collegiate Circuit Courts. Tenth Epoch. Subject Matter(s): Civil. Thesis: I.8o.C.25 C (10a.). Source: Gaceta del Semanario Judicial: Gazette of the Judicial Weekly of the Federation. Book 19. June 2015, Volume III, page 2411. Type: Isolated. (Emphasis added).

when two or more debtors have the obligation to, each one on its own, in its entirety, the due performance."

78.　　In passive solidarity, each debtor is obligated for the total, *as if he were the only debtor*. Therefore, the payment made by one of them releases all other debtors.

79.　　In these cases, comparative doctrine indicates that the debt must be distributed among all the co-perpetrators according to the degree of their fault and their causal contribution to the materialization of the damage.

## Illegitimate Enrichment.

80.　　In Mexican civil law, one of the sources of obligations is illegitimate enrichment.

81.　　The FCC regulates this matter in Chapter III (Illegitimate Enrichment), Title One (Sources of Obligations), articles 1882 to 1895.

82.　　Article 1882 provides: "They who without cause enrich themselves to the detriment of another is obliged to compensate them for their impoverishment to the extent that they have enriched themselves."

83.　　Mexican doctrine states: "All enrichment experienced at the expense of another person must have a cause or legal reason that justifies or explains it, since no one is impoverished without reason for the benefit of another; and when this occurs, it is inferred that the injured party has not had the purpose of benefiting another to his detriment and it would not be equitable to inflict such loss on him. For this reason, the law imposes on the beneficiary the obligation to restitute the amount of their enrichment up to the amount of the impoverishment of another."[24]

84.　　This source of obligation has three elements: (i) the impoverishment of the claimant; (ii) the transit of benefits from the claimant to another; and (iii) the lack of legal cause justifying the displacement of assets.[25]

---

[24] Manuel Bejarano Sánchez. Obligaciones civiles. 6th ed. Oxford. Mexico. 2010, p. 200.

[25] In this regard, the courts have stated the following: "The Supreme Court has established that the conditions for the existence of an action for unjust enrichment are:1st. That one person has enriched himself, obtaining something that did not belong to him, that it was not in his estate; 2nd.That another person has suffered

## Public Nuisance.

85.     The concept of public order is recognized in Mexican civil law, including the doctrine, diverse legislations and in its jurisprudence. It is an indeterminate concept whose primary purpose is to defend the social interest over the particular interest and its interpretation has varied over time, taking into account historical, social, cultural and other factors rooted in the social fabric.

86.     Public order is a set of principles, rules and provisions of a legal nature on which the legal system is based to preserve the goods and values of general interest of society, acting as a limitation to the autonomy of the will of the parties so that such interests prevail over private interests.[26]

87.     In Civil Law, an act contrary to "public order" laws must be considered unlawful[27] and, as a consequence, such act may give rise to a claim for damages through the exercise of an action of contractual and/or non-contractual civil liability.

---

impoverishment, that he has ceased to have something that was in his patrimony or to receive something that belonged to him by right; 3rd. That there is a causal link between both elements, that is to say that the employer's displacement is from the impoverished party to the enriched party; and 4th. That the enrichment is not justified by any legal cause and that the impoverished person has no other legal means to obtain compensation. Amparo directo 7233/58. Arturo Gómez Núñez. April 3, 1961. Unanimity of four votes. Speaker: Alberto R: Vela. Epoch: Sixth Epoch. Record: 803268. Instance: Third Chamber. Type of Thesis: Isolated. Source: Semanario Judicial de la Federación: Judicial Weekly of the Federation. Volume XLVI, Fourth Part. Subject Matter(s): Civil. Thesis. Page: 81.

It has also stated: "Article 1882 of the Civil Code of the Federal District defines illegitimate enrichment in the following terms: 'He who without cause enriches himself to the detriment of another, is obligated to indemnify him for his impoverishment, to the extent that he has enriched himself.' According to the law, illegitimate enrichment and enrichment without cause are synonymous, which means that an enrichment without cause is illegitimate and that not being legitimate, it is without cause. Therefore, there are three elements of this legal figure: first, enrichment, second, to the detriment of another and third, without cause; elements from which the obligation to compensate the impoverished is born, from his impoverishment to the extent of the enrichment". Amparo civil direct 6552/39. Santibanez Felipe. March 12, 1943. Unanimity of four votes. Justice Felipe de Jesús Tena Ramírez did not intervene in the vote on this matter for the reasons stated in the minutes of the day. The publication does not mention the name of the speaker. Epoch: Fifth Epoch. Record: 351446. Instance: Third Chamber. Type of Thesis: Isolated. Source: Semanario Judicial de la Federación: Judicial Weekly of the Federation. Volume LXXV. Subject(s): Civil. Thesis. Page: 6504.

