**No. 22-1823**

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————

ESTADOS UNIDOS MEXICANOS,

*Plaintiff-Appellant*,

v.

SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS MANUFACTURING, INC.; BERETTA U.S.A. CORP.; BERETTA HOLDING S.P.A.; CENTURY INTERNATIONAL ARMS, INC.; COLT'S MANUFACTURING COMPANY LLC; GLOCK, INC.; GLOCK GES.M.B.H.; STURM, RUGER & CO., INC.; WITMER PUBLIC SAFETY GROUP, INC. D/B/A INTERSTATE ARMS,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the District of Massachusetts (Saylor, C.J.)
No. 1:21-CV-11269-FDS

———————————

## BRIEF OF APPELLANT
## ESTADOS UNIDOS MEXICANOS

———————————

Steve D. Shadowen
Richard M. Brunell
Nicholas W. Shadowen
SHADOWEN PLLC
1135 W. 6th Street, Suite 125
Austin, TX 78703
Phone: (855) 344-3298
sshadowen@shadowenpllc.com

Jonathan E. Lowy
GLOBAL ACTION ON GUN
VIOLENCE
805 15th Street NW, #601
Washington, DC 20005
Phone: (202) 415-0691
jlowy@actiononguns.org

*Counsel for Estados Unidos Mexicanos*

March 14, 2023

**TABLE OF CONTENTS**

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.............................ix

JURISDICTIONAL STATEMENT ...........................................................1

ISSUES PRESENTED FOR REVIEW .....................................................1

STATEMENT OF THE CASE ..............................................................3

SUMMARY OF THE ARGUMENT .....................................................15

ARGUMENT ...............................................................................17

I.   APPLYING PLCAA TO BAR MEXICO'S CLAIMS
     ARISING UNDER MEXICAN LAW FOR INJURIES IN
     MEXICO FROM GUN MISUSE IN MEXICO IS
     IMPERMISSIBLY EXTRATERRITORIAL. .............................17

     A.   Defendants Cannot Rebut the Presumption Against
          Extraterritorial Application of PLCAA. ............................19

     B.   The Conduct and Circumstances Relevant to PLCAA's
          Focus—Injury From Gun Misuse—Occurred in Mexico.................20

          1.   The specific terms of Sections 7902(a) and
               7903(5)(A) determine the relevant focus.................................23

          2.   Whether to preclude claims arising under foreign
               law for injuries incurred abroad is a decision for
               Congress. ...........................................................26

          3.   Whether to preclude a foreign sovereign's claim
               for injuries in its territory is a decision for
               Congress. ...........................................................30

II.  EVEN IF PLCAA OTHERWISE APPLIED, IT WOULD NOT
     BAR THE GOVERNMENT'S CLAIMS. .....................................33

     A.   If PLCAA Applied, Courts Must Construe Its Key Terms
          to Be Domestic in Scope.....................................................34

i

B.    If PLCAA Applied, the Government's Claims Would Be Within Its "Predicate" Exception.........................................................38

1.    The Complaint alleges violations of numerous statutes applicable to gun sales.................................................40

a.    Aiding and abetting unlicensed exports, straw purchases, and other unlawful sales practices...........................................................................41

b.    The ban on sales of machine guns..................................44

2.    The plaintiff's claims need not arise under the predicate statute. ......................................................................46

CONCLUSION ........................................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

ii

# TABLE OF AUTHORITIES

## Cases

*Abramski v. United States,*
   573 U.S. 169 (2014)....................................................................41

*Alves v. Siegel's Broadway Auto Parts, Inc.,*
   710 F. Supp. 864 (D. Mass. 1989) ...........................................32

*Banco Nacional de Cuba v. Sabbatino,*
   376 U.S. 398 (1964)...................................................................30

*Bannerman v. Mt. State Pawn Inc.,*
   2010 WL 9103469 (N.D.W. Va. Nov. 5, 2010)............................49, 50

*Bond v. United States,*
   572 U.S. 844 (2014)...................................................................52

*Born Free USA v. Norton,*
   278 F. Supp. 2d 5 (D.D.C. 2003) ..............................................29

*Brady v. Walmart Inc.,*
   2022 WL 2987078 (D. Md. July 28, 2022).................................47

*Burleigh v. Alfa Laval, Inc.,*
   313 F. Supp. 3d 343 (D. Mass. 2018) .....................................9, 32

*Chiapperini v. Gander Mountain Co., Inc.,*
   13 N.Y.S.3d 777 (N.Y. Sup. Ct. 2014) .....................................47

*Cipollone v. Liggett Grp., Inc.,*
   505 U.S. 504 (1992)...............................................................51, 52

*City of Boston v. Purdue Pharm, L.P.,*
   2020 WL 977056 (Mass. Super. Jan. 29, 2020)........................43

*City of Gary v. Smith & Wesson Corp.,*
   126 N.E.3d 813 (Ind. 2019) ......................................................42

*City of New York v. A–1 Jewelry & Pawn, Inc.,*
   247 F.R.D. 296 (E.D.N.Y. 2007) ..............................................47

*City of New York v. Beretta U.S.A. Corp.,*
   524 F.3d 384 (2d Cir. 2008).......................................................22

*City of New York v. Mickalis Pawn Shop, LLC,*
   645 F.3d 114 (2d Cir. 2011).......................................................28

*Cohen v. McDonnell Douglas Corp.*,
    450 N.E.2d 581 (Mass. 1983) ............................................................................32

*Consumer Data Industry Association v. Frey*,
    26 F.4th 1 (1st Cir. 2022) ...................................................................................48

*Corporan v. Wal-Mart Stores East, LP*,
    2016 WL 3881341 (D. Kan. July 18, 2016) ......................................................47

*Coxie v. Academy, Ltd.*,
    No. 2018-CP-42-04297 (S.C. Ct. Cmmn. Pl. Jul. 29, 2019)..............................47

*Ctr. for Biological Diversity v. Exp.-Imp. Bank of the United States*,
    2014 WL 3963203 (N.D. Cal. Aug. 12, 2014) ..................................................29

*Direct Sales Co., Inc. v. United States*,
    319 U.S. 703 (1943)...........................................................................................43

*Duncan v. Walker*,
    533 U.S. 167 (2001)...........................................................................................48

*EEOC v. Arabian American Oil Co.*,
    499 U.S. 244 (1991)...........................................................................................20

*Englund v. World Pawn Exch., LLC*,
    2017 WL 7518923 (Oregon Cir. Ct. Jun. 30, 2017) ..........................................47

*Envtl. Def. Fund, Inc. v. Massey*,
    986 F.2d 528 (D.C. Cir. 1993) .....................................................................28, 29

*Est. of Pemberton v. John's Sports Ctr., Inc.*,
    135 P.3d 174 (Kan. Ct. App. 2006) ...................................................................49

*Estados Unidos Mexicanos v. DeCoster*,
    229 F.3d 332 (1st Cir. 2000)................................................................................3

*F. Hoffmann–La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004)...........................................................................................11

*Fox v. L&J Supply, LLC*,
    No. 2014-24619, (Pa. Ct. Cmmn. Pl. Nov. 26, 2018)........................................47

*Goldstein v. Earnest*,
    No. 37-2020-00016638-CU-PO-CTL (Ca. Super. Ct. Jul. 2, 2021).............45, 47

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)...........................................................................................51

*Ileto v. Glock Inc.*,
    565 F.3d 1126 (9th Cir. 2009) ...........................................................................22

*In re National Prescription Opiate Litig.*,
  2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ................................................43

*In re Picard, Trustee for Liquidation of Bernard L. Madoff Investment Securities
  LLC*, 917 F.3d 85 (2d Cir. 2019) ........................................................24

*Keene Corp. v. United States*,
  508 U.S. 200 (1993) ..........................................................................48

*King v. Klocek*,
  133 N.Y.S.3d 356 (N.Y. Sup. Ct. 2020) ...........................................47

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ............................................................... passim

*L. Offs. Of Jeffrey S. Glassman v. Palmisciano*,
  690 F. Supp. 2d 5 (D. Mass. 2009) ................................................32

*Lanza v. Fin. Indus. Regul. Auth.*,
  953 F.3d 159 (1st Cir. 2020) ..........................................................44

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*,
  507 U.S. 163 (1993) ........................................................................36

*Longtin v. Organon USA, Inc.*,
  363 F. Supp. 3d 186 (D. Mass. 2018) ............................................32

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ........................................................................51

*Monroe v. Medtronic, Inc.*,
  511 F. Supp. 3d 26 (D. Mass. 2021) ..........................................8, 32

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247  (2010) ................................................................ passim

*NEPA Coal. of Japan v. Aspin*,
  837 F. Supp. 466 (D.D.C. 1993) ....................................................29

*Nestle USA, Inc. v. Doe*,
  141 S. Ct. 1931 (2021) ....................................................................27

*Parsons v. Colt's Mfg. Co.*,
  2020 WL 1821306 (D. Nev. Apr. 10, 2020) ...................................45

*Patchak v. Zinke*,
  138 S. Ct. 897 (2018) ......................................................................28

*Prescott v. Slide Fire Solutions, LP*,
  410 F. Supp. 3d 1123 (D. Nev. 2019) .............................................47

v

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
   937 F.3d 94 (2d Cir. 2019) ...................................................................25

*Rick v. Profit Mgmt. Assocs., Inc.*,
   241 F. Supp. 3d 215 (D. Mass. 2017) ...................................................32

*RJR Nabisco, Inc. v. European Community*,
   579 U.S. 325 (2016) .................................................................... passim

*Romani v. Cramer, Inc.*,
   992 F. Supp. 74 (D. Mass. 1998) .........................................................32

*Russello v. United States*,
   464 U.S. 16 (1983) ...............................................................................48

*SEC v. Morrone*,
   997 F.3d 52 (1st Cir. 2021) ..................................................................24

*Small v. United States,*
   544 U.S. 385 (2005) .........................................................................2, 37

*Smith & Wesson Corp. v. City of Gary*,
   875 N.E.2d 422 (Ind. App. 2007) .............................................41, 42, 47

*Smith v. United States*,
   507 U.S. 197 (1993) .......................................................................29, 35

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) .........................................................................8, 31

*Soto v. Bushmaster Firearms Int'l, LLC*,
   202 A.3d 262 (Conn. 2019) .................................................................51

*Soto v. Bushmaster Firearms Intern., LLC*,
   2016 WL 2602550 (Conn. Superior Ct. Apr. 14, 2016) .......................28

*Spinozzi v. ITT Sheraton Corp.*,
   174 F.3d 842 (7th Cir. 1999) ................................................................8

*Starr v. Price*,
   385 F. Supp. 2d 502 (M.D. Pa. 2005) ..................................................49

*T&M Jewelry, Inc. v. Hicks*,
   189 S.W.3d 526 (Ky. 2006) ..................................................................49

*TargetSmart Holdings, LLC v. GHP Advisors, LLC*,
   366 F. Supp. 3d 195 (D. Mass. 2019) ..................................................32

*The Sapphire*,
   78 U.S. (11 Wall.) 164 (1870) .......................................................11, 30

*United States v. Carney*,
   387 F.3d 436 (6th Cir. 2004) .........................................................41, 42

*United States v. Ford*,
   821 F.3d 63 (1st Cir. 2016).................................................................42

*United States v. McLellan*,
   959 F.3d 442 (1st Cir. 2020).........................................................19, 24

*WesternGeco LLC v. ION Geophysical Corp.*,
   138 S. Ct. 2129 (2018) ................................................................ passim

*Williams v. Beemiller, Inc.*,
   100 A.D.3d 143 (N.Y. App. Div. 2012) .......................................42, 47

## Statutes

15 U.S.C. § 7901 ......................................................................... passim

15 U.S.C. § 7903 ......................................................................... passim

18 U.S.C. § 922 .........................................................34, 40, 41, 44

18 U.S.C. § 925 .................................................................................44

26 U.S.C. § 5845 .................................................................................44

26 U.S.C. § 5861 .................................................................................44

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1332 ..............................................................................1, 3

28 U.S.C. § 2778 .................................................................................41

## Other Authorities

151 Cong. Rec. S9,061 (daily ed. July 27, 2005).........................9, 22, 51

Franklin A. Gevurtz, Building a Wall Against Private
   Actions for Overseas Injuries: The Impact of RJR
   Nabisco v. European Community,
   23 U.C. Davis J. Int'l L. & Pol'y 1  (2016) .......................................27

National Report of Eritrea on its Implementation of the United
   Nations Programme of Action to Prevent, Combat and Eradicate
   the Illicit Trade in Small Arms and Light Weapons in All
   Its Aspects (Jan. 1, 2010) .......................................................37

Robert L. Nay, Firearms Regulation in Various Foreign
    Countries (Law Library of Congress 1990) .........................................................37

S. 1805, 108th Cong. § (b)(1) (2003) .......................................................52

S. 397, 109th Cong. (2005) ......................................................................52

Symeon C. Symeonides, Choice of Law in Cross-Border Torts:
    Why Plaintiffs Win and Should, 61 Hastings L.J. 337 (2009) ............................8

## Rules

15 C.F.R. § 738.4..........................................................................................41

ATF Rul. 82-8 at 1, *reprinted in* 1982-2 A.T.F.Q.B. 49 (1982) ............................45

Fed. R. Civ. P. 12(b) .................................................................................12

## Constitutional Provisions

U.S. Const., Art. III ...................................................................................1

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

The Court should hear oral argument in this case because the matter is of paramount public importance to Mexico and the United States. It raises significant issues of comity and international relations involving a foreign sovereign's access to U.S. courts to seek relief against U.S.-based corporations that the Complaint alleges unlawfully facilitate gun trafficking across the border to the drug cartels in Mexico. The Court's intepretation of the The Protection of Lawful Commerce in Arms Act, and application of the presumption against extraterritoriality, on which the appeal turns, will be aided by a full airing of the issues at oral argument.

## JURISDICTIONAL STATEMENT

This is an appeal from a judgment of the United States District Court for the District of Massachusetts (Saylor, C.J.), dated October 1, 2022 and entered October 17, 2022. The district court had subject matter jurisdiction based on diversity under U.S. Const., Art. III, § 2, cl. 1, and 28 U.S.C. § 1332(a)(4) because this action is between a foreign state as plaintiff and citizens of a State or of different States, and the matter in controversy exceeds the sum or value of $75,000.00. Plaintiff-Appellant timely filed its Notice of Appeal on October 26, 2022. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 because Appellant seeks review of a final decision.

## ISSUES PRESENTED FOR REVIEW

1.      The Complaint alleges that Defendants aided and abetted the unlawful trafficking of guns into Mexico, where they were criminally misused to cause massive injury. The Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903 *et seq.* ("PLCAA")[1] defines the claims that it bars (subject to exceptions) as those for injury resulting from criminal or unlawful misuse of guns. Courts may apply a federal statute to circumstances that occur abroad if those circumstances do not relate to the statute's "focus," which courts determine by examining the statute's specific text. *WesternGeco LLC v. ION Geophysical Corp.,*

---

[1] The statute is included in the Addendum (Add.) to this brief at ADD000047.

138 S. Ct. 2129, 2138 (2018). The district court held that this case involves a permissible domestic application of PLCAA because its focus is broadly "regulat[ing] the types of claims" that can be brought in U.S. courts and the injury and gun misuse in Mexico are merely "incidental." Did the district court err in defining PLCAA's focus so broadly, where PLCAA does not merely regulate claims but *defines the precluded claims* specifically as those for injury resulting from gun misuse—both of which elements occur abroad?

2.      Even when a federal statute otherwise applies to circumstances abroad, a court construing its terms must assume that Congress used them in their domestic scope. *Small v. United States,* 544 U.S. 385, 388-89 (2005). Did the district court err in ignoring this requirement and failing to construe PLCAA's key terms of injury and "criminal or unlawful misuse" to mean injury in the United States and misuse in the United States (i.e., unlawful under U.S. law)?

3.      PLCAA provides an exception from its preclusion where the plaintiff alleges and proves that the defendant's violation of an applicable federal or state gun statute was a proximate cause of the injury. The Complaint alleges that Defendants violated many such statutes, including those prohibiting aiding and abetting the unlawful export of guns into Mexico, participating in unlawful straw purchases, and engaging in other unlawful gun-sales practices. Did the district court err in holding, contrary to PLCAA's plain text and all precedent, that the

2

"predicate exception" applies only if the predicate statute itself provides a private right of action?[2]

## STATEMENT OF THE CASE

### Background

The United Mexican States (the "Government") brings this action against seven gun manufacturers whose weapons are among the deadliest and are most often recovered at crime scenes in Mexico. Compl. ¶ 5.[3] Every year, Defendants' deliberate business practices result in some 340,000 of their guns being unlawfully imported from the United States into Mexico. *Id*. Drug cartels and other criminal organizations use these military-style weapons to wreak havoc in Mexico and terrorize its populace. *Id*. ¶¶ 210-26.

Invoking the diversity jurisdiction provided for claims brought by foreign sovereigns, 28 U.S.C. § 1332(a)(4), the Complaint alleges claims arising under Mexican tort law for, among other counts, negligence and public nuisance. Compl. ¶¶ 506-19. It seeks narrowly sculpted injunctive relief designed to end the trafficking of Defendants' guns into Mexico. That relief includes, for example, an

---

[2] Appellant also preserves for further review its ability to prosecute these claims in parens patriae as well as in its own right. *Cf. Estados Unidos Mexicanos v. DeCoster,* 229 F.3d 332, 337 (1st Cir. 2000).

[3] The Complaint is available in Volume I of the Joint Appendix at JA000044-JA000184. A gun wholesaler is also named as a defendant. Compl. ¶ 40.

Order requiring Defendants to ensure that their dealers screen for "red flags" that indicate a potential sale to a trafficker, limit the supply of guns to dealers that sell to traffickers, and institute other sales protocols to prevent diversion of guns to Mexico. *Id.* ¶¶ 96, 369. Only U.S. courts can provide effective injunctive relief against these U.S.-domiciled manufacturers.

PLCAA precludes certain claims from being filed against gun manufacturers and sellers in state or federal courts. It defines the precluded claims (subject to exceptions) as those for injury resulting from criminal or unlawful gun misuse. 15 U.S.C. § 7903(5)(A). One of the principal questions in this case is whether PLCAA precludes claims for injury incurred abroad resulting from gun misuse abroad.

The Government does not question the right of the United States to preclude claims brought against its domiciliaries for injuries resulting from gun misuse *in U.S. territory*. That is a balancing of domestic interests among U.S.-domiciled manufacturers and those injured in the United States. It would be another matter altogether, however, to transform a statute that balances among domestic interests into one that creates a safe haven for U.S.-based firms that cause systematic and grave injury abroad by participating in trafficking their guns out of the United States into a neighboring country.

Such a transformation would interfere with the interests of a foreign sovereign and raise serious U.S. foreign-policy issues that are the province of the

U.S. political branches, not the courts. The Supreme Court therefore mandates a presumption against applying federal statutes to matters abroad and separately applying that presumption to any statutory provision concerning a private right of action for injuries abroad.

**Defendants' Unlawful Exports Into Mexico**

Defendants know that their dealers sell military style weapons in bulk, with no restrictions, clearly intended for trafficking into Mexico. Compl. ¶¶ 115-277, 230. These guns include .50 caliber sniper rifles that can shoot down helicopters and penetrate lightly armored vehicles and bullet-proof glass (*id.* ¶¶ 292-99) and semi-automatic rifles that Defendants design to be difficult to trace and easily convertible into fully automatic machineguns (*id.* ¶¶ 300-13).

Mexico criminalizes unlicensed importing of guns. *Id.* ¶¶ 55-59. It has one gun store, located on a military base, and strict requirements for lawful gun purchases and possession. *Id.* ¶¶ 4, 397-403. Yet it suffers one of the highest homicide rates in the world, with more than 23,000 gun-related deaths every year. *Id.* ¶¶ 450-51. Most of these deaths are at the hands of drug cartels and other criminal organizations that the Defendants' practices supply with guns. *Id.* ¶¶ 5, 116.

The U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives conducts "traces" of guns recovered at crime scenes in Mexico. ATF's data show that almost

all of those guns—70% to 90% of them—were trafficked from the United States.

*Id*. ¶ 1. The Defendants collectively account for 68% of the U.S.-origin crime guns

recovered in Mexico. *Id*. ¶¶ 5, 435. The 340,000 guns trafficked from the United

States into Mexico every year generate more than $170 million in annual sales for

the Defendants. *Id*. ¶¶ 389, 377-95, 438.

That a massive number of guns are trafficked into Mexico every year is a

foreseeable result of Defendants' deliberate and knowing conduct. *Id*. ¶ 50. They

know they are supplying the cartels. *Id*. ¶¶ 118, 134-45. They know their guns are

favorites of notorious gun-trafficking rings (*id*. ¶¶ 146-209) and are regularly used

in horrendous incidents in Mexico (*id*. ¶¶ 210-26). Indeed, Defendants pointedly

market their guns to the cartels, selling guns emblazoned with Mexican names and

slogans—Defendant Colt's "El Jefe" pistol is a cartel favorite. *Id*. ¶¶ 215-18.

