No. 22-1823

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

ESTADOS UNIDOS MEXICANOS,

*Plaintiff-Appellant*,

v.

SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS
MANUFACTURING, INC.; BERETTA U.S.A. CORP.; BERETTA HOLDING
S.P.A.; CENTURY INTERNATIONAL ARMS, INC.; COLT'S
MANUFACTURING COMPANY LLC; GLOCK, INC.; GLOCK GES.M.B.H.;
STURM, RUGER & CO., INC.; WITMER PUBLIC SAFETY GROUP, INC.
D/B/A INTERSTATE ARMS,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF OF *AMICI CURIAE* JORGE SÁNCHEZ CORDERO DÁVILA AND
RAÚL CONTRERAS BUSTAMANTE
IN SUPPORT OF PLAINTIFF-APPELLANT**

WILLKIE FARR & GALLAGHER LLP
Sameer Advani
James C. Dugan
Gabrielle K. Antonello
Ferdinand G. Suba Jr.
787 Seventh Avenue
New York, New York  10019
(212) 728-8000
sadvani@willkie.com
jdugan@willkie.com
gantonello@willkie.com
fsuba@willkie.com

Zainab Ali
1875 K Street, N.W. #100
Washington, DC 20006
(202) 303-3042
zali@willkie.com

Benita Yu
2029 Century Park East
Los Angeles, California  90067
(310) 855-3077
byu@willkie.com
*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

RULE 29(A)(4)(E) STATEMENT ...............................................................1

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................2

SUMMARY OF ARGUMENT ..................................................................4

ARGUMENT ...........................................................................................6

    I.    ACCESS TO JUSTICE IS A FUNDAMENTAL PRINCIPLE THAT CAUTIONS AGAINST A CONSTRUCTION OF PLCAA THAT WOULD DENY MEXICO LEGAL RECOURSE IN THIS CASE...........6

        A.    Access to Justice Is a Core Principle of the Rule of Law .................6

        B.    Federal Courts and Lawmakers Have Recognized the Importance of International Law Principles, Including Access to Justice ..........8

        C.    The Principle of Access to Justice Should Be Considered in This Case .......................................................................................11

    II.    PLCAA DOES NOT BAR MEXICO'S CLAIMS IN THIS CASE .........12

        A.    Application of the Presumption Against Extraterritoriality to PLCAA Promotes Access to Justice ................................................12

        B.    PLCAA Only Applies to Actions Based on the Misuse of a Gun that Is Criminal or Illegal Under Federal or State Law .................15

        C.    PLCAA Does Not Preclude the Claims Brought by Mexico in this Case .......................................................................................18

CONCLUSION ......................................................................................25

CERTIFICATE OF SERVICE ...............................................................28

i

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Davila-Perez v. Lockheed Martin Corp.*,
  202 F.3d 464 (1st Cir. 2000)....................................................23

*Delaware v. Pennsylvania*,
  143 S. Ct. 696 (2023).......................................................19

*E.E.O.C. v. Arabian Am. Oil. Co.*,
  499 U.S. 244 (1991).........................................................13

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993)..................................................5, 11, 12

*Ileto v. Glock, Inc.*,
  421 F. Supp. 2d 1274 (C.D. Cal. 2006) ............................16

*Ileto v. Glock, Inc.*,
  565 F.3d 1126 (9th Cir. 2009) ........................................17

*Jara v. Nunez*,
  878 F.3d 1268 (11th Cir. 2018) ......................................14

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013)....................................................17, 20

*Lopez-Lopez v. Robinson Sch. Inc.*,
  495 F. Supp. 3d 84 (D.P.R. 2020) ......................................9

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010).....................................................13, 18

*Murray v. Schooner Charming Betsy*,
  6 U.S. (2 Cranch) 64 (1804) ............................................8

*RJR Nabisco, Inc. v. European Cmty.*,
  579 U.S. 325 (2016).................................................12, 13, 14

*Small v. U.S.*,
    544 U.S. 385 (2005)...................................................................19, 25

*Smith v. U.S.*,
    507 U.S. 197 (1993).........................................................................19

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004).........................................................................8

*The Paquete Habana*,
    175 U.S. 677 (1900).........................................................................8

*WesternGeco LLC v. ION Physical Corp.*,
    138 S. Ct. 2129 (2018)....................................................................13

**Statutes and Rules**

1 U.S.C. § 2014 ...............................................................................20

15 U.S.C. § 450rr-1 ..........................................................................20

15 U.S.C. § 7901 ....................................... 4, 16, 17, 19, 22, 23, 24

15 U.S.C. § 7902 ........................................................................4, 15

15 U.S.C. § 7903 ...................................................................4, 15, 18

16 U.S.C. § 973 ...............................................................................21

16 U.S.C. § 1531 .........................................................................21, 22

16 U.S.C. § 1532 .........................................................................20, 21

16 U.S.C. § 3372 ..............................................................................16

16 U.S.C. § 4903 ..............................................................................21

16 U.S.C. § 5502 ..............................................................................21

16 U.S.C. § 7801 ..............................................................................21

18 U.S.C § 1030 ...............................................................................20

18 U.S.C. § 2711 ..............................................................................20

18 U.S.C § 3071 ....................................................................................20

18 U.S.C § 3074 ....................................................................................21

18 U.S.C § 3077 ....................................................................................20

19 U.S.C. § 1527(a) ..............................................................................16

22 U.S.C. § 3102 ...................................................................................20

Fed. R. App. P. 29 ..................................................................................2

