# No. 22-1823

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

ESTADOS UNIDOS MEXICANOS,

*Plaintiff-Appellant,*

v.

SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS MANUFACTURING, INC.; BERETTA U.S.A. CORP.; GLOCK, INC.; STURM, RUGER & COMPANY, INC.; WITMER PUBLIC SAFETY GROUP, INC., d/b/a Interstate Arms; CENTURY INTERNATIONAL ARMS, INC.; BARETTA HOLDINGS SPA, GLOCK GES.M.B.H; COLT'S MANUFACTURING COMPANY, LLC,

*Defendants-Appellees*

_____

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 21-cv-11269
Chief District Judge F. Dennis Saylor, IV

---

### BRIEF OF AMICUS CURIAE STATE OF MONTANA AND 19 OTHER STATES SUPPORTING DEFENDANTS-APPELLEES AND AFFIRMANCE

AUSTIN KNUDSEN
  *Montana Attorney General*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
peter.torstensen@mt.gov

BRENT MEAD
  *Deputy Solicitor General*

PETER M. TORSTENSEN, JR.
  *Assistant Solicitor General*

TANNER BAIRD[*]
  *Solicitor's Fellow*

*Counsel for Amicus Curiae*
*State of Montana*

---

[*] Admitted in Texas only. Supervised by members of the Montana bar.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................... iii

INTERESTS OF AMICI CURIAE................................................................1

SUMMARY OF ARGUMENT ....................................................................1

ARGUMENT...............................................................................................2

I. American gun manufacturers are not to blame for increased gun
violence in Mexico. ..............................................................................2

    A. Mexico's war on cartels, not the expiration of the U.S. assault-
weapons ban, caused Mexico's homicide spike. .........................3

    B. Few American retail guns are used in Mexican homicides. .......6

    C. Mexican cartels can acquire firearms elsewhere. .....................10

    D. Individuals, not gun manufacturers, must be
held accountable. ........................................................................11

II. PLCCA forecloses Mexico's meritless liability theory. ......................14

    A. Mexico recycles tactics from the American anti-gun lobby. .....15

    B. Congress foreclosed an already meritless tort theory
in PLCAA. ..................................................................................17

        1. Mexico advances tort theories without basis in American
law. ........................................................................................17

        2. Congress codified a pre-PLCAA liability standard............21

CONCLUSION .........................................................................................23

CERTIFICATE OF COMPLIANCE ...............................................................26

CERTIFICATE OF SERVICE .......................................................................26

## TABLE OF AUTHORITIES

### Cases

*Casillas v. Auto-Ordnance Corp.*,
　　No. C 95-3601 FMS, 1996 WL 276830 (N.D. Cal. May 17, 1996) .... 18

*Cook v. MillerCoors, LLC*,
　　829 F. Supp. 2d 1208 (M.D. Fla. 2011) ........................................ 19-20

*Copier* By & Through Lindsey *v. Smith & Wesson Corp.*,
　　138 F.3d 833 (10th Cir. 1988) ............................................................. 18

*De Rosa v. Remington Arms Co.*,
　　509 F. Supp. 762 (E.D.N.Y. 1981) ..................................................... 18

*Gaines-Tabb v. ICI Explosives, USA, Inc.*,
　　160 F.3d 613 (10th Cir. 1998) ............................................................ 20

*Martin v. Harrington and Richardson*,
　　743 F.2d 1200 (7th Cir. 1984) ............................................................ 18

*Patterson v. Gesellschaft*,
　　608 F. Supp. 1206 (N.D. Tex. 1985) ............................................ 16, 19

*Port Auth. v. Arcadian Corp.*,
　　189 F.3d 305 (3d Cir. 1999) ............................................................... 20

### United States Code

　　15 U.S.C. § 7901(b)(2) ....................................................................... 17
　　22 U.S.C. § 2778(b)(2) ....................................................................... 11
　　26 U.S.C. § 5845(a), (f) ...................................................................... 10

**Other Authorities**

Allen Rostron, *Symposium: Armed Standoff: The Impasse in Gun Legislation and Litigation,*73 UMKC L. Rev. 1047 (2005) ............. 16

Amanda Macias, *Here's a Look at the $5.6 Billion in Firepower the U.S. has Committed to Ukraine in its Fight Against Russia,* CNBC (Jun 17, 2022) .......................................................................... 8

Andrew Jay McClurg, *The Tortious Marketing of Handguns: Strict Liability is Dead, Long Live Negligence*, 19 Seton Hall Legis. J. 777 (1995) ............................................................................. 15

