No. 22-1823

# United States Court of Appeals for the First Circuit

ESTADOS UNIDOS MEXICANOS,

*Plaintiff-Appellant,*

v.

SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS MANUFACTURING, INC.; BERETTA U.S.A. CORP.; GLOCK, INC.; STURM, RUGER & COMPANY, INC.; WITMER PUBLIC SAFETY GROUP, INC., d/b/a Interstate Arms; CENTURY INTERNATIONAL ARMS, INC.; BARETTA HOLDINGS SPA; GLOCK GES.M.B.H.; COLT'S MANUFACTURING COMPANY, LLC,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:21-cv-11269-FDS (Hon. F. Dennis Saylor, IV)

**BRIEF FOR U.S. SENATOR TED CRUZ,
U.S. REPRESENTATIVE MIKE JOHNSON,
AND 37 OTHER MEMBERS OF CONGRESS
AS *AMICI CURIAE* SUPPORTING
DEFENDANTS-APPELLEES AND AFFIRMANCE**

H. Christopher Bartolomucci
Kenneth A. Klukowski
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ......................1

SUMMARY OF ARGUMENT ....................................................................4

ARGUMENT ..............................................................................................8

    I.    Mexico's Lawsuit is an Affront to American Sovereignty...........8

        A.    Mexico attempts to hijack U.S. courts to subject American citizens to Mexican law, which restricts the right to bear arms. .............................................................10

        B.    Principles of comity confine each court to its own territorial jurisdiction......................................................11

        C.    PLCAA's reach is coextensive with the reach of U.S. court jurisdiction...............................................................13

    II.    Mexico is Disrespecting the U.S. Constitution and U.S. Law..............................................................................................14

        A.    The Second Amendment recognizes a fundamental right to keep and bear arms. ..........................................15

        B.    PLCAA was enacted to preserve the Second Amendment....................................................................18

        C.    This matter is a foreign policy dispute properly handled through diplomacy, not domestic litigation. .......23

CONCLUSION ........................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ................................. 24

*Church v. Hubbart*, 6 U.S. (2 Cranch) 187 (1804) .................................... 8

*District of Columbia v. Heller*, 554 U.S. 577 (2008) ......................... 15, 17

*Foster v. Neilson*, 27 U.S. (2 Pet.) 253 (1829) ........................................ 25

*Head Money Cases*, 112 U.S. 580 (1884) ................................................. 24

*Hilton v. Guyot*, 159 U.S. 113 (1895) ...................................................... 11

*McDonald v. Chicago*, 561 U.S. 742 (2010) ............................... 15, 16, 17

*Medellin v. Texas*, 552 U.S. 491 (2008) ................................................... 24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) .................................................................... 17, 18

*Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918) ............................... 23

*Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978) ....................... 12

*Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006) .................................... 25

*Societe Nationale Industrielle Aerospatiale v.*
    *U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522 (1987) ................ 12

*The Apollon*, 22 U.S. (9 Wheat.) 362 (1824) .............................................. 9

*The Santissima Trinidad*, 20 U.S. (7 Wheat.) 283 (1822) ........................ 9

*The Sapphire*, 78 U.S. (11 Wall.) 164 (1870) .......................................... 12

*United States v. Godin*, 534 F.3d 51 (1st Cir. 2008) ............................... 18

*United States v. Jimenez*, 507 F.3d 13 (1st Cir. 2007) ........................... 18

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ..................................... 15

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............ 24

**Constitutional Provisions**

Constitución Política de los Estados Unidos Mexicanos [Const.],
    as amended, art. X (1917) (Mex.) ...................................................... 10

U.S. Const. art. I, § 8, cl. 3 ...................................................................... 21

**Statutes**

15 U.S.C. § 7901 ............................................................................... *passim*

15 U.S.C. § 7902 ...................................................................................... 13

15 U.S.C. § 7903 ...................................................................................... 13

Protection of Lawful Commerce in Arms Act,
    Pub. L. No. 109-92, 119 Stat. 2095 (2005) .......................................... 8

**Treatises**

3 Joseph Story, *Commentaries on the Constitution of the
    United States* (1833) ............................................................................ 16

Restatement (Third) of the Foreign Relations Law of the
    United States (Am. L. Inst. 1987) ......................................................... 9

**Other Authorities**

151 Cong. Rec. H8998 (daily ed. Oct. 20, 2005) .............................. 21, 22

*Black's Law Dictionary* (10th ed. 2014) .................................................. 12