[26] *Cfr*. Domínguez Martínez, Jorge Alfredo, "*Public Order and Free Will*" at Sánchez Barroso, José Antonio (coord.) *A Hundred Years of Civil Law in Mexico 1910-2010. Conferences in honor of Universidad Nacional Autónoma de México on its centenary*, UNAM, Mexico. 2011, p.83.

[27] *Cfr* Article 1830: "Any act against public order laws or good customs is illicit". FCC.

88. Thus, conduct that violates any provision in force in any type of legal system or the principles they protect enables individuals to initiate a legal action.

89. The figure gives right to the action *in rem verso* which in Mexican law is provided for in Article 26 of the Code of Civil Procedures for the Federal District: "The enrichment without cause, of one party to the detriment of another, gives merit to the injured party to exercise the action for reparation to the extent that the former was enriched."

90. This action allows the person who suffered the decrease of his estate to sue and recover what his estate decreased, and which is the cause of the increase of the defendant's estate.


**Product Liability or Defective Products.**

91. Product liability is understood at first as the right of the consumer of a defective product to claim, either from the manufacturer or the distributor, the payment of damages caused by such defect. However, anyone who has been in contact with the defective product or has been affected by its defect may also have a valid claim.

92. For example, if a company that commercializes steel products, purchases for its facilities certain air filters to prevent particles from being emitted into the environment, and after a few months such filters are shown not to fulfill their purpose. In this case, it is not only the company that purchased the air filters who could file a claim against the filter manufacturer for damages, but also, the workers, neighbors and in general, any person who has been affected.

93. Thus, product liability can be translated into the obligation of the producer, manufacturer, distributor or importer to compensate for the damages caused by a defective product.

94. This type of liability can be claimed in Mexico, since the company that markets certain products is liable for having manufactured or marketed a defective product or, as the case may be, if it violates certain principles of law or legal provisions of public order that may give rise to unlawful acts, such company may be attributed subjective civil liability in accordance with the provisions of article 1910 of the FCC.

95.     Likewise, the Federal Consumer Protection Act (LFPC for its acronym in Spanish) enshrines as one of its basic principles in consumer relations, that of adequate and clear information on the different products and services,[28] with correct specification of quantity, characteristics, composition, quality and price, as well as on the risks they represent, the failure to provide this type of information may be claimed as an unlawful act and, consequently, giving rise to a right to claim reparation of damages and injuries.

96.     On the other hand, the aforementioned statute provides that in cases where, according to the applicable law, products or services are considered potentially dangerous for the consumer or harmful to the environment or when their dangerousness is foreseeable, the supplier must include directions warning about their harmful characteristics and clearly explain the recommended use or destination and the possible effects of their use, application or destination outside the recommended directions. The supplier shall be liable for the damages caused to the consumer for the violation of this provision.

97.     In addition, the LFPC seeks to protect Mexican consumers, binding all suppliers to inform and respect prices, rates, guarantees, quantities, qualities, measures, interests, charges, terms, restrictions, deadlines, dates, modalities, reservations and other conditions applicable in the commercialization of goods, products or services.[29]

98.     In the case of defective products, the LFPC allows the individual to choose between restitution of the good or service, the termination of the contract or the reduction of the price, and in any case, the return of the payment or compensation when the thing or object of the contract has defects or hidden defects that make it unsuitable for the uses to which it is intended, that diminish its quality or the possibility of its use, or if it does not offer the safety that given its nature is normally expected from it and its reasonable use.[30]

99.     Also, for example, if a company at the time of marketing a product violates not only regulations but also a duty of care or vigilance, it may be held jointly liable with the other party who contributed to the damage. This type of damage is usually claimed as a violation of provisions of public order or good customs, invoking as a wrongful act the infringement of any

---

[28] *Cfr.* Article 82, LFPC.

[29] *Cfr.* Article 7, *Ibidem*.

[30] *Cfr.* Article 41, *Ibidem*.

type of rule or a legal duty of vigilance or care, or having chosen the person who caused the damage.