Defendants also know that certain dealers in their supply chains are the

source of the problem, regularly making straw sales, multiple sales, and repeat

sales to traffickers who arm the cartels. *Id*. ¶¶ 115–226. They know which

relatively small number of dealers sell the vast majority of crime guns. *Id*. ¶¶ 119-

33.

Defendants nevertheless refuse to monitor and discipline their distribution

systems. *Id*. ¶¶ 145, 206, 227-36. They supply dealers with all the guns they can

pay for, with no public-safety conditions, even if the dealer repeatedly has violated

6

gun laws, been indicted, hired workers with previously revoked gun licenses, or made bulk sales of assault rifles and sniper rifles in suspicious and obvious sales to traffickers. *Id.* ¶ 247. Defendants have not implemented ***any*** public-safety-related controls on their distribution systems—***none at all.*** *Id.* ¶¶ 7, 227. They are "deliberate and willing participants, reaping profits from the criminal market they knowingly supply." *Id.* ¶ 16.

The district court concluded that the Complaint adequately alleges that "Mexico's injuries are 'fairly traceable' to defendants' conduct." Mem. & Order on Defendants' Motions to Dismiss, ECF 163, at 18 (Add. 18).[4] The link between Defendants' conduct and the homicide rate in Mexico is indisputable. From 1999 to 2004, homicides in Mexico were declining. But Defendants exploited the expiration of the U.S. assault-weapons ban in 2004 to dramatically increase production of their military-grade weapons. Homicides in Mexico rose exactly contemporaneously and commensurately, as did the percentage of homicides in Mexico committed with a gun. Compl. ¶¶ 13, 443.

The ongoing injuries include the murder of the Government's police, judges, and soldiers, the property damage to its planes and vehicles (*id.* ¶¶ 458-64), and the enormous costs of responding to the "epidemic of [gun] violence that Defendants

---

[4] Hereafter, the district court's decision is cited as Add. ##.

have created" (*id*. ¶447; *see id.* ¶¶ 448-74). The violence-induced outflow of Mexican citizens through immigration is a painful loss to Mexico, but it also causes political difficulties in the United States. *Id*. ¶¶ 471-73. And, increasingly, the cartel violence is directly spreading north of the border. *Id*. ¶ 478.

**Choice of Tort Law**

The Government's claims arise under Mexican tort law. "[A] court will ordinarily 'apply *foreign* law to determine the tortfeasor's liability' to 'a plaintiff injured in a foreign country.'" *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 351 (2016) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 706 (2004)) (emphasis in *RJR Nabisco*). The law of the place of injury can be expected "to be responsive and responsible law, law that internalizes the costs and benefits of the people affected by it." *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 845 (7th Cir. 1999).

This is the preponderant rule throughout the world.[5] Massachusetts likewise effectively prescribes a presumption in favor of the place of injury, *e.g. Monroe v. Medtronic, Inc*., 511 F. Supp. 3d 26, 33 (D. Mass. 2021), which "carries even

---

[5] *See, e.g.,* Symeon C. Symeonides, *Choice of Law in Cross-Border Torts: Why Plaintiffs Win and Should*, 61 Hastings L.J. 337, 367 (2009) (89% of jurisdictions faced with a conflict between the place of conduct and place of injury apply the law of the place of injury).

greater weight" when the plaintiff is also domiciled there, *Burleigh v. Alfa Laval, Inc.*, 313 F. Supp. 3d 343, 353 (D. Mass. 2018).

**PLCAA's Preclusion of Claims for Injury from Gun Misuse**

Section 7902(a) of PLCAA provides that no "qualified civil liability action" may be brought in any federal or state court. Section 7903(5)(A) defines the precluded "qualified civil liability actions" as those (subject to exceptions) seeking "damages … or other relief, resulting from the criminal or unlawful misuse" of guns. 15 U.S.C. § 7903(5)(A).

The statute does not broadly protect gun manufacturers and sellers from all types of lawsuits. Even before accounting for exceptions, it "prohibits one narrow category of lawsuits: suits against the firearms industry for damages resulting from the criminal or unlawful misuse of a firearm or ammunition by a third party." 151 Cong. Rec. S9,061 (daily ed. July 27, 2005) (Sen. Craig). It gives no indication that its defining elements of injury ("damages . . . resulting from"[6]) or gun misuse were intended to apply to injury or gun misuse abroad.

---

[6] Corresponding provisions confirm that the reference to "damages . . . resulting from" means "harm." *See, e.g.*, 15 U.S.C. § 7903(5)(A)(1), (iii); *id.* § 7901 (a)(3), (5), (6); *id.* § 7901 (b)(1).

**Extraterritoriality**

Choice-of-law principles determine which tort law applies, but not whether a U.S. federal statute applies abroad. The latter question is instead determined by a two-step "extraterritoriality" inquiry.

The first step applies the "presumption against extraterritoriality"—a presumption that a federal statute does not apply to events or circumstances abroad. *WesternGeco*, 138 S. Ct. at 2136. The statute applies extraterritorially only when "Congress has affirmatively and unmistakably instructed that [it] will do so." *RJR Nabisco,* 579 U.S. at 335. The presumption "helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Kiobel v. Royal Dutch Petroleum Co*., 569 U.S. 108, 116 (2013).

If the defendant does not overcome the presumption against extraterritoriality, the second step examines the "focus" of the relevant statutory provisions and whether "the conduct relevant to the statute's focus occurred in the United States" or abroad. *RJR Nabisco*, 579 U.S. at 337. If the conduct or circumstances occurred abroad, "then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id*.

10

Moreover, courts must "separately apply the presumption against extraterritoriality to [the statute's provision creating] a cause of action." *Id*. at 346. Providing or precluding a claim for injuries incurred abroad risks "upsetting a balance of competing considerations that [foreign sovereigns'] own domestic . . . laws embody" and thereby "offend[ing] the sovereign interests of foreign nations." *Id*. at 347-48 (quoting *F. Hoffmann–La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 167 (2004)).

Precluding a foreign-law claim asserted by foreign sovereign itself would raise especially acute foreign-relations issues. That preclusion "would manifest a want of comity and friendly feeling." *The Sapphire*, 78 U.S. (11 Wall.) 164, 167 (1870). Accordingly, Congress provided jurisdiction for foreign sovereigns "to sue [a U.S. domestic corporation] for violations of *their own laws* and to invoke federal diversity jurisdiction as a basis for proceeding in U.S. courts." *RJR Nabisco*, 579 U.S. at 351 (emphasis in original).

**PLCAA's Exception When Defendants Violate Gun Laws**

Even when PLCAA would otherwise apply to a claim for injury resulting from gun misuse, the statute provides exceptions to its preclusion. Under the "predicate exception," lawsuits are not precluded if plaintiffs allege and prove that "a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation

11

was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii).

The Complaint alleges in detail that Defendants systematically aid and abet (Compl. ¶¶ 114, 227, 235) violations of U.S. prohibitions on exporting guns from the United States without a permit (*id*. ¶¶ 63-65). They also aid and abet violations of U.S. statutes prohibiting selling guns without a license (*id*. ¶¶ 66-67, 249-50), and selling to straw purchasers (*id*. ¶¶ 69, 248-50). Defendants directly violate the U.S. ban on selling machine guns. *Id*. ¶¶ 68, 70-72, 301-13. Each of these violations takes this lawsuit out of PLCAA even if it otherwise applied.

**Proceedings Below**

The Complaint asserts six counts under Mexican tort law against all Defendants and counts against two Defendants for violating state unfair and deceptive practices statutes. Defendants moved to dismiss the Complaint for lack of Article III standing under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6) based on PLCAA and other grounds. All Defendants other than the two Massachusetts Defendants also moved to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). *See* ECF Nos. 56, 58, 60, 62, 69, 70, 73 (individual motions); ECF No. 66 (joint motion). The district court heard oral argument on January 27, 2022. *See* JA000243 (hearing transcript).

12

**District Court's Decision**

The district court dismissed all of the Government's claims for failure to state a claim upon which relief can be granted. Add. 14.

Regarding choice of law for the tort claims, the district court asserted that "all claims arise under state law" (Add. 3) and that the Government had not "argued for the application of the law of any other jurisdiction [than Massachusetts]" (*id.* 32). The district court overlooked or ignored that the Government urged Mexican tort law in the Complaint (Compl. ¶¶ 21-22, 29), a 23-page expert report on Mexican tort law (JA000185), arguments throughout its briefs (*e.g.,* ECF 111 at 1, 5, 35, 36, 39, 40, 42; ECF 98 at 14; ECF 104 at 8), and a separate brief devoted to choice of tort law (ECF 152).

The district court concluded that "the complaint plausibly alleges that Mexico's injuries are 'fairly traceable' to defendants' conduct for purposes of Article III standing" Add. 18. As to the merits, it held that "there are insufficient indications in the text of the PLCAA to overcome the presumption against extraterritoriality." *Id.* 23.

The district court nevertheless held that applying PLCAA was permissibly domestic. It concluded that PLCAA's focus is "regulat[ing] the types of claims that can be asserted against firearm manufacturers and sellers" and thereby "protect[ing] the interests of the United States firearms industry and the rights of

13

gun owners." Add. 24. The court's focus analysis did not examine PLCAA's text *defining* the "types of claims" that it precludes—those for injury resulting from gun misuse—and ignored that the conduct and circumstances relevant to those defining elements occur in Mexico.

The district court also justified applying PLCAA on the ground that "all" of Defendants' unlawful conduct "*occurred* within the United States and only *resulted* in harm in Mexico." Add. 25 (emphasis in original). But a fundamental allegation in the Complaint is that Defendants aid and abet the unlawful export/import of weapons from the United States into Mexico. Nor did the court try to square its analysis and conclusion with *RJR Nabisco*'s holding that the place of injury is so central to the inquiry that the presumption against extraterritoriality applies separately and distinctly to the injury element of a claim.

Regarding the "predicate violation" exception to PLCAA, the district court held that it applies only if the plaintiff's claim "arises under" the predicate statute. Add. 27. The court cited no authority, provided no statutory or other analysis, and neither acknowledged nor tried to distinguish the numerous cases holding the contrary. Its conclusion conflicts with PLCAA's explicit reference to federal gun statutes—which do not provide a private right of action—as examples of statutes whose violation satisfies the predicate exception.

14

The court also ruled that other PLCAA exceptions did not apply, Add. 29-34, and that the Complaint did not state a claim under the Connecticut or Massachusetts unfair and deceptive practices statutes, *id.* at 37, 43. Given the disposition on the merits, the court denied Defendants' personal-jurisdiction motions without prejudice as moot. *Id.* at 43-44.

## SUMMARY OF THE ARGUMENT

The Supreme Court has repeatedly held that if a federal statute provides no clear indication that it has extraterritorial reach, it has none. Courts should not try to divine whether Congress might have enacted extraterritorial scope had it thought of the issue. Courts instead apply a presumption against extraterritorial reach for the very purpose of ensuring that the decision to extend a statute abroad—thereby risking effects on U.S. foreign-policy—is made by Congress, not the courts.

PLCAA contains no indication that Congress intended to preclude claims that arise under Mexican law, from gun misuse in Mexico, for injury incurred in Mexico when Defendants systematically aid and abet the unlawful export of guns into Mexico. Just the opposite. PLCAA extends its protection to importers but not exporters; provides exceptions related to "Federal or State" law, but not to corresponding foreign law; and its legislative history does not mention claims for injuries resulting from gun misuse abroad or refer even once to Mexico or Canada or their citizens.

15

Courts may apply a statute if the conduct or circumstances abroad are not related to its "focus." Subject to its exceptions, PLCAA precludes a specified set of lawsuits—"qualified civil liability actions"—which it defines as those for injury resulting from gun misuse. The district court elided the fact that the defined elements of injury and gun misuse occur in Mexico. Rather than acknowledge that PLCAA *defines* the precluded claims, the district court held that PLCAA merely "*regulates the type*" of claims that are precluded and that the "regulation" occurs in the United States.

Defining the statute's focus at that level of generality would find a permissible domestic application of *all* statutes relating to legal claims—they *all* "regulate" claims, and the regulation *always* occurs in the United States. Under that analysis, two leading Supreme Court extraterritoriality decisions (*RJR Nabisco* and *Kiobel*) would have had different outcomes, and a third (*WesternGeco*) would have reached the same outcome through radically different reasoning. Contrary to *WesternGeco*, the district court failed to parse the statute's definitions of key terms; contrary to *RJR Nabisco*, the court failed to separately apply the presumption against extraterritoriality to the "injury" element, thus encroaching on the heightened foreign-policy interests at stake when the injury occurs abroad.

Even if PLCAA otherwise applied, at least a dozen cases have held that it provides no basis to dismiss a case alleging that defendants violated applicable

16

state or federal gun statutes and thereby caused harm to the plaintiff. The Complaint alleges numerous such violations. The district court's conclusion that the predicate exception applies only if the claim arises under the predicate statute failed to address or distinguish the overwhelming contrary authority. It is inconsistent with PLCAA's language, purpose, and legislative history, and would render the predicate exception a virtual nullity. The Protection of *Lawful* Commerce in Arms Act does not protect unlawful commerce in arms.

## ARGUMENT

## I.   APPLYING PLCAA TO BAR MEXICO'S CLAIMS ARISING UNDER MEXICAN LAW FOR INJURIES IN MEXICO FROM GUN MISUSE IN MEXICO IS IMPERMISSIBLY EXTRATERRITORIAL.

Over the past two decades the Supreme Court has repeatedly emphasized that courts may apply a federal statute abroad only when Congress has unmistakably instructed them to do so. The holdings in two of the leading Supreme Court decisions illustrate how far the district court here strayed from the required analysis.

*Kiobel* held that it is not a permissible domestic application of the Alien Tort Statute—which provides federal-court jurisdiction to sue for violations of the law of nations—for a U.S. resident to sue in a U.S. court when the conduct immediately causing the injury occurred abroad. 569 U.S. at 124. *RJR Nabisco* held that it is not a permissible domestic application of RICO's claim-granting

17

provision—even though RICO's substantive provisions apply abroad—when the injury occurs abroad. 579 U.S. at 354. The district court here, in contrast, held that it is a permissible domestic application of PLCAA—which *defines the claims it precludes* as those arising from injury from gun misuse—to preclude claims for injury incurred abroad from gun misuse abroad, the Defendants having aided and abetted trafficking the guns abroad.

The district court correctly concluded that Defendants cannot overcome the presumption against extraterritoriality. As demonstrated below, however, the court then wholly undermined the presumption—and the compelling rationales for it— by describing PLCAA's "focus" so broadly as to be tautological. The statute *defines* the precluded claims as those arising from injury from gun misuse. Yet the court concluded that it was merely "incidental" to the statute (Add. 24) that the Government's claims result from Defendants annually trafficking 340,000 guns into Mexico and proximately causing some 20,000 deaths.

*RJR Nabisco* and *Kiobel* involved *granting a claim under U.S. law* for injury incurred abroad. The same analysis applies here, to *precluding a claim under Mexico's law* for injury incurred in Mexico. The latter decision carries every bit as much potential as the former for creating unintended clashes with the foreign sovereign's interests.

18

Nor is it an answer that the district court's reading would preclude the Government from suing only in U.S. courts, not Mexican courts. The Defendants are here, not in Mexico. Only U.S. courts can enter effective injunctive relief requiring Defendants to reform their sales practices where "red flags" indicate potential trafficking to Mexico. If the United States is to depart from the reciprocal comity that keeps each neighbor's courts open to the other, that is a decision that should be made by the U.S. Congress.

### A.     Defendants Cannot Rebut the Presumption Against Extraterritorial Application of PLCAA.

At the first step of the extraterritoriality analysis, Defendants must overcome the presumption against extraterritoriality—the strong presumption that a U.S. federal statute does not apply to events or circumstances abroad. *WesternGeco,* 138 S. Ct. at 2136; *United States v. McLellan*, 959 F.3d 442, 467-68 (1st Cir. 2020). "When a [federal] statute gives no clear indication of an extraterritorial application, it has none." *Kiobel*, 569 U.S. at 115 (quoting *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 255 (2010)). A federal statute applies extraterritorially only when "Congress has affirmatively and unmistakably instructed that [it] will do so." *RJR Nabisco,* 579 U.S. at 335.

The presumption "has deep roots." *WesternGeco,* 138 S. Ct. at 2136. It is grounded in the commonsense notion that "Congress ordinarily legislates with respect to domestic, not foreign, matters." *Morrison,* 561 U.S. at 255.

19

The presumption also serves the separation of powers. Without an "unmistakable" directive to apply a federal statute extraterritorially, the U.S. judiciary could create "unintended clashes between our laws and those of other nations." *Kiobel*, 569 U.S. at 115 (quoting *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248 (1991) ("*Aramco*")). The presumption "helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Id*. at 116.

PLCAA has "no clear indication of an extraterritorial application, [so] it has none." *Id*. at 115. Defendants can only point to generalized statutory references to "interstate and foreign" commerce, but the Supreme Court "ha[s] emphatically rejected reliance on such language, holding that 'even statutes . . . that expressly refer to '*foreign* commerce' do not apply abroad." *RJR Nabisco*, 579 U.S. at 353 (quoting *Morrison,* 561 U.S. at 262-63) (emphasis in original); *see also Aramco,* 499 U.S. at 251 (citing additional cases). The district court correctly concluded that Defendants cannot overcome the presumption. Add. 22-23.

### B. The Conduct and Circumstances Relevant to PLCAA's Focus— Injury From Gun Misuse—Occurred in Mexico.

At the second step of the extraterritoriality analysis, courts determine the "focus" of the statutory provisions and whether "the conduct relevant to the statute's focus occurred in the United States" or abroad. *RJR Nabisco*, 579 U.S. at

337. A statute's "focus is 'the objec[t] of the statute's solicitude'—which can turn on the 'conduct,' 'parties,' or interests that it regulates or protects." *WesternGeco*, 138 S. Ct. at 2138 (quoting *Morrison*, 561 U.S. at 267). If the relevant conduct or circumstances occurred abroad, "then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 579 U.S. at 337.

The district court concluded that PLCAA's focus is "regulat[ing] the types of claims that can be asserted against firearm manufacturers and sellers." Add. 24. But that definition of PLCAA's focus is so broad as to be tautological. *All* statutes "regulate the type" of activity to which they are directed, and *all* such "regulat[ion]" by definition occurs in the United States—in the U.S. courts that apply the statutes. Under the district court's analysis, the Supreme Court in *RJR Nabisco* and *Kiobel* should have applied the statutes extraterritorially because they both "regulate the type of claims" that can be brought in U.S. courts. Defining a statute's focus at that level of generality would give courts free rein to try to "divin[e] what Congress would have wanted if it had thought of the situation," *Morrison*, 561 U.S. at 261, rather than ensuring that Congress, not the courts, makes those foreign-policy judgments.

PLCAA does not "regulate the types of claims" that are precluded and thereby "protect the interests of the United States firearms industry and the rights

21

of gun owners." Add. 24. It *defines which claims* it precludes and protects gun

manufacturers and sellers from *those* claims.

PLCAA's actual text makes this unmistakably clear. Section 7902(a)

provides that no "qualified civil liability action" may be brought in any Federal or

State court, and then provides exceptions. Section 7903(5)(A) defines a "qualified

civil liability action" as one seeking "damages . . . or other relief, resulting from

the criminal or unlawful misuse" of guns. 15 U.S.C. § 7903(5)(A). Section

7903(5)(A)'s focus is indisputably gun misuse and the resulting injury. *See*

JA000269.

PLCAA "insulat[es] the firearms industry from *a specified set of lawsuits*"—

those defined in Section 7903(5)(A). *Ileto v. Glock Inc.,* 565 F.3d 1126, 1140-41

(9th Cir. 2009) (emphasis added); *see also City of New York v. Beretta U.S.A.*

*Corp.*, 524 F.3d 384, 398 (2d Cir. 2008) (PLCAA provides protection to "a

specific type of defendant from a specific type of suit"). Even before being further

constricted by its exceptions, PLCAA "prohibits one narrow category of lawsuits:

suits against the firearms industry for damages resulting from the criminal or

unlawful misuse of a firearm or ammunition by a third party." 151 Cong. Rec.

S9,061 (daily ed. July 27, 2005) (Sen. Craig). PLCAA's findings and purposes

confirm that the narrow set of precluded claims is those for "harm caused by . . .

misuse." *See, e.g.*, 15 U.S.C. § 7901(a)(3); *id.* §7901(a)(5); *id.* § 7901(a)(6) ("harm

22

solely caused by others"); *id*. § 7901(b)(1) ("harm solely caused by the criminal or unlawful misuse").