## Other Authorities

151 Cong. Rec. 18055–18112 .................................................................24

151 Cong. Rec. 23258–23283 .................................................................24

Access to Justice 2010–2018, https://www.justice.gov/archives/atj .......10

Bart M.J. Szewczyk, Customary International Law and Statutory
    Interpretation: An Empirical Analysis of Federal Court Decisions,
    82 GEO. WASH. L. REV. 1118 (2014) ............................................7

Congressional Research Service, *International Law and Agreements:
    Their Effect Upon U.S. Law* (2018) ...............................................7, 8

Earl Johnson, Jr., *Equal Access to Justice: Comparing Access to
    Justice in the United States and Other Industrial Democracies*, 24
    FORDHAM INT'L L.J. S83 (2000) .......................................................9

Elizabeth J. Cabraser, Apportioning Due Process: Preserving the
    Right to Affordable Justice, 87 DENV. U. L. REV. 437 (2010) .........9

Francesco Francioni, "The Rights of Access to Justice Under
    Customary International Law," *Access to Justice as a Human
    Right, Collected Courses of the Academy of European Law*
    (Oxford, 2007) ..................................................................................7

H.R. 4501, 117th Cong. (2021–2022) ....................................................10

Judicial Conference of the United States, *Strategic Plan for the
    Federal Judiciary* (2020) .................................................................9

Louis Henkin, *International Law as Law in the United States*, 82
    MICH. L. REV. 1555 (1984) ...................................................................8

Memorandum on Restoring the Department of Justice's Access-to-
    Justice Function and Reinvigorating the White House Legal Aid
    Interagency Roundtable (May 18, 2021) ...........................................10

Office for Access to Justice, *About ATJ*,
    https://www.justice.gov/atj/about-atj (last visited Mar. 15, 2023) ....................10

Ralph G. Steinhardt, *The Role of International Law as a Canon of
    Domestic Statutory Construction*, 43 VAND. L. REV. 1103 (1990) ......................8

S. 2701, 117th Cong. (2021–2022) ........................................................10

U.S. Const. amend. XIV ..........................................................................9

United Nations and the Rule of Law, "Access to Justice,"
    https://www.un.org/ruleoflaw/thematic-areas/access-to-justice-and-
    rule-of-law-institutions/access-to-justice/ (last visited Mar. 15,
    2023) ...............................................................................................6

United States Institute of Peace, "Necessary Condition:  Access to
    Justice,"
    https://www.usip.org/guiding-principles-stabilization-and-
    reconstruction-the-web-version/rule-law/access-justice (last visited
    Mar. 15, 2023) ................................................................................6

## <u>RULE 29(A)(4)(E) STATEMENT</u>

No part of this brief was authored, in whole or in part, by counsel for any party.  No person, including but not limited to any party of party's counsel, other than *amici* contributed any money intended to fund the preparation or submission of this brief.

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Dr. Jorge A. Sánchez Cordero Dávila ("Dr. Sánchez Cordero") is a legal practitioner and diplomat in Mexico City, Mexico.  He serves as a pro bono advisor to the Mexican Foreign Ministry and has served as a representative of the Government of Mexico in several diplomatic capacities.  He was a judge at the Federal Electoral Tribunal.  Dr. Sánchez Cordero is President Ad Honorem of the Mexican branch of the French Association Henri Capitant and Vice-President of the International Association of Legal Science (UNESCO).  He is also a member of the International Academy of Comparative Law, the American Law Institute, the European Law Institute, the International Institute for the Unification of Private Law (UNIDROIT) (where he formerly served as Vice-President of the Governing Council and is currently a Member of the Permanent Committee), the Draft Committee of the Model Provisions on the Prevention and Fight against the Illicit Trafficking of Cultural Property, the International Committee on Legal, Administrative and Financial Issues (ICLAFI), and the Committee on Participation in Global Cultural Heritage Governance of the International Law Association.

---

[1] This brief is filed with the consent of the parties pursuant to Fed. R. App. P. 29(a)(2).

Additionally, Dr. Sánchez Cordero has authored and edited various books available in several languages, and numerous articles and essays in Mexican and international reviews, including publications related to international law.

Dr. Sánchez Cordero has dedicated his professional career to the study of international law and transnational litigation, including questions of extraterritoriality, international comity, and access to justice. For his achievements in those fields, he has been awarded by the French Government and the International Association of Comparative Law, among other honors. Dr. Sánchez Cordero thus has an interest in the application of such principles and doctrines. Additionally, he believes his experience and expertise may be useful to the Court in deciding the issues presented by this appeal.