Benjamin Caryan, *Held Accountable: Should Gun Manufacturers Be Held Liable for the Criminal Use of Their Products*, 13 J. Bus. Entrepreneurship & L. 23 (2020) .................................................... 21

David B. Kopel, *Mexico's Gun-Control Laws:  A Model for the United States?* 18 *Tex. Rev. L. & Pol.* 27 (2013) ...................... *passim*

Ed Vulliamy, *Tijuana Streets Flow with the Blood of Rival Drug Cartels*, Guardian (Nov. 1, 2008) ......................................................... 5

Eyder Peralta, *ATF Promotes Supervisors of its Controversial 'Fast and Furious' Operation*, NPR (Aug. 16, 2011) ........................ 13

Fox Butterfield, *Lawsuits Lead Gun Maker to File for Bank-ruptcy*, New York Times, June 24, 1999 .......................................... 16

Jon Stewart, *The Fast and the Furious – Mexico Grift*, Daily Show (Jun. 21, 2011) ...................................................................... 13

Junaid Kathju, *U.S. Arms Left in Afghanistan are Turning up in a Different Conflict*, NBC (Jan. 30, 2023) ........................................ 8

John Culhane, *Defining a Proper Role for Public Nuisance Law in Municipal Suits Against Gun Sellers: Beyond Rhetoric and Expe-dience*, 52 S.C. L. Rev. 287 (2001) .................................................. 15

Mike Allen, *Colt's to Curtail Sale of Handguns*, New York Times, Oct. 11, 1999 ...................................................................... 17

Peter Boyer, *Big Guns,* New Yorker, May 17, 1999 .......................... 16

Ryan Devereaux, *The U.S. is Organizing a $5 Million Gun Sale to Mexican Forces Accused of Murder and Kidnapping*, Intercept (Oct. 6, 2021) ....................................................................... 9

Scott R. Thomas, Mystica M. Alexander, *Suing Guns Out of Existence?*, 75 Wash. & Lee L. Rev. Online 175, 188 (2019) .................... 17

Vanda Felbab-Brown, *The Foreign Policies of the Sinaloa Cartel and CJNG – Part V: Europe's Supercoke and On-The-Horizon Issues and the Middle East*, Brookings .................................. 8

William La Jeunesse, *U.S. Officials Behind 'Fast and Furious' Gun Sales Should be Tried in Mexico, Lawmaker Says*, Fox News (Dec. 12, 2015) .................................................................. 13

## INTERESTS OF AMICI CURIAE

Amici Curiae States of Montana, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, New Hampshire, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming (the "States"), represented by their respective Attorneys General, submit this amicus brief in support of Appellees. The States have strong interests in the application of the Protection of Lawful Commerce in Arms Act ("PLCAA") in this suit, both to protect the lawful firearms industry within their borders and to protect the rights of their citizens to keep and bear arms under the Second Amendment of the United States Constitution. For these reasons, the States urge this Court to affirm the judgment of the district court.

## SUMMARY OF ARGUMENT

Mexico advances a legal theory that is unsupported by fact or law. On the facts, American gun manufacturers are not responsible for gun violence in Mexico. Rather, policy choices by the Mexican government, policy failures in the United States, and independent criminal actions by third parties are alone responsible for gun violence in Mexico.

And on the law, even if Mexico could establish but-for causation between the manufacture of guns in America and gun violence in Mexico, intervening criminal actions preclude finding proximate causation between a gun's legal sale and the harm caused by it. Before PLCAA's enactment, no high court in the United States found gun manufacturers liable for the criminal acts of third parties. PLCAA simply codified this existing causation standard to protect gun manufacturers from the expense of litigating meritless tort cases and from tort law innovations targeting the gun industry.

<div align="center">ARGUMENT</div>

## I. American gun manufacturers are not to blame for increased gun violence in Mexico.

Mexico's theory of liability rests entirely on the factual assertion that American gun manufacturers knowingly cause Mexican gun violence. Appellant's Br. at 3. But its theory falls apart under even cursory scrutiny.

The available evidence suggests that gun violence in Mexico increased, not because of the expiration of the U.S. assault-weapons ban, but instead because of the Mexican government's crackdown on the cartels. *See* David B. Kopel, *Mexico's Gun-Control Laws: A Model for the United*

<div align="center">2</div>

*States?*, 18 *Tex. Rev. L. & Pol.* 27, 42–44 (2013).  Contrary to Mexico's claims that American guns are "among the deadliest and most often recovered at crime scenes in Mexico," *see* Appellant's Br. at 3, only a minority of guns recovered at crime scenes in Mexico can be traced back to the United States, *see* Kopel, *supra*, at 46–49.  Among the American guns recovered at crime scenes in Mexico, many were sold wholesale to the Mexican military and law enforcement and only ended up in cartel hands after soldiers or policemen deserted.  *See id.* at 46.  And the age of the few American retail guns that do end up in cartel hands suggests that these weapons were stolen, or sold on the black market, years after their legal sale in the United States and were not intentionally trafficked to Mexico through straw purchases.  *See id.* at 48–49.