Robert J. Cottrol & Raymond T. Diamond,
    *The Fifth Auxiliary Right*, 104 Yale L.J. 995 (1995) .......................... 15

Stephen Halbrook, *The Founders' Second Amendment* (2008) .............. 16

David B. Kopel, *Mexico's Gun-Control Laws: A Model for the United States?*, 18 Tex. Rev. L. & Pol. 27 (2014) .................................. 10

Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 Ga. L. Rev. 1 (1996) ................................. 15

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994) ................................ 16

Julie Rose O'Sullivan,
*The Extraterritorial Application of Federal Criminal Statutes: Analytical Roadmap, Normative Conclusions, and a Plea to Congress for Direction*, 106 Geo. L.J. 1021 (2018) ................................ 9

Statement on House of Representatives Passage of the Proposed "Protection of Lawful Commerce in Arms Act," 41 Weekly Comp. Pres. Doc. 1566 (Oct. 20, 2005) ............................ 22

Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. Rev. 793 (1998) ................................ 15

## INTRODUCTION AND INTEREST OF *AMICI CURIAE*[1]

*Amici* are United States Senators and United States Representatives:

U.S. Senator Ted Cruz
U.S. Representative Mike Johnson
U.S. Representative Rick W. Allen
U.S. Representative Kelly Armstrong
U.S. Representative Brian Babin
U.S. Representative Aaron Bean
U.S. Representative Stephanie Bice
U.S. Senator Marsha Blackburn
U.S. Representative Lauren Boebert
U.S. Representative Mike Bost
U.S. Representative Josh Brecheen
U.S. Senator Ted Budd
U.S. Representative Andrew S. Clyde
U.S. Representative Tom Cole
U.S. Representative Eli Crane
U.S. Representative Warren Davidson
U.S. Representative Jeff Duncan
U.S. Representative Ron Estes
U.S. Representative Mike Ezell
U.S. Representative Mike Garcia
U.S. Representative Bob Good
U.S. Representative Paul A. Gosar

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici* and their counsel, made any monetary contribution toward the brief's preparation or submission. The parties were given timely notice of *amici's* intent to file, and all parties have consented to the filing of this brief.

U.S. Representative Michael Guest

U.S. Representative Clay Higgins

U.S. Representative Ronny L. Jackson

U.S. Representative Doug LaMalfa

U.S. Representative Doug Lamborn

U.S. Representative Anna Paulina Luna

U.S. Representative Gregory F. Murphy

U.S. Representative Ralph Norman

U.S. Representative Mike D. Rogers

U.S. Representative John Rose

U.S. Senator Rick Scott

U.S. Representative Keith Self

U.S. Representative Pete Sessions

U.S. Representative Elise M. Stefanik

U.S. Representative Claudia Tenney

U.S. Representative Tim Walberg

U.S. Representative Joe Wilson

The foreign nation of Mexico is attempting to use federal courts to advance a theory of liability for lawful American businesses that would vitiate a constitutional right and do so in direct conflict with a law Congress passed precisely to prevent such liability. The Second Amendment to the Constitution ensures the right to keep and bear arms for law abiding and peaceable American citizens, but it would be impossible to exercise that right if a citizen could not lawfully purchase a firearm because the firearm industry had become insolvent. Congress

2

passed the Protection of Lawful Commerce in Arms Act to prevent such an outcome by placing firearm manufacturers on equal footing with other American manufacturers. So long as a firearm is properly made and properly transferred into commercial channels, a manufacturer is generally not liable if a criminal later misuses that firearm in the commission of a crime.

*Amici* are U.S. Senator Ted Cruz of Texas, the Ranking Member of the Subcommittee on the Constitution, U.S. Representative Mike Johnson of Louisiana, the Chairman of the Subcommittee on the Constitution and Limited Government, and 37 of their fellow Members of Congress in both the Senate and the House of Representatives. Members of Congress are called to pass statutes that constitute much of the public policy of this Nation, and as such have a substantial interest in seeing the judiciary interpret and apply those statutes in the manner Congress intended. *Amici* are Members who recognize the importance of the Second Amendment as a fundamental right, and are committed to ensuring that Acts of Congress have the desired effect of protecting the Second Amendment for future generations of Americans.