100.     Another hypothetical case that could illustrate the above would be if, for instance, a company engaged in the manufacture of brakes for automobiles that omitted to comply with certain quality control or makes some error in its design and its omission causes a series of vehicles to have accidents, having participated in the production chain of the vehicle and not having observed the quality controls that by law or in attention to a duty of care it should have observed. Whoever has suffered the damage may hold such company liable for having allowed the commercialization of a defective product in the market, involving the brand that owns the vehicle, the car dealer that sold it, and in general all those who in some way have been involved in the commercial chain.

**Abbreviations**

FCC: Federal Civil Code

LFPC: Federal Consumer Protection Act (for its acronym in Spanish).

_____
José Ramón Cossío-Díaz

_____
Juan Carlos Marín G.

_____
Roberto Fernández del Valle M.

# EXHIBIT A

# José Ramón Cossío Díaz

## Curriculum Vitae

I was born in Mexico City in 1960. I studied law at the University of Colima. Subsequently, I obtained a Master's Degree in Constitutional Law and Political Science at the *Centro de Estudios Constitucionales de Madrid* and a Ph.D. from the Faculty of Law of the *Universidad Complutense de Madrid* with *summa cum laude*. Subsequently, I coursed a Master's degree from the Law School of the Universidad Nacional Autónoma de México.

Throughout my undergraduate studies, I worked as a legal intern in a renowned law firm in the city of Colima. In 1983, I began my career as a professor teaching at various academic institutions, especially at the *Instituto Tecnológico Autónomo de México* (ITAM), where I also held the position of Head of the Law Department from 1995 to 2003.

My professional training has been divided between teaching, research and public service. My main area of research is constitutional law, although I have also conducted research in other branches of law. I have directed undergraduate, master's and doctoral theses of students from various Mexican and foreign universities. I have given several lectures, courses, seminars, presentations and speeches at various universities in Mexico and abroad.

I have coordinated 13 books, compiled 8 and written 31. I have been awarded several prizes and recognitions, including the following: the National Research Award 1998, in the area of Social Sciences; the National Award of Sciences and Arts 2009, in the field of History, Social Sciences and Philosophy; the National Communication Award *José Pagés Llergo* in 2010 and 2017; the "*Nacional Malinalli 2011*" for the Promotion of the Arts, Human Rights and Cultural Diversity; and the National Jurisprudence Award 2019, as well as 9 honorary doctorates.

I am a member of several academic, scientific and professional institutions, including: the National System of Researchers as a National Researcher Level III; the Mexican Academy of Sciences; the American Law Institute; the Mexican Bar Association; the Advisory Council of Sciences; the Board of Trustees of the National Institute of Genomic Medicine; the Advisory Council of the Center for U.S. and Mexican Law of Houston University; the Mexican Academy of International Law; the National Academy of Medicine; *El Colegio Nacional*; the Mexican Society of Public Health; the Academic Council of the Chair of Ibero-American Legal Studies; of the *Universidad Carlos III de Madrid*; of *Tirant lo Blanch*; of the Advisory Council of the *Universidad Autónoma Metropolitana*; of the Mexican Institute of Mediation and of the Mexican Academy of History.

I was a minister of the Mexican Supreme Court from December 1, 2003 to November 30, 2018. In that position, I had the opportunity to analyze and resolve a wide diversity of cases, given the broad competencies of the Mexican Supreme Court. Thus, for example, in matters of human rights, crimes, contracts, administrative responsibilities or corruption.

I am currently an associate professor-researcher at *El Colegio de México*, I direct the *Instituto para el Fortalecimiento del Estado de Derecho, A.C.* (IFED) and I chair the *Instituto para el Fortalecimiento del Estado de Derecho, A.C.* (IFED). (IFED) and chair the Mexican Mediation Institute (IMM), an association that brings together the most important law firms in Mexico.