The gun misuse and injury occurred in Mexico, so "[this] case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 579 U.S. at 337. Three principles articulated by the Supreme Court powerfully reinforce this conclusion:

### 1. The specific terms of Sections 7902(a) and 7903(5)(A) determine the relevant focus.

The decision in *WesternGeco* reveals the district court's error in failing to base its focus analysis on PLCAA's specific terms. *WesternGeco* considered whether the Patent Act permitted a patentee who proved infringement to recover damages for lost profits on sales made abroad. The Court determined the relevant focus by "analyz[ing] the provision at issue." 138 S. Ct. at 2137.

One provision granted a damages remedy to a patentee who proves infringement (35 U.S.C. § 284), and another made it an act of infringement to ship components of a patented invention abroad to be assembled there (*id*. § 271(f)(2)). The Court parsed each provision's specific text, quoted the key language, and

determined that the language or concept *in the text itself* was the relevant focus.[7]

The same is true of the Court's other "focus" cases.[8]

Before the district court, the Defendants tried to derive PLCAA's focus by

examining only Section 7902(a), without regard to Section 7903(5)(A). ECF 140 at

19. *WesternGeco* forecloses that siloed approach. "When determining the focus of

a statute, we do not analyze the provision at issue in a vacuum. If the statutory

provision at issue works in tandem with other provisions, it must be assessed in

concert with those other provisions." *WesternGeco*, 138 S. Ct. at 2137 (citation

omitted).[9] The focus of the Patent Act's damages provision (§ 284) is "the

---

[7] *WesternGeco,* 138 S. Ct. at 2137 ("The portion of § 284 at issue here states that 'the court shall award the claimant damages adequate to compensate for the infringement.' We conclude that 'the infringement' is the focus of this statute."); *id*. at 2137-38 ("[§ 271(f)(2)] provides that a company 'shall be liable as an infringer' if it 'supplies' certain components of a patented invention 'in or from the United States' with the intent that they 'will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States.' The conduct that § 271(f)(2) regulates—i.e., its focus— is the domestic act of 'suppl[ying] in or from the United States.'").

[8] *See, e.g., RJR Nabisco*, 579 U.S. at 342; *Morrison*, 561 U.S. at 266; *see also SEC v. Morrone,* 997 F.3d 52, 60 (1st Cir. 2021) (following *Morrison* to conclude that "§ 10(b)'s focus is on transactions"); *McLellan*, 959 F.3d at 469 (parsing "the structure, elements, and purpose of the wire fraud statute" and determining that its focus is "the abuse of the instrumentality in furtherance of a fraud").

[9] *See also In re Picard, Trustee for Liquidation of Bernard L. Madoff Investment Securities LLC*, 917 F.3d 85, 97 (2d Cir. 2019) ("Just as the focus of [the damages provision] of the Patent Act depends on the infringement provision that enables a plaintiff to seek damages, the focus of [the recovery provision] of the Bankruptcy Code depends on the avoidance provision that enables a trustee to recover property.").

infringement," so the Court looked to the focus of the provision (§ 271(f)(2)) that *defines the relevant infringement. Id*. at 2137-38.[10]

Here, Section 7902(a) provides that no "qualified civil liability action" may be brought in any federal or state court. Qualified civil liability actions are the focus of—literally the subject of—the one sentence in Section 7902(a). Section 7902(a) "works in tandem with" and so must be "assessed in concert" with (*WesternGeco*, 138 S. Ct. at 2137) Section 7903(5)(A), which defines a "qualified civil liability action." *WesternGeco* requires that the Court determine the focus of that definition. The focus of Section 7903(5)(A)'s definition of the precluded actions is indisputably its defining substantive elements—namely, injury and criminal or unlawful gun misuse.

In *WesternGeco*, the Court concluded that the focus was the domestic act of infringement, and that "[t]hose overseas events [lost profits on sales] were merely incidental to the infringement." *Id*. at 2138. Here the injury and gun misuse are far from "merely incidental." They define the very scope of PLCAA's preclusion.

---

[10] *See also RJR Nabisco*, 579 U.S. at 346 ("separately appl[ying] the presumption against extraterritoriality to RICO's cause of action"); *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 104 (2d Cir. 2019) (the court must "discern the 'focus' of each [statutory] provision individually").

### 2. Whether to preclude claims arising under foreign law for injuries incurred abroad is a decision for Congress.

*RJR Nabisco* held that certain of RICO's substantive prohibitions apply abroad. 579 U.S. at 346-54. The Court nevertheless held "that the presumption against extraterritoriality must be applied separately to both RICO's substantive prohibitions and its private right of action." *Id*. at 350. The reason is straightforward: "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." *Id.* at 346-47. The focus of RICO's grant of a private civil claim to "[a]ny person injured in his business or property" is the injury, so a plaintiff must "allege and prove a domestic injury to business or property." *Id*. at 354.

U.S. domestic conduct that causes injury abroad engages the foreign sovereign's interest in having its law applied. Providing a U.S. claim for those injuries risks "upsetting a balance of competing considerations that [foreign sovereigns'] own domestic … laws embody" and thereby "offend[ing] the sovereign interests of foreign nations." *Id*. at 347-48 (citation omitted). And Congress, not a court, "has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident." *Kiobel,* 569 U.S. at 116.

26

*RJR Nabisco* is dispositive because PLCAA is the mirror image of RICO's claim-granting provision. RICO's granting a claim could undermine a foreign sovereign's interests by providing a civil claim under U.S. law for an injury that the sovereign might conclude is best left to public prosecution or left unremedied altogether. Here, applying PLCAA would usurp Mexico's sovereign interests by *precluding* a claim for injury incurred in Mexico, from gun misuse in Mexico, under the tort law of Mexico, against manufacturers that participated in unlawfully importing their guns into Mexico, pursued in the only national forum in which Mexico can get effective injunctive relief against these U.S.-based gun sellers.

Precluding this claim would surely be no less an interference with a foreign sovereign's interest than would granting a civil RICO claim. "Closing the courthouse doors … gives rise to foreign-policy concerns just as invariably as leaving them open." *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1948 (2021) (Sotomayor, J., dissenting) (cleaned up).[11] Both decisions are for Congress, not the courts, to make.

_____

[11] *See also* Franklin A. Gevurtz, *Building a Wall Against Private Actions for Overseas Injuries: The Impact of RJR Nabisco v. European Community*, 23 U.C. Davis J. Int'l L. & Pol'y 1, 35 (2016) ("[A]s the Court pointed out in *RJR Nabisco*, 'what is sauce for the goose normally is sauce for the gander.' If U.S. courts are going to say [when the injury occurs abroad] that foreign laws must apply when they are more favorable to U.S. defendants, then U.S. courts must be prepared to accept the consequences of applying such laws when they are more favorable to plaintiffs suing U.S. defendants.") (quoting *RJR Nabisco*, 579 U.S. at 349).

27

The district court ignored *RJR Nabisco*'s "injury" analysis, instead citing an out-of-circuit appellate decision for the proposition that where injury occurs abroad "the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States." Add. 23 (quoting *Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993)).[12] The district court erred at the outset in asserting that "Mexico is seeking to hold defendants liable for practices that *occurred* within the United States and only *resulted* in harm in Mexico." Add. 25. The Complaint alleges in detail that Defendants engage in *conduct in Mexico* when they aid and abet trafficking guns into Mexico. *See, e.g.*, Compl. ¶¶ 434-505.

Regardless, there is good reason why none of the parties here cited *Massey*. *Massey* tied its holding—that the locus of federal agency decisionmaking in the

_____

[12] The district court appeared to apply PLCAA on the ground, in part, that it is a "jurisdiction-stripping statute." Add. 19. But the presumption against extraterritoriality applies even to "strictly jurisdictional" statutes. *Kiobel*, 569 U.S. at 116; *see also Morrison*, 561 U.S. at 261 ("we apply the presumption in all cases"); *RJR Nabisco*, 579 U.S. at 349 (same). If it mattered, the district court erred in rejecting the Second Circuit's holding in *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 127 (2d Cir. 2011), that PLCAA is not jurisdictional. Add. 20 n. 6. Indeed, no other court has held that PLCAA is jurisdiction-stripping. *See, e.g., Soto v. Bushmaster Firearms Intern.*, LLC, 2016 WL 2602550, at *5 & n. 9 (Conn. Superior Ct. Apr. 14, 2016) (following *Mickalis* and collecting cases). The district court's reliance (*see* Add. 20 n.6) on the plurality opinion in *Patchak v. Zinke*, 138 S. Ct. 897 (2018), is misplaced because that statute "has no exceptions" and "cannot plausibly be read" as anything other than jurisdictional. 138 S. Ct. at 905-06.

U.S. justified applying the National Environmental Policy Act to assess the effects of an incinerator in Antarctica—to the inapplicability of any other sovereign's law.[13] The Supreme Court later undercut even that limited holding, concluding that the presumption against extraterritoriality applies in sovereignless regions despite the absence of a potential conflict with foreign law. *Smith v. United States*, 507 U.S. 197, 203-04 (1993).

*Massey* was decided before the coalescence of the modern two-step extraterritoriality analysis in 2010. *See Morrison*, 561 U.S. at 266-67. No court of appeals has cited *Massey*'s extraterritoriality analysis post-*Morrison*. The proposition for which the district court cited *Massey*—that a statute can be applied despite injury outside the U.S. so long as significant conduct occurred inside—has not survived adoption of that modern framework. If it had, then *RJR Nabisco*, which involved unlawful domestic as well as foreign conduct (*see* 579 U.S. at 345) and *Morrison* (conduct in Florida, injury in Australia, 561 U.S. at 266) would have been decided differently.

---

[13] *Massey*, 986 F.2d at 537 ("We find it important to note . . . that we do not decide today how NEPA might apply to actions in a case involving an actual foreign sovereign or how other U.S. statutes might apply to Antarctica."). Other courts have so limited *Massey*. *See, e.g.*, *NEPA Coal. of Japan v. Aspin*, 837 F. Supp. 466, 467 (D.D.C. 1993); *Born Free USA v. Norton,* 278 F. Supp. 2d 5, 19-20 (D.D.C. 2003), *vacated as moot*, 2004 WL 180263 (D.C. Cir. Jan. 21, 2004); *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the United States*, 2014 WL 3963203, at *5 (N.D. Cal. Aug. 12, 2014).

Precluding a foreign-law claim for injuries incurred abroad "carries with it significant foreign policy implications." *RJR Nabisco*, 579 U.S. at 347 (quoting *Kiobel*, 569 U.S. at 117) (cleaned up). That decision is for Congress to make.

### 3.    Whether to preclude a foreign sovereign's claim for injuries in its territory is a decision for Congress.

Deriving Section 7903(5)(A)'s "focus" from its actual text will also ensure that courts do not undermine the international comity that keeps U.S. courts reciprocally open to foreign sovereigns' claims. The United States has honored this international principle for more than 230 years. To our knowledge, the U.S. Congress has never, in peacetime, stripped foreign sovereigns of their ability to litigate claims under their laws in U.S. courts.

"Under principles of comity governing this country's relations with other nations, sovereign states are allowed to sue in the courts of the United States." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 408-09 (1964). Closing the courthouse doors to foreign sovereigns "would manifest a want of comity and friendly feeling" and raise significant foreign-relations issues, not least because the comity that keeps the doors open is *reciprocal*: the United States itself "has largely availed itself of the like privilege to bring suits in [other nations'] courts." *The Sapphire*, 78 U.S. at 167. Whether to renounce the principle of open courts for foreign sovereigns is the prerogative of Congress, not the courts.

30

*RJR Nabisco* noted that the "background legal principle" is that "a court will ordinarily 'apply *foreign* law to determine the tortfeasor's liability' to 'a plaintiff injured in a foreign country.'" 579 U.S. at 351 (quoting *Sosa,* 542 U.S. at 706). The Court avoided the "potential for international controversy" by separately applying the presumption against extraterritoriality to the injury element and thereby refusing to "'recognize a cause of action *under U.S. law*' for injury suffered overseas." *Id*. at 348, 351 (emphasis in original) (quoting *Kiobel*, 569 U.S. at 119).

Instead, the Court emphasized that Congress provided jurisdiction for foreign sovereigns "to sue [a U.S. domestic corporation] for violations of *their own laws* and to invoke federal diversity jurisdiction as a basis for proceeding in U.S. courts." *Id*. at 351 (emphasis in original). The Government has proceeded exactly as *RJR Nabisco* envisioned, suing in U.S. courts under Mexico's own substantive tort law for injuries sustained in Mexico.

Nor is it any answer to assert that PLCAA would preclude the Government's claims only to the extent that it also precludes those of U.S. governmental entities. Comity does not inhere in forcing on the Government the same balancing of interests that the United States chose for itself for injuries in its territory; it inheres in even-handedly permitting the Government to *choose its own balance of interests for injuries in Mexico*. Comity requires not "upsetting a balance of competing

31

considerations that [foreign sovereigns'] own domestic … laws embody." *RJR Nabisco*, 579 U.S. at 348 (citation omitted).

Moreover, despite the district court's inexplicable statement to the contrary,[14] Mexican tort law governs these claims. Massachusetts's "functional approach" to choice of law effectively prescribes a presumption in favor of the place of injury.[15] When the injury and conduct occur in different jurisdictions, "the law of the state where the injury occurred 'usually' applies" and "carries even greater weight" where, as here, the plaintiff is domiciled there. *Burleigh*, 313 F. Supp. 3d at 353;[16] *see also L. Offs. Of Jeffrey S. Glassman v. Palmisciano*, 690 F. Supp. 2d 5, 13 (D. Mass. 2009).

---

[14] Add. 3 ("[a]ll claims arise under state law"). The Complaint alleges that the Government's tort claims arise under the substantive law of Mexico (Compl. ¶¶ 21-22, 29); the Government submitted a 23-page expert declaration detailing Mexican tort principles (ECF 108, Exhibit 2); its briefs in opposition to the motions to dismiss invoked those principles on every contested issue of tort law (*e.g.*, ECF 111, at 1, 5, 35, 36, 39, 40, 42; ECF 98, at 14; ECF 104, at 8); and when Defendants belatedly challenged choice of law on the tort claims, it filed an additional 11-page brief on the issue (ECF 152). Nor did the Government contend (Add. 19) that choice of law determined the applicability of PLCAA. *See* ECF 152, at 2.

[15] *See, e.g., Monroe v. Medtronic, Inc.*, 511 F. Supp. 3d 26, 33 (D. Mass. 2021); *Longtin v. Organon USA, Inc.*, 363 F. Supp. 3d 186, 191-92 (D. Mass. 2018); *Rick v. Profit Mgmt. Assocs., Inc.*, 241 F. Supp. 3d 215, 223 (D. Mass. 2017); *TargetSmart Holdings, LLC v. GHP Advisors, LLC*, 366 F. Supp. 3d 195, 212 n.2 (D. Mass. 2019); *Romani v. Cramer, Inc.*, 992 F. Supp. 74, 78 (D. Mass. 1998).

[16] *See also Cohen v. McDonnell Douglas Corp.*, 450 N.E.2d 581, 586 (Mass. 1983); *Alves v. Siegel's Broadway Auto Parts, Inc.*, 710 F. Supp. 864, 871 (D. Mass. 1989).

*******

This is a far easier extraterritoriality case than *RJR Nabisco*. No PLCAA terms expressly apply abroad; the *defining elements* of the precluded claims are injury resulting from gun misuse; the reason that injury and gun misuse occur in Mexico is that Defendants aid and abet unlawfully exporting guns there—340,000 of them every year. Mexican tort law provides claims for these injuries; under world-wide norms and Massachusetts's choice-of-law rule, Mexican tort law governs these claims; and the Government has done exactly what *RJR Nabisco* taught and what practical reality demands—it has sued under its own law in U.S. courts, because only they can provide the injunctive relief required to help stop the violence that Defendants abet.

At a bare minimum "there is a potential for international controversy that militates against" precluding "foreign-injury claims without clear direction from Congress." *RJR Nabisco*, 579 U.S. at 348. Because "such a risk is evident, the need to enforce the presumption [against extraterritoriality] is at its apex." *Id*.

## II.  EVEN IF PLCAA OTHERWISE APPLIED, IT WOULD NOT BAR THE GOVERNMENT'S CLAIMS.

PLCAA would not bar the Government's claims even if applying it here were permissibly domestic. Even when a federal statute otherwise applies, courts still construe it based on the assumption that its terms have only domestic scope. Injury and "criminal or unlawful gun misuse" mean injury in the United States and

33

gun misuse that is criminal or unlawful under U.S. law. The district court did not address these points, although the Government urged them. ECF 111, at 8-14, 19-20.

Moreover, PLCAA provides an exception from its preclusion when plaintiffs allege and prove that defendants violated federal or state statutes applicable to gun sales. The Complaint alleges such violations in abundance, including aiding and abetting violations of federal statutes prohibiting guns exports without a permit, straw purchases, and unlicensed sales, and direct violations of the federal prohibition on selling machine guns. With no textual analysis and without citing any authority—there is none—the district court became the first to hold that this exception applies only if the plaintiff's claim arises under these gun-sales statutes, i.e., only if they provide a private right of action. That was error.

### A.    If PLCAA Applied, Courts Must Construe Its Key Terms to Be Domestic in Scope.

Even if the two-step extraterritoriality analysis did not altogether prohibit applying PLCAA, a court must still *construe its substantive terms* with the "assumption" that Congress used them in their strictly domestic scope. *See Small*, 544 U.S. at 389.

The statute in *Small* has many similarities to PLCAA. It criminalized possession of a firearm in the United States by "any person . . . convicted in any court" of certain crimes. *See* 18 U.S.C. § 922(g)(1). The Court held that "convicted

34

in any court," despite its broad language, meant only convictions *in U.S. courts*.

Applying that reasoning, PLCAA's reference to "criminal or unlawful misuse"

similarly means only gun misuse that is criminal or unlawful *under U.S. law*. Gun

misuse in Mexico does not violate U.S. law.

The gun possession in *Small* occurred in the United States, so the case

involved a domestic application of the statute to which "the presumption against

extraterritorial application does not apply." 544 U.S. at 389. Nevertheless, the

Court used "the 'commonsense notion that Congress generally legislates with

domestic concerns in mind,'" and concluded that "a similar assumption is

appropriate when we consider the scope of the phrase 'convicted in any court'

here." *Id*. at 388-89 (quoting *Smith*, 507 U.S. at 204 n.5).

The assumption was bolstered because the phrase "convicted in any court"

was one element of domestic conduct (unlawful gun possession) that the statute

prohibited. *Id*. at 389. *Small* also concluded that Congress likely did not intend to

invoke foreign criminal laws because some of them are inconsistent with U.S.

criminal law. *Id*.

Moreover, including foreign convictions would create internal

inconsistencies in the statute. It provided exceptions if the prior conviction was for

certain "Federal or State" crimes, but omitted exceptions for similar convictions

under foreign law, thus creating "apparently senseless distinction[s]." *Id*. at 392.

35

And the legislative history revealed no intention to encompass foreign convictions. *Id*. at 389-94.

The textual analysis here is even more compelling than in *Small*. PLCAA precludes claims against gun importers, *but not exporters.*[17] Its Findings also omit any reference to exporting, referring only to "[t]he *manufacture, importation, possession, sale, and use of firearms and ammunition in the United States.*" 15 U.S.C. § 7901 (a)(4) (emphasis added). This confirms Congress's use of the statute's substantive terms in only their domestic scope. *See, e.g., Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993) ("Expressio unius est exclusio alterius.").

Moreover, like the key terms in *Small*, here "criminal or unlawful misuse" is a defining element of a domestic violation/defense, implying the terms have only domestic scope. And it is similarly improbable that Congress intended to

---

[17] 15 U.S.C. § 7903(6)(A); *see also id*. § 7901(b)(1) (among statute's goals is protecting importers from the defined claims; not mentioning exporters). Section 7903(5)(A) defines a prohibited qualified civil liability action as one brought against "manufacturers" and "sellers." Section 7903(6)(A) defines "sellers" to include licensed importers, but omits exporters. Section 7903(2) defines a "manufacturer" as someone who is licensed as a manufacturer under 18 U.S.C. § 923. A license to import or manufacture does not include the right to export firearms, which requires additional licenses. And PLCAA refers not just to the status of being an importer (omitting exporters), but also to the business of importing but not of exporting. *See* 15 U.S.C. § 7901(a)(5) (referring to "manufacture, marketing, distribution, importation, or sale to the public"); *id*. § 7901(a)(4) (same).

incorporate foreign criminal law into the statute, especially here given the extremes among, and wide variations in, foreign gun laws.[18]

As in *Smith*, significant anomalies would result from reading "criminal or unlawful" to include unlawfulness under Mexican law: PLCAA provides exceptions where the seller violated certain "State or Federal statute[s]" (15 U.S.C. § 7903(5)(A)(i), (iii)), but not similar foreign statutes, and preserves certain claims, including those of minors, "under Federal or State law" (*id*. § 7903(5)(D)) but not under similar foreign law. These exceptions—without corresponding exceptions based on foreign laws—confirm that Congress had only "domestic [law] in mind." 544 U.S. at 388-389. And as in *Small*, PLCAA's legislative history has no discussion of gun misuse that occurs abroad or that is criminal under foreign law; it includes not a single reference to Mexico, Canada, or their nationals.