Dr. Raúl Contreras Bustamante is the Dean of Legal Faculty and professor at the Universidad Autónoma de México. Dr. Contreras has been a professor at the Universidad Autónoma de México since 1986, where he teaches courses on constitutional law, constitutional theory, and intergovernmental relations. Dr. Contreras is co-author of several academic papers and books on topics ranging from Mexican constitutional law to human rights. He has received awards from the Mexican legislature and government of Mexico City for his work as a thought leader in legal studies. As a preeminent scholar in Mexican law, Dr. Contreras has an interest in ensuring accountability for the wrongs committed in Mexico, and believes

his expertise may be useful to the Court in deciding the issues presented by this appeal.

## SUMMARY OF ARGUMENT

Access to justice is an internationally recognized principle of the rule of law. In the absence of access to justice, people are unable to exercise basic rights, remedy their injuries, or have their voice heard. In this case, Mexico has alleged several statutory and Mexican law tort claims against gun manufacturers and a gun wholesaler for, among other things, extensive harm to Mexican citizens as a result of illegal gun violence committed in Mexico. The District Court dismissed those claims in their entirety on the ground that they are precluded by the Protection of Lawful Commerce in Arms Act ("PLCAA"). 15 U.S.C. §§ 7901–7903. For the reasons that follow, the District Court's decision was flawed and should be overturned.

Mexico's claims are brought, at least in part, on behalf of the victims of the violence directly attributable to Defendants. In its complaint, Mexico alleges as injuries, among other things, the "[c]osts associated with the deaths of and substantial injuries to police and military personnel . . . [c]osts of mental-health services, treatment, counseling, rehabilitation services, and social services to victims and their families . . . [and] [c]osts of providing care for children whose parents were victims of Defendants' conduct." *See* Compl. ¶ 448. Mexico's claims are the only

4

means by which such victims of gun violence have the opportunity to obtain justice in the United States, where the Defendants can be found. Access to justice thus demands that Mexico's claims against the Defendants in this litigation be heard.

Application of the access to justice principle in this case is supported by well-founded principles of United States law. The Supreme Court has "recognized the principle that the scope of generally worded statutes must be construed in light of international law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 816 (1993). Moreover, under the principle of the presumption against extraterritoriality, courts have routinely refused to interpret statutes such as PLCAA to apply outside the United States unless Congress has clearly indicated its intent that they so apply. Here, the principle of access to justice as well as the presumption against extraterritoriality counsel against the application of PLCAA to dismiss Mexico's claims. Specifically, the text of PLCAA, its explicit purpose, and its legislative history all demonstrate that Congress did not intend to preclude litigation by a foreign sovereign on behalf of its citizens based on the criminal or tortious misuse of firearms in a foreign land. Accordingly, the District Court's decision should be overturned.

## **ARGUMENT**

**I.**    **ACCESS TO JUSTICE IS A FUNDAMENTAL PRINCIPLE THAT CAUTIONS AGAINST A CONSTRUCTION OF PLCAA THAT WOULD DENY MEXICO LEGAL RECOURSE IN THIS CASE**

### **A.**    **Access to Justice Is a Core Principle of the Rule of Law**

Access to justice, which refers to a person's "ability to seek and obtain remedy through formal or informal institutions of justice for grievances in compliance with human rights standards," is a basic and core principle of the rule of law that is considered to be a core principle of customary international law. *See* United Nations and the Rule of Law, "Access to Justice," https://www.un.org/ruleoflaw/thematic-areas/access-to-justice-and-rule-of-law-institutions/access-to-justice/ (last visited Mar. 15, 2023); *see also* United States Institute of Peace, "Necessary Condition: Access to Justice," https://www.usip.org/guiding-principles-stabilization-and-reconstruction-the-web-version/rule-law/access-justice (last visited Mar. 15, 2023). Permitting access to justice ensures claimants "have their voice heard" and have the ability to "exercise their rights, challenge discrimination or hold decision-makers accountable." *See* United Nations and the Rule of Law, "Access to Justice," https://www.un.org/ruleoflaw/thematic-areas/access-to-justice-and-rule-of-law-institutions/access-to-justice/ (last visited Mar. 15, 2023). As such, access to justice is a fundamental principle that courts should consider when interpreting and analyzing statutes, especially in cases such as this one that involve significant injury abroad.

The fundamental nature of access to justice in the rule of law has been recognized by the United Nations in the Universal Declaration of Human Rights of 1948, which provides that all individuals have "the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law." Universal Declaration of Human Rights, Art. 8; *see also* Francesco Francioni, "The Rights of Access to Justice Under Customary International Law," in *Access to Justice as a Human Right, Collected Courses of the Academy of European Law* (Oxford, 2007), at 24–41.