### A. Mexico's war on cartels, not the expiration of the U.S. assault-weapons ban, caused Mexico's homicide spike.

Mexico claims that gun violence in its country increased because of the expiration of the U.S. assault-weapons ban in 2004.  Appellant's Br. at 7.  But homicide rates in Mexico *declined* in the three years after the

assault-weapons ban ended and didn't increase until Mexico declared war on its drug cartels in late 2006.[2] *Id.* at 43–44.

Before 2006, the Mexican government took a passive approach to the illegal drug trade. *Id.* at 42. High levels of corruption in Mexico meant that government officials accepted payoffs from the cartels, allowing them to smuggle drugs north of the border with relative ease. *Id.* This status quo meant that the cartels grew in power, established set territories, and flooded the United States with illegal drugs, all while keeping violence at a minimum—lest they provoke a policy response from Mexican officials. *See id.*

That changed with the election of Felipe de Jesús Calderón Hinojosa. *Id.* Calderón declared war on the cartels days after his inauguration in December 2006, and he deployed 30,000 Mexican troops across the country to end the drug trade. *Id.* The cartels responded with a

---

[2] In 2003, Mexico reported 10,087 homicides. Kopel, *supra*, at 43–44. Homicides declined to 9,329 in 2004, the year the assault-weapons ban expired. *Id.* at 44. Mexican homicides more or less stayed in this range between 2005 to 2007, reaching 10,452 in 2006 and then dropping to 8,867 in 2007. *Id.* The homicide rate in 2007, three years after Defendants allegedly "increase[d] production of their military-grade weapons," was significantly lower than Mexican homicides during the height of the assault-weapons ban. Appellant's Br. at 7; Kopel, *supra*, at 44.

counteroffensive against Mexican soldiers.[3]  Oftentimes, fighting between the government and cartels spilled over into the civilian population, as cartels conducted "social terrorism" by killing and kidnapping children until Mexican officials left their territory.  Vulliamy, *supra* note 2.  And, as authorities weakened one cartel, another expanded its operations and killed rival cartel members in the process.  *Id.*; *see also* Kopel, *supra*, at 43.

Calderón's late-2006 declaration of war on the cartels reversed the declining homicide trend in Mexico.  From 2007 to 2008, homicides related to the drug war more than doubled.  Kopel, *supra*, at 43.  Mexico's total homicide rate rose 57%.  *Id.*  The increase continued for years, with drug war homicides increasing by another 41% between 2008 and 2009.  *Id.*

Mexico's Complaint, and several amicus briefs, blame the sale of "assault weapons" in the United States for Mexico's gun violence.  *See, e.g.*, Appellant's Br. at 3, 7; District Attorneys' Br. at 15; Gun Prevention Groups Br. at 20; Mexican Activists Br. at 2–7.  But gun violence in Mexico decreased in the three years after the U.S. assault-weapons ban

---

[3] Ed Vulliamy, *Tijuana Streets Flow with the Blood of Rival Drug Cartels*, Guardian (Nov. 1, 2008), https://www.theguardian.com/world/2008/nov/02/mexico-drugs-trade-tijuana-cocaine.

expired and didn't increase until "the [Mexican] government's crackdown on the cartels. Kopel, *supra*, at 43 (alteration in original); *see also id.* at 43–44.

## B. Few American retail guns are used in Mexican homicides.

American-manufactured weapons constitute a small minority of guns recovered from crime scenes in Mexico. Researchers believe that only about 12% of the guns recovered at those crime scenes originate from U.S. retail gun stores. *Id.* at 49. Mexican officials estimate that number to be slightly higher—18%—but still far below the number cited by Appellant. *Compare* Appellant's Br. at 5–6 (claiming that 70%–90% of Mexican crime guns traced by ATF originate in the United States) *with* Kopel, *supra*, at 48 (citing estimates, from both Mexico's former Foreign Minister and Presidential Press Secretary, that only 18% of guns recovered from crime scenes in Mexico originate in the United States). And those guns are—on average—fifteen years old, which suggests that they arrive in Mexico through thefts, not straw purchases. *Id.* at 49.