## SUMMARY OF ARGUMENT

Mexico's lawsuit is an affront to the sovereignty of the United States of America. It has no place in federal court, and it attempts to dragoon American courts to subvert the policy determinations of the political branches of the U.S. Government. A nation's authority on its own soil is virtually absolute. Congress exercised that authority in passing the Protection of Lawful Commerce in Arms Act (PLCAA). Mexico's suit disregards those legal principles, trying to impose Mexico's view of law, the right to bear arms, and liability protection on the American people.

Mexico attempts to impose the laws of that foreign nation upon the citizens and companies of this nation. This is ironic, given that Mexico's Constitution also provides its citizens have the right to possess firearms in their residences for purposes of self-defense. But that nominal right is a pale shadow of its American counterpart, subject to severe restrictions, coupled with the fact that there is only a single gun store in Mexico. That nation's laws and tradition of the right to own firearms bear little resemblance to America's.

This Court cannot do what Mexico asks and be consistent with principles of comity:  the recognition one nation gives domestically to the official acts of another nation, having due regard to international duty and the rights of those under the protection of its laws.  Accordingly, a foreign nation is generally entitled to pursue claims in U.S. courts on the same basis as a domestic person might do.  Thus, Mexico is entitled to pursue firearm manufacturers to the same extent that a U.S. citizen could, but no more.

Contrary to Mexico's contention, there is no gap in PLCAA's coverage that would allow this suit.  PLCAA reaches as far as each district court's jurisdiction, and prevents it at every turn.  The theory of liability that Mexico argues for U.S. courts to impose upon firearm manufacturers here contradicts the clear and unambiguous language of PLCAA precluding that liability.

Mexico's lawsuit thus disrespects the U.S. Constitution and U.S. law.  While Mexico may not place much stock in the Second Amendment, the right to keep and bear arms is fundamental to *our* scheme of ordered liberty.  The right predates the Amendment's adoption in 1791, but the concept of everyday law-abiding citizens being able to own firearms is a

distinctly American right.  By the time the Fourteenth Amendment was ratified in 1868, the right's focus shifted from concern about an oppressive central government to personal protection against criminal elements.  But throughout our history and tradition, the right has remained fundamental to American liberty.

The Second Amendment must be construed according to its original public meaning.  Anything its plain text covers is presumptively protected, placing the burden on the government to demonstrate that a restriction is consistent with America's historical firearm tradition.  As with other constitutional rights, the Second Amendment is the product of interest balancing by the American people and secures the right of law-abiding citizens to use arms for lawful purposes.

Congress passed PLCAA to protect the Second Amendment, as the right is practically worthless if the firearms industry goes out of business. As with interpreting any statute, begin with PLCAA's text.  Congress' enacted findings include that lawful firearm businesses whose products "have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by" criminals; that "imposing liability on an entire industry for harm that is solely caused by

others is an abuse of the legal system" and threatens constitutional rights under the Second and Fourteenth Amendments; and that such efforts "circumvent the Legislative branch of government to regulate interstate and foreign commerce." 15 U.S.C. §§ 7901(a)(5), (6), (8). Congress' express purpose was "[t]o prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition" predicated on such theories, in order "[t]o preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes." *Id.* §§ 7901(a)(1), (2). *PLCAA's* legislative history is fully consistent with this enacted language.

This does not leave Mexico without recourse if it has suffered loss. Mexico has the full range of diplomatic tools at its disposal. A nation's lawsuit pursued on foreign soil carries foreign-policy implications for both nations, which is the province of Congress and the President. As with an agreement between nations, grievances become the subject of international negotiations and reclamations, resolved through political and diplomatic channels. It is the President's role to address such grievances consistent with law, as the Constitution assigns the President primary responsibility for the conduct of foreign relations. Congress left

7

no route for judicial redress here, because Congress made clear that firearm companies are not liable for criminal misuse of their products.

Congress passed PLCAA to prevent precisely this sort of lawsuit. Mexico cannot use our courts to evade our own positive law.

## ARGUMENT

### I. Mexico's Lawsuit is an Affront to American Sovereignty.

This lawsuit has no place in a court of the United States. It is an attempt to coopt the power of the federal judiciary to both circumvent the role of Congress and usurp the role of the Executive. It shows disregard for the respective roles that the Constitution of the United States has assigned to the three branches of the Federal Government, and is an affront to the sovereignty of the United States.