The cases in which I served as an expert witness in the last four years are:

1) Zimmer Biomet Holdings vs Instituto Mexicano del Seguro Social

2) Fresenius Medical Care A.G & Co KGaA and Fresenius Medical Care Holdings vs Instituto Mexicano del Seguro Social

3) The Brewers of Europe vs el Consejo Regulador del Tequila

4) Electricidad Águila de Tuxpan S. de R.L. de C.V vs Comisión Federal de Electricidad (coárbitro)

5) Servicios Digitales Lusad S.de R.L. de C.V. vs  Secretaría de Movilidad (SEMOVI)

6)Econ Soluciones Energéticas Integrales, S.A.P.I. de C.V y Banco Interamericano de Desarrollo

# EXHIBIT B

Santamarina
+ Steta



**Roberto Fernández del Valle M.**
Partner
Mexico City Office
+52 55 5279 5490
rfernandez@s-s.mx

Roberto has more than 20 years of experience representing clients during trials on real estate matters, recovery of past due portfolios, compliance with different types of contracts, class actions, conflicts between shareholders, civil liability, as well as pain and suffering matters, mediation and arbitration processes, among others.

His outstanding work has strengthened his position in Mexico as an expert in litigation, commercial arbitration and insolvency proceedings.

**Education**
JD
2003, Universidad Iberoamericana de la Ciudad de México, Mexico

Legal Specialization in Civil Law
2011, Escuela Libre de Derecho, Mexico

Diploma in the New Constitutional Regulation of Human Rights and Protection
2012, Escuela Libre de Derecho, Mexico

LL.M in Constitutional Law and Human Rights
2015, Universidad Panamericana, Mexico

Diploma in Anti-Corruption
2017, ICC Mexico-Universidad Panamericana, Mexico

LL.M in International Dispute Resolution and Arbitration
2020-2022 Queen Mary University of London, United Kingdom *Candidate*.

**Languages**
Spanish, English

**Associations and Affiliations**

+ Asociación Nacional de Abogados de Empresa, Colegio de Abogados, A.C. (ANADE)
+ International Chamber of Commerce México (ICC Mexico)

JA000213

Santamarina
+ Steta

+ International Bar Association (IBA)
+ Mexican Mediation Institute (IMM)
+ Spanish Arbitration Club (CEA)
+ Latin American Arbitration Association (ALARB)

**Educational Experience**

Professor of Obligations II at the Universidad Iberoamericana, Mexico.

**Publications**

+ "Civil Responsibility Regarding Diffuse Rights and Interests Protected by Class Actions", Legal Encyclopedia to commemorate the centenary of the Escuela Libre de Derecho, Obligations Volume, Editorial Porrúa, 2012.
+ "The Role of the Judge in the Summoning of Third Parties Bound by the Federal Law of Environmental Liability", Derecho Ambiental y Ecología, magazine, December 2013- January 2014.
+ Co-author of the "Dispute Resolution: Mexico Chapter", in "Getting the Deal Through", published by Law Business Research, August 2016, 2017 and 2018, "International Arbitration 2019", published by Chambers and Partners.
+ Co-author of "International Arbitration 2019", published by Chambers and Partners.
+ Co-author of "Litigation Financing: A tool for companies in dispute resolution?", Pauta Magazine, ICC Mexico, July 2020.
+ Co-author of "Commercial Arbitration and Mediation: efficient and effective alternatives for dispute resolution in times of pandemic", Pauta Magazine, ICC Mexico, March 2021.

**Acknowledgements**

 

# EXHIBIT C

# CURRICULUM VITAE

Juan Carlos Marín González

Av. Revolución 756, Nonoalco, Benito Juárez, 03700 Mexico City, CDMX

Mexico

Phone: +52 55 5591778192

Email: jcmaring@tec.mx

## II. ACADEMIC DEGREE

-JD. Universidad de Chile (1989)

-Ph.D in Law. Universidad Carlos III de Madrid, Spain (2001)

## III. PROFESSIONAL DEGREE

-Attorney (1994)

## IV. WORK EXPERIENCE

-2018 - Full time professor at Tecnologico de Monterrey (TEC)

-2002 -2017. Full time professor at ITAM (Mexico)

## V. RESEARCH

Eighteen years' experience as a researcher in the law of Torts and Civil Procedure.

Projects:

- OECD - Ministry of Economy project, 2017-2018, in the field of civil liability for damages to free competition in Mexico. Project leader - Pedro Caro de Suosa (pedrocarodesuosa@oecd.org).https://www.oecd.org/daf/competition/individual-and-collective-private-enforcement-of-competition-law-insights-for-mexico-2018.htm

- Project contracted by the Safety, Energy, and Environment Agency (ASEA México) and EnergeA to draw up new multisector hydrocarbons regulations. Part relating to civil liability damages to the environment derived from hydrocarbons spillage. Years 2016-2017. Project leader: Roberto Ortega Lomelín (EnergeA). (http://structura.com.mx/energea/).