For the same reasons, PLCAA's reference to injury— "damages … or other relief, resulting from" gun misuse—must be construed to mean injury in the United States. *See* 15 U.S.C. § 7903(5)(A); *id.* §§ 7901 (a)(6), (b)(1). "Injury" in *RJR Nabisco* was "a substantive element of a cause of action" to which the Court

---

[18] *See, e.g.,* National Report of Eritrea on its Implementation of the United Nations Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in All Its Aspects at 1 (Jan. 1, 2010) (gun possession outlawed); Robert L. Nay, *Firearms Regulation in Various Foreign Countries* (Law Library of Congress 1990), available at https://www.ojp.gov.

"appl[ied] the presumption against extraterritoriality *to interpret the scope* of [the] injury requirement." *WesternGeco*, 138 S. Ct. at 2138. The injury element should be similarly construed here to have only domestic scope. Likewise, PLCAA pointedly refers to precluding actions "by the Federal Government, States, municipalities [and some non-governmental entities]" omitting any express references to *foreign* governments. *See* 15 U.S.C. §§ 7901 (a)(7), (8). Its reference to governments should be construed to mean only domestic governments.

In short, PLCAA's preclusion of certain lawsuits in U.S. federal and state courts says *nothing at all* about whether the defined precluded lawsuits include those where the injury occurs abroad and the gun misuse is unlawful under foreign law rather than U.S. law. In construing that definition's terms, the governing assumption is that Congress legislates with respect to only domestic matters and does not intend to undermine a foreign sovereign's law regarding injuries and circumstances within its jurisdiction. Defendants had a fulsome opportunity in the district court to marshal support for their assertion that PLCAA's terms encompass such foreign conduct—they failed to do so.

### B.    If PLCAA Applied, the Government's Claims Would Be Within Its "Predicate" Exception.

Even if PLCAA otherwise reached these claims by a foreign government for injuries incurred abroad resulting from gun misuse abroad, PLCAA would not bar this suit. Defendants knowingly violated numerous statutes applicable to the

marketing and sale of guns, and those violations caused harm to the Government. These claims therefore fall within PLCAA's "predicate exception." In ruling otherwise, the district court contravened overwhelming case authority from across the country that the Protection of *Lawful* Commerce in Arms Act does not protect companies that engage in unlawful commerce in arms.

PLCAA provides that its preclusive effect "shall not include" an action that satisfies one of five exceptions. Under the "predicate exception," PLCAA does not preclude:

> (iii) an action *in which* a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—
>
>> (I) *any case* in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or
>>
>> (II) *any case* in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18 [.]

§ 7903(5)(A)(iii) (emphasis added).

39

Notably, while other PLCAA exceptions exempt actions "*for*" specific claims, the "predicate exception" exempts "an action *in which* a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." § 7903(5)(A)(iii) (emphasis added).[19] Accordingly, where the predicate exception applies, it permits all of the plaintiff's tort claims to proceed, regardless of whether each of them would independently fall within an exception.

### 1. The Complaint alleges violations of numerous statutes applicable to gun sales.

This is an "action in which" the Complaint plausibly alleges that Defendants knowingly violated statutes "applicable to" the sale of guns. The Complaint alleges, for example, that Defendants are accomplices in violations of U.S. federal statutes regulating gun exports, straw purchases, gun licensing and possession, and other gun-sales practices. It also alleges that Defendants violated 18 U.S.C.§ 922(b)(4)'s prohibition on the sale to the general public of "machinegun[s]" (as defined in 26 U.S.C. § 5845(b)).

---

[19] The district court properly held that the Complaint adequately alleges that Defendants' conduct foreseeably causes the Government's injuries. Add. 17.

40

### a. Aiding and abetting unlicensed exports, straw purchases, and other unlawful sales practices

The Complaint alleges that Defendants are accomplices in violating 28 U.S.C. § 2778(a)(1) and its implementing regulations, which prohibit exporting guns from the United States into Mexico without a permit. Compl. ¶¶ 63-65.[20] Defendants systematically violate that statute by aiding and abetting sales to traffickers. *Id.* ¶ 244, 247-48. Defendants similarly aid and abet violations of U.S. gun statutes that prohibit sales without a license (*id.* ¶¶ 66-67, 249-50), and selling to straw purchasers (*id*. ¶¶ 69, 248-50).[21]

Numerous cases have held that similar allegations adequately plead predicate violations, and therefore PLCAA provides no basis to dismiss the case. For example, in *Smith & Wesson Corp. v. City of Gary*, 875 N.E.2d 422, 425 (Ind. App. 2007), the City, like the Government here, alleged that many of these same Defendants aid and abet illegal gun sales and possession through their distribution practices that supply the criminal gun market. The Indiana Court of Appeals held

---

[20] *See also* 28 U.S.C. § 2778(b)(1)(A)(i) (registration requirements for "manufacturing, exporting, or importing any defense articles . . . designated by the President"); 15 C.F.R. § 738.4.

[21] A straw purchaser "buys a gun on someone else's behalf while falsely claiming that it is for himself." *Abramski v. United States,* 573 U.S. 169, 171-72 (2014) (straw purchaser violates 18 USC §§ 922(a)(6), 924(a)(1)(a)). A dealer that completes a gun sale despite actual or constructive knowledge that the buyer is a straw purchaser is an accomplice to those purchase-related crimes. *See United States v. Carney,* 387 F.3d 436, 443 n.4, 448-50 (6th Cir. 2004).

that the manufacturers' distribution practices established knowing violations of gun laws, as well as the state public nuisance statute, and thus the City's negligence and public nuisance claims could proceed. *Id.* at 432-34. The Court of Appeals later reaffirmed that decision, reversing a trial court decision that subsequent PLCAA case law required dismissing the case. *City of Gary v. Smith & Wesson Corp.*, 126 N.E.3d 813 (Ind. 2019).

The New York Appellate Division similarly held that a gun manufacturer's aiding and abetting illegal downstream sales constitutes a predicate violation, so PLCAA did not bar plaintiff's negligence and public nuisance claims. *Williams v. Beemiller, Inc.*, 952 N.Y.S.2d 333, 339–40 (N.Y. App. Div. 2012), *amended by* 962 N.Y.S.2d 834 (N.Y. App. Div. 2013). The many other courts cited below, *see* note 23, similarly held that PLCAA does not preclude claims against gun dealers or manufacturers alleged to have knowingly violated gun laws, such as aiding and abetting sales to straw buyers or traffickers. The case law is not simply overwhelming; it is unanimous. *See also United States v. Ford*, 821 F.3d 63, 74 (1st Cir. 2016) (accomplice's knowledge can be proved by willful blindness to red flags); *Carney*, 387 F.3d at 448–50 (dealer convicted of participating in straw sales).

The Supreme Court upheld ***a criminal conspiracy conviction*** of a drug manufacturer under facts that were very similar to, though in many ways weaker

than, this case. *See Direct Sales Co., Inc. v. United States*, 319 U.S. 703 (1943).

Like this case, the manufacturer in *Direct Sales* supplied a licensed seller (a

physician) with a legal product, there through mail orders. Like this case (*see*

Compl. ¶¶ 89-94), the U.S. government told the manufacturer that certain sales

(bulk sales) were associated with illegal downstream diversion. Unlike this case,

the *Direct Sales* manufacturer did what the U.S. government requested and stopped

engaging in some bulk sales. Nonetheless, it continued to make some large sales,

and was convicted of criminal conspiracy when one doctor to whom it supplied

high volumes then illegally resold those drugs. The manufacturer in *Direct Sales*

did not have any knowledge of the physician's illegal conduct; it was aware only

that the (legal) bulk sales it supplied to the downstream seller were suspect. *See*

*also City of Boston v. Purdue Pharm*, *L.P.*, 2020 WL 977056, at *5 (Mass. Super.

Jan. 29, 2020) (cities adequately alleged that distributors "knowing[ly] supplied an

illicit opioid market over the course of years"); *In re National Prescription Opiate*

*Litig.*, 2018 WL 6628898, at *19 (N.D. Ohio Dec. 19, 2018) (complaint adequately

alleged that defendants "fail[ed] to administer responsible distribution practices

(many required by law)" and "not only failed to prevent diversion, but

affirmatively [and foreseeably] created an illegal, secondary opioid market").

    Defendants' conduct is more egregious than *Direct Sales*, as that

manufacturer stopped making some bulk sales when the Department of Justice said

they were indicative of trafficking; Defendants here defied U.S. government calls
to reform and "self-polic[e]" their distribution practices, and even sued the United
States to prevent ATF from cracking down on cross-border trafficking. Compl. ¶¶
143-44. In any event, the plausible, detailed allegations that Defendants knowingly
violated gun laws must be accepted here. *See, e.g., Lanza v. Fin. Indus. Regul.
Auth*., 953 F.3d 159, 162 (1st Cir. 2020).

### b.    The ban on sales of machine guns

The Complaint also alleges that Defendants violated 18 U.S.C. § 922(b)(4)'s
prohibition on the sale to the general public of "machinegun[s]" (as defined in 26
U.S.C. § 5845(b)). Defendants sell AR-15 and AK-47 style firearms that they
design to allow "simple modification or elimination of existing component parts"
to transform them into guns capable of "full automatic fire," rendering them
prohibited "machinegun[s]." Compl. ¶¶ 307-18; *see also id.* ¶¶ 300-06 (alleging
violation of 18 U.S.C. §§ 922(r) and 925(d)(3), which restrict import and assembly
of semi-automatic weapons with features not suitable for "sporting purposes").

The National Firearms Act (NFA) strictly regulates fully automatic
weapons, and the Gun Control Act (GCA) does not allow them to be sold to the
general public without the law's strict registration requirements. *See* 18 U.S.C.
§ 922(b)(4) (prohibiting sales of machineguns to general public); 26 U.S.C. § 5861
(requiring compliance with NFA). ATF has made clear that the restricted weapons

include those that "have not previously functioned as machineguns but possess design features which facilitate full automatic fire *by a simple modification or elimination of existing component parts*." ATF Rul. 82-8 at 1, 1982-2 A.T.F.Q.B. 49 (1982), https://www.atf.gov/file/55376/download (emphasis added).

That is what the Government alleges: Defendants make and sell assault rifles that can easily be modified to fire automatically, and are accessories to illegal possession of those guns. Compl. ¶ 308–13. Indeed, it is well known that the cartels modify Defendants' assault weapons to fire automatically. *Id.* ¶¶ 11, 311-12.

These allegations plead predicate violations of PLCAA. *See, e.g., Parsons v. Colt's Mfg. Co.*, 2020 WL 1821306, at *6 (D. Nev. Apr. 10, 2020) ("[plaintiffs] allege that these defendants knowingly manufactured and sold weapons 'designed to shoot' automatically because they were aware their AR-15s could be easily modified with bump stocks to do so. The [plaintiffs] have alleged a wrongful death claim that is not precluded by the PLCAA"), *subsequently dismissed on other grounds under Nevada state law*, 499 P.3d 602 (Nev. 2021); *Goldstein v. Earnest*, No. 37-2020-16638-CU-PO-CTL at 3–4 (Cal. Super. Ct. July 2, 2021) (similar), *pet. for writ denied* (Cal. Ct. App. Sept. 4, 2021) (JA000224).

### 2. The plaintiff's claims need not arise under the predicate statute.

The district court acknowledged the Government's allegation that "defendants' conduct violates various federal criminal firearm statutes" (Add. 32), but never considered whether it exempted the Government's action from PLCAA under the predicate exception.[22] The court erroneously concluded that the exception requires not just that the plaintiff prove that the defendant violated a predicate statute, but also that the plaintiff's claim *arise under* the predicate statute—that the predicate statute must provide a private right of action. Add. 27 (the Government's tort claims "*are not claimed to arise under any federal or state statute*") (emphasis added). So the Government's negligence, nuisance, and other tort claims could not proceed even if Defendants violated federal gun laws. *Id.*

No other court has ever construed PLCAA that way. For good reason. The predicate exception does not state that it allows only actions "arising under" a statute. Instead, courts routinely hold that where, as here, a predicate statutory violation is alleged, *all claims* asserted in the action are excepted from PLCAA's preclusion, regardless of whether they would independently fall within an

---

[22] The court considered the allegations only in connection with its holding that the negligence per se exception was not applicable. Add. 32.

46

exception, provided that the predicate violation was a proximate cause of the harm
for which relief is sought.[23]

The district court's idiosyncratic reading is at odds with PLCAA's text.
Congress knew how to make a PLCAA exception depend on the law under which a
particular claim arises. Several other PLCAA exceptions exempt specific legal

---

[23] *See, e.g.*, *Prescott v. Slide Fire Solutions, LP*, 410 F. Supp. 3d 1123, 1139 n. 9
(D. Nev. 2019) ("lack of standing to pursue a private cause of action" does not bar
statute "from serving as a predicate statute," and "violation would open the door
for civil liability on other claims"); *Fox v. L&J Supply, LLC*, No. 2014-24619, 1
n.1 (Pa. Ct. Cmmn. Pl. Nov. 26, 2018) (where predicate exception applies, "entire
action" is removed from preclusion) (JA0002021); *Englund v. World Pawn Exch.,
LLC*, 2017 WL 7518923, at *4 (Oregon Cir. Ct. June 30, 2017) ("Congress
intended for all otherwise justiciable claims to go forward in cases that trigger
application of the predicate exception"); *Corporan v. Wal-Mart Stores East, LP*,
2016 WL 3881341, at *4 n.4 (D. Kan. July 18, 2016) (allegation of predicate
violation—aiding and abetting straw purchase—would permit common law claims
including negligence to proceed without "engag[ing] in . . . claim-by-claim
analysis"); *Chiapperini v. Gander Mountain Co., Inc.*, 13 N.Y.S.3d 777, 787 (N.Y.
Sup. Ct. 2014) (predicate exception "permitt[ed] the entire Complaint to proceed
through litigation, without the need for a claim-by-claim PLCAA
analysis"); *Williams*, 952 N.Y.S. 2d at 339 (predicate exception permitted common
law negligence and other claims to proceed); *see also Smith & Wesson,* 875 N.E.2d
at 434 (motion to dismiss nuisance and negligence claims properly denied where
predicate violation alleged); *City of New York v. A–1 Jewelry & Pawn, Inc.*, 247
F.R.D. 296, 351 (E.D.N.Y. 2007) (nuisance claim not barred where predicate
violation alleged); *King v. Klocek*, 133 N.Y.S.3d 356, 359 (N.Y. Sup. Ct. 2020)
(because predicate exception satisfied, "the 'action' [for negligence] is not subject
to dismissal at this stage of the proceeding"); *Brady v. Walmart Inc.*, 2022 WL
2987078 at *12 (D. Md. July 28, 2022) (same); *cf. Goldstein v. Earnest*, No. 37-
2020-16638-CU-PO-CTL, at 5 (Ca. Super. Ct. Jul. 2, 2021) (although PLCAA
required claim-by-claim analysis, violation of federal and state gun laws supported
claims for negligence and nuisance) (JA000224).

causes of action: actions **"for"** negligent entrustment and negligence per se

(§ 7903(5)(A)(ii)); actions **"for"** breach of contract or warranty (§ 7903(5)(A)(iv));

actions **"for"** damages from a product defect (§ 7903(5)(A)(v)) (all emphasis

added).

In contrast, the predicate exception exempts actions ***"in which"*** the plaintiff

proves certain statutory violations. "In which" does not mean "for." "[W]here

Congress includes particular language in one section of a statute but omits it in

another . . . it is generally presumed that Congress acts intentionally and purposely

. . . . " *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v.*

*United States*, 464 U.S. 16, 23 (1983)) (internal quotations omitted).

The district court's reading also makes the exemption's proximate-cause

requirement superfluous. It serves no apparent purpose if the claim "arises under" a

predicate statute, as proximate cause would already be an element of a private

statutory right of action. But it makes perfect sense as a nexus element that permits

other claims in the action to proceed. *See Consumer Data Ind. Ass'n v. Frey*, 26

F.4th 1, 7 (1st Cir. 2022) ("A statute . . . ought to be construed in a way that 'no

clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting

*Duncan v. Walker*, 533 U.S. 167, 174 (2001))).

Indeed, the district court's reading makes the predicate exception

nonsensical. As non-exhaustive examples of viable predicate violations, PLCAA

explicitly includes violating the federal Gun Control Act by aiding and abetting

illegal gun sales and possession, such as straw purchasing and trafficking.

§§ 7903(5)(A)(iii)(I), (II); *see* Section II.B.1 *supra*. Yet courts have held that

private claims cannot "arise under" the Gun Control Act because it provides no

private right of action, including for the illegal sales practices that PLCAA lists as

examples of viable predicate violations. *See, e.g., Est. of Pemberton v. John's*

*Sports Ctr., Inc.*, 135 P.3d 174, 180–83 (Kan. Ct. App. 2006); *T&M Jewelry, Inc.*

*v. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006); *Starr v. Price*, 385 F. Supp. 2d 502, 513

(M.D. Pa. 2005). So, according to the district court's holding, the predicate

exception allows only claims that are not viable, making it effectively a nullity.[24]

The untenability of the district court's reading is illustrated by *Bannerman v.*

*Mt. State Pawn, Inc.*, 2010 WL 9103469 (N.D. W.Va. Nov. 5, 2010), *aff'd,* 436

Fed. Appx. 151 (4th Cir. 2011). In *Bannerman*, a gun dealer sold a gun to a felon,

who then shot the plaintiffs. Plaintiffs sued the gun dealer, but the statute of

limitations had expired on their state common-law claims, so they asserted only a

private right of action for violating the Gun Control Act, which would survive

---

[24] A violation of the Gun Control Act or other federal statutes might provide the
basis for a claim under the negligence-per-se exception, but that exception is
available only for claims against "sellers," while the predicate exception extends to
manufacturers that are not also sellers. Add. 30. And the existence of the separate
exception for negligence per se itself suggests that the predicate exception was
intended to permit more than simply claims for negligence per se.

49

under the four-year federal statute of limitations. The court dismissed for failure to timely sue. The Court recognized that under the predicate exception PLCAA does not protect sellers where they "knowingly violated a state or federal statute applicable to the sale," *id*. at \*8, but held (citing extensive authority) that the Gun Control Act provides no private right of action, *id*. at \*5-\*7. The court concluded:

> *In addition to a predicate exception*, the plaintiffs must assert a claim giving rise to a cause of action. Since a private cause of action does not arise from [the Gun Control Act] as this Court has found above, the plaintiffs have failed to state a claim for which relief can be granted.

*Id.* at \*9 (emphasis added; citations omitted); *see also Ileto,* 565 F.3d at 1132 ("This exception has come to be known as the predicate exception, because a plaintiff not only must present a cognizable claim, he or she also must allege a knowing violation of a predicate statute.") (internal quotation marks omitted).

If the Gun Control Act provides no private right of action, as *Bannerman* and its extensive cited authority hold, and if the district court here were right that the predicate exception applies only if plaintiff's claim arises under the predicate statute, then the predicate exception would allow only actions that are not allowed, including even those that the statute cites in §7903(5)(A)(iii)(I) and (II) as examples of viable actions. That makes no sense.

PLCAA's sponsors made clear that gun companies could be liable for negligence when they break the law. PLCAA's chief Senate sponsor, Senator Larry Craig, repeatedly stated on the Senate floor, "If manufacturers or dealers break the

law or commit negligence, they are still liable." 151 Cong. Rec. S9061, S.9099 (daily ed. July 27, 2005). Sponsor Senator Max Baucus also asserted that "[t]his bill . . . will not shield that industry from its own wrongdoing or from its negligence." 151 Cong. Rec. S9107 (daily ed. July 27, 2005). Given that most of the statutes at issue are criminal statutes that do not provide a private right of action, the district court's idiosyncratic reading would effectively convert PLCAA into the very categorical immunity statute that its sponsors repeatedly disclaimed.

Even when claims arise under state law, federalism principles and the presumption against preemption require reading PLCAA to preserve common law actions and narrowly construe the scope of any preemption. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522–24 (1992); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Deference to a foreign sovereign's law requires no less. The Court should "not read [PLCAA] to [bar claims like the Government's] unless Congress has made it clear that [they] are *included.*" *Gregory*, 501 U.S. at 467 (emphasis in original). PLCAA does not include such a plain statement that negligence or other tort claims are barred. Accordingly, courts "are compelled to resolve any textual ambiguities in favor of the plaintiffs." *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 312–13 & n. 58 (Conn. 2019), *cert denied sub nom. Remington Arms Co., LLC v. Soto*, 140 S.