Additionally, access to justice is recognized as a right under customary international law through general practice. *See Id.* (tracing the development of access to justice in customary international law). Customary international law, in turn, is generally defined as "general practice accepted as law." *See* Bart M.J. Szewczyk, *Customary International Law and Statutory Interpretation: An Empirical Analysis of Federal Court Decisions*, 82 GEO. WASH. L. REV. 1118, 1120 (2014); *see also* Congressional Research Service, *International Law and Agreements: Their Effect Upon U.S. Law* (2018) at 28 (explaining that customary international law results from "a general and consistent practice of States followed by them from a sense of legal obligation").

**B.    Federal Courts and Lawmakers Have Recognized the Importance of International Law Principles, Including Access to Justice**

Principles of international law may be considered when interpreting United States statutes, especially those that impact foreign countries or foreign interests. *See* Louis Henkin, *International Law as Law in the United States*, 82 MICH. L. REV. 1555, 1560 (1984); *see also* Ralph G. Steinhardt, *The Role of International Law as a Canon of Domestic Statutory Construction*, 43 VAND. L. REV. 1103, 1152–62 (1990) (analyzing courts' endorsement of applying international law principles in the interpretation of statutes relating to international matters).  Indeed, the Supreme Court has held that customary international law may be incorporated into domestic law to the extent that "there is no treaty, and no controlling executive or legislative act or judicial decision" in conflict.  *The Paquete Habana*, 175 U.S. 677, 700 (1900); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004) (stating "any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms"); Congressional Research Service, *International Law and Agreements:  Their Effect Upon U.S. Law* (2018) at 30.  In addition, statutes enacted by Congress "ought never to be construed to violate the law of nations if any other possible construction remains."  *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804).

More specifically, the principle of access to justice is embedded in the United States legal system insofar as it relates to notions of due process and equal protection, which are afforded to all litigants. U.S. Const. amend. XIV, *see also* Elizabeth J. Cabraser, *Apportioning Due Process: Preserving the Right to Affordable Justice*, 87 DENV. U. L. REV. 437, 441–45 (2010). Access to justice is also interpreted by some as equal justice. *See* Earl Johnson, Jr., *Equal Access to Justice: Comparing Access to Justice in the United States and Other Industrial Democracies*, 24 FORDHAM INT'L L.J. S83, S87 (2000) ("Equal justice can be found in the language of the U.S. constitution, the political philosophy underlying the U.S. constitution, and the common law legal tradition from which the U.S. legal system sprung."). In its Strategic Plan for the Federal Judiciary, the Judicial Conference of the United States listed "enhancing access to justice and the judicial process" as one of seven strategic issues facing the federal judiciary and recognized it as a core value. Judicial Conference of the United States, *Strategic Plan for the Federal Judiciary* at 4 (2020). Providing access to the judicial process in effect provides access to justice because such a process provides litigants the opportunity to seek remedies for harms they have suffered. The District Court of Puerto Rico explicitly recognized this very purpose of the judicial system, noting "[t]his Court firmly believes in promoting access to justice through equitable access to courts." *Lopez-Lopez v. Robinson Sch. Inc.*, 495 F. Supp. 3d 84, 87 (D.P.R. 2020).

9

Congress and the Executive Branch have also focused on expanding access to justice. In March 2010, the United States Department of Justice established the Office for Access to Justice to address access to justice issues in the criminal and civil justice systems. *See* Access to Justice 2010–2018, https://www.justice.gov/archives/atj. Although the office shut down in 2018, it was re-established in October 2021. *See* Office for Access to Justice, *About ATJ*, https://www.justice.gov/atj/about-atj (last visited Mar. 15, 2023). Moreover, in 2021, bills were introduced in both the House and the Senate that would provide for the permanent establishment of the Office for Access to Justice in the Department of Justice. H.R. 4501, 117th Cong. (2021–2022); S. 2701, 117th Cong. (2021–2022). Of the various duties of the Director of this new Office, Sec. 4 (7) notes that the Director will "consult with the Secretary of State and serve as the central authority of the executive branch on access to justice before international and multilateral organizations." H.R. 4501, 117th Cong. § 4(7) (2021).

Additionally, on May 18, 2021, President Biden reconvened the White House Legal Aid Interagency Roundtable ("LAIR") in an effort to "increase meaningful access to our legal system and array of Federal programs." Memorandum on Restoring the Department of Justice's Access-to-Justice Function and Reinvigorating the White House Legal Aid Interagency Roundtable (May 18, 2021). President Biden outlined that LAIR shall work across departments, agencies, and

offices in the Executive Branch to, among other things, "develop policy recommendations that improve access to justice in Federal, State, local, Tribal, and international jurisdictions" and "assist the United States with implementation of Goal 16 of the United Nation's 2030 Agenda for Sustainable Development to promote peaceful and inclusive societies for sustainable development, provide access to justice for all, and build effective, accountable, and inclusive institutions at all levels." *Id.* These objectives illustrate that the principle of access to justice is so critical that it transcends domestic jurisdictions.