Mexico only asks ATF to trace a fraction of the guns it recovers at crime scenes, so the actual percentage of American firearms recovered from crime scenes in Mexico is much lower than the figure Mexico cites

in its brief. *See id.* at 45–46 (explaining that of 11,055 trace requests made to ATF in 2007 and 2008, *which accounted for only 38% of guns recovered at crime scenes in Mexico*, 10,347 guns were traced back to the United States); *see also* Appellant's Br. at 5–6 (arguing that 70% to 90% of traced guns were "trafficked from the United States"). For years, ATF has maintained field offices in Mexico and offers to trace any gun that Mexican authorities bring to it. Kopel, *supra*, at 45. But Mexican officials rarely bring non-American guns to trace. That decision makes sense because Mexican officials can easily trace Mexican retail guns. *Id.* at 47–48. Other non-American guns, like those that originate in China or Eastern Europe aren't traceable by the ATF. *Id.* at 46–47. So when officials find those guns at crime scenes, they don't bother asking for a trace.

Even among the American guns recovered at crime scenes in Mexico, few can be traced to retail gun sales. Many of these guns were originally supplied to U.S.-backed militants and later sold on the black market. *Id.* at 46. Many more were left behind in Vietnam or other theaters of conflict. *Id.* And in the future, it's likely (and unfortunate) that American guns abandoned in Afghanistan will also find their way to Mexican drug

cartels.[4]  Although tragic, this is hardly the fault of American gun manufacturers.  These manufacturers sold guns to the United States military, not to the cartels or straw purchasers.  That some of their guns made it into the hands of Mexican cartels is the result of American foreign policy failures, not decisions by American gun manufacturers.[5]

Another major (unintentional) supplier of American firearms to Mexican cartels is the Mexican government itself.  For years, American gun

---

[4] *See*, Junaid Kathju, *U.S. Arms Left in Afghanistan are Turning up in a Different Conflict*, NBC (Jan. 30, 2023), https://www.nbcnews.com/news/world/us-weapons-afghanistan-taliban-kashmir-rcna67134 (reporting that the Taliban is selling American firearms to militants in Kashmir); *see also* Vanda Felbab-Brown, *The Foreign Policies of the Sinaloa Cartel and CJNG – Part V: Europe's Supercoke and On-The-Horizon Issues and the Middle East*, Brookings (Sept. 16, 2022), https://www.brookings.edu/opinions/the-foreign-policies-of-the-sinaloa-cartel-and-cjng-part-v-europes-supercoke-and-on-the-horizon-issues-and-the-middle-east/ (detailing the Sinaloa Cartel's middle eastern smuggling routes).

[5] Mexico argues, in part, that applying PLCAA's jurisdictional bar to overseas harms would interfere with congressional foreign policy choices. *See* Appellant's Br. at 19–20.  But the reverse is true.  Holding gun manufacturers liable for weapons sent overseas on behalf of the United States would upend American foreign policy.  If overseas harms evade PLCAA's jurisdictional bar, the gun industry would never have supplied "7,000 various types of small arms and 50 million rounds of ammunition to Ukraine." Amanda Macias, *Here's a Look at the $5.6 Billion in Firepower the U.S. has Committed to Ukraine in its Fight Against Russia*, CNBC (Jun 17, 2022), https://www.cnbc.com/2022/06/17/russia-ukraine-war-summary-of-weapons-us-has-given-to-ukraine.html.

manufacturers have supplied actual weapons of war—fully automatic, select-fire, and high-caliber rifles—to the Mexican army.[6]  But when members of the Mexican army defect to join the cartels—usually to accept higher pay—they often bring their American-made service weapons with them.  *See* Devereaux, *supra* note 4 (estimating that one-fifth of weapons supplied in Guerrero go missing).  From 2003 to 2009, around 150,000 Mexican troops defected to the cartels—taking their American-made rifles with them.  Kopel, *supra*, at 51.  To put that in perspective, roughly "one-eighth of the Mexican army deserts annually."  *Id.*  "So the fact that a Mexican army deserter is later caught with his M-16 does not mean that the U.S. civilian gun market is somehow at fault."  *Id.*

Mexico's theory depends entirely on its claim that U.S. gun manufacturers intentionally supply the cartels with American guns.  But that's not what the facts show.  Few guns recovered at crimes scenes in Mexico are American made.  Most of the guns that are American made, ended up in Mexico because of U.S. foreign policy failures, not because of American

---

[6] *See, e.g.*, Ryan Devereaux, *The U.S. is Organizing a $5 Million Gun Sale to Mexican Forces Accused of Murder and Kidnapping*, Intercept (Oct. 6, 2021), https://theintercept.com/2021/10/06/mexico-weapons-sale-biden-murder-kidnapping/.

gun manufacturers. And, of the few retail guns that end up in Mexico, most of those come from thefts, not straw purchases.