"The authority of a nation within its own territory is absolute and exclusive." *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 234 (1804). The United States exercised its sovereign prerogative to create and enforce a system of laws within its own borders when Congress passed the Protection of Lawful Commerce in Arms Act, Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§ 7901–03) (PLCAA). That Act

of Congress forecloses relief for the Appellant here, as the court below correctly held.

Mexico's lawsuit disregards the principle of territorial sovereignty in both directions. "The laws of no nation can justly expand beyond its own territories, except so far as regards its own citizens." *The Apollon*, 22 U.S. (9 Wheat.) 362, 370 (1824); *see also The Santissima Trinidad*, 20 U.S. (7 Wheat.) 283, 353–54 (1822). "The Third Restatement provides that a State has jurisdiction to prescribe law with respect to '*conduct* that, wholly or in substantial part, takes place within its own territory.' This is known as subjective territorial jurisdiction…." Julie Rose O'Sullivan, *The Extraterritorial Application of Federal Criminal Statutes: Analytical Roadmap, Normative Conclusions, and a Plea to Congress for Direction*, 106 Geo. L.J. 1021, 1031 (2018) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 402(1)(a) (Am. L. Inst. 1987)). Here, Mexico both ignores Congress' prerogative in PLCAA to limit tort liability and Mexico's constraint to focus its legal efforts on persons and events on Mexican soil.

### A. Mexico attempts to hijack U.S. courts to subject American citizens to Mexican law, which restricts the right to bear arms.

Mexico attempts to impose the laws of that foreign nation upon the citizens and companies of this nation. *See* JA62–64. Mexico also presumes to exempt itself from American law in such a way as to manipulate American courts into giving that foreign power what it wants here, in violation of clear U.S. law (i.e., PLCAA). *See* JA64–76.

Ironically, Mexico's Constitution provides that its citizens have a right to possess firearms in their residences for purposes of self-defense. *See* Constitución Política de los Estados Unidos Mexicanos [Const.], as amended, art. X (1917) (Mex.). But rather than the broad individual right enshrined in the Second Amendment, "[i]n practice, the right is much weaker in Mexico than in the United States." David B. Kopel, *Mexico's Gun-Control Laws: A Model for the United States?*, 18 Tex. Rev. L. & Pol. 27, 28 (2014). Mexico admits in this lawsuit that "Mexico has one gun store in the entire nation and issues fewer than 50 gun permits per year." Compl. ¶ 4 (JA49). The Mexican government confines firearm possession to the home, forbids various models and calibers of firearms, and has an assortment of other major restrictions. Kopel, *supra*, at 31–

40. This does not resemble the American conception of a constitutional right. *Compare infra* Part II.A.

Thus, Mexico is trying to diminish the fundamental right to bear arms in America to resemble the nominal right to bear arms in Mexico. The court below did not allow Mexico to do so, and this Court should not allow it, either.

## B.  Principles of comity confine each court to its own territorial jurisdiction.

Principles of comity in foreign relations do not allow this Court to do what Mexico is asking.  International comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  Each sovereign power on earth must act in a manner that shows due respect to its fellow nations.  "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for*

*the S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987).  *Black's Law Dictionary* defines comity as "[a] practice among political entities (as countries, states, or courts of different jurisdictions), involving esp[ecially] mutual recognition of legislative, executive, and judicial acts." *Black's Law Dictionary* 324 (10th ed. 2014).

These principles govern the resolution of this case.  The Supreme Court "has long recognized the rule that a foreign nation is generally entitled to prosecute any civil claim in the courts of the United States upon the *same basis* as a domestic corporation or individual might do." *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 318–19 (1978) (emphasis added).  Indeed, to do otherwise "would manifest a want of comity and friendly feeling."  *The Sapphire*, 78 U.S. (11 Wall.) 164, 167 (1870).

That is what Appellees successfully argued below.  Mexico is entitled to pursue firearm manufacturers to the same extent that a U.S. citizen or a U.S. company could pursue those manufacturers.  But PLCAA would not allow district courts to entertain a suit by domestic plaintiffs seeking to impose the tort liability on the manufacturers that Mexico seeks in this case.  Domestic plaintiffs could not bring suit for these same

12

alleged injuries.  *Pfizer* allows this Court to allow Mexico to sue only on the "same basis" domestic parties could sue, foreclosing Mexico's claims here.