- Project contracted by ADIGAS: "Analysis of provisions establishing obligatory insertion of the brand as means of identification of transportable recipients in liquid gas distribution market". Year: 2015. Project leader: Víctor Figueroa Aeyón (adigas@hotmail.com).

 - Project undertaken by the Federal Commission for Economic de Competition (CFCE): "Normative Design of Federal Commission for Economic de Competition Regulations and Bylaws". Year: 2014. Project leader: Josefina Cortés Campos (cortescampos.j@gmail.com). In COFECE, Alejandra Palacios Prieto.

- Project to draft the new Chilean Civil Procedural Code, 2005 - 2009. Project contracted by the Chilean Ministry of Justice with the Faculty of Law of Universidad de Chile. Project sent to the National Congress by President Michelle Bachelet on 18 May, 2009, through Message 398-357.

- Project contracted by the State of Sonora and ITAM to draw up the State Patrimonial Liability Law. Year 2003.

Project leader: Dr. José Ramón Cossío Díaz.

- • Draft legislation

- State of Sonora Patrimonial Liability Bill of Law, México (2004).

- Draft bill for Chilean Civil Procedural Code (Agreement between Ministry of Justice and Universidad de Chile). 2005-2006.

- Member of the Civil Procedural Reform Forum, Ministry of Justice (Chile), 2006-2008.

- Bill of law modifying Chilean judicial officers' qualification system. (January 2008. Co-author with Jorge Vial Álamos).

- • *International expert*

- Expert in civil procedural law before ICC International Court of Arbitration. Case ICC16000/JRF. Hearing held in Santiago de Chile on 14 and 15 November 2010 -

- Expert in procedural law before the Inter-American Human Rights Court at the 92nd Period of Regular Sessions, Case 12.592, Karen Atala and daughters, held in Santa Fe de Bogotá, Colombia between 22 August and 2 September, 2011.

- *Report on Mexico for the Global Class Actions Project*, Stanford University (http://globalclassactions.stanford.edu/). (Co-author with Rolando García Mirón).

## VI. PUBLISHED WORKS

Law Reviews and book chapters.

- "Strict liability and medical liability", in Revista de la Comisión Nacional de Arbitraje Médico (Conamed), vol. 9, N° 2, April-June (2004), pp. 8-13.

- "Pain and suffering damages in the regulation of civil Mexican Law: some relevant aspects". Estudios juridicos en homenaje a Federico Garcia Zamano. ITAM-Porrua. 2010. 295-320.

- "Problems faced by digital proof in the United States", Revista de Estudios de la Justicia (REJ), N° 21, July, (2014), pp. 75-91. (Co-author with Guillermo García Sánchez).

- "Average duration and certain statistics of non-contractual civil liability suits in Mexico City". Revista de Derecho. Universidad Austral de Chile. June. 2018, pp. 273-301.

- "Cases of accident or force majeure, inability, and creditor remedies. *La harmonizacion del derecho de contratos en Latinoamerica*.

Books

- *Injunction and Contract*. Editorial Jurídica de Chile. Santiago. 1996.

- *Provisional Measures in Chilean Law*. Editorial Jurídica de Chile. 2004.

- *State civil liability*. Porrúa. México. 2004.

- *Provisional remedies in Mexico Law*. Porrúa. México. 2004.

- *Torts Law in USA*. Instituto de Investigaciones Jurídicas (UNAM). México. 2013. (Co-author with Juan Javier del Granado).

- *Treatise on provisional measures in Chilean Law*. Editorial Jurídica. Chile. 2016.

- *State Liability in Mexico*. Avances y retos. Josefina Cortés C. Juan Carlos Marín G. José Roldán X. (Coordinators). Tirant lo Blanch. México. 2020.

## VII. SCHOLARSHIPS

- 1995 - 1998.  Instituto de Cooperacion Iberoamericano (Spain) , to study a Ph.D in Law at Universidad Carlos III de Madrid (Spain).

- 1995 - 1998. Ministerio de Planificación y Cooperación (Chile), to study Ph.D. in Law at Universidad Carlos III de Madrid (Spain).

- 2002.  Fundación Andes (Chile) to develop a draft of the New Code of Civil Procedure (Chile).