Ct. 513 (2019) (citing *Cipollone* and *Bond v. United States*, 572 U.S. 844, 857–58 (2014)).

Further, PLCAA's first Purpose and one Finding indicate Congress's intent to shield only liability for "harm solely caused" by third-party misuse. *See* 15 U.S.C. §§ 7901(a)(6), (b)(1). The addition of "solely" was one of the few changes made to PLCAA after it failed to pass,[25] suggesting it was instrumental to its passage and that Congress wished to preserve liability in cases where one cause of the harm was third-party misuse, and another cause was gun company violation of laws applicable to firearms, as the predicate exception provides.

## CONCLUSION

Recourse to U.S. courts is sometimes necessary to get effective relief against U.S.-domiciled corporations. Under principles of reciprocal comity, U.S. courts are generally open to foreign sovereigns to pursue claims for such relief under their own laws. PLCAA precludes claims, subject to exceptions, for injury resulting from gun misuse—properly construed to mean injury in the United States from gun misuse in the United States.

The Government alleges—with the proof yet to come in undoubtedly hard fought litigation—that these U.S.-domiciled Defendants systematically aid and

---

[25] *Compare* S. 1805, 108th Cong. § (b)(1) (2003) *with* 15 U.S.C. § 7901 (b)(1) and S. 397, 109th Cong. (2005) (enacted).

abet trafficking of 340,000 guns every year from the United States into Mexico, in violation of Mexico's import laws, U.S. export laws, and other U.S. gun statutes. The trafficking materially contributes to massive gun misuse in Mexico with consequent devastating injury in Mexico. These claims are not barred by PLCAA—they come within its predicate exception. More fundamentally, PLCAA adjusts interests among U.S.-domiciled manufacturers and those injured by the products in the United States. If PLCAA is instead to be extended to create a safe haven for Defendants that abet the unlawful export of their guns across the border into Mexico, that is a decision that the U.S. Congress, not courts, must make.

The Court should reverse the district court's dismissal of the Complaint, and the Government should be permitted to prove its case.

Dated: March 14, 2023                    Respectfully submitted,

/s/ *Steve D. Shadowen*
Steve D. Shadowen
Richard M. Brunell
Nicholas W. Shadowen
SHADOWEN PLLC
1135 W. 6th Street, Suite 125
Austin, TX 78703
Phone: 855-344-3298
sshadowen@shadowenpllc.com
rbrunell@shadowenpllc.com
nshadowen@shadowenpllc.com

/s/ *Jonathan E. Lowy*
Jonathan E. Lowy
GLOBAL ACTION ON GUN
VIOLENCE
805 15th Street NW, #601
Washington, DC 20005
Phone: (202) 415-0691
jlowy@actiononguns.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,686 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*/s/ Steve D. Shadowen*
Steve D. Shadowen

## CERTIFICATE OF SERVICE

I, Steve D. Shadowen, hereby certify that this document was filed with the Clerk of the Court via CM/ECF. Those attorneys who are registered with the Court's electronic filing systems may access this filing through the Court's CM/ECF system, and notice of this filing will be sent to these parties by operation of the Court's electronic filings system.

Dated: March 14, 2023                           /s/ *Steve D. Shadowen*
                                                 Steve D. Shadowen

# Addendum

# TABLE OF CONTENTS

Memorandum and Order on Defendants' Motions to Dismiss, ECF No. 163, September 30, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD000001

Order of Dismissal, ECF No. 174, October 1, 2022 . . . . . . . . . . . . . . . . ADD000046

Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD000047

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ )<br>ESTADOS UNIDOS MEXICANOS, )<br> )<br>   **Plaintiff,** )<br> )<br>   **v.** )<br> )<br>**SMITH & WESSON BRANDS, INC.;** )<br>**BARRETT FIREARMS MANUFACTURING,** )<br>**INC.; BERETTA USA CORP.; CENTURY** )<br>**INTERNATIONAL ARMS, INC.; COLT'S** )<br>**MANUFACTURING COMPANY, LLC;** )<br>**GLOCK, INC.; STURM, RUGER & CO., INC.;** )<br>**and WITMER PUBLIC SAFETY GROUP,** )<br>**INC. d/b/a INTERSTATE ARMS,** )<br> )<br>   **Defendants.** )<br>_____ ) | **Civil Action No.**<br>**21-11269-FDS** |

# MEMORANDUM AND ORDER ON
# <u>DEFENDANTS' MOTIONS TO DISMISS</u>

**SAYLOR, C.J.**

  This lawsuit involves claims against seven gun manufacturers and one wholesaler alleging the illegal trafficking of guns into Mexico. The plaintiff is the government of Mexico. The principal issue is whether the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. §§ 7901-7903 *et seq.*—a statute passed with the express purpose of protecting the firearm industry from civil liability for the criminal misuse of its products—requires dismissal of the complaint.

  Mexico's domestic gun laws are strict. There is only one gun store in the entire nation, and it issues fewer than 50 permits per year. Nonetheless, Mexico is suffering from an epidemic of gun-related violence. In 2003, it had fewer than 2,500 gun-related homicides per year. By 2019, that number had risen to 23,000. In 2019 alone, there were more than 3.9 million crimes

committed in Mexico with U.S.-manufactured guns.

The direct causes of that increase are, of course, the decisions of individual actors in Mexico to commit violent crimes. The indirect causes are no doubt many, but surely a substantial portion of the blame rests with American citizens. The rise of Mexican criminal organizations has been fueled by the unrelenting demand of Americans for illegal drugs, and those same organizations now play an ever-increasing role in the smuggling of illegal migrants across the border. The complaint here focuses on an additional indirect cause of that violence: the marketing and sales practices of American gun manufacturers and distributors.

According to the complaint, the increase in gun-related violence in Mexico is directly linked to the expiration of the U.S. ban on assault rifles in 2004. It alleges that when that ban expired, the production and manufacturing of firearms in the United States increased dramatically. In particular, gun manufacturers increased the production of military-style assault weapons, which are the type favored by criminal organizations. The complaint alleges that the manufacturers are aware of this and are "deliberate and willing participants, reaping profits from the criminal market they knowingly supply." (Compl. ¶ 16).

The complaint alleges that 70 to 90 percent of guns recovered at crime scenes in Mexico were trafficked from the United States, with defendants producing more than 68 percent of those guns. It further alleges that defendants are "fully on notice of the massive trafficking of their guns into Mexico" because it has been extensively documented in government reports and throughout the media. (*Id.* ¶ 6). According to the complaint, defendants have been nonetheless unwilling to implement any public-safety monitoring of their distribution systems to limit that illegal trafficking.

The complaint asserts claims against eight defendants. Seven are gun manufacturers—

ADD000002

Smith & Wesson, Beretta, Century Arms, Colt, Glock, Ruger, and Barrett. The eighth defendant is Interstate Arms, a gun wholesaler and distributor. All claims arise under state law, and include, among other things, claims for negligence, public nuisance, defective design, unjust enrichment, and violation of Connecticut and Massachusetts state consumer-protection statutes.

Defendants have moved to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. In addition, defendants have moved to dismiss based on lack of Article III standing pursuant to Fed. R. Civ. P. 12(b)(1). Certain defendants have also moved to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

Unfortunately for the government of Mexico, all of its claims are either barred by federal law or fail for other reasons. The PLCAA unequivocally bars lawsuits seeking to hold gun manufacturers responsible for the acts of individuals using guns for their intended purpose. And while the statute contains several narrow exceptions, none are applicable here.

This Court does not have the authority to ignore an act of Congress. Nor is its proper role to devise stratagems to avoid statutory commands, even where the allegations of the complaint may evoke a sympathetic response. And while the Court has considerable sympathy for the people of Mexico, and none whatsoever for those who traffic guns to Mexican criminal organizations, it is duty-bound to follow the law.

Accordingly, and for the reasons set forth below, the motions to dismiss will be granted.

## I.   **Background**

### A.   **Factual Background**

#### 1.   **Parties**

Estados Unidos Mexicanos ("Mexico") is a foreign nation. (Compl. ¶ 30).

Smith & Wesson Brands, Inc.; Barrett Firearms Manufacturing, Inc.; Beretta U.S.A.

Corp.; Century International Arms, Inc.; Colt's Manufacturing Company, LLC; Glock, Inc.; and

Sturm, Ruger & Co., Inc. are manufacturers and sellers of firearms.  (*Id.* ¶¶ 31-39).

Witmer Public Safety Group, Inc., currently doing business as "Interstate Arms," is a

Boston-area wholesaler of firearms.  (*Id.* ¶ 40).  All defendant manufacturers, except Barrett, use

Interstate Arms to sell their guns for resale to gun dealers throughout the United States.  (*Id.* ¶¶ 1,

31-40).  Barrett's authorized dealer in Massachusetts is the Natick Outdoor Store.  (*Id.* ¶ 32).

### 2. Defendants' Alleged Knowledge of Unlawful Trafficking of Guns to Mexico

According to the complaint, defendants are aware of the harmful effects their actions

have in Mexico.  (*Id.* ¶¶ 115-226).  Specifically, the complaint alleges that gun dealers utilize a

variety of practices that enable them to traffic guns to Mexico and that defendants are aware of

those practices.  (*Id.* ¶ 118).

For example, the complaint alleges that defendants know that the gun dealers they sell to

engage in conduct such as "straw sales, multiple sales, repeat sales, and other business practices

that supply traffickers who arm the drug cartels."  (*Id.*).  It also alleges that both the public news

and government sources put defendants on notice of those practices and of the specific dealers

that routinely cross guns into Mexico utilizing those tactics.  (*Id.* ¶¶ 119-22).  That information

has been allegedly "spoon fed" to defendants because of its public nature.  (*Id.* ¶ 121).

According to the complaint, news sources have published more than 3,000 articles since 2011 in

the United States alone that explain how defendants' products contribute to violence in Mexico.

(*Id.* ¶¶ 135, 139).  Allegedly, those sources have also provided the names of particular dealers

whose guns are most commonly found in the hands of Mexican cartels.  (*Id.* ¶¶ 119-20).  The

complaint also details congressional, other governmental, and NGO data that is publicly

available.  (*Id.* ¶¶ 137-40).

According to the complaint, defendants willfully refuse to utilize the resources available to them that would make the distribution and sale of firearms safer.  (*Id.* ¶¶ 121-23).  For example, it alleges that defendants could use ATF trace data to obtain more detailed information as to which dealers contribute to the illegal Mexican gun market, but choose not to.  (*Id.* ¶¶ 123, 125).  Instead, defendants allegedly capitalize on ATF's inability to monitor the entire industry and sell to dealers whose licenses should be revoked.  (*Id.* ¶¶ 126-30).  According to the complaint, defendants have resisted governmental efforts to address the public safety issues caused by the sale of their firearms.  (*Id.* ¶¶ 141-44).

The complaint alleges that defendants intentionally allow the continued unlawful trafficking of guns into Mexico.  (*Id.* ¶¶ 209; 377-95).  Specifically, it alleges that the flow of guns into the illegal market is a "feature" and not a "bug."  (*Id.* ¶ 384).  According to the complaint, defendants have received at least $170 million annually from such sales.  (*Id.* ¶ 389).  It further alleges that research from the University of San Diego suggests that almost half of all licensed gun dealers would be forced to close shop if not for gun trafficking into Mexico.  (*Id.* ¶ 395).

### 3.    Defendants' Alleged Conduct

The complaint alleges that defendants engage in multiple practices that are contrary to their obligations as manufacturers or sellers of dangerous goods.  (*Id.* ¶¶ 227-376).

### a.    General Distribution Practices

Defendants use three-tier distribution systems.  (*Id.* ¶ 378).  Defendants, as manufacturers, sell to distributors, who sell to retailers, who then sell to civilian end-users.  (*Id.*).  According to the complaint, defendants' distribution practices enable the unlawful trafficking of guns to Mexico for multiple reasons.  (*Id.* ¶¶ 227-376).

First, the complaint alleges that defendants sell to "any and all" distributors with federal

licenses, ignoring potential "irresponsible" actors and the possible effects on public safety. (*Id.* ¶¶ 228-30). Second, it alleges that defendants' distribution and sales practices enable straw purchases, multiple and repeat sales, "kitchen-table sales," and unlawful sales at gun shows. (*Id.* ¶¶ 237-77).

A straw purchaser is someone who purchases a gun on behalf of the final intended recipients, who often are not lawfully permitted to purchase a gun themselves. (*Id.* ¶ 69). According to the complaint, straw purchasers are involved in the movement of the majority of the guns that end up illegally in Mexico. (*Id.* ¶ 237). Allegedly, straw purchases often occur in situations where defendants should have known they were dealing with such a purchaser and where additional training and diligence could have prevented the gun from being passed to criminals or other downstream users. (*Id.* ¶¶ 238-39). According to the complaint, defendants have taken no action to implement such training and diligence. (*Id.*).

Multiple sales occur when someone clusters gun purchases to buy multiple guns at the same time from the same dealer, which is further exacerbated by repeat sales to those customers. (*Id.* ¶ 251). According to the complaint, the multiple-sale buyer "transfers the guns to [persons] who do not want to submit to a background check." (*Id.*). The guns are then diverted to the criminal market and then trafficked illegally into Mexico. (*Id.* ¶ 252). The complaint further alleges that multiple sales often occur under circumstances that "indicate[] or should have indicated" that the guns "were destined for the unlawful market." (*Id.*). Defendants allegedly know the likely consequences of their actions, but still choose to "regularly allow their guns to be sold . . . as part of multiple purchases." (*Id.*). Congress and ATF have also acknowledged the "high-risk practice" of multiple sales because it is a common way that traffickers purchase guns to sell in the illegal market. (*Id.* ¶ 253). Various sources within the gun manufacturing

6

community have also allegedly acknowledged the role such sales play in fueling the illegal market.  (*Id.* ¶¶ 253-55).

The term "kitchen-table sales" refers to gun sales that occur outside of stores, such as at a dealer's home or a parking lot.  (*Id.* ¶ 258).  According to the complaint, defendants allegedly sell to dealers who make such sales, and who use the Internet to manage customer orders.  (*Id.* ¶¶ 258-59).  This allows the dealer to act as a conduit between a manufacturer or distributor and the ultimate purchasers without the legal restrictions placed on sellers at brick-and-mortar stores. (*Id.* ¶¶ 259-60).  Those types of sales result in almost a quarter of all ATF licensed-dealer trafficking investigations, because many of those dealers allegedly capitalize on their relative freedom to circumvent federal gun sale and reporting laws.  (*Id.* ¶ 261).  Despite awareness in the industry about the effects of selling to dealers engaged in this practice, defendants allegedly ignore the danger and continue their practice of selling to them without proper scrutiny.  (*Id.* ¶¶ 262-64).

Gun show sales occur when dealers purchase guns from other dealers and then sell them at gun shows for cash without adhering to legal requirements.  (*Id.* ¶ 276).  Defendants are also allegedly aware of and nonetheless ignore the industry "loophole" that gun shows represent.  (*Id.* ¶ 273).  This "virtually unregulated" process leads to a considerable number of guns being illegally trafficked.  (*Id.* ¶ 275).

### b.    <u>Gun Design</u>

The complaint highlights a variety of ways in which defendants allegedly design their guns against the interest of public safety.  (*Id.* ¶¶ 283-318).

### (1)    <u>Semi-Automatic Weapons</u>

Semi-automatic weapons that are available for civilian purchase were originally designed to mirror the efficient and lightweight military weapons of the 1950s.  (*Id.* ¶¶ 282-84).  Those

7

guns utilize the same design as military weapons and permit rapid-fire emptying of magazines only slightly slower than fully automated weapons. (*Id.* ¶¶ 285, 288, 289).[1]  The complaint alleges that defendants know, or otherwise remain willfully blind to the fact, that their civilian semi-automatic weapons are easily converted into automatic weapons. (*Id.* ¶¶ 290-91). Allegedly, they choose designs that facilitate such illegal modification. (*Id.* ¶ 291).

### (2)  Military-Style Weapons

The complaint alleges that Barrett's .50 caliber sniper rifle "is a weapon of war." (*Id.* ¶ 292).  The gun was designed and marketed as "armor-penetrating" and employs ammunition five to ten times larger than that found in semi-automatic guns. (*Id.* ¶¶ 292, 296).  That ammunition, and the power the gun must possess to fire it, allows the rifle to hit a variety of non-civilian targets, such as aircraft, which it can do from up to 2,000 meters away. (*Id.* ¶¶ 296-97).[2]  For that reason, according to the complaint, the weapon is favored among a variety of criminal organizations, including Mexican drug cartels. (*Id.* ¶ 298).

The complaint further alleges that the Century Arms WASR-10 assault rifle is a military weapon because it is a "variant" of an AK-47 assault weapon. (*Id.* ¶ 300).  Allegedly, a Romanian company ships weapons to Century Arms in the United States, where the company modifies them with military-type features. (*Id.* ¶¶ 301-02).

### (3)  Machine Guns

Defendants Colt, Smith & Wesson, Ruger, and Century Arms allegedly sell AR-15 and AK-47 guns as semi-automatic weapons that can be easily modified to allow for automatic firing. (*Id.* ¶¶ 307-10).  The complaint alleges that this design feature is intentional and attractive

---

[1] According to the complaint, it takes two seconds to empty a large-capacity ammunition magazine in an automatic weapon and only five seconds to empty the same size magazine in a semi-automatic weapon. (*Id.* ¶ 289).

[2] The complaint includes a photograph of a helicopter allegedly shot down in Mexico by a criminal cartel member using the Barrett .50 caliber sniper rifle. (*Id.* ¶ 299).

8

to criminal organizations. (*Id.* ¶ 312). The complaint alleges that defendants "indiscriminately supply the civilian market" with semi-automatic guns that they know will be used by criminals in Mexico. (*Id.* ¶ 318).

### (4)    Alterable Serial Numbers

Criminals often destroy or otherwise remove the serial numbers on guns to make them more difficult to track and detect. (*Id.* ¶¶ 363-64). Guns whose serial numbers are easily altered or removed are favored by Mexican criminal organizations because without a serial number, investigators often hit a dead end in retracing a gun's movements. (*Id.* ¶ 364). It is possible to create serial numbers that are impossible to remove or alter or to include an additional serial number hidden elsewhere on the gun. (*Id.* ¶ 365). According to the complaint, this was a stipulated portion of an agreement in 2000 between Smith & Wesson and the government. (*Id.*).[3] The complaint alleges that because defendants benefit from the unlawful trafficking of guns, they do not implement strategies to avoid the destruction of serial numbers. (*Id.* ¶ 366).

### (5)    Potential Safety Improvements

The complaint alleges that defendants exacerbate existing public-safety issues by failing to incorporate reasonable safety measures in their design, marketing, and distribution practices. (*Id.* ¶ 353). It also alleges that there are practical steps defendants can take to improve the design of guns that would prevent them from being used improperly. (*Id.* ¶¶ 356-59). Moreover, according to the complaint, there would be no downside to defendants incorporating such features into their designs, as they would not prohibit lawful users from using the guns, and such features are technologically feasible. (*Id.* ¶¶ 354, 357). For example, according to the

---

[3] According to the complaint, on March 17, 2000, the federal government and various cities entered into a settlement agreement with Smith & Wesson in which the company accepted an obligation to sell to only "authorized distributors and authorized dealers" who abided by a code of conduct, including the requirement that the distributors and dealers store all trace requests and report them to the company. (Compl. ¶ 94).

9

complaint, the Smith & Wesson 2000 Agreement included a provision under which the company agreed to develop guns that only a particular, intended user could fire.  (*Id.* ¶ 359).  Defendants have allegedly refused to take such measures and therefore, according to the complaint, sell guns that are "defective and unreasonably dangerous."  (*Id.* ¶¶ 355-56).

### c.    **Marketing Practices**

According to the complaint, defendants have marketed and advertised their guns in an unsafe manner.  (*Id.* ¶¶ 319-22).

The complaint alleges that defendants "routinely" market their guns with military and law-enforcement images and language.  (*Id.* ¶ 322).  This has been referred to as the "halo effect" and allegedly allows defendants to "leverage" affiliations with military or police to increase civilian interest.  (*Id.* ¶ 323).  The complaint also alleges that the use of explicit military and law enforcement references, as well as references to a weapon's ability to function in "combat-like scenarios," attracts dangerous users or criminals.  (*Id.* ¶¶ 321-30).