### C.    The Principle of Access to Justice Should Be Considered in This Case

The Supreme Court has "recognized the principle that the scope of generally worded statutes must be construed in light of international law." *Hartford Fire Ins.*, 509 U.S. at 816. Here, under the international principle of access to justice, Mexico's claims should be permitted to proceed because those on whose behalf it litigates—the Mexican citizens who have suffered death and grave injury by illegal gun violence in Mexico—otherwise have no opportunity to obtain justice in the United States against the U.S-based defendants for the harms alleged in its complaint.

Mexico brings these claims and seeks remedies on behalf of the victims of the violence directly attributed to the gun manufacturers and wholesalers. In its complaint, Mexico alleges as injuries, among other things, the "[c]osts associated

11

with the deaths of and substantial injuries to police and military personnel . . . [c]osts of mental-health services, treatment, counseling, rehabilitation services, and social services to victims and their families . . . [and] [c]osts of providing care for children whose parents were victims of Defendants' conduct." *See* Compl. ¶ 448. These victims of gun violence, both the Mexican citizens who have suffered injury and death, and their families and others affected by the carnage, do not themselves have the opportunity to bring claims in the United States against the manufacturers and distributors of the guns used to commit such violence. The government of Mexico brings these claims so that the victims of these crimes have an opportunity for redress against parties who are largely responsible for their injuries.

## II.     PLCAA DOES NOT BAR MEXICO'S CLAIMS IN THIS CASE

### A.     Application of the Presumption Against Extraterritoriality to PLCAA Promotes Access to Justice

Application of the presumption against extraterritoriality to PLCAA is aligned with and promotes the principles underpinning access to justice discussed in Section I *supra*. *See Hartford Fire Ins.*, at 818 ("[T]he practice of using international law to limit the extraterritorial reach of statutes is firmly established in our jurisprudence."). The presumption against extraterritoriality is a canon of statutory construction derived, in part, from international comity principles. It stands for the proposition that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European*

12

*Cmty.*, 579 U.S. 325, 335 (2016) (defining the presumption against extraterritoriality); *see also E.E.O.C. v. Arabian Am. Oil. Co.*, 499 U.S. 244, 248 (1991) ("[L]egislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."). The presumption "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters[,]" *Morrison v. National Australia. Bank Ltd.*, 561 U.S. 247, 255 (2010), and "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *see also RJR Nabisco, Inc.*, 579 U.S. at 335.

Courts use a two-step test to determine whether the presumption applies. The first step requires courts to consider whether Congress included explicit language in the statute that allows it to be applicable to conduct in foreign nations. *RJR Nabisco*, 579 U.S. at 337. Courts move on to the second step if they do not find "affirmative and unmistakable" language in the statute that makes it apply extraterritorially. *WesternGeco LLC v. ION Physical Corp.*, 138 S. Ct. 2129, 2136 (2018).

Under the second step, courts must determine the statute's focus and "whether the conduct relevant to that focus occurred in United States territory." *Id.* at 2133. "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *WesternGeco LLC*, 138 S. Ct. at 2137. If the relevant conduct occurred

13

in the United States, "the case involves a permissible domestic application of the statute." *Id*. In other words, "a claim will carry sufficient force to displace the presumption against extraterritorial application only when enough relevant conduct occurred within the United States." *Jara v. Nunez*, 878 F.3d 1268, 1273 (11th Cir. 2018) (internal quotation marks omitted).

In applying the two-part presumption against extraterritoriality test, the District Court correctly determined that "there are insufficient indications in the text of the PLCAA to overcome the presumption against extraterritoriality." D. Op. at 23; *see RJR Nabisco*, 579 U.S. at 335 ("When a statute gives no clear indication of an extraterritorial application, it has none."). However, the District Court erred in finding at the second step that "[t]his case represents a valid domestic application of the PLCAA, and the presumption against extraterritoriality does not apply." D. Op. at 24. In doing so, the District Court disregarded the entire rationale and purpose of the presumption, which is to avoid conflict of laws. *See RJR Nabisco*, 579 U.S. at 336 (explaining that where there is "a risk of conflict between the American statute and a foreign law . . . the need to enforce the presumption is at its apex"). Under the District Court's rationale and ruling, precisely such a conflict will arise between the laws of Mexico that were broken and PLCAA.

Application of the presumption is appropriate for at least two reasons. *First*, PLCAA applies only to actions based on the misuse of a gun that is criminal or illegal

14

under federal or state law.  Here, Mexico's claims are based on the criminal misuse of guns in Mexico under Mexican law.  *Second*, PLCAA does not preclude claims brought by sovereign governments like Mexico.

### B.    PLCAA Only Applies to Actions Based on the Misuse of a Gun that Is Criminal or Illegal Under Federal or State Law

PLCAA prohibits bringing "a qualified civil liability action" based on the "criminal or unlawful misuse of a qualified product" in any federal or state court. 15 U.S.C. §§ 7902(a), 7903(5)(A).    Applying the presumption against extraterritoriality, PLCAA must be read to exclude from the terms "criminal or unlawful misuse" situations in which the criminal or unlawful use occurred abroad. Such application is appropriate because Congress did not intend for PLCAA to preclude recovery for injuries that occurred abroad and implicate foreign law.