### C. Mexican cartels can acquire firearms elsewhere.

Even if domestic gun manufacturers supplied the cartels with a substantial number of firearms (they don't), bankrupting American gun companies would do little to prevent cartels from obtaining firearms. That's because the cartels acquire firearms—often far more lethal than what American gun retailers can sell—from many other sources.

Firearms are reportedly quite easy to obtain on the black market in Mexico, as corrupt officials from the Mexican Ministry of Defense often supply these markets with "revolvers, submachine guns, rifles and grenade launchers." Kopel, *supra*, at 52. Mexican officials often seize weapons from cartels that are not available from the U.S. retail market. Among the most common weapons seized by Mexican officials are M72 and AT-4 anti-tank rockets, RPGs, 37 mm and 40 mm grenade launchers, rocket launchers, and submachine guns. *Id.* at 52–53. But U.S. law bans the retail sale of these weapons, *see* 26 U.S.C. § 5845(a), (f) (outlawing the sale and possession of destructive devices and machineguns), so Mexican cartels clearly acquire many of their weapons from non-U.S. sources.

10

In 2009, a representative from the ATF testified before Congress that "weapons of war" enter Mexico not from the United States, but through its border with Guatemala. Kopel, *supra*, at 53. Arms traffickers in Russia, South America, and Asia funnel weapons into the hands of the cartels through Mexico's southern border—supplying weapons that are far more deadly than those sold on the American retail gun market. Even if Mexico successfully shut down the American retail gun market, far deadlier weapons would continue to find their way to the hands of the cartels.

### D. Individuals, not gun manufacturers, must be held accountable.

Finally, Mexico claims that a "relatively small number of dealers" account for most American retail sales to the cartels. Appellant's Br. at 6. But if that allegation is true, Mexico should name, report, and sue *those individuals*. PLCAA does not protect people who directly make straw sales, and the Arms Control & Export Act criminalizes the international trafficking of arms. 22 U.S.C. § 2778(b)(2). Mexican law likewise criminalizes conspiracies to illegally smuggle guns into its country. Kopel, *supra*, at 58–59. But Mexico is unlikely to pursue civil and criminal charges against individuals for political reasons. That's largely because the individuals who most notably facilitated illegal arms shipments to Mexico did

so at the direction of U.S. government officials. *See* Kopel, *supra*, at 56 (describing efforts by American officials to traffic firearms into Mexico). But that unfortunate truth is no reason to lay the blame at the feet of the American gun industry.

Take, for example, William Newell. In 2007, Newell served as the Special Agent in Charge of the ATF's Phoenix Field Office. *Id.* While there, Newell initiated a program called "Wide Receiver." *Id.* The program encouraged gun dealers to sell firearms to individuals they knew to be straw purchasers for the cartels. *Id.* Newell and the ATF told gun store owners that they would track the firearms after their sale, trace them back to the cartels, and intercept them before they could be used in a crime. *Id.* at 56–57. But when officials in the Bush Administration began asking about the program, the Phoenix ATF office immediately shut it down. *Id.* at 57. Newell failed to deliver on his promise to track the guns, and instead put 300 firearms into cartel hands. *Id.*

Newell tried again under the Obama Administration in a program called "Fast & Furious." *Id.* at 57. This time, the ATF and Department of Justice enthusiastically endorsed the program, which again encouraged gun dealers to sell firearms to straw purchasers for the cartels. *Id.*

Once again, ATF failed to track the guns after they left gun stores. *Id.* After more than a year of facilitating gun sales to Mexico, Newell orchestrated the delivery of over 2,000 weapons to the cartels that were used in over 200 homicides—including the murder of a U.S. Border Patrol Agent. *Id.* ATF has never offered a viable explanation for how they planned to prevent the guns from being used by the cartels and the incompetence on display in Fast & Furious has been widely ridiculed.[7]

The Mexican government has stated that it wishes to extradite the ringleaders of Fast & Furious for trial in Mexico.[8] But so far, the United States has declined to do so or to bring charges against them in the United States. In fact, the United States has promoted many of these individuals—including Newell—within the ATF.[9]

---

[7] *See, e.g.,* Jon Stewart, *The Fast and the Furious – Mexico Grift*, Daily Show (Jun. 21, 2011), https://www.cc.com/video/1mdpat/the-daily-show-with-jon-stewart-the-fast-and-the-furious-mexico-grift.