### C.   PLCAA's reach is coextensive with the reach of U.S. court jurisdiction.

Bizarrely, Mexico argues that PLCAA does not take away the authority of the U.S. District Court for the District of Massachusetts to hear this case.  But the wording of the statute is clearly to the contrary: "A qualified civil liability action may not be brought in any Federal or State court."  15 U.S.C. § 7902(a).  PLCAA adds:

> The term 'qualified civil liability' means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party.

*Id.* § 7903(5)(A).  The statute then provides a number of exemptions, *see id.* § 7903(5)(A)(i)–(vi), but none of those apply here for the reasons argued by Appellees and recognized by the court below.

Mexico has it precisely backward.  PLCAA is intended to provide protection as far as U.S. courts can reach, consistent with Congress'

findings and purposes set forth below in Part II.B.  These American causes of action do not extend to conduct on Mexican soil, and the foreign laws of Mexico do not extend into U.S. courts on U.S. soil.  Insofar as any cause of action would otherwise obtain on U.S. soil under U.S. or foreign law, PLCAA bars it.

It would be a perverse reading of PLCAA to refuse to give effect to the clear and unambiguous language of an Act of Congress that precludes that liability.  PLCAA's prohibition on a district court's adjudicating a "qualified civil liability action" such as Mexico's suit here extends to the full extent of the district court's jurisdictional reach, including geographical, personal, and subject-matter jurisdiction.  PLCAA applies here, and bars Mexico's suit.

## II.   Mexico is Disrespecting the U.S. Constitution and U.S. Law.

This lawsuit's affront to the sovereignty of the United States also manifests disrespect to the U.S. Constitution and U.S. statutory law. This Court should have none of it.

14

**A.    The Second Amendment recognizes a fundamental right to keep and bear arms.**

While Mexico may not place much stock in America's Second Amendment, "the right to keep and bear arms is fundamental to *our* scheme of ordered liberty." *McDonald v. Chicago*, 561 U.S. 742, 767 (2010) (emphasis in original). The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 577 (2008), made "clear that this right is 'deeply rooted in this Nation's history and tradition.'" *McDonald*, 561 U.S. at 767 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). This right is antecedent to the Constitution, *Heller*, 554 U.S. at 603, as Blackstone had regarded it as "one of the fundamental rights of Englishmen," *id.* at 594; *see also* Robert J. Cottrol & Raymond T. Diamond, *The Fifth Auxiliary Right*, 104 Yale L.J. 995 (1995). But the concept of everyday law-abiding private citizens being able to own and carry firearms is a distinctly American right, as recognized years before *Heller*. *See generally* Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. Rev. 793 (1998); Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 Ga. L. Rev. 1 (1996). "The right to keep and bear arms was considered no less fundamental by those who drafted

and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768 (citing, *inter alia*, Stephen Halbrook, *The Founders' Second Amendment* 171–278 (2008); Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 155–64 (1994)).  That regard continued in the Early Republic, illustrated by this view from Justice Joseph Story:

> The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them.

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890 (1833), quoted in *McDonald*, 561 U.S. at 770.

The decades between the adoption of the Second Amendment and the adoption of the Fourteenth Amendment—which extended the right to keep and bear arms to apply against the States, *id.* at 750—saw the central concern shift from protection against an all-powerful national government that would disarm the people writ large to a concern for personal self-defense, *see id.* at 769–77.  This was nothing new.  The Supreme Court had already held that when the Second Amendment was ratified in 1791, individual self-defense was "the central component'" of

the right to keep and bear arms. *Heller*, 554 U.S. at 599. That core remained throughout the development of the American Nation, such that "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778.

The contours of the right to keep and bear arms are the capacious metes and bounds of the Second Amendment's original public meaning. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulations by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022). This too is nothing new. "The Second Amendment standard accords with how we protect other constitutional rights." *Id.* at 2130. The Second Amendment "is the very *product* of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for lawful purposes. *Heller*, 554 U.S. at 635 (emphasis in original). "It is this balance—struck by the traditions of the American people—that demands [this Court's]

17

unqualified deference." *Bruen*, 142 S. Ct. at 2131.

**B.    PLCAA was enacted to preserve the Second Amendment.**

The Second Amendment is a right on paper only—a practically meaningless right—if American citizens are unable to lawfully obtain firearms. And firearms will become increasingly harder to procure if they are no longer being manufactured because the companies who currently do so went out of business. Congress passed PLCAA precisely to obviate such an eventuality.