There are several examples of these types of marketing practices in the complaint.  Smith & Wesson advertisements display "combat-like scenarios" and include statements such as "authentic Military & Police . . . design."  (*Id.* ¶ 324).  Colt advertisements market its "Trooper" assault rifle, discuss missions, and liken a civilian gun to its "combat-proven brother."  (*Id.* ¶ 325).  Barrett advertises its .50 caliber rifle as "battle proven" and capable of hitting targets 1800 meters away.  (*Id.* ¶ 326).  It also advertises its MRAD sniper rifle as "transform[ing] the military platform to fit civilian precision shooters."  (*Id.* ¶¶ 326-27).  Century Arms "emphasizes that its WASR-10 gun is based on a design used by 'Romanian ranger teams,' " includes "Paratrooper" in a civilian gun name, and highlights their gun's ability to "eat more ammo."  (*Id.* ¶ 328).[4]

---

[4] According to the complaint, "eat more ammo" indicates the gun's capacity for rapid-pace, high-output shooting that, allegedly, would be neither necessary nor desired for the average civilian buyer.  (*Id.* ¶ 328).

ADD000010

Glock uses military uniforms, associates with police, and discusses "tactical" uses to advertise its guns.  (*Id.* ¶ 329).  Interstate Arms refers to itself as a seller of "military-style" guns.  (*Id.* ¶ 330).

In addition, according to the complaint, Colt specifically markets its guns in ways that specifically entice Mexican criminal cartels.  (*Id.* ¶¶ 215-21).  Colt sells three guns that it intends for Mexican buyers:  the "El Jefe" pistol, the "El Grito" pistol, and the "Emiliano Zapata 1911" pistol.  (*Id.* ¶ 215).  Allegedly, these "models are status symbols and coveted by the drug cartels." (*Id.*).

According to the complaint, defendants utilize these marketing tactics while knowing that they are "disproportionately" attractive to criminal organizations.  (*Id.* ¶ 331).

### 4.    Alleged Injuries to the Mexican Government

The complaint alleges "massive" injury to the Mexican government as a result of defendants' conduct.  (*Id.* ¶ 446).

#### a.    General Harm

The complaint alleges that an estimated 342,000-597,000 guns sold by defendants are smuggled illegally into Mexico from the United States each year.  (*Id.* ¶¶ 437-38).  It also states that Mexico now ranks third in the world for number of gun-related deaths.  (*Id.* ¶ 453).

The complaint alleges a direct link between the increasing violence in Mexico and defendants' conduct.  (*Id.* ¶¶ 434-45).  It specifically shows a correlation between the increase in gun manufacturing in the United States, after the ban on assault-weapons expired in 2004, and (1) the number of illegal guns within Mexico, (2) the Mexican homicide rate, and (3) the increased use of guns for homicide.  (*Id.* ¶¶ 440-44).

#### b.    Specific Claimed Injuries

According to the complaint, the Mexican government "has had to spend vast funds on a wide range of services to fight the effects of Defendants' unlawful conduct," including

ADD000011

"substantial and unusual costs for providing, for example, extraordinary health care, law enforcement and military services, criminal justice administration, public assistance, and other social services and public programs." (*Id.* ¶ 447).

Specifically, the complaint alleges that the Mexican government has suffered the following injuries:

a. Losses caused by the decrease in funding available for other public services because the funds were diverted to services designed to address the effects of Defendants' conduct;

b. Costs of providing healthcare and medical care;

c. Costs of additional and specialized training for military and police;

d. Costs associated with the deaths of and substantial injuries to police and military personnel;

e. Costs of mental-health services, treatment, counseling, rehabilitation services, and social services to victims and their families;

f. Costs of law enforcement and public safety . . . ;

g. Costs of the increased burden on the Government's judicial system, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the escalating levels of crime caused by Defendants' conduct;

h. Costs of providing care for children whose parents were victims of Defendants' conduct;

i. Losses from the decreased efficiency and size of the working population in Mexico;

j. Losses from the diminished property values in the communities affected by Defendants' conduct;

k. Losses from decreased business investment and economic activity;

l. Losses incurred by the Government acting in its commercial capacity, including from armed attacks on employees of state-owned enterprises and compensation paid to such victims.

(*Id.* ¶ 448).

## B.     Procedural Background

The complaint asserts nine counts, seven of which are against all defendants.  Count 1 asserts a claim for negligence based on gun design, marketing, and distribution.  (*Id.* ¶¶ 506-10). Count 2 asserts a claim for public nuisance based on the increase in violence tied to defendants' alleged behavior.  (*Id.* ¶¶ 511-19).  Count 3 asserts a claim for defective design based on the allegedly unreasonably dangerous design of defendants' guns.  (*Id.* ¶¶ 520-22).  Count 4 asserts a claim for negligence *per se* involving defendants' gun-distribution systems.  (*Id.* ¶¶ 523-26). Count 5 asserts a claim for gross negligence.  (*Id.* ¶¶ 527-32).  Count 6 asserts a claim for unjust enrichment and restitution, based on defendants' profits and gains from the sale of illegally trafficked guns.  (*Id.* ¶¶ 533-41).  Count 7 asserts a claim against defendant Colt for violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*.  (*Id.* ¶¶ 542-48). Count 8 asserts a claim against defendant Smith & Wesson for violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A.  (*Id.* ¶¶ 549-56).  Count 9 asserts a claim for punitive damages against all defendants.  (*Id.* ¶¶ 557-60).

Defendants have filed multiple motions to dismiss.  All defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of Article III standing and failure to state a claim upon which relief can be granted.  Interstate Arms and Smith & Wesson have separately moved to dismiss for failure to state a claim.  Ruger, Century Arms, Glock, and Beretta have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.  Barrett and Colt have moved to dismiss for both lack of personal jurisdiction and failure to state a claim.[5]

For the reasons set forth below, although plaintiff has made a sufficient showing of

---

[5] On December 31, 2021, plaintiff voluntarily dismissed its claims against two foreign corporations named as defendants (Beretta Holding S.p.A and Glock Ges.m.b.H).

standing for the complaint to survive a motion to dismiss, all counts will be dismissed for failure to state a claim upon which relief can be granted. The court need not reach the motions to dismiss for lack of personal jurisdiction. *See Johnson v. Andrews*, 1994 WL 455013, at *4 (D. Mass. Aug. 17, 1994); *In re Vitamins Antitrust Litig.*, 2001 WL 849928, at *11 (D.D.C. Apr. 11, 2001); *see also* 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.6 (4th ed.) (stating that a court can "resolv[e] the suit on the merits when they clearly must be decided in favor of the party challenging [personal] jurisdiction, thereby obviating any need to decide the [jurisdictional] question").

## II.   Standard of Review

### A.   Fed. R. Civ. P. 12(b)(1)

On a motion to dismiss for lack of subject-matter jurisdiction, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007) (quoting *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995)). If the party seeking to invoke federal jurisdiction "fails to demonstrate a basis for jurisdiction," the motion to dismiss must be granted. *Id.* When ruling on a motion to dismiss under Rule 12(b)(1), the court "must credit the plaintiff's well-[pleaded] factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).

### B.   Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (cleaned up). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has

14

acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.   <u>Analysis</u>

### A.   <u>Article III Standing</u>

Standing is a threshold question in every case; "[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case." *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir. 1992). To satisfy the case-or-controversy requirement of Article III of the Constitution, plaintiffs bear the burden of establishing that they (1) have suffered an "injury-in-fact" that is "concrete and particularized" and "actual or imminent;" (2) that the injury is " 'fairly traceable' to the actions of the defendant;" and (3) that the injury will likely be redressed by a favorable decision. *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012). Those elements must be proved "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Defendants only contest the second requirement: they contend that the harms alleged are not "fairly traceable" to their actions.

The "fairly traceable" component of constitutional standing examines the causal connection between the assertedly unlawful conduct and the alleged injury. *See California v. Texas*, 141 S. Ct. 2104, 2113-14 (2021) (explaining that plaintiff failed to show how defendant's "action or conduct has caused or will cause the injury" for which they seek redress). One critical question is whether the "causal relation between [the] injury and challenged action depends upon the decision of an independent third party." *California v. Texas*, 141 S. Ct. at 2117; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (explaining that the Court has been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"). However, even if the causal relation depends on the actions of independent third parties, "standing is not precluded," but rather is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (cleaned up). To satisfy the element of causation, the plaintiff must at least show "that third parties will likely react in predictable ways," even where such actions are unlawful. *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

Here, plaintiff contends that the Mexican government and its citizens "have been victimized by a deadly flood" of firearms from the United States "into criminal hands in Mexico" as a consequence of defendants' "deliberate actions and business practices." (Compl. ¶ 2). According to the complaint, defendants "design, market, distribute, and sell guns in ways they know routinely arm the drug cartels in Mexico." (*Id.* ¶ 3). Specifically, the complaint alleges that the trafficking of firearms into Mexico, and the resulting violence, are the direct product of the intentional sales practices of defendants. (*Id.* ¶ 3).

The causal relation between the harm alleged and defendants' conduct depends upon the decisions of multiple independent parties—that is, the decisions of distributors to sell to retailers; the decisions of those retailers to sell to straw purchasers or similar persons; the decisions of

16

those purchasers to transfer weapons to cartel members or other criminal actors; and the

independent choices of those individuals to engage in criminal behavior.  And the chain of

causality does not stop there.  The plaintiff is not an individual victim of gun violence; it is the

Mexican government, which alleges a series of consequential harms arising out of that violence,

such as increased costs for health care and law enforcement.

Nonetheless, the complaint sufficiently alleges—at least for standing purposes—that

those third parties "will likely react in predictable ways," even if unlawfully.  *Department of

Commerce*, 139 S. Ct. at 2556.  The complaint alleges that 70 to 90 percent of guns that are

recovered at crime scenes in Mexico were trafficked from the United States, and that defendants

produce more than 68 percent of those trafficked guns.  (Compl. ¶¶ 1,5).  It further alleges that

defendants' policy is "to sell to any distributor or dealer that has a U.S. license to buy and sell

the product, regardless of the buyer's record of flouting the law and despite blazing red flags

indicating that a gun dealer is conspiring with straw purchasers or others to traffic Defendants'

guns into Mexico."  (*Id.* ¶ 7).

Furthermore, the complaint alleges throughout that violence in Mexico is a predictable, or

"foreseeable," result of defendants' actions.  (*See, e.g.*, *id.* ¶¶ 2, 50, 80, 87, 356).  For example,

section five of the complaint—titled "DEFENDANTS ARE FULLY ON NOTICE THAT

THEIR CONDUCT CAUSES UNLAWFUL TRAFFICKING TO MEXICO"—provides

examples of reports and articles that publicly revealed which gun dealers were the biggest

contributors to the illegal gun market in Mexico.  (*Id.* ¶ 120).  (*See also id.* ¶ 122 ("Defendants

regularly receive even more direct information about problem dealers.  Trace requests from ATF

and other agencies alert Defendants that guns they sell to specific distributors and dealers are

being recovered at crime scenes in Mexico.")).

The causation requirement of Article III standing "requires no more than *de facto* causality." *Department of Commerce*, 139 S.Ct. at 2566 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)); *Bennett v. Spear*, 520 U.S. at 167-68.  At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Bennett v. Spear*, 520 U.S. at 168 (cleaned up).  Under the circumstances, the requirement of *de facto* causation is satisfied here.

Accordingly, the complaint plausibly alleges that Mexico's injuries are "fairly traceable" to defendants' conduct for purposes of Article III standing.

**B.    The Protection of Lawful Commerce in Arms Act**

The PLCAA was enacted in 2005.  (Pub. L. No. 109-92, 119 Stat. 2095).  The statute contains a lengthy preamble setting forth various congressional findings and statutory purposes. 15 U.S.C. § 7901.  Among those findings is the following:

> (5)  Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not and should not be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

> (6)  The possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States.

> (7) The liability actions commenced or contemplated by the Federal Government . . . and others are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law.  The possible sustaining of these actions by a maverick judicial officer or petit jury would expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States.

18

*Id*. § 7901(a)(5)-(7).

Among the stated purposes of the statute is to "prohibit causes of action against manufacturers [and] distributors . . . of firearms . . . for the harm solely caused by the criminal or unlawful misuse of firearm products . . . by others when the product functioned as designed and intended." *Id*. § 7901(b)(1).

As relevant here, the statute provides that a "qualified civil liability action may not be brought in any Federal or State court." *Id*. § 7902(a). The term "qualified civil liability action" is defined to mean "a civil action or proceeding . . . brought by any person against a manufacturer or seller" of a firearm "for damages, punitive damages, injunctive or declaratory relief," or other relief, "resulting from the criminal or unlawful misuse" of a firearm by the person or a third party," subject to certain exceptions. *Id*. § 7903(5)(A).

For the following reasons, the Court finds that the PLCAA applies to this case and therefore, at a minimum, Counts 1-6 and Count 9 must be dismissed.

### 1. <u>Choice-of-Law Analysis</u>

Plaintiff first contends that under choice-of-law principles, tort claims are generally governed by the law of the place where the injury occurred, and therefore Mexican law, not the PLCAA, should apply to this dispute. That argument may be disposed of summarily: because the PLCAA is a jurisdiction-stripping statute, no choice-of-law analysis is necessary.

Statutes that "completely prohibit" certain types of actions or that "address[] 'a court's competence to adjudicate a particular category of cases' " are "best read as jurisdiction-stripping statute[s]." *Patchak v. Zinke*, 138 S. Ct. 897, 906 (2018) (quoting *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 316 (2006)). To determine whether a statute is jurisdictional, the court must look to the language used and whether the statute "imposes jurisdictional consequences."

19

*Patchak*, 138 S. Ct. at 905. A statute can be jurisdictional even if it does not use the word "jurisdiction." *See id.* ("Although § 2(b) does not use the word 'jurisdiction,' this Court does not require jurisdictional statutes to 'incant magic words.' " (citation omitted)). Examples of jurisdictional language include: "an action shall not be filed or maintained in a Federal court;" "an appeal may not be taken;" "no person shall file or prosecute;" and "no action shall be brought under." *See Patchak*, 138 S. Ct. at 905-06 (collecting cases). An example of "jurisdictional consequences" includes a directive by Congress, in the statute, that pending actions concerning the statute's scope "shall be promptly dismissed." *Id.* at 905.

By its plain terms, the PLCAA limits the types of lawsuits that can be brought against gun manufacturers and distributors in federal and state court. Specifically, the PLCAA states that a "qualified civil liability *action may not be brought in any* Federal or State court." 15 U.S.C. § 7902(a) (emphasis added). The PLCAA also provides that any such pending action, as of the date of enactment, must be "immediately dismissed by the court." 15 U.S.C. § 7902(b).[6] The PLCAA, therefore, is a jurisdictional statute. And because it bars exactly this type of action from being brought in federal and state courts, no choice-of-law analysis is necessary.

### 2. Presumption Against Extraterritoriality

Plaintiff further contends that the PLCAA does not apply when the lawsuit is brought by a foreign government for harms that primarily occurred in a foreign country. To resolve that question, the Court must consider whether the presumption against extraterritoriality applies.

"It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United

---

[6] The Court recognizes that the Second Circuit reached an opposite conclusion in *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 127 (2d Cir. 2011). However, since that opinion, the Supreme Court clarified in *Patchak* that a statute employing language such as "no action shall be brought under," and instructing that all covered pending actions must be dismissed upon enactment, is jurisdictional in nature. As noted, the PLCAA has both jurisdictional language and jurisdictional consequences.

States.' " *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). "This principle finds expression in a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016) (citation omitted). The main objective of the presumption against extraterritoriality is "to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Arabian Am. Oil Co.*, 499 U.S. at 248.

The Supreme Court has developed a two-step test to examine whether a given statute applies extraterritorially. *See RJR Nabisco*, 579 U.S. at 337. The first step examines whether Congress included explicit language in the statute that allows it to be applicable to conduct in foreign nations. *See id.* at 337. If a court does not find "affirmative and unmistakable" language in the statute that makes it applicable extraterritorially, *see id.* at 335, then, at the second step, the courts must determine the statute's "focus" and "whether the conduct relevant to that focus occurred in United States territory," *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018). If the relevant conduct occurred within United States territory, then the "case involves a permissible domestic application of the statute" and the presumption does not apply. *WesternGeco LLC*, 138 S. Ct. at 2136.

### a. <u>Step One</u>

As to the first step, "the question is not whether we think Congress would have wanted a statute to apply to foreign conduct . . . but whether Congress has affirmatively and unmistakably instructed that the statute will do so. When a statute gives no clear indication of an extraterritorial application, it has none." *RJR Nabisco*, 579 U.S. at 335 (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255, 261 (2010)) (cleaned up). General references

21

to "foreign commerce" or the use of generic terms such as "any" are not sufficient to defeat the presumption against extraterritoriality. *See Morrison*, 561 U.S. at 262-63; *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 118 (2013).

The relevant portions of the PLCAA are §§ 7902 and 7903. As noted, § 7902 of the PLCAA bars any "qualified civil liability action" in any United States court. A "qualified civil liability action" includes "a civil action or proceeding" brought by "any person" against gun manufacturers or sellers. 15 U.S.C. § 7903(5)(a). "Person" is defined as "any individual, corporation, . . . or *any other entity, including any governmental entity*." § 7903(3) (emphasis added).

The PLCAA thus explicitly bars *any* governmental entity from bringing a civil action in any United States court against gun manufacturers or sellers. Nonetheless, "it is well established that generic terms like 'any' . . . do not rebut the presumption against extraterritoriality." *Kiobel*, 569 U.S. at 118; *see also id.* (explaining that "the fact that the text [of the statute] reaches '*any* civil action' " does not suggest application to torts committed abroad). Accordingly, the use of the word "any" throughout the PLCAA is not sufficient to rebut the presumption.

Similarly, the PLCAA also contains numerous references to "foreign commerce." For example, both the congressional findings and purposes set out in § 7901 use the term, and one of the explicit statutory purposes is to "prevent the use of such lawsuits to impose unreasonable burdens on interstate and *foreign* commerce." § 7901(b)(4) (emphasis added); *see also* § 7903(2) (defining "manufacturer" to include "a person who is engaged in the business of manufacturing the product in interstate or *foreign* commerce" (emphasis added)). Again, however, such general references are not sufficient to overcome the presumption. *See Morrison*, 561 U.S. at 262-63 (explaining that "we have repeatedly held that even statutes that contain

broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad" (cleaned up)).

Thus, there are insufficient indications in the text of the PLCAA to overcome the presumption against extraterritoriality. The Court will therefore turn to step two of the analysis.

**b.** <u>**Step Two**</u>

At the second step, the court must examine "whether the case involves a domestic application of the statute;" this is done by "looking to the statute's 'focus.' " *RJR Nabisco*, 579 U.S. at 337. "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *WesternGeco LLC*, 138 S. Ct. at 2137 (cleaned up). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad . . . ." *RJR Nabisco*, 579 U.S. at 337. That is, "[e]ven where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States." *Environmental Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993). Thus, when the conduct regulated by the statute occurs within the United States, the presumption against extraterritoriality does not apply. *See Massey*, 986 F.2d at 531.

In *WesternGeco LLC v. ION Geophysical Corp.*, the Supreme Court examined the Patent Act, which provides damages for patent infringement. 138 S.Ct. 2129 at 2137-39. The court found that patent infringement was "plainly the focus" of that statute. *Id.* at 2137. And it determined that the specific conduct that constituted the infringement was the act of exporting components from the United States. *See id.* at 2138 ("[I]t was ION's domestic act of supplying the components that infringed WesternGeco's patents."). Because the "conduct [] that is relevant

23

to [the statute's] focus clearly occurred in the United States," it found that this was a domestic application of the Patent Act and the presumption did not apply. *Id.* at 2138-2139. It did not matter that there were other "incidental" "overseas events" or that the profits lost were "foreign profits." *Id.* at 2138-39.

Similarly, in *Environmental Defense Fund, Inc. v. Massey*, the D.C. Circuit determined that the statute at issue in that case was not subject to the presumption against extraterritoriality because the decision-making processes that it regulated took place "almost exclusively in this country" and "involve[d] the workings of the United States government." 986 F.2d at 532. In other words, because the statute regulated a "particular process" that was "uniquely domestic," the presumption did not apply. *Id.*

The focus of the PLCAA is both the civil actions that it "seeks to regulate" and the commercial activity and constitutional rights it "seeks to protect." *See Morrison*, 561 U.S. at 267; *WesternGeco*, 138 S. Ct. at 2137; 15 U.S.C. § 7901(b)(1), (6). That is, the PLCAA seeks to regulate the types of claims that can be asserted against firearm manufacturers and sellers and seeks to protect the interests of the United States firearms industry and the rights of gun owners. Indeed, the statute seeks to prohibit exactly the type of claim that is currently before this Court.