Here, Mexico alleges that its injuries resulted from criminal or unlawful misuse of guns in Mexico under Mexican law – a scenario not within the purview of PLCAA.  *See* Compl. ¶¶ 434–474.  The text of PLCAA makes clear that its bar on civil actions for damages or other relief "resulting from the criminal or unlawful misuse of a qualified product" is limited to claims brought under U.S. federal or state law.  15 U.S.C. § 7903(5)(A).  For instance, the definition of "civil actions" that are prohibited have a series of exceptions, two of which refer explicitly to federal and state law.  *See, e.g.*, 15 U.S.C. § 7903(5)(A)(i)–(iii) (permitting actions against persons convicted of transferring guns knowing that they will be used in violent

crimes in violation of a federal statute and permitting actions against manufacturers or sellers who knowingly violate state or federal laws).  If Congress had intended PLCAA to apply to the criminal or unlawful misuse of guns under foreign law, it would have drafted these exceptions to refer to foreign law as well.  *See* 16 U.S.C. § 3372(a)(2)–(3) (referring expressly to foreign law); 19 U.S.C. § 1527(a) (same).

Moreover, Congress's codified findings and purposes of PLCAA make no mention of foreign law.  Instead, they refer explicitly to the constitutional rights of citizens.  For example, Congress's findings refer to the right to bear arms under the Second Amendment and note that guns "are heavily regulated by Federal, State, and local laws."  15 U.S.C. § 7901(a)(1) & (2), (4).  The statute also specifically identifies the civil actions with which it is concerned as those "commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others are based on theories without foundation in hundreds of years of the *common law and jurisprudence of the United States*."  *Id.* § 7901(a)(7) (emphasis added); *see also Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274, 1290 (C.D. Cal. 2006) (emphasis added) (discussing how the language of Section 7901(a)(7) is intended to foreclose "the development of novel theories of liability based on violations of generally applicable State and Federal statutes.").  Here, Mexico's claims are based on foreign law, not the common law and jurisprudence of the United States.

The District Court found that "the PLCAA seeks to regulate the types of claims that can be asserted against firearm manufacturers and sellers and seeks to protect the interests of the United States firearms industry and the rights of gun owners." D. Op. at 24 (internal quotation marks omitted). This is wrong. The District Court's own statement regarding PLCAA's focus makes no mention of harm occurring abroad or of the applicability of PLCAA to claims for misuse under Mexican law. *See id.*

PLCAA's legislative history further evidences that the statute's purpose and focus is to protect the constitutional rights of American citizens under the Constitution. *See* 15 U.S.C. § 7901(b)(2) (stating that it is PLCAA's stated purpose "[t]o preserve *a citizen's* access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting"); *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1140 n. 10 (9th Cir. 2009) (discussing Congress's explicit inclusion of "statements of purpose related to its interest in protecting individuals' Second Amendment right to bear arms").

In contrast to these clear statements of domestic focus, there is no expressed congressional intent for PLCAA to apply where extensive harm occurred abroad based on foreign law. *See Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 118 (2013) (applying the presumption of extraterritoriality where "nothing in the text of the statute suggest[ed] that Congress intended causes of action recognized under it

17

to have extraterritorial reach"). This suggests that PLCAA should *not* apply extraterritorially. In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 261 (2010), the Court discussed Congress's usual silence when it comes to the extraterritorial application of a law and found that the resulting speculation about Congressional intent "demonstrate[s] the wisdom of the presumption against extraterritoriality." The court must not disregard such wisdom, as a decision in favor of applying PLCAA extraterritorially contradicts both precedent and access to justice principles.

### C.   PLCAA Does Not Preclude the Claims Brought by Mexico in this Case

PLCAA's statutory text, purpose and history demonstrate that Congress did not intend to prohibit claims made by foreign sovereigns such as Mexico: an interpretation consistent with access to justice. PLCAA prohibits "qualified civil liability actions," meaning "civil action[s] or proceeding[s]…brought by ***any person***" against gun manufacturers, sellers, and trade associations. 15 U.S.C. § 7903(5)(A). The statute defines "person" as "any individual, corporation, company, association, firm, partnership, society, joint stock company, or any other entity, including any governmental entity." 15 U.S.C. § 7903(3). This definition does not include foreign governments.

While "person" includes "any governmental entity," this term is undefined by the statute. Determining the scope of "any governmental entity" first requires an

18

examination of the "ordinary, contemporary, common meaning of the term." *Delaware v. Pennsylvania*, 143 S. Ct. 696, 705 (2023). In law, a general term such as "any" must be limited in application to only "those objects [where] the legislature intended to apply them." *Small v. U.S.*, 544 U.S. 385, 388 (2005). Furthermore, a broad term must be interpreted in light of the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Id.* (citing *Smith v. U.S.*, 507 U.S. 197, 204 n.5 (1993)). The presumption against an extraterritorial interpretation of "any" may be rebutted only through showing that "statutory language, context, history, and purpose show the contrary." *Id.* at 391.