[8] William La Jeunesse, *U.S. Officials Behind 'Fast and Furious' Gun Sales Should be Tried in Mexico, Lawmaker Says*, Fox News (Dec. 12, 2015), https://www.foxnews.com/world/u-s-officials-behind-fast-and-furious-gun-sales-should-be-tried-in-mexico-lawmaker-says.

[9] Eyder Peralta, *ATF Promotes Supervisors of its Controversial 'Fast and Furious' Operation*, NPR (Aug. 16, 2011), https://www.npr.org/sections/thetwo-way/2011/08/16/139682699/atf-promotes-supervisors-of-its-controversial-fast-and-furious-operation.

Considering the reluctance of American officials to hold gun traffickers accountable, it's understandable that Mexico would pursue different routes for relief.  But when American firearms end up in Mexico, it's individuals, not gun manufacturers, who are responsible for getting them there.  Mexico's frustration with this state of affairs, understandable as it may be, is no excuse to shift the blame to gun manufacturers.

## II. PLCCA forecloses Mexico's meritless liability theory.

Mexico's lawsuit attempts to do what the American anti-gun lobby cannot—bankrupt companies for the lawful manufacturing and sale of firearms.  American courts have soundly rejected the theory Mexico advances, and Congress passed PLCAA to foreclose these predatory lawsuits.

That Mexico restyles its Complaint as an extraterritorial application of PLCAA is too clever by half.  PLCAA codified an already established standard of proximate causation—it makes no difference whether a third party's criminal action occurred domestically or internationally.  Under PLCAA, domestic gun manufacturers are protected from liability stemming from the criminal misuse of guns when they lawfully sell or manufacture firearms in the United States.

### A. Mexico recycles tactics from the American anti-gun lobby.

Congress didn't pass PLCAA in a vacuum.  Instead, it did so in direct response to lawsuits from anti-gun groups seeking to financially cripple the firearms market—just as Mexico does here.  *See* Andrew Jay McClurg, *The Tortious Marketing of Handguns: Strict Liability is Dead, Long Live Negligence*, 19 Seton Hall Legis. J. 777, 777 (1995) (explaining anti-gun attempts to cripple firearms manufacturing).  But the courts rejected these suits time and again.  *See id.* ("Courts have rejected strict liability.  Legislatures have rejected it.  Influential commentators have rejected it.").  Undeterred, these plaintiffs moved to novel theories of negligence, arguing that the design, marketing, and sale of firearms created financial liability for the gun industry.  *See id.* at 796.

These attacks on the gun industry failed to win jury verdicts, but they still financially crippled gun manufacturers.  That's because the lawsuits acted to "divide, separate and weaken the gun manufacturers" through suits that "ma[de] them stretch out their own financial resources."  John Culhane, *Defining a Proper Role for Public Nuisance Law in Municipal Suits Against Gun Sellers: Beyond Rhetoric and Expedience*, 52 S.C. L. Rev. 287, 290 (2001).  These lawyers weren't interested in improving gun

safety, "plaintiff's attorneys simply want[ed] to eliminate []guns." *Patterson v. Gesellschaft*, 608 F. Supp. 1206, 1212 (N.D. Tex. 1985).

This lawfare tactic reached a fever pitch in the late 1990s when anti-gun groups started a coordinated strategy to bankrupt the firearms industry. In 1998, more than 30 local governments joined the anti-gun lobby and sued firearm companies and trade associations. Allen Rostron, *Symposium: Armed Standoff: The Impasse in Gun Legislation and Litigation*, 73 UMKC L. Rev. 1047, 1054 (2005). Each case sought damages ranging from $100 million to $800 million. *Id.* But the cost of defending against these suits alone had the potential to destroy the firearms industry—firearms companies spent upward of $1 million per day in legal fees while under attack. Peter Boyer, *Big Guns,* New Yorker, May 17, 1999. The anti-gun lobby knew that "the costs alone of defending these suits [would] eat up the gun companies." Fox Butterfield, *Lawsuits Lead Gun Maker to File for Bankruptcy*, New York Times, June 24, 1999.

And they did. Davis Industries, among the ten largest firearm manufacturers in the country at the time, declared bankruptcy in 1999. Fox Butterfield, *Lawsuits Lead Gun Maker to File for Bankruptcy*, New York Times, June 24, 1999. Colt's Manufacturing Company likewise

abandoned "its 144-year-old retail gun business in an effort to limit its liability."  Mike Allen, *Colt's to Curtail Sale of Handguns*, New York Times, Oct. 11, 1999.  But Congress put an end to these predatory lawsuits by passing PLCAA, in an effort to "preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes."  15 U.S.C. § 7901(b)(2).