When interpreting a statute, this Court begins with the statute's text. *United States v. Jimenez*, 507 F.3d 13, 19 (1st Cir. 2007). As part of that task, this Court looks "to the plain meaning of words in the broader context of the statute as a whole." *United States v. Godin*, 534 F.3d 51, 56 (1st Cir. 2008) (internal quotation marks omitted). Mexico argues that the firearm manufacturers named here are unprotected because exceptions to PLCAA's operative protections apply here. Regarding both those points and Mexico's other arguments, the plain words of Congress' findings and purposes belie Mexico's position.

18

Congress made several findings relevant here. One is that

Congress found:

> Businesses in the United States that are engaged in interstate
> and foreign commerce through the lawful design,
> manufacture, marketing, distribution, importation, or sale to
> the public of firearms or ammunition products that have been
> shipped or transported in interstate or foreign commerce are
> not, and should not, be liable for the harm caused by those
> who criminally or unlawfully misuse firearm products or
> ammunition products that function as designed and intended.

15 U.S.C. § 7901(a)(5). Another relevant finding is Congress determined

that:

> The possibility of imposing liability on an entire industry for
> harm that is solely caused by others is an abuse of the legal
> system, erodes public confidence in our Nation's laws,
> threatens the diminution of a basic constitutional right and
> civil liberty, invites the disassembly and destabilization of
> other industries and economic sectors lawfully competing in
> the free enterprise system of the United States, and
> constitutes an unreasonable burden on interstate and foreign
> commerce of the United States.

*Id.* § 7901(a)(6). Directly on point regarding suing American companies

for the illegal conduct of others occurring on Mexican soil, Congress found

that such lawsuits are based on theories:

> without foundation in hundreds of years of the common law
> and jurisprudence of the United States and do not represent
> a bona fide expansion of the common law. The possible
> sustaining of these actions by a maverick judicial officer or

19

petit jury would expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States. Such an expansion of liability would constitute a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States under the Fourteenth Amendment to the United States Constitution.

*Id.* § 7901(a)(7). As a final point, Congress found:

The liability actions commenced or contemplated by the Federal Government, States, municipalities, private interest groups *and others* attempt to use the judicial branch to circumvent the Legislative branch of government to regulate interstate *and foreign* commerce through judgments and judicial decrees thereby threatening the Separation of Powers doctrine and weakening and undermining important principles of federalism, State sovereignty and comity between the sister States.

*Id.* § 7901(a)(8) (emphases added).

All this is consistent with Congress' express purposes for the statute. As relevant to this litigation, the purposes of PLCAA include:

To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

*Id.* § 7901(b)(1). Of critical importance, Congress intended PLCAA "[t]o preserve a citizen's access to a supply of firearms and ammunition for all

lawful purposes." *Id.* § 7901(b)(2). And specific to Congress' power to regulate commerce, U.S. Const. art. I, § 8, cl. 3, yet another purpose is [t]o prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce." 15 U.S.C. § 7901(b)(4).

The enacted text is controlling here. And this reading of the text is further supported by legislative history, as Members of Congress likewise explained what they were doing in passing PLCAA. One of the authors of the bill, Congressman Cliff Stearns, called PLCAA's protection against suits like Mexico's an "obvious idea," explaining,

> After all, would we hold a car company responsible if a driver gets drunk or reckless and hits somebody with a vehicle? Of course not. This is the United States of America where we are responsible for our own actions; but yet these frivolous lawsuits against a vital, legitimate and perfectly lawful industry have continued unabated for the last several years in the simple hope of bankrupting this industry.

151 Cong. Rec. H8998 (daily ed. Oct. 20, 2005) (statement of Rep. Stearns). House Judiciary Committee Chairman Jim Sensenbrenner said of the litigation costs in fighting back against the sort of litigation that Mexico brought here, "[t]he legal fees alone are enough to bankrupt the industry." *Id.* at H8993 (statement of Rep. Sensenbrenner). Vice President (then-Congressman) Mike Pence agreed, explaining, "By

21

passing this bill, Congress will prevent one or a few State courts from

bankrupting the national firearms industry with baseless lawsuits." *Id.*

at H8999 (statement of Rep. Pence).

President George W. Bush understood this well as he prepared to

sign PLCAA into law. As the President explained when the legislation

passed the U.S. House of Representatives:

> Our laws should punish criminals who use guns to commit
> crimes, not law-abiding manufacturers of lawful products.
> This legislation will further our efforts to stem frivolous
> lawsuits, which cause a logjam in America's courts, harm
> America's small businesses, and benefit a handful of lawyers
> at the expense of victims and consumers.