The PLCAA therefore seeks to regulate a "particular process" of government that is "uniquely domestic": the types of cases that can be brought in United States courts against domestic gun manufacturers and distributors. *See Massey*, 986 F.2d at 532; 15 U.S.C. §§ 7902(a), 7903(5)(A). The regulation of the types of cases that can be brought in federal and state courts against domestic defendants is unquestionably a domestic matter. It is the type of conduct that "touch[es] and concern[s] the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Kiobel*, 569 U.S. at 124-25.

24

Furthermore, the conduct of defendants for which plaintiff seeks to hold defendants liable occurred in the United States. The complained-of practices—such as the manufacture of certain types of guns, the marketing of guns in a manner intended to appeal to criminal organizations, and the sale of guns through distribution networks that facilitate the transfer to such organizations—all occurred entirely within the borders of the United States. Mexico is seeking to hold defendants liable for practices that *occurred* within the United States and only *resulted* in harm in Mexico.

In short, "the conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco*, 579 U.S. at 337. Therefore, this case "involve[s] a permissible domestic application" of the PLCAA, "even if other conduct occurred abroad," *id*., and even if the "significant effects of the regulated conduct are felt outside U.S. borders," *Massey*, 986 F.2d at 531.

This case thus represents a valid domestic application of the PLCAA, and the presumption against extraterritoriality does not apply.[7]

### 3. Application of General Prohibition of the PLCAA

There is no doubt that the general prohibition of the PLCAA applies to this lawsuit. It is unquestionably a "qualified civil liability action"—that is, "a civil action or proceeding . . . brought by any person against a manufacturer or seller" of a firearm "for damages, punitive damages, injunctive or declaratory relief," or other relief, "resulting from the

---

[7] In determining whether the presumption applied, the D.C. Circuit in *Massey* also considered whether "the failure to extend the scope of the statute to a foreign setting [would] result in adverse effects within the United States." *Massey*, 986 F.2d at 531. In particular, the court discussed the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (1976), and the Lanham Trademark Act, 15 U.S.C. § 1051 *et. seq*. (1976), as "prime examples" of when avoiding "negative economic consequences within the United States" was sufficient reason to extend a statute extraterritorially. *Massey*, 986 F.2d at 531. If the PLCAA did not apply to the claims by Mexico, and this lawsuit were to succeed, there would be economic consequences within the United States, which would clearly undermine the intent of Congress. *See* 15 U.S.C. § 7901(a)(6) (stating that lawsuits against firearm manufacturers "invite[] the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitute[] an unreasonable burden on interstate and foreign commerce of the United States").

criminal or unlawful misuse" of a firearm by the person or a third party."  15 U.S.C.

§ 7903(5)(A).  Such a lawsuit "may not be brought in any Federal or State court."  *Id*. § 7902(a).

Accordingly, for the claims to survive a motion to dismiss, an exception to the statute must

apply.

### 4.  **Statutory Exceptions**

The PLCAA contains six exceptions that permit civil actions against gun manufacturers

and distributors.  15 U.S.C. § 7903(5)(A)(i)-(vi).  Of those six, three are potentially applicable

here.

### a.  **Predicate Exception**

The first potentially applicable exception is the so-called "predicate exception."  15

U.S.C. § 7903(5)(A)(iii).[8]  That exception excludes from the definition of "qualified civil

liability action" any

> action in which a manufacturer or seller of a qualified product knowingly violated
> a State or Federal statute *applicable to the sale or marketing of the product*, and
> the violation was a proximate cause of the harm for which relief is sought,
> including –
>
>> (I) any case in which the manufacturer or seller knowingly made
>> any false entry in, or failed to make appropriate entry in, any
>> record required to be kept under Federal or State law with respect
>> to the qualified product, or aided, abetted, or conspired with any
>> person in making any false or fictitious oral or written statement
>> with respect to any fact material to the lawfulness of the sale or
>> other disposition of a qualified product; or
>>
>> (II) any case in which the manufacturer or seller aided, abetted, or
>> conspired with any other person to sell or otherwise dispose of a

---

[8] Courts refer to § 7903(5)(A)(iii) as the "predicate exception" because it requires "proof of a knowing violation of a 'predicate statute.' "  *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1224 (D. Colo. 2015) (quoting *Ileto v. Glock*, 565 F.3d 1126, 1132 (9th Cir. 2009)).  *See also City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 390 (2d Cir. 2008); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 168 (D.C. 2008) ("[O]ther courts construing [the section's] language, have referred to subsection (5)(A)(iii) as the 'predicate exception' to the PLCAA because, to take effect, it requires that the manufacturer or seller have committed an underlying (or predicate) statutory violation.").

> qualified product, knowing, or having reasonable cause to believe,
> that the actual buyer of the qualified product was prohibited from
> possessing or receiving a firearm or ammunition under subsection
> (g) or (n) of section 922 of Title 18 . . . .

15 U.S.C. § 7903(5)(A)(iii)(I)-(II) (emphasis added). The term "qualified product," as applied

here, means a firearm. 15 U.S.C. § 7903(4).

The predicate exception applies only to "statutes," not common-law causes of action. To

the extent, therefore, that the complaint asserts claims for negligence or other causes of action

arising under common law, the exception does not apply. Indeed, the claims asserted in Counts

1 through 6 and Count 9 are not claimed to arise under any federal or state statute. The only

statutory claims asserted are set forth in Count 7, which alleges a claim against Colt under the

Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*., and Count 8, which

alleges a claim against Smith & Wesson under the Massachusetts Consumer Protection Act,

Mass. Gen. Laws ch. 93A.

Both CUTPA and Chapter 93A are consumer-protection statutes that generally prohibit

unfair and deceptive acts or practices. The question is thus whether those statutes should be

considered "applicable" to the sale or marketing of firearms, and thus fall within the predicate

exception.

The Second Circuit interpreted the predicate exception in *City of New York v. Beretta

U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008). The court began by noting that the general language

in § 7903(5)(A) is followed by more specific language that refers to statutes that regulate the

firearms industry in specific ways (for example, requiring recordkeeping and prohibiting the sale

of firearms to certain purchasers). *Beretta*, 524 F.3d at 402. Because of that, the court

concluded that the "general term—'applicable to'—should be construed to embrace only objects

similar to those enumerated by sections 7903(5)(A)(iii)(I) and (II)" and therefore "to mean

statutes that clearly can be said to regulate the firearms industry," as opposed to any federal or state statute that is "capable of being applied" to the sale or marketing of firearms. *Id.* at 402-03 (cleaned up). The court explained that such a reading would also "more accurately reflect[] the intent of Congress." *Id.* at 402.

The court further observed that reading the predicate exception to include any law "capable of being applied to" the sale or marketing of firearms would "allow the predicate exception to swallow the statute." *Id.* at 403. And such a reading would go against the "interpretive principle that statutory exceptions are to be construed narrowly in order to preserve the primary operation of the general rule." *Id.* at 403 (cleaned up) (citing *Commissioner v. Clark*, 489 U.S. 726, 739 (1989)).

The court then held that the New York criminal-nuisance statute was a statute of general applicability that had never been applied to firearms suppliers, and therefore did not fall within the exception. *Id.* at 400, 404. It went on to hold, however, that the predicate exception encompasses not only those statutes that "expressly regulate firearms," but also those that "courts have applied to the sale and marketing of firearms" or that "do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." *Id.* at 404.

As the dissent in *Beretta* pointed out, the court's approach creates a number of ambiguities and other issues that (in the dissenting judge's view) would have been better resolved by certifying a question to the New York Court of Appeals whether the statute at issue is "applicable to the sale and marketing of firearms." *Id.* at 408 (Katzmann, J., dissenting).

In any event, there are reasons to conclude that Congress did not intend the predicate exception of the PLCAA to permit lawsuits based on violations of generally applicable state statutes that do not specifically address firearms. *See Soto v. Bushmaster Firearms Int'l, LLC,*

331 Conn. 53, 162 (2019) (Robinson, J., dissenting) (concluding that the predicate exception does not apply to consumer-protection statutes of general applicability). There are also reasons to conclude, as the *Beretta* court did, that generally applicable statutes that "have [been] applied" in the past to the sale or marketing of firearms, or that "clearly can be said to implicate the purchase and sale of firearms," fall within the exception. *Beretta*, 524 F.3d at 404. Indeed, the Connecticut Supreme Court has held that CUTPA qualifies as a "sale or marketing" statute that falls within the exception. *Soto*, 331 Conn. at 125, 129.[9]

Rather than resolve the issue, the Court will assume, for present purposes, that the predicate exception applies to the two state statutory claims. However, because Count 1 (negligence), Count 2 (public nuisance), Count 3 (defective design), Count 4 (negligence *per se*), Count 5 (gross negligence), Count 6 (unjust enrichment and restitution), and Count 9 (punitive damages) all involve common-law, not statutory, claims, they do not fall within the predicate exception set forth in § 7903(5)(A)(iii).

### b.    <u>Negligence *Per Se* Exception</u>

The second potentially applicable exception to the general prohibition is set forth in § 7903(5)(A)(ii), which (as relevant here) permits an action "against a seller for . . . negligence *per se*." 15 U.S.C. § 7903(5)(A)(ii). That exception, however, is inapplicable for at least three reasons.

First, the exception clearly does not apply to the seven defendants who are manufacturers of firearms. The exception applies only to claims against "a seller," which is a defined term; by

---

[9] *Soto* involved a lawsuit by victims of gun violence, rather than a governmental entity alleging that it suffered indirect harms from such acts. *Cf. Ganim v. Smith & Wesson Corp.*, 258 Conn. 313 (2001). The predicate exception also requires that "the violation [of the statute]" must be "a proximate cause of the harm for which relief is sought." § 7903(5)(A)(iii). As set forth below, the Connecticut Supreme Court held in *Ganim* that a governmental entity does not have statutory standing under CUTPA to assert relief for injuries to citizens caused by gun violence. It is therefore doubtful whether the proximate-cause requirement could be satisfied even if CUTPA falls within the predicate exception.

contrast, the predicate exception applies to claims against "a manufacturer or seller." *Id.*

§§ 7903(5)(A)(ii), (iii).  That distinction must be presumed to be meaningful, and to reflect a

deliberate intent on the part of Congress that the exception should not apply to "manufacturers."

*See Duncan v. Walker*, 533 U.S. 167, 173 (2001) (stating that "where Congress includes

particular language in one section of a statute but omits it in another section of the same Act, it is

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion" (cleaned up)); *see also* 15 U.S.C. § 7903(5)(C) ("The exceptions [in the PLCAA]

shall be construed so as not to be in conflict . . . .").

The PLCCA defines a "seller," as relevant here, to mean "a dealer (as defined in section

921(a)(11) of Title 18) who is engaged in the business as such a dealer in interstate or foreign

commerce and who is licensed to engage in the business as such a dealer under chapter 44 of

Title 18."  15 U.S.C. § 7903(6)(B).  Section 921(a)(11), in turn, defines "dealer" in part as "any

person engaged in the business of selling firearms at wholesale or retail."  18 U.S.C. § 921(a)(11)

The same statute defines "manufacturer" in part as "any person engaged in the business of

manufacturing firearms or ammunition for purposes of sale or distribution."  *Id.* § 921(a)(10).

Again, that demonstrates a congressional intent to distinguish between "sellers" and

"manufacturers."

It is true, of course, that manufacturers sell products, and that therefore in a general sense

all manufacturers are sellers.  But if the statute were interpreted so that all manufacturers were

included in the statutory definition of "seller," the statutory distinction between "manufacturers"

and "sellers" would be meaningless, and render the definition of "manufacturer" in § 921(a)(11)

entirely redundant.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) (explaining that a

"statute should be construed so that effect is given to all its provisions, so that no part will be

inoperative or superfluous, void or insignificant" (cleaned up)).

It is also true that a "manufacturer" may also be a "seller." But there is nothing in the complaint—other than the general allegation that each of the seven manufacturers is a "manufacturer and seller" of firearms, *see* Compl. ¶¶ 31-39—that plausibly suggests that those manufacturers satisfy the statutory definition of "seller." In particular, none of the seven is alleged to be "engaged in the business of selling firearms at wholesale or retail," or to possess the necessary licenses to do so. To the contrary, a central focus of the complaint is the allegation that the manufacturers use a three-tier distribution system to *avoid* being in the business of wholesaling or retailing firearms. For example, the complaint alleges the following:

> Manufacturer Defendants generally use a three-tier distribution: (1) manufacturers sell guns to distributors, (2) distributors then sell guns to retailers, and (3) retailers sell guns to civilian purchasers. This system is not required by law. Manufacturers could sell guns through their own dealerships (and they sometimes have) or maintain in-house distribution departments that sell to dealers (some do, for some sales). But they choose not to.

(Compl. ¶ 378).

In short, the complaint does not plausibly allege that any of the seven manufacturers are "sellers" within the meaning of the "negligence *per se*" exception of § 7903(A)(5)(ii). At most, Interstate Arms (which is alleged to be a wholesaler and distributor of firearms, *see* Compl. ¶¶ 40-41) could qualify as a "seller" within the meaning of the exception.

Second, the exception applies to actions for negligence *per se*. Count 4 alleges such a cause of action in general terms, without identifying the law of any particular jurisdiction. There is no federal common law, and the statute itself creates no cause of action; therefore, such a cause of action must arise under the law of one or more states. *See* 15 U.S.C. § 7903(5)(C) ("no provision of this chapter shall be construed to create a public or private cause of action or remedy"); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1225 (D. Colo. 2015) (stating

that any claim that falls within the exception must arise under state law). Neither the complaint nor plaintiff's opposition to the motion to dismiss identifies what state (or states) that might be. Because plaintiff filed this action in Massachusetts, and because no party has argued for the application of the law of any other jurisdiction, the Court will apply Massachusetts law.[10]

Under Massachusetts law, negligence *per se* is not an independent cause of action. *See Deutsche Lufthansa AG v. Massachusetts Port Auth.*, 2018 WL 3466938, at *2 (D. Mass. July 18, 2018) ("The Supreme Judicial Court has repeatedly reaffirmed the principle that negligence *per se* does not exist as a cause of action independent from a general negligence action . . . ."). Rather, under Massachusetts law, a statutory violation "can only be some evidence of the defendant's negligence." *Deutsche*, 2018 WL 3466938, at *2. Thus, as to any statutory violations that plaintiff contends constitutes negligence *per se*, the exception is not applicable under Massachusetts law.

Finally, and in any event, even if the Court considers negligence *per se* as an abstract principle, disconnected from the law of any state, the exception still would not apply. Generally, a claim for negligence *per se* applies only where an actor "violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the class of persons the statute is designed to protect." RESTATEMENT (THIRD) OF TORTS § 14 (2010). Here, the complaint asserts a claim for negligence *per se* alleging that defendants' conduct violates various federal criminal firearm statutes. (Compl. ¶¶ 66-68, 305, 310, 313). Congress enacted federal firearms laws to protect against unlawful gun violence in the United

---

[10] Interstate Arms, which is the only defendant that is alleged to be a wholesaler or distributor, and therefore a "seller" within the meaning of the exception, is alleged to have "conducted its gun-wholesaling business in Massachusetts for more than 40 years." (Compl. ¶ 41). The complaint further alleges that it "was incorporated in Massachusetts until 2018," that it "continues to conduct its business through its location in Middlesex County," and that it "is at home in Massachusetts and resides in Middlesex County." (*Id.*). It seems likely, therefore, that Massachusetts law would apply to a claim against it in any event.

States, and therefore to protect the victims of that violence.  However, Congress did not enact

those laws to protect foreign governments—and in particular, not to protect foreign governments

from increases in health care and law-enforcement expenses incurred as a result of acts of

violence perpetrated against foreign citizens in foreign nations.  The citizens of Mexico might

conceivably fall within the class of persons that the statute was intended to protect, but the

Mexican government certainly does not.[11]

Accordingly, and for those reasons, the negligence *per se* exception set forth in

§ 7903(5)(A)(ii) does not apply to Count 4.

### c.    Design-Defect Exception

The third potentially applicable exception concerns claims for design or manufacturing

defects.  Section 7903(5)(A)(v) of the PLCAA provides as follows:

> an action for death, physical injuries or property damage resulting directly from a
> defect in design or manufacture of the product, when used as intended or in a
> reasonably foreseeable manner, except that where the discharge of the product
> was caused by a volitional act that constituted a criminal offense, then such act
> shall be considered the sole proximate cause of any resulting death, personal
> injuries or property damage.

That section thus contains an exception to an exception—that is, if the discharge of a firearm is

caused by a volitional criminal act, then the design-defect exception does not apply.[12]

The complaint alleges in multiple places that the harm for which Mexico seeks redress is

perpetrated by drug cartels and "other criminals."  (*See, e.g.*, Compl. ¶¶ 1, 480-505).  That is a

sufficient basis from which to conclude that the claims are based on volitional acts perpetrated

---

[11] *See, e.g.*, *Town of Plainville v. Almost Home Animal Rescue & Shelter, Inc.*, 182 Conn. App. 55, 67
(2018) (concluding, in considering a claim for negligence *per se*, that a municipality was not within the class of
persons or things that a criminal statute addressing animal cruelty was intended to protect, even if the municipality
incurred increased expenses for care provided to animals that were abused or neglected).

[12] Moreover, the Court notes that the exception does not require a criminal conviction, but rather a
volitional criminal act.  *See Ryan v. Hughes-Ortiz*, 81 Mass. App. Ct. 90, 100 (2012) (citing *Adames v. Sheahan*, 233
Ill. 2d 276, 311 (2009)).

ADD000033

by drug cartels and "other criminals" and thus constitute intervening criminal offenses that "shall be the sole proximate cause" of the resulting injuries and property damage.  15 U.S.C. § 7903(5)(A)(v).

Accordingly, the design-defect exception set forth in § 7903(5)(A)(v) does not apply to Count 3.

### 5.     Conclusion

In summary, the application of the PLCAA under the circumstances presented here is not an impermissible extraterritorial application of United States law; the general prohibition of the statute applies to this lawsuit; and none of the statutory exceptions apply to Counts 1 through 6 and 9.  Those claims are accordingly barred by the PLCAA, and will be dismissed.  The Court does not reach the issue of whether Counts 7 or 8, which are generally applicable consumer-protection statutes, fall under the predicate exception to the PLCAA.  However, for other reasons, and as set forth below, both of those claims fail to state a claim upon which relief can be granted.[13]

### C.     State Statutory Claims Against Colt and Smith & Wesson

Counts 7 and 8 allege claims under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*., and the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, respectively.

### 1.     Count 7:  Connecticut Unfair Trade Practices Act

Count 7 alleges a claim against defendant Colt under the CUTPA, Conn. Gen. Stat. § 42-110a, *et seq*.  Even assuming that the predicate exception to the PLCAA applies, Mexico lacks standing under Connecticut law to assert such a claim.

---

[13] Because all nine counts fail for other reasons, the Court need not address defendants' remaining arguments, which are based on lack of proximate cause, absence of a legal duty to plaintiff, and failure to state a claim for public nuisance.

ADD000034

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  To be entitled to relief under CUTPA, a plaintiff must "establish both that the defendant has engaged in a prohibited act and that, as a result of this act, the plaintiff suffered an injury."  *Sticht v. Wells Fargo Bank, N.A.*, 2022 WL 267470, at *3 (D. Conn. Jan. 28, 2022) (cleaned up).  "The language 'as a result of' requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff.  Mere 'but for' causation is not sufficient to support a CUTPA claim."  *Id.* (cleaned up).

A plaintiff must also have statutory standing under CUTPA in order to assert a claim. "[S]tanding to bring a CUTPA claim will lie only when the purportedly unfair trade practice is alleged to have directly and proximately caused the plaintiff's injuries."  *Tyus v. Bertera Subaru*, 2021 WL 4993058, at *8 (D. Conn. Oct. 27, 2021) (quoting *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 94 (2019), *cert. denied sub nom. Remington Arms Co., LLC, et al. v. Soto*, 140 S. Ct. 513 (2019)).  The standing inquiry focuses on the directness or remoteness of a plaintiff's claimed injuries.  *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 372-73 (2001). *See also Gilbert v. Zablauskas*, 2022 WL 1404219, at *1 (Conn. Super. Ct. Apr. 29, 2022) (explaining that Connecticut courts "have applied traditional common-law principles of remoteness and proximate causation to determine whether a party has standing to bring an action under CUTPA" (quoting *Soto*, 331 Conn. at 93-94)).[14]

In *Ganim*, the city and mayor of Bridgeport brought claims under CUTPA against various firearm manufacturers, trade associations, and retail sellers.  258 Conn. at 316.  The facts in

---

[14] A plaintiff may have Article III standing and yet still lack statutory standing under CUTPA.  *See Gibson v. Bartlett Dairy, Inc.*, 2022 WL 784746, at *9 (E.D.N.Y. Mar. 15, 2022) (finding that plaintiff has Article III standing but that "[p]laintiff does, however, lack statutory standing" under CUTPA); *see also Gale v. Chicago Title Ins. Co.*, 2008 WL 4000477, at *2-3 (D. Conn. Aug. 21, 2008) (determining, at the motion to dismiss stage, whether plaintiff has Article III standing and also whether plaintiff has "standing under CUTPA").

*Ganim* are clearly analogous to those here.  Like Mexico, the city and mayor of Bridgeport claimed that because of defendants' conduct they had incurred increased expenses for police services, emergency services, health care, and social services.  *Ganim*, 258 Conn. at 345.  In addition, they sought damages for the harm caused to their citizens who were injured or killed by firearms.  *Id.*

The Supreme Court of Connecticut determined that the city and mayor did not have standing to bring such a claim.  *Id.* at 373.  Specifically, the court concluded that there were too many links in the causal chain connecting the defendants' conduct to the plaintiffs' harm.  *See id.* at 354 (explaining that the manufacturers lawfully sell handguns to distributors or wholesalers who then lawfully sell them to retailers, who then sell to legitimate consumers or "straw man" purchasers, and it is not until then that they could enter the illegal market, and even then, a future intervening act by an unauthorized user must occur that results in injury to another).

Moreover, the *Ganim* court explained that the harms that plaintiffs ultimately suffered were derivative of the injuries suffered by the "primary victims"—the persons who have been actually assaulted or killed by the misuse of the handguns.  *Id.* at 358-60.  Because of that, the court determined that the city and mayor lacked standing to bring a CUTPA claim because the "harms they claim[ed] [were] too remote from the defendants' misconduct" and "too derivative of the injuries of others."  *Id.* at 365, 373.

The Supreme Court of Connecticut applied that same standing inquiry to the CUTPA claims asserted in *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53 (2019).  Plaintiffs in *Soto* were administrators of the estates of elementary school students and faculty who died in the school shooting at Sandy Hook Elementary School.  *Id.* at 66 n.2.  The court held that those plaintiffs, unlike the *Ganim* plaintiffs, did have standing under CUTPA.  *Id.* at 100.  The court

ADD000036

explained that "in this case, unlike in *Ganim*, it is the direct victims of gun violence who are challenging the defendants' conduct [and] no private party is better situated than the plaintiffs to bring the action." *Id.* at 98-99.  The court noted that "*Ganim*, in fact, provides an instructive contrast to the present case" because the harms claimed by the "municipal plaintiffs" were too "indirect, remote, and derivative" as compared to those who are more "directly harmed by the [gun manufacturers'] alleged misconduct," such as those "who have been assaulted or killed by the misuse of handguns." *Id*. at 97-98.

Here, plaintiff is the Mexican government, which seeks redress for harms that are derivative of the injuries suffered by its citizens.  And, as in *Ganim*, "there are numerous steps between the conduct of the various defendants and the harms suffered by the plaintiffs." *Ganim*, 258 Conn. at 355.  Where the causal link is "too remote" from defendants' conduct and a plaintiff's harms are "too derivative of the injuries of others" a plaintiff lacks standing to assert a claim under CUTPA.  *Ganim*, 258 Conn. at 365; *Soto*, 331 Conn. at 97-99.

The government of Mexico here is in essentially the same position as the city government of Bridgeport was in *Ganim*, and it therefore lacks standing to assert a claim under CUTPA. Accordingly, Count 7 will be dismissed.

### 2.   Count 8:  Massachusetts Gen. Laws ch. 93A

Count 8 alleges a violation of Mass. Gen. Laws ch. 93A, the Massachusetts consumer-protection statute, against defendant Smith & Wesson.  Specifically, it alleges that Smith & Wesson violated Chapter 93A by marketing its guns in ways that "emphasize[] the ability of civilians to misuse Smith & Wesson assault rifles in unlawful, military-style attacks."  (Compl. ¶ 342).

### a.   Deceptive Acts

Chapter 93A prohibits unfair methods of competition and unfair or deceptive acts or

practices. Mass. Gen. Laws ch. 93A, §§ 2, 11. A violation of Chapter 93A requires that the conduct in question fall within " 'the penumbra of some common-law, statutory, or other established concept of unfairness' or be 'immoral, unethical, oppressive or unscrupulous.' " *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000) (quoting *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996)) (cleaned up).

"To plausibly state a Chapter 93A claim premised on a deceptive act, the plaintiff must allege '(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury.' " *Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 71 (1st Cir. 2020) (quoting *Casavant v. Norwegian Cruise Line, Ltd.*, 76 Mass. App. Ct. 73, 76 (2009)). "[A]n advertisement is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)." *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 396 (2004). "The spectrum of liability for deceptive acts or practices spans from affirmative misrepresentations to certain kinds of nondisclosures, such as advertising [that] may consist of a half truth, or even may be true as a literal matter, but still create[s] an over-all misleading impression through failure to disclose material information." *Tomasella*, 962 F.3d at 71 (cleaned up).

Here, the complaint alleges that the marketing campaign of Smith & Wesson is false and misleading because it "associates its 'civilian' products with the U.S. military and law enforcement" and its advertisements "repeatedly emphasize its weapons' ability to function in combat-like scenarios and quickly dispatch a large number of perceived enemies with a torrent of

38

fire."  (Compl. ¶ 324).[15]  Chapter 93A, however, prohibits statements that are actually false or misleading.  *See Aspinall*, 442 Mass. at 396.  But the complaint alleges that the violation by Smith & Wesson is that its firearms do exactly what they are advertised to do.

The complaint does not allege that the firearm cannot in fact "quickly dispatch" bullets. Rather, it alleges that the violation by Smith & Wesson is that the firearm functions exactly as it is advertised to, and in doing so it has caused harm in Mexico.  Such advertising is perhaps distasteful, but it is not false, misleading, or deceptive within the meaning of the statute.

### b.    Unfair Acts

The complaint further alleges that the conduct of Smith & Wesson is "unfair" within the meaning of Chapter 93A.  The challenged advertisements may be "unfair" if they "1) [are] within the penumbra of some common law, statutory or other established concept of unfairness, 2) [are] immoral, unethical, oppressive or unscrupulous and 3) cause[ ] substantial injury to consumers, competitors or other business entities."  *Tomasella*, 962 F.3d at 79 (citations omitted).  While "Massachusetts leaves the determination of what constitutes an unfair trade practice to the finder of fact," that determination is "subject to the court's performance of a legal gate-keeping function."  *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir. 2009) (citation omitted).

The crux of Mexico's claim is that Smith & Wesson engaged in unfair conduct by marketing their firearms in such a way that "emphasized the ability of civilians to use Smith & Wesson assault rifles in unlawful, military-style attacks."  (Compl. ¶ 550).  Specifically, the complaint alleges that by placing "M&P" on their ads, which signifies "Military and Police," the

---

[15] The complaint specifically includes two Smith & Wesson advertisements.  (Compl. ¶ 324).  One of the advertisements states, "[b]urn through all the ammunition you want with the new M&P 15-22."  (*Id.*).  The other advertisement contains an image of someone who appears to be in military or law enforcement gear using a sniper rifle.  (*Id.*)

advertisements "attract persons and organizations that intend[] to use Smith & Wesson's products to battle against the military and police" and "carry out unlawful military-style combat missions." (*Id.* ¶¶ 551-52).

Mexico has, however, failed to identify any common-law or statutory authority that the advertisements violate. Again, while the defendant's conduct may be distasteful, nothing about the advertisement is unlawful or "immoral, unethical, oppressive or unscrupulous." *See Tomasella*, 962 F.3d at 80-81. The public is fully aware that the police and military use firearms. An image depicting an officer's lawful use of a firearm does not suggest to the reasonable consumer that they should engage in criminal, "combat-like" conduct. And the Court is unwilling to hold that the advertising of lawful conduct to sell a lawful product, without more, constitutes an "unfair" act. *See, e.g.*, *McCarthy v. Sturm, Ruger & Co.*, 916 F. Supp. 366, 369 (S.D.N.Y. Mar. 5, 1996), *aff'd sub nom. McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir. 1997) (refusing to find advertisements to be negligent because they highlighted the ammunition's "destructive capabilities" which could make it "attractive to criminals" because the advertisements were not in any way false or misleading).

Accordingly, the complaint fails to allege that the marketing practices of Smith & Wesson violate any common-law, statutory, or other established concept of unfairness.

### c. <u>Occurring Primarily and Substantially within the Commonwealth</u>

Chapter 93A provides that an action under § 11 can only be brought if "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." Mass. Gen. Laws ch. 93A, § 11.

In considering whether the unfair or deceptive act "occurred primarily and substantially

within the commonwealth," Massachusetts courts consider three factors:  (1) "where the defendant committed the deception," (2) "where the plaintiff was deceived and acted upon the deception," and (3) "the situs of plaintiff's losses due to the deception."  *Garshman Co. v. General Elec. Co.*, 176 F.3d 1, 6-7 (1st Cir. 1999) (citing *Clinton Hosp. Ass'n v. Corson Grp., Inc.*, 907 F.2d 1260, 1265-66 (1st Cir. 1990)).  However, "[w]hether the 'actions and transactions [constituting the sec. 11 claim] occurred primarily and substantially within the commonwealth' is not a determination that can be reduced to any precise formula."  *Stoneridge Control Devices, Inc. v. Teleflex, Inc.*, 2004 WL 389105, at *7 (Mass. Super. Feb. 17, 2004).  Rather, it is a "pragmatic, functional analysis," with the "first factor [being] the least weighty of the three factors."  *Roche v. Royal Bank of Canada*, 109 F.3d 820, 827, 829 (1st Cir. 1997); *see also Kuwaiti Danish Comput. Co. v. Digital Equip. Corp.*, 438 Mass. 459, 473 (2003) (instructing courts to look to "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth").

For example, in *Bushkin Associates, Inc. v. Raytheon Co.*, a New York corporation brought a Chapter 93A claim against Raytheon, a Massachusetts corporation.  393 Mass. 622 (1985).  The plaintiff based his Chapter 93A claim on allegedly false statements that were made in a telephone conversation by a Raytheon officer.  *Bushkin*, 393 Mass. at 672.  The plaintiff contended that those statements caused it to disclose sensitive business information and suffer economic losses.  *Id.*  The Supreme Judicial Court held that Chapter 93A was inapplicable because the majority of the conduct occurred outside of Massachusetts.  *Id.*  Specifically, the SJC explained that although the statements were "made in Massachusetts," they were "received and acted on in New York," and "[a]ny loss was incurred in New York."  *Id.*

The First Circuit followed the reasoning of *Bushkin* in *Compagnie De Reassurance D'Ile*

41

*de France v. New England Reinsurance Corp.*, 57 F.3d 56 (1st Cir. 1995). There, the court explained that, as in *Bushkin*, "non-Massachusetts residents [were] attempting to recover for the allegedly unfair trade practices" of a Massachusetts corporation. *New England Reinsurance Corp.*, 57 F.3d at 90. Although the allegedly deceptive acts originated in Massachusetts, the deceptive information was "intended to be, and was, circulated abroad, and plaintiffs received and acted upon it there." *Id.* And the "situs of plaintiffs' losses was also in Europe." *Id.* The court determined that because Chapter 93A is designed to "protect against in-state frauds" and the bulk of defendants' conduct occurred elsewhere, their "fraudulent conduct did not occur primarily and substantially in Massachusetts." *Id.*

Here, a foreign nation is attempting to recover for the allegedly unfair trade practices of a Massachusetts corporation. Even assuming that the advertisements and marketing originated in Massachusetts, the complaint clearly suggests that its advertisements and marketing practices were "intended to be [] circulated abroad" and were "received and acted upon [] there." *New England Reinsurance Corp.*, 57 F.3d at 90. (*See also* Compl. ¶¶ 551-52 (explaining that Smith & Wesson knew its marketing practices would attract persons and organizations to use their products against the military and police, "including the military and police in Mexico" and would be "appealing especially to criminals like the cartels")); (*id.* ¶ 384 ("Defendants have affirmatively and deliberately chosen to maintain their supply chain to cartels . . . . Their supply of guns to the criminal market in Mexico is a feature, not a bug.")). Furthermore, the situs of plaintiff's losses is entirely in Mexico. (*See* Compl. ¶¶ 450-64); *New England Reinsurance Corp.*, 57 F.3d at 90.

In short, this matter did not occur primarily and substantially in the Commonwealth. For that reason, Chapter 93A does not apply.

Accordingly, Count 8 fails to state a claim under Mass. Gen. Laws ch. 93A.

## IV.    <u>Conclusion</u>

For the foregoing reasons:

The motion of all defendants to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 66) is DENIED as to Rule 12(b)(1) and GRANTED as to Rule 12(b)(6);

The motion of defendant Sturm, Ruger & Company to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Docket No. 56) is DENIED without prejudice as moot;

The motion of defendant Barrett Firearms Manufacturing, Inc., to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 58) is DENIED as to Rule 12(b)(1), GRANTED as to Rule 12(b)(6), and otherwise DENIED without prejudice as moot;

The motion of defendant Witmer Public Safety Group, Inc., d/b/a Interstate Arms to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 60) is GRANTED;

The motion of defendant Glock Inc. to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 62) is DENIED as to Rule 12(b)(1), GRANTED as to Rule 12(b)(6), and otherwise DENIED without prejudice as moot;

ADD000043

The motion of defendant Colt's Manufacturing Company LLC to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 64) is DENIED as to Rule 12(b)(1), GRANTED as to Rule 12(b)(6), and otherwise DENIED without prejudice as moot;

The motion of defendant Smith & Wesson Brands, Inc. to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 69) is DENIED as to Rule 12(b)(1) and GRANTED as to Rule 12(b)(6);

The motion of defendant Century International Arms, Inc. to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Docket No. 70) is DENIED without prejudice as moot; and

The motion of defendant Beretta U.S.A. Corp. to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Docket No. 73) is DENIED without prejudice as moot.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: September 30, 2022                    Chief Judge, United States District Court

ADD000044

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS


**Estados Unidos Mexicanos**
            Plaintiff

                                        CIVIL ACTION

        V.

                                        NO. 21-11269-FDS


**Smith & Wesson Brands, Inc. et al**
            Defendant

## **ORDER OF DISMISSAL**


Saylor, C. J.


    In accordance with the Court's Memorandum and Order dated September 30, 2022, it is hereby ORDERED that the above-entitled action be and hereby is DISMISSED.

                                By the Court,


 10/1/2022                           /s/ Flaviana de Oliveira
        Date                              Deputy Clerk

🟨 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedNegative Treatment Vacated by *Gustafson v. Springfield, Inc.,* Pa.Super., Aug. 12, 2022

🟨 KeyCite Yellow Flag - Negative TreatmentProposed Legislation

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 105. Protection of Lawful Commerce in Arms

15 U.S.C.A. § 7901

§ 7901. Findings; purposes

Effective: October 26, 2005
Currentness

**(a) Findings**

Congress finds the following:

**(1)** The Second Amendment to the United States Constitution provides that the right of the people to keep and bear arms shall not be infringed.

**(2)** The Second Amendment to the United States Constitution protects the rights of individuals, including those who are not members of a militia or engaged in military service or training, to keep and bear arms.

**(3)** Lawsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals.

**(4)** The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws. Such Federal laws include the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act.

**(5)** Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

**(6)** The possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States.

ADD000046

(7) The liability actions commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law. The possible sustaining of these actions by a maverick judicial officer or petit jury would expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States. Such an expansion of liability would constitute a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States under the Fourteenth Amendment to the United States Constitution.

(8) The liability actions commenced or contemplated by the Federal Government, States, municipalities, private interest groups and others attempt to use the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce through judgments and judicial decrees thereby threatening the Separation of Powers doctrine and weakening and undermining important principles of federalism, State sovereignty and comity between the sister States.

**(b) Purposes**

The purposes of this chapter are as follows:

(1) To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

(2) To preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting.

(3) To guarantee a citizen's rights, privileges, and immunities, as applied to the States, under the Fourteenth Amendment to the United States Constitution, pursuant to section 5 of that Amendment.

(4) To prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce.

(5) To protect the right, under the First Amendment to the Constitution, of manufacturers, distributors, dealers, and importers of firearms or ammunition products, and trade associations, to speak freely, to assemble peaceably, and to petition the Government for a redress of their grievances.

(6) To preserve and protect the Separation of Powers doctrine and important principles of federalism, State sovereignty and comity between sister States.

(7) To exercise congressional power under article IV, section 1 (the Full Faith and Credit Clause) of the United States Constitution.

### CREDIT(S)

(Pub.L. 109-92, § 2, Oct. 26, 2005, 119 Stat. 2095.)

ADD000047

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedNegative Treatment Vacated by Gustafson v. Springfield, Inc., Pa.Super., Aug. 12, 2022

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 105. Protection of Lawful Commerce in Arms

15 U.S.C.A. § 7902

§ 7902. Prohibition on bringing of qualified civil liability actions in Federal or State court

Effective: October 26, 2005

Currentness

**(a) In general**

A qualified civil liability action may not be brought in any Federal or State court.

**(b) Dismissal of pending actions**

A qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending.

**CREDIT(S)**

(Pub.L. 109-92, § 3, Oct. 26, 2005, 119 Stat. 2096.)

Notes of Decisions (19)

15 U.S.C.A. § 7902, 15 USCA § 7902
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedNegative Treatment Vacated by Gustafson v. Springfield, Inc., Pa.Super., Aug. 12, 2022

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 105. Protection of Lawful Commerce in Arms

15 U.S.C.A. § 7903

§ 7903. Definitions

Effective: October 26, 2005
Currentness

In this chapter:

**(1) Engaged in the business**

The term "engaged in the business" has the meaning given that term in section 921(a)(21) of Title 18, and, as applied to a seller of ammunition, means a person who devotes time, attention, and labor to the sale of ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of ammunition.

**(2) Manufacturer**

The term "manufacturer" means, with respect to a qualified product, a person who is engaged in the business of manufacturing the product in interstate or foreign commerce and who is licensed to engage in business as such a manufacturer under chapter 44 of Title 18.

**(3) Person**

The term "person" means any individual, corporation, company, association, firm, partnership, society, joint stock company, or any other entity, including any governmental entity.

**(4) Qualified product**

The term "qualified product" means a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of Title 18), including any antique firearm (as defined in section 921(a)(16) of such title), or ammunition (as defined in section 921(a)(17)(A) of such title), or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce.

**(5) Qualified civil liability action**

ADD000049

**(A) In general**

The term "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include--

**(i)** an action brought against a transferor convicted under section 924(h) of Title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;

**(ii)** an action brought against a seller for negligent entrustment or negligence per se;

**(iii)** an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including--

**(I)** any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

**(II)** any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18;

**(iv)** an action for breach of contract or warranty in connection with the purchase of the product;

**(v)** an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or

**(vi)** an action or proceeding commenced by the Attorney General to enforce the provisions of chapter 44 of Title 18 or chapter 53 of Title 26.

**(B) Negligent entrustment**

As used in subparagraph (A)(ii), the term "negligent entrustment" means the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others.

ADD000050

**(C) Rule of construction**

The exceptions enumerated under clauses (i) through (v) of subparagraph (A) shall be construed so as not to be in conflict, and no provision of this chapter shall be construed to create a public or private cause of action or remedy.

**(D) Minor child exception**

Nothing in this chapter shall be construed to limit the right of a person under 17 years of age to recover damages authorized under Federal or State law in a civil action that meets 1 of the requirements under clauses (i) through (v) of subparagraph (A).

**(6) Seller**

The term "seller" means, with respect to a qualified product--

**(A)** an importer (as defined in section 921(a)(9) of Title 18) who is engaged in the business as such an importer in interstate or foreign commerce and who is licensed to engage in business as such an importer under chapter 44 of Title 18;

**(B)** a dealer (as defined in section 921(a)(11) of Title 18) who is engaged in the business as such a dealer in interstate or foreign commerce and who is licensed to engage in business as such a dealer under chapter 44 of Title 18; or

**(C)** a person engaged in the business of selling ammunition (as defined in section 921(a)(17)(A) of Title 18) in interstate or foreign commerce at the wholesale or retail level.

**(7) State**

The term "State" includes each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands, and any other territory or possession of the United States, and any political subdivision of any such place.

**(8) Trade association**

The term "trade association" means--

**(A)** any corporation, unincorporated association, federation, business league, professional or business organization not organized or operated for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual;

**(B)** that is an organization described in section 501(c)(6) of Title 26 and exempt from tax under section 501(a) of such title; and

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    ADD000051    3

**(C)** 2 or more members of which are manufacturers or sellers of a qualified product.

**(9) Unlawful misuse**

The term "unlawful misuse" means conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product.

**CREDIT(S)**

(Pub.L. 109-92, § 4, Oct. 26, 2005, 119 Stat. 2097.)

Notes of Decisions (20)

15 U.S.C.A. § 7903, 15 USCA § 7903
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD000052