Examining the plain statutory language, with the presumption against extraterritoriality in mind, suggests that "any governmental entity" must be confined to domestic governmental entities, not the government of Mexico. As the District Court correctly recognized, "the use of the word 'any' throughout the PLCAA is insufficient to rebut" the presumption that PLCAA does not apply to the government of Mexico. Memo Op. at 22. Thus, the court must determine whether Congress intended to include foreign sovereigns in their definition of "government entity." PLCAA's findings are instructive. The only governmental entities mentioned as harming the gun industry in the statute are domestic: the Federal Government, States, and municipalities. 15 U.S.C. § 7901(a) (7)–(8). While the statute does mention "others" in the same sentence as those governmental entities, such a general

term does not sufficiently demonstrate that PLCAA was intended to apply to Mexico as a foreign sovereign. *Kiobel*, 569 U.S. at 118. Rather, "any government entity" has been routinely construed as limited to entities within the federal and state governments. *See* 18 U.S.C. § 2711(4) (confining "government entity" to "a department or agency of the United States or any State").

Where Congress has intended to include foreign countries in the definition of governmental entities or person, they have done so expressly. *See* 18 U.S.C § 3077 and 18 U.S.C § 1030. Indeed, the U.S. Code is riddled with provisions expressly including foreign government entities in the definition of "person" in cases where the inclusion of a foreign government is necessary to effect the legislative purpose of the statute. *See, e.g.*, 15 U.S.C. § 450rr–1, 1 U.S.C. § 2014, 16 U.S.C. § 1532; 22 U.S.C. § 3102. Unlike PLCAA, each of these statutes touch conduct or persons outside of the United States.

For instance, the definitions section of the federal law establishing rewards for information concerning terrorist acts and espionage includes "foreign countr[ies]" in the definition of "government entity." 18 U.S.C § 3077. The chapter authorizes the U.S Attorney General to reward individuals who provide information leading to "the arrest or conviction, *in any country*" of persons who commit acts of terrorism and espionage against the United States. 18 U.S.C § 3071 (emphasis added). The term "government entity" in the chapter relates to the exception of

government officials from such rewards, stating "no officer or employee of any governmental entity . . . shall be eligible for any monetary reward under this chapter." 18 U.S.C § 3074. If the statute only excluded domestic government employees from receiving rewards, a British Secret Intelligence Service agent may have been rewarded for performing their official duties, whereas an American CIA agent would have been excluded. Thus, Congress added "foreign country" to the definition of "government entity" to effectuate the purpose of such exclusion: that government employees who report terrorism against the United States "in any country" should not be specially rewarded for performing their job.

Similarly, statutes focused on international wildlife conservation always include "foreign government[s]" or "instrumentalit[ies]" thereof in their definition of person. *See* 16 U.S.C. § 973; 16 U.S.C. § 1532; 16 U.S.C. § 4903; 16 U.S.C. § 5502; 16 U.S.C. § 7801. There, international cooperation is required to effectuate the statutory goal of wildlife conservation. For example, the definition of "person" in the Endangered Species Act includes "any instrumentality" of "any foreign government." 16 U.S.C. § 1532. The congressional findings for the Endangered Species Act expressly recognize the United States' commitment to "the international community" in relation to wildlife conservation pursuant to various international treaties. 16 U.S.C. § 1531(a). The Endangered Species Act allows "interested person[s]" to petition for the "issuance, amendment, or repeal" of a rule designating

a species as endangered or threatened.  16 U.S.C. § 1531(b)(3)(A).  Those interested

persons include foreign governments whose animal species migrate between the

foreign country and the United States.  If Congress did not include foreign

government entities in the definition of "person," foreign governments would be

unable to petition the United States about rules that affect species within their own

border.  In other words, the United States would be unable to fulfill its statutory

commitment of international wildlife conservation under both the Endangered

Species Act and international treaties.  The Endangered Species Act, along with

other wildlife conservation statutes, indicate that Congress expressly includes

foreign governments in their statutory definitions when the statute applies to foreign

governments.  Such inclusions also align with the legislative purpose of each statute.

Moreover, elsewhere in the statute, Congress specifically references the

Federal Government and state governments without including foreign sovereigns.

*See* 15 U.S.C. § 7901(a)(5) (noting PLCAA's purpose to prevent "the Federal

Government, states, municipalities, private interest groups, and others" from

attempting to "use the judicial branch to circumvent" the legislative process through

novel liability actions).  This further suggests that Congress did not intend to include

foreign governments within the scope of the statute.

Had Congress intended PLCAA to reach claims from foreign governments,

they easily could have included such entities in the statutory definition of "person"

or provided a definition of "government entity."  However, a plain reading of PLCAA indicates that "governmental entities" was confined to domestic government entities—consistent with PLCAA's domestic focus and the presumption against extraterritoriality.

To the extent that the plain text remains unclear, PLCAA's purpose and legislative history only bolster the conclusion that the statute does not apply to the sovereign nation of Mexico.  To determine Congress's intent in light of statutory ambiguity, courts look beyond the statute towards the "character and aim" of PLCAA, and "other aids" such as legislative history.  *Davila-Perez v. Lockheed Martin Corp.*, 202 F. 3d 464, 468 (1st Cir. 2000).

PLCAA has an undeniably domestic focus.  PLCAA was enacted to prevent "the Federal Government, states, municipalities, private interest groups, and others" from attempting to "use the judicial branch to circumvent" the legislative process through novel liability actions.  15 U.S.C. § 7901(a)(5).  According to the statute, such actions from domestic actors threaten domestic interests:  the Separation of Powers doctrine, federalism, state sovereignty, and comity between sister states.  *Id.* More generally,  PLCAA aims to "preserve a *citizen's* access to supply of firearms" under the Second Amendment, "guarantee a *citizens rights*" under the Fourteenth

Amendment, and protect rights of *domestic* gun manufacturers.  *See* 15 U.S.C. § 7901(a)(5), 15 U.S.C. § 7901(b)(1)–(3), 15 U.S.C. § 7901(b)(5) (emphasis added).[2]

Mexico's lawsuit does not implicate any of these concerns.  Mexico does not seek to usurp legislative power by altering domestic gun control laws through its lawsuit.  Mexico does not seek to limit the Second Amendment rights of American citizens.  Nor does Mexico's lawsuit threaten any of the important federalism concerns addressed in the statute.  Rather, Mexico simply seeks to hold gun manufacturers and wholesalers accountable for injuries to Mexican citizens occurring in Mexico.  Mexico's non-interference with PLCAA's "character and aim" further supports that Congress did not intend to include foreign countries such as Mexico in their definition of governmental entity.

Finally, PLCAA's legislative history demonstrates that Congress was not concerned with lawsuits by foreign countries when drafting the statute.  Lawsuits by foreign governments were not mentioned anywhere in the lengthy debates over PLCAA.  *See* 151 Cong. Rec. 18055–18112; 151 Cong. Rec. 23258–23283.  In Senate debates, Sponsor Craig explained that PLCAA is a "modest bill to help prevent the gun industry from a tidal wave of baseless lawsuits."  151 Cong. Rec. 18073 (2005).  Those lawsuits were coming from municipal and state government

---

[2]    To note, all references to "foreign commerce" merely relate to domestic manufacturer's ability to do business abroad.  *See* 15 U.S.C. § 7901(a)(5); § 7901(b)(4).

entities, as the statute itself mentions—not foreign countries.  This empirical fact, along with the aforementioned congressional silence on the issue, reinforces "the likelihood that Congress, at best, paid no attention" to lawsuits initiated by foreign governments when drafting PLCAA.  *Small*, 544 U.S. at 394.  In light of such congressional silence, the definition of "governmental entity" should not be expanded so as to broaden PLCAA's scope beyond what was intended.  Hearing Mexico's claims would not change PLCAA's purpose of preventing baseless lawsuits against the firearms industry nor would it lead to a "tidal wave" of litigation. PLCAA would continue to apply to all claims brought by individuals and entities other than those brought by 1) foreign sovereigns, 2) parties who suffered harm abroad, and 3) parties who claim violation of foreign law.  Thus, absent express congressional indication that "governmental entity" should include foreign countries, PLCAA's text, purpose, and history prove that the statute was not meant to bar Mexico's lawsuit.  Such an interpretation also comports with traditional notions of access to justice.

## CONCLUSION

For the foregoing reasons, as well as those advanced in the Brief of Plaintiff-Appellant Estados Unidos Mexicanos, this Court should reverse the District Court and remand this action to the District Court for further appropriate proceedings.

Respectfully submitted,

Dated: New York, New York          **WILLKIE FARR & GALLAGHER LLP**
March 21, 2023

By: */s/Sameer Advani_____*
   Sameer Advani
   *Counsel of Record*

   James C. Dugan
   Gabrielle K. Antonello
   Ferdinand G. Suba Jr.
   787 Seventh Avenue
   New York, New York  10019
   (212) 728-8000
   sadvani@willkie.com
   jdugan@willkie.com
   gantonello@willkie.com
   fsuba@willkie.com

   Zainab Ali
   1875 K Street, N.W. #100
   Washington, DC  20006
   (202) 303-3042
   zali@willkie.com

   Benita Yu
   2029 Century Park East
   Los Angeles, California  90067
   (310) 855-3077
   byu@willkie.com

   *Counsel for Amici Curiae*

26

## CERTIFICATE OF COMPLIANCE

According to the word-processing system used to prepare the foregoing filing, the brief complies with Federal Rule of Appellate Procedure 29(a)(4) because it contains 5,552 words, excluding the portions exempted by Rule 32(f).

Further, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Sameer Advani_____
Sameer Advani

*Counsel for Amicus Curiae*

Dated: March 21, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of March, 2023, a copy of the foregoing brief was filed electronically and is available for viewing and downloading on the Court's CM/ECF system, and service was made on all counsel of record via the Court's CM/ECF system.

/s/ Sameer Advani_____
Sameer Advani

Dated: March 21, 2023