## B. Congress foreclosed an already meritless tort theory in PLCAA.

PLCAA doesn't foreclose an otherwise legitimate tort theory, it forecloses a meritless one.  Prior to PLCAA's passage, no high court had ever found gun manufacturers liable for the criminal misuse of their products.  Those rulings are in line with other product liability doctrines, which find that the criminal misuse of a product severs proximate causation between the product's manufacture and harm caused by third parties.

### 1. Mexico advances tort theories without basis in American law.

PLCAA, correctly understood, does not provide an exception for tort liability to gun manufacturers.  Instead, it codifies a well-established liability standard that predated its passage.  At the time of its enactment in 2005, no high court had ever found liability for gun manufacturers

17

stemming from the criminal misuse of functioning firearms. PLCAA froze this status quo—protecting gun manufacturers from both the expense of defending against meritless suits and from innovations in tort law aimed at bankrupting the industry.

Courts have consistently held that the criminal misuse of a firearm breaks the causal connection between the manufacture of that weapon and the injury of a plaintiff. *See, e.g.*, *Martin v. Harrington and Richardson*, 743 F.2d 1200, 1205 (7th Cir. 1984); *Copier By & Through Lindsey v. Smith & Wesson Corp.*, 138 F.3d 833, 836 (10th Cir. 1988) (identifying a gun's criminal misuse as the cause of an injury, not its manufacture) (10th Cir. 1998); *De Rosa v. Remington Arms Co.*, 509 F. Supp. 762, 770 (E.D.N.Y. 1981) (finding no liability where third party negligently discharged firearm); *Casillas v. Auto-Ordnance Corp.*, No. C 95-3601 FMS, 1996 WL 276830 (N.D. Cal. May 17, 1996) (dismissing "a claim against a firearm manufacturer for damages caused by a third party's illegal use of a legal and nondefective firearm").

A judge who "believe[d], very strongly, that handguns should be banned" succinctly explained the causation issues with the same theory

Mexico advances here. *Patterson*, 608 F. Supp. at 1216.[10]  There, the court dismissed as "baseless," a claim alleging that a gun manufacturer both designed an unreasonably dangerous weapon and distributed it in a manner that allowed criminals to easily obtain and misuse it. *Id.* at 1208. The court declined to extend the "risk/utility test" pushed by plaintiffs, noting that legal firearms, which function as intended, can never be defective as a matter of law. *Id.* at 1211.  The court also rejected plaintiffs' defective distribution theory, holding that the criminal misuse of a handgun breaks the causal chain between manufacturing the weapon and the injury it inflicts. *Id.* at 1215.

That ruling didn't extend special protections to firearm manufacturers, it applied the same tort rules that apply to every other industry.  The criminal misuse of other products severs proximate causation between the item's manufacture and the harm caused by it. *See, e.g.*, *Cook v.*

---

[10] In that case, plaintiffs argued that a handgun's manufacturer was liable for the criminal misuse of a firearm for two reasons. *Patterson*, 608 F. Supp. at 1208.  Along with arguing that the handgun was "defective and unreasonably dangerous," plaintiffs also alleged a "defect in distribution" claim similar to the one Mexico advances here. *Id.*  They argued "that the system of distributing and marketing handguns was 'defective and unreasonably dangerous' because it is too easy for handguns to be obtained by criminals and others who misuse them." *Id.*

*MillerCoors, LLC*, 829 F. Supp. 2d 1208, 1218 (M.D. Fla. 2011) (finding that a criminal's "voluntary drinking of alcohol, not the manufacture or sale of [alcohol], is the proximate cause of [plaintiff's] injury"). If proximate causation worked any other way, then producing matches, cars, or alcohol would be prohibitively expensive because of the downstream liability associated with their criminal misuse.

This is true even when companies market or manufacture items that can reasonably be predicted to be misused. *See Port Auth. v. Arcadian Corp.*, 189 F.3d 305, 319 (3d Cir. 1999) (finding no liability for fertilizer manufacturer, even when terrorists had previously used fertilizer to create a bomb because "terrorists' [criminal] actions were superseding and intervening events breaking the chain of causation"); *Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 621 (10th Cir. 1998) ("Because the conduct of the bomber or bombers was … adequate by itself to bring about plaintiffs' injuries, the criminal activities of the bomber … acted as the supervening cause of plaintiffs' injuries. Because of the lack of proximate cause, plaintiffs have failed to state a claim for negligence.").

The proximate causation standard in torts is essential to protect companies from liability when criminals intentionally misuse functioning

products.  Companies that make and manufacture fast vehicles know that they might be driven at unsafe speeds by customers.  The manufacturers of large vans also know that their vehicles may be picked by criminals who will use them to drive into crowds or buildings.  And the manufacturers and distributors of sugary or flavored alcohol know that their products may be illegally consumed by teenagers.  Yet in all these cases, it is the criminal who misuses a product who is liable for damages, not the manufacturer of the product.  So too with guns: "traditional tort theories of negligence and strict products liability do not provide a basis to hold gun manufacturers liable for the criminal misuse of guns by others." Benjamin Caryan, *Held Accountable: Should Gun Manufacturers Be Held Liable for the Criminal Use of Their Products*, 13 J. Bus. Entrepreneurship & L. 23, 36 (2020).

### 2. Congress codified a pre-PLCAA liability standard.

This proximate causation standard is exactly what PLCAA codified. At the time of PLCAA's passage, no high court had held gun manufacturers liable for the criminal misuse of their products.  Congress, however, feared that one might.  Instead of allowing tort innovations in one state

to eradicate the lawful manufacturing and sale of arms nationwide, Congress stepped in to freeze the proximate causation status quo.

> As explained by a Senator at the time of passage:

> But *what this bill prevents*, and I think rightfully so, is *establishing a duty* along this line: That you have a *responsibility*, even if you do a lawful transaction or make a safe gun, *for an event that you can't control*, which is the intentional misuse of a weapon in a criminal fashion by another person. That is the heart of this bill.

Scott R. Thomas, Mystica M. Alexander, *Suing Guns Out of Existence?*, 75 Wash. & Lee L. Rev. Online 175, 188 (2019).

This understanding of PLCAA—as freezing the status quo for an activity inside the United States—defeats Mexico's primary argument. Under this proximate causation standard, it is irrelevant where the criminal harm occurred. The conduct Mexico sues over—gun sales and manufacturing—occurred in the United States. While Mexico spends much time arguing that PLCAA does not apply extraterritorially, *see* Appellant's Br. at 17–33, that inquiry is irrelevant, *see* Appellee's Br. at 12 (explaining that PLCAA isn't concerned about "whether the plaintiff or source of law invoked is foreign or domestic," but it instead "takes issue with a certain *type* of claim and shuts the courthouse doors to such claims"). PLCAA did not carve out an exception to an otherwise meritorious tort theory, it

precluded a meritless one. *See* Sect.II.B.2. The activity that Congress shielded from liability—the production and sale of firearms—occurred entirely in the United States and is protected from the criminal actions of third parties, wherever that might occur. *See* Appellee's Br. at 10–12.

## CONCLUSION

Mexico's lawsuit rests on a legal theory that is unsupported by fact or law. This Court should affirm the district court and dismiss all claims against Defendants.

DATED this 18th day of May, 2023.

<div style="margin-left:40%">

AUSTIN KNUDSEN
  *Montana Attorney General*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
BRENT MEAD
  *Deputy Solicitor General*

*/s/ Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
  *Assistant Solicitor General*
TANNER BAIRD
  *Solicitor's Fellow*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549

*Counsel for Amicus Curiae
State of Montana*

</div>

ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of
Alabama*

TREG TAYLOR
*Attorney General of
Alaska*

TIM GRIFFIN
*Attorney General of
Arkansas*

ASHLEY MOODY
*Attorney General of
Florida*

CHRISTOPHER M. CARR
*Attorney General of
Georgia*

THEODORE E. ROKITA
*Attorney General of
Indiana*

BRENNA BIRD
*Attorney General of
Iowa*

DANIEL CAMERON
*Attorney General of
Kentucky*

JEFF LANDRY
*Attorney General of
Louisiana*

LYNN FITCH
*Attorney General of
Mississippi*

ANDREW BAILEY
*Attorney General of
Missouri*

JOHN M. FORMELLA
*Attorney General of
New Hampshire*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of
South Dakota*

KEN PAXTON
*Attorney General of
Texas*

SEAN D. REYES
*Attorney General of
Utah*

JASON MIYARES
*Attorney General of
Virginia*

PATRICK MORRISEY
*Attorney General of
West Virginia*

BRIDGET HILL
*Attorney General of*
*Wyoming*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,635 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font and is double-spaced except for footnotes and for quoted and indented material.

<div align="right">

/s/ *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.

</div>

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: May 18, 2023       /s/ *Peter M. Torstensen, Jr.*
                                 PETER M. TORSTENSEN, JR.