Statement on House of Representatives Passage of the Proposed

"Protection of Lawful Commerce in Arms Act," 41 Weekly Comp. Pres.

Doc. 1566 (Oct. 20, 2005). So from its passage through Congress to

approval by the President, the recurring impetus for PLCAA was to

prevent products-liability litigation of the sort here, where the firearms

were lawfully manufactured, had no defects, and were properly

transferred from the manufacturer into streams of lawful commerce.

PLCAA would not permit a U.S. plaintiff to bring this suit in district

court against U.S. firearms manufacturers for purported injuries such as

22

these if they were suffered by U.S. citizens on U.S. soil invoking U.S. law. For all these reasons, it follows *a fortiori* that PLCAA does not permit a foreign plaintiff to bring this suit in district court for these purported injuries suffered by foreign citizens on foreign soil invoking not only U.S. law, but also foreign law.  PLCAA bars this suit.

### C.  This matter is a foreign policy dispute properly handled through diplomacy, not domestic litigation.

None of this is to say that if Mexico considers itself aggrieved by the American firearms industry that Mexico has no recourse.  Quite the contrary, Mexico has the full range of diplomatic tools at its disposal. That is where this complaint would be properly directed: to the U.S. Department of State, with the goal of bringing it to the attention of the White House.  If Mexico believes the United States is not meeting its international obligations, then the President of Mexico should seek action from the President of the United States.

Foreign policy is committed to the political branches of Congress and the Executive.  *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918).  In dealings between sovereign nations, an "infraction becomes the subject of international negotiations and reclamations," such that the

23

Supreme Court regards it as "obvious that with all this the judicial courts have nothing to do and can give no redress." *Head Money Cases*, 112 U.S. 580, 598 (1884).  In other words, such disputes are resolved through "political and diplomatic negotiations." *Medellin v. Texas*, 552 U.S. 491, 520 (2008).

The President addresses such international grievances as part of his power to resolve claims against the United States.  *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003).  Indeed, the Constitution tasks the President with the "'vast share of responsibility for the conduct of our foreign relations.'"  *Id.* at 414 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). "Such considerations, however, do not allow [courts] to set aside first principles.  The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'"  *Medellin*, 552 U.S. at 524 (quoting *Youngstown*, 343 U.S. at 585).

However, Congress left no channel for any such purported international obligation here to be brought in district court.  It is Congress' prerogative to make international obligations binding in U.S.

courts. *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 315 (1829). Moreover, unless international agreements include language that speaks to judicial remedies, the default presumption is that the only remedies for grievances are diplomatic. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347 (2006). Without a clear statement in a statute, obligations under international agreements are not enforceable in U.S. district courts. *Kiobel*, 569 U.S. at 115–16. And there is no agreement here, anyway.

Even if there were, the only clear statements are to the contrary. Congress found that "[b]usinesses … engaged in … foreign commerce … of firearms … that have been shipped or transported in … foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products." 15 U.S.C. § 7901(a)(5). "The possibility of imposing liability on an entire industry for harm that is solely caused by others … constitutes an unreasonable burden on … foreign commerce." *Id.* § 7901(a)(6). Such lawsuits "attempt to use the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce through judgments and judicial decrees." *Id.* § 7901(a)(8). Therefore, one of Congress' purposes in PLCAA was "[t]o prevent the use of such

lawsuits to impose unreasonable burdens on interstate and foreign commerce." *Id.* § 7901(b)(4). So Congress did speak clearly: Congress clearly did *not* want lawsuits such as Mexico's lawsuit here to be adjudicated in U.S. courts.

## CONCLUSION

Congress passed PLCAA to prevent precisely this sort of lawsuit. For the foregoing reasons, and for those set forth by Appellees, the judgment of the District Court should be affirmed.

Respectfully submitted,

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci
Kenneth A. Klukowski
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com

*Counsel for Amici Curiae*

May 18, 2023

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5,032 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft 365 in 14-point Century Schoolbook font.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2023, the foregoing document was filed with the United States Court of Appeals for the First Circuit by using the CM/ECF system. Counsel of record for all parties are registered as ECF Filers and will therefore be served by the CM/ECF system.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci