No. 22-1823

# United States Court of Appeals for the First Circuit

───────────────

ESTADOS UNIDOS MEXICANOS,
Plaintiff - Appellant,

v.

SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS
MANUFACTURING, INC.; BERETTA U.S.A. CORP.; GLOCK, INC.;
STURM, RUGER & COMPANY, INC.; WITMER PUBLIC SAFETY GROUP,
INC., d/b/a Interstate Arms; CENTURY INTERNATIONAL ARMS, INC.;
BARETTA HOLDINGS SPA; GLOCK GES.M.B.H.; COLT'S
MANUFACTURING COMPANY, LLC,
Defendants - Appellees.

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS, BOSTON

**AMICUS BRIEF OF NATIONAL SHOOTING SPORTS FOUNDATION,
INC. IN SUPPORT OF DEFENDANTS-APPELLEES SMITH & WESSON
BRANDS AND AFFIRMANCE**

Christopher A. Kenney, # 35397
cakenney@KSlegal.com
KENNEY & SAMS, P.C.
144 Turnpike Road, Suite 350
Southborough, MA 01772
Tel.: (508) 490-8500
Fax: (508) 490-8501

Paul B. Stephan        *
*First Circuit Admission Application Pending*
University of Virginia School of Law
580 Massie Road
Charlottesville, VA 22903
(434) 924-7098

Dated: May 19, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, National Shooting Sports Foundation, Inc., submits the following statement: National Shooting Sports Foundation, Inc. hereby certifies that National Shooting Sports Foundation, Inc. does not have a parent corporation and no other publicly held corporation currently owns more than 10% of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF INTEREST................................................................... 1

CONSENT TO FILE ...............................................................................3

STATEMENT OF FUNDING...................................................................3

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT ........................................................................................6

     I.     Section 7902(a) Applies to All Civil Actions Based on Criminal
           or Unlawful Misuse of Products Covered by PLCAA, Absent
           an Applicable Exception .......................................................6

     II.    The Government of Mexico is a "Person" for Purposes of the
           PLCAA's Rule Requiring Dismissal of Civil Actions........................18

     III.   The Presumption Against Extraterritoriality Has No Bearing on
           the Applicability of the PLCAA to Plaintiff's Suit..............................22

CONCLUSION.....................................................................................27

CERTIFICATE OF COMPLIANCE...........................................................29

CERTIFICATE OF SERVICE ..................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) ............................... 23

*Georgia v. Evans*, 316 U.S. 159 (1942) ............................................................. 21

*Jesner v. Arab Bank*, PLC, 138 S. Ct. 1386 (2018) .......................................... 15

*Morrison v. National Australia Bank Ltd.,* 561 U.S. 247 (2010) ..................... 23

*Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978) ........................... 20-22

*RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016) ............. 23, 24

*Small v. United States*, 544 U.S. 385 (2005) .................................................... 19

*Smith v. United States*, 507 U.S. 197 (1993) .................................................... 19

*Türkiye Halk Bankasi A.S. v. United States*, 598 U.S. __ (2023) ..................... 19

*United States v. Grady*, 544 F.2d 598 (2d Cir. 1976) .........................................9

*United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818) ...................... 19, 22-23

*WesternGeco LLC v. Ion Geophysical Corp.*, 138 S. Ct. 2129 (2018) ............. 23

**Statutes**

18 U.S.C. § 922 ............................................................................................... 9-11

Alien Tort Statute, 28 U.S.C. § 1350 ................................................................ 15

Arms Export Control Act, 22 U.S.C. § 2778 .......................................................9

Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-03 ...... *passim*

Sherman Act ................................................................................. 21-22

**Secondary Materials**

Restatement (Second) of Conflict of Law § 145 (Am. L. Inst. 1971) ............... 17

## STATEMENT OF INTEREST

Amicus NSSF offers this Brief in support of defendants-appellees' position that the Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C. §§ 7901-03, applies to the Government of Mexico's civil suit and requires dismissal of the complaint.[1]

Amicus is a nonprofit trade association representing U.S. companies engaged in the lawful manufacture and sale of firearms in the United States. It has an interest in this proceeding because the companies who are its members are all U.S. firms who manufacture or deal in firearms in the United States subject to federal, state, and local licensing. The exposure of these firms to liability under foreign law through U.S. civil litigation, using legal theories expressly forbidden by the PLCAA, would run contrary to both the language and purpose of that statute. The threat of such litigation would be harmful to these companies even if foreign-law lawsuits ultimately were determined to be meritless. These lawsuits could impose substantial litigation expense on NSSF members in spite of the ultimate dismissal of the claims against them.

---

[1] NSSF gratefully acknowledges the scholarship and assistance of Professor Paul Stephan, of the University of Virginia School of Law, as the principal author of this brief.

1

The question presented by this appeal is not, as the Government of Mexico would have it, optimal firearms safety policy or the prevention of transnational harms. Congress already has made choices on those issues that are binding on the courts in the United States. Rather, the issue before this court is whether to read a federal statute so as to thwart its plain text and express purpose, simply because that purpose is controversial in the eyes of many. One can empathize with those who have suffered from criminal firearms violence in Mexico and still recognize that this lawsuit represents an impermissible end run around binding U.S. law.

Amicus supports legal and safe use of firearms. Its principal mission is to promote safety and to assist its members so they can comply with all governing laws and regulations. Its members do not operate in foreign countries and do not sell their products outside the United States except in accordance with U.S. law and strict licensing requirements administered by the U.S. Department of State or Department of Commerce on exports, as well as foreign laws governing imports.

The legal theories advanced by the Government of Mexico's suit would create new forms of liability for NSSF members based on an extravagant conception of causation that the PLCAA expressly forbids. Congress has determined that the "possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system," would be inconsistent with traditional

understandings of proximate cause, and "invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States." Such lawmaking by U.S. courts, in the absence of statutory authorization, would create "an unreasonable burden on interstate and foreign commerce." PLCAA § 2(a)(6), 15 U.S.C. § 7901(a)(6) (hereinafter § 7901).

## CONSENT TO FILE

Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief.

## STATEMENT OF FUNDING

National Shooting Sports Foundation, Inc. states that no person other than it or its counsel authored the brief in whole or in part, and no person or entity other than National Shooting Sports Foundation, Inc. and its counsel contributed money intended to fund preparing or submitting the brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Government of Mexico appeals from the district court's dismissal of its suit against seven U.S. gun manufacturers and one distributor. Its complaint asserts claims based on negligence, public nuisance, defective design or formulation, negligence per se, gross negligence, unjust enrichment and restitution, and violations of Connecticut and Massachusetts consumer protection statutes, as well as an

entitlement to punitive damages. The complaint does not allege that defendants manufactured or sold any firearms or ammunition in Mexico, but rather that Mexican criminals illegally obtained products made and sold legally in the United States and used them to cause harm in Mexico. The legal theory of the case is that defendants should have foreseen that third parties would illegally smuggle these products into Mexico, making it possible for them to end up in the hands of criminals in Mexico, and thus bear legal accountability for the harm these criminals brought about.

The district court dismissed the suit under Federal Rule 12(b)(6) for failure to state a claim. It determined that the PLCAA applies to the complaint and mandates this result. It considered whether any of the Government of Mexico's claims fell within the exceptions provided by PLCAA § 4(5)(A)((i)-(vi), 15 U.S.C. § 7903(5)(A)((i)-(vi) (hereinafter § 7903), and determined that even if they did, they failed on the merits. As a result, it ruled that this suit was a "qualified civil liability action" that, pursuant to PLCAA § 3(a), 15 U.S.C. § 7902(a) (hereinafter§ 7902(a)), "may not be brought in any Federal or State court."

The district court correctly ruled that § 7902(a) applies to the Government of Mexico's complaint. The PLCAA's ban on civil liability actions encompasses suits brought in the United States asserting foreign-law causes of action based on harm occurring outside the United States. Moreover, the Government of Mexico is a

4

"person" for purposes of the PLCAA. Accordingly, the district court had no choice but to dismiss the Government of Mexico's suit.

The Government of Mexico and several amici supporting its appeal argue that the district court's interpretation of § 7903(5)(A) runs afoul of the presumption against extraterritoriality articulated by the Supreme Court in numerous cases. It does not. As the Supreme Court has made clear, this presumption applies to the "focus" of a statute, not to all behavior that might bear some relationship to the asserted claim. The focus of § 7903(5)(A) is on civil actions filed in U.S. courts, federal and state, against the U.S. firearms industry. The presumption does not require that every element of the legal claims covered by § 7903(5)(A), in particular the place where harms result, have a domestic character. The statute does not focus on either the place of harm or the source of the law rendering the misuse criminal or unlawful, but rather on limiting civil actions in U.S. courts based on lawful production and sale of firearms within the United States. The PLCAA accords with presumption against extraterritoriality exactly because it governs only domestic conduct.

Amicus agrees with the determinations of the district court as to the exceptions provided by § 7903(5(A). This brief, however, is limited to the general principles supporting the interpretation of the PLCAA, and not its application to the facts of

this particular case. Accordingly, it does not discuss the relevance of the § 7903(5)(A) exceptions to this lawsuit, except where they illuminate the scope of § 7903(5)(A)'s definition of a "qualified civil liability action."

## **ARGUMENT**

## I.  **Section 7902(a) Applies to All Civil Actions Based on Criminal or Unlawful Misuse of Products Covered by PLCAA, Absent an Applicable Exception**

Congress adopted the PLCAA in 2005. The statute makes several legislative findings that explain its object and purpose. These findings frame the correct interpretation of § 7903(5)(A), which sets the limits of the rule of immunity from civil suits imposed by § 7902(a).

The congressional findings first identify the problem to which the PLCAA responds. They observe that lawsuits "have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. § 7901(a)(4). The U.S. businesses targeted by these suits already submit to substantial regulation at all levels of government:

> The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State,

6

> and local laws. Such Federal laws include the Gun Control Act of 1968,
> the National Firearms Act, and the Arms Export Control Act.

*Id.* Congress objected to the supplanting of existing statutory and administrative

regulation through private litigation:

> The possibility of imposing liability on an entire industry for harm that
> is solely caused by others is an abuse of the legal system, erodes public
> confidence in our Nation's laws, threatens the diminution of a basic
> constitutional right and civil liberty, invites the disassembly and
> destabilization of other industries and economic sectors lawfully
> competing in the free enterprise system of the United States, and
> constitutes an unreasonable burden on interstate and foreign commerce
> of the United States.

*Id.* § 7901(a)(6). Not only did existing and anticipated litigation threaten the access

of U.S. persons to lawful firearms by putting the industry at risk, but the legal

theories on which they were based would override existing regulation and replace it

with unprecedented and, in the view of Congress, unsound legal principles:

> The liability actions commenced or contemplated by the Federal
> Government, States, municipalities, and private interest groups and
> others are based on theories without foundation in hundreds of years of
> the common law and jurisprudence of the United States and do not
> represent a bona fide expansion of the common law. The possible
> sustaining of these actions by a maverick judicial officer or petit jury
> would expand civil liability in a manner never contemplated by the
> framers of the Constitution, by Congress, or by the legislatures of the
> several States. Such an expansion of liability would constitute a
> deprivation of the rights, privileges, and immunities guaranteed to a
> citizen of the United States under the Fourteenth Amendment to the
> United States Constitution.

7

*Id.* § 7901(a)(7). To protect against present and prospective legal risk that had the potential to undermine existing regulatory schemes and the policy choices they represent, Congress banned lawsuits based on injuries caused by criminal or unlawful behavior of persons who had come into possession of firearms, absent facts meeting one or more of the statutory exceptions.

Congress followed these findings with a statement of the purpose of the PLCAA. The statute's object is to ban civil actions based on "harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." § 7901(b)(1). It seeks in particular to "prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce." § 7901(b)(4).

In these findings and statements of purpose, Congress made clear that the lawsuits proscribed by § 7902(a) would, but for the PLCAA's ban, have an impact on foreign, not only interstate, commerce. § 7901(a)(5), (8), (b)(4). The totality of the statute, including the definitions of "manufacturer," "qualified product," and "seller," shows that these references to "foreign commerce" are not "boilerplate," as asserted by amici Professors of Transnational Litigation.[2] Congress, when

---

[2] Brief of Amici Professors of Transnational Litigation in Support of Plaintiff-Appellant and Reversal of the District Court, p. 10.

describing the federal legislation that regulates the industry and thus obviates the need for the civil suits that the PLCAA forbids, cites in particular the Arms Export Control Act. § 7901(a)(4). That legislation applies to sales of firearms to any foreign purchaser and criminalizes unlicensed exports. 22 U.S.C. § 2278; 18 U.S.C. § 922; *see*, *e.g.*, *United States v. Grady*, 544 F.2d 598 (2d Cir. 1976) (conviction under § 922 for unlicensed exports of firearms to Northern Ireland). This reference is clearly advertent and addresses exactly the activity on which plaintiff bases its lawsuit.[3]

The definitional provisions of the PLCAA establish the connection between the banned civil actions and existing regulatory programs. Rather than blocking all civil actions against firearms manufacturers, § 7902(a)'s rule of immunity is limited to suits against *licensed* manufacturers, specifically "a person who is engaged in the business of manufacturing the product in interstate or foreign commerce and who is licensed to engage in business as such a manufacturer under chapter 44 of Title 18." PLCAA § 7903(2). For claims against dealers in firearms, immunity from suit

---

[3] Appellant's brief cites § 7904(a)(4) as proof that the "PLCAA precludes claims against gun importers, *but not exporters*." Brief of Appellant Estados Unidos Mexicanos, p. 36 & n. 17 (emphasis in existing text). It correctly notes that the first sentence of this finding omits any reference to exporting. The brief leaves out, however, the finding's second sentence, which refers expressly to the Arms Export Control Act.

applies only to "sellers" who are "licensed to engage in business as such a dealer under chapter 44 of Title 18." PLCAA § 7903(6)(B).[4] Immunity from suit thus is coextensive with the imposition of federal licensing requirements backed up with administrative and criminal penalties.

Chapter 44 of Title 18, which Congress uses in the PLCAA to define manufacturers, sellers, and covered products, includes § 922(a)(1)(A). This provision criminalizes unlicensed shipping of firearms in foreign commerce. A parallel provision, § *id.* (a)(1)(B), applies to importing, making clear that subsection (A) applies to exports. The same parallelism exists in the definition of protected sellers in § 7903(6), which defines separately importers in subsection 6(A) and includes all other dealers, including exporters, in subsection 6(B).

Other provisions in 18 U.S.C. § 922, which carve out narrow exceptions for exports of specific products, reinforce the conclusion that its proscriptions as a whole apply to unlicensed exports. § *Id.* (a)(7)(B) (exception for manufacture of armor-piercing ammunition for export); *id.* (a)(8)(B) (exception for sale of armor-piercing

---

[4] Section 7903(6) also encompasses "sellers" who are licensed importers, *id.* § 6(A), and sellers of ammunition, *id.* § 6(C), neither of these subsections are relevant to this suit. It is noteworthy, however, they contain the same reference to foreign commerce found in subsection 6(B).

ammunition for export). The inference is unmistakable that sellers protected by the PLCAA include exporters.

Amici Professors of Transnational Litigation contend that if the five separate references to "foreign commerce" that appear in the PLCAA are not boilerplate, they must mean only imports.[5] But the criminal provisions referenced in the PLCAA's definitions of "manufacturer," "qualified product," and "seller," in particular those in 18 U.S.C. § 922, refer separately to imports and exports, encompassing both. The statutory framework clearly indicates that Congress wanted to protect licensed firearms manufacturers and dealers engaged in business within the United States from civil actions based on harm caused by any and all criminal or unlawful misuse by downstream users of firearms they make or sell, including the misuse of exported firearms.

One of the exceptions to § 7902(a)'s rule of immunity sheds light on the precise scope of the ban on civil suits. Section 7903(A)(5)(v) permits suits for death or injury caused by "a defect in design or manufacture of the product," but with the critical proviso that if the harm was "caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any

---

[5] Brief of Amici Professors of Transnational Litigation in Support of Plaintiff-Appellant and Reversal of the District Court, pp. 10-11.

resulting death, personal injuries or property damage." The PLCAA does not shut down traditional tort liability for U.S. firearms manufacturers or sellers, including common law theories of product liability, but does insist on application of a rule of "sole proximate cause" when harm results from the criminal acts of third parties.[6] The Government of Mexico's suit, which pleads defective design, seeks to circumvent exactly that rule based on the improbable argument that causation is different when the criminal acts are foreign.

In sum, the PLCAA in its findings, statement of purpose, and definitions make clear that it applies to exported firearms, not just those used in the United States. Congress wanted to cut off civil actions that entrench on existing regulatory authority, referring specifically to regulation of exports. To achieve this purpose, the PLCAA limits its coverage to manufacturers and sellers subject to federal regulation, including arms export regulation. This policy choice is clearly deliberate, not unintended boilerplate.

---

[6] Similarly, another exception covers suits based on the violation of federal or State law governing the sale or marketing of the product, but only where such violation "was a proximate cause of the harm." § 7901(5)(A)(iii). This provision provides further evidence that Congress was concerned with civil litigation in U.S. courts based on extravagant claims of causation that ignore the intentional misconduct of the person causing harm.

Although close statutory analysis is sufficient to make this point, it is also obvious that allowing this suit to go forward would completely undermine the purpose of the PLCAA. Congress determined that the risk of "possible sustaining of these actions by a maverick judicial official or petit jury" imposed an unacceptable burden on the domestic firearms industry. It accordingly foreclosed civil actions seeking to hold the already highly regulated industry liable for harms caused by third-party criminal or unlawful acts. It is impossible to believe that Congress wanted to protect the industry from such suits when brought by U.S. victims, but not if foreigners are harmed. Both kinds of suits pose exactly the threat that Congress intended to eliminate.

Consider the kinds of litigation that the U.S. industry might face, were the district court's interpretation of the PLCAA to be reversed. Any person harmed in a place outside a U.S. territory, were a firearm made or sold in the United States involved, could bring a suit, including one based on foreign law, seeking to impose strict liability based on an extravagant theory of causation. The amici brief submitted by the Latin American and Caribbean Nations might be understood as intimating that, were this court to reverse the district court, multiple suits modeled on the

Government of Mexico's should be anticipated.[7] Any government hostile to the United States, including Iran, Nicaragua, the Palestinian Authority, and Venezuela, could create a cause of action allowing damages for harms to its nationals, including its military personnel, caused by the use of U.S.-made or sold firearms. Manufacturers and sellers, no matter how compliant with the U.S. export licensing regime, would face the risk of potentially bankrupting civil liability. It would not suffice as a defense to such an action to prove, for example, that third persons illegally imported the firearms or that the users of these firearms engaged in war crimes; a link between a U.S.-made firearm and a foreign injury based on extravagant notions of causation embraced by hostile foreign legislators would allow a foreign plaintiff to circumvent the PLCAA's ban on U.S. civil actions.

Were the PLCAA to be interpreted as the Government of Mexico and its amici wish, foreign nationals would enjoy a significant entitlement that Congress has expressly denied to U.S. nationals and residents. The PLCAA makes unenforceable in U.S. courts, federal and state, legal claims against licensed U.S. firearms manufacturers and dealers based on harm resulting from the unlawful acts of third

---

[7] Brief of Amici Curiae Latin American and Caribbean Nations and NGO in Support of Plaintiff-Appellant and in Favor of Reversal, p. x ("although Mexico is the only party plaintiff, the defendants' business practices have also harmed, and continue to harm, many other nations.").

14

persons. Under the Government of Mexico's theory, however, foreign persons could use U.S. courts to apply foreign law so as to impose strict liability on U.S. firms that introduce firearms into commerce, even absent any direct nexus between the defendant and the persons who cause harm and in spite of the wrongfulness of the conduct that causes harm.

There is no conceivable reason why Congress would want to leave U.S. courts open to foreign claimants, but not domestic ones, for cases rejecting the conventional rules of proximate cause. Certainly, neither international law nor sound foreign relations requires the United States to empower foreign plaintiffs. The claims barred by the PLCAA are not like those that aliens, but not U.S. nationals, may bring under the so-called "Alien Tort Statute," 28 U.S.C. § 1350. Neither international law nor friendly relations with other states impose a legal duty on the United States to recognize lawsuits that reject U.S. rules of proximate cause. Cf. *Jesner v. Arab Bank*, PLC, 138 S. Ct. 1386, 1397 (2018) ("The principal objective of the [Alien Tort Statute] . . . was . . . ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen.")

No treaty to which the United States is a party, nor any rule of customary international law, obligates the United States to forbid its firearms industry from

making products that may result in remote downstream harm outside of its borders. Nor does the PLCAA discriminate against aliens. Rather, as the district court held, it treats foreign plaintiffs exactly as it does U.S. ones, denying both access to U.S. courts for a narrow class of civil cases that, in the view of Congress, interfere with the existing regulation of a particular industry.

The Government of Mexico asserts that its access to U.S. courts is required not by international law as such, but by principles of international comity, specifically "the reciprocal comity that keeps each neighbor's courts open to the other." Brief of Appellant Estados Unidos Mexicanos, p. 19. This completely misdescribes what the PLCAA does. It shuts the door to U.S. courts for Mexican plaintiffs on the same basis as it does for those in the United States. This equal treatment is all that principles of international comity require.

In their amici brief, Professors Kadner Graziano and Mills observe that many states have developed a practice of choosing the law of the place of harm to govern tort-based claims for compensation. They imply that this practice constitutes a customary rule under private international law.[8] Their observation is both incorrect and beside the point.

---

[8] Brief of Thomas Kadner Graziano and Alex Mills, Scholars of International Law, as *Amici Curae* in Support of Appellant *passim*.

First, several states of the United States do not adhere to this practice. Rather, they take a more nuanced and complex approach and typically do not treat any single factor as dispositive. Restatement (Second) of Conflict of Law § 145 (Am. L. Inst. 1971) (governing law for torts is that of the state with "the most significant relationship to the occurrence"). Second, the existence of a practice permitted by private international law does not create duties under public international law, that is an obligation that binds a state. The point is that Congress could not have believed that international law or the essentials of sound foreign relations require the United States to treat foreign plaintiffs differently from U.S. plaintiffs, because no such rule of international law or general principle of good foreign relations exists.

Not only is it absurd to argue that Congress intended to elevate foreign plaintiffs over U.S. ones, but Congress provided plenty of indications that it did not. The PLCAA is replete with references to export transactions, not only in the five statements regarding foreign commerce but, at least as importantly, in the incorporation by reference of federal legislation that expressly regulates arms exports. The district court acted in accordance with congressional intent, as well as the object and purpose of the statute, when it held that this suit is a "qualified civil liability action" within the meaning of § 7903(5)(A).

17

## II.    The Government of Mexico is a "Person" for Purposes of the PLCAA's Rule Requiring Dismissal of Civil Actions

The PLCAA's ban on civil actions applies to lawsuits "brought by any person" that satisfy the definition of a qualified civil liability action. § 7903(5)(A). The PLCAA further defines the term "person" as "any individual, corporation, company, association, firm, partnership, society, joint stock company, or any other entity, including any governmental entity." § 7903(3). Amici Professors of Transnational Litigation, however, argue that the term "any governmental entity" does not apply to the Government of Mexico. They maintain that the best reading of the definitions of "person" in § 7903(3) is to restrict it to U.S. entities. According to these amici, when Congress refers to "liability actions commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others" as the object of its ban on suits, it did not mean "others" to include foreign governments.[9]

It simply is not true that, when Congress uses the term "person" to include foreign actors, especially foreign governments, it always uses express inclusive language to ensure that outcome. To the contrary, what the Supreme Court said in

---

[9] Brief of Amici Professors of Transnational Litigation in Support of Plaintiff-Appellant and Reversal of the District Court, pp. 12-14.

*Türkiye Halk Bankasi A.S. v. United States*, 598 U.S. __ (2023), about the general criminal jurisdiction statute applies here as well:

> We decline to graft an atextual limitation onto § 3231's broad jurisdictional grant over "all offenses" simply because several unrelated provisions in the U.S. Code happen to expressly reference foreign states and instrumentalities.

Slip op. at 3.

In *Small v. United States*, 544 U.S. 385 (2005), the Supreme Court acknowledged that the term "any," used as a modifier in a statute, "demands a broad interpretation." *Id.* at 388. It cautioned only against placing dispositive weight on the mere use of "any" and called instead for considering the "'objects to which the legislature intended to apply'" the term modified by "any." *Id.* at 388 (quoting *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 630 (1818)). In *Small*, the Court interpreted the statute's object by invoking "'the commonsense notion that Congress generally legislates with domestic concerns in mind." *Id.* (quoting *Smith v. United States*, 507 U.S. 197, 204 (1993)). *Small* identified the domestic concern in that case as recidivism with respect to U.S. law, not foreign criminal legislation.

Using the same commonsense notion to interpret the PLCAA, this court must interpret "any governmental entity" in § 7903(3) as including the Government of Mexico. As Part I of this brief demonstrates, the domestic concern that Congress had

19

in mind was the protection of U.S. manufacturers and sellers of qualified products from claims based on injury caused by third-party misconduct. Its multiple references to exports of firearms makes clear that it contemplated and was concerned with foreign plaintiffs as much as domestic ones. It wanted to limit civil actions based on the status of defendants – U.S. firms subject to domestic regulation – and not the nationality of the plaintiffs or the place where they suffered harm.

Nor did Congress mean to leave open a door for suits by foreign governments, as opposed to other foreign plaintiffs. The Supreme Court decision most clearly on point holds to the contrary. In *Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978), the Court interpreted "any person" to include foreign governments, thus allowing them to bring suits under US antitrust laws.

The relevant statute, § 4 of the Clayton Act (originally part of the Sherman Act), 15 U.S.C. § 15, provides: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . ." The Sherman Act at the time of its enactment made clear that its proscriptions apply to foreign persons, *id*. § 7, therefore making them eligible to be defendants, but nothing in the Act addressed the status of foreign persons as plaintiffs under § 15.

*Government of India* interpreted § 15 in light of the purpose of the Act. Congress intended to deprive law violators of "the fruits of their illegality" as well as to ensure compensation to all victims. 434 U.S. at 314. Those purposes, the Court concluded, open the statute to enforcement by foreign victims of Sherman Act violations. Once the Court determined that § 15's reference to "any person" included foreign plaintiffs, it had no difficulty concluding that a foreign government also is a foreign person, and hence an eligible plaintiff under § 15. The Court relied on *Georgia v. Evans*, 316 U.S. 159 (1942), a case that recognized a U.S. State as a person under § 15. As *Government of India* explained:

> "[a]lthough the legislative history of the Sherman Act did not indicate that Congress ever considered whether a State would be entitled to sue, the Court found no reason to believe that Congress had intended to deprive a State of the remedy made available to all other victims of antitrust violations."

434 U.S. at 317. This reasoning compelled treating foreign states the same as U.S. States. "When a foreign nation enters our commercial markets as a purchaser of goods or services, it can be victimized by anticompetitive practices just as surely as a private person or a domestic state." *Id.* at 319. Aligning the term "any person" with the statute's purposes thus requires recognizing that the term encompassed a foreign government.

21

*Government of India* extended access to a right of action, while the PLCAA bars specific civil actions. In all other respects, though, this case fits squarely within that precedent. *Government of India* determined that regarding a foreign government as a "person" so as to have access to a cause of action would advance the purposes of the Sherman Act. Here regarding a foreign government as a "person" so as to apply a ban on civil actions to its suit advances the purposes of the PLCAA, namely preventing the imposition of multiple and inconsistent regulatory burdens on a U.S. industry already subject to domestic regulation.

## III. The Presumption Against Extraterritoriality Has No Bearing on the Applicability of the PLCAA to Plaintiff's Suit

The Government of Mexico, as well as several amici supporting its appeal, argue that the presumption against extraterritoriality requires reversal of the district court's dismissal of its suit. They argue that the presumption mandates a carve-out from the PLCAA's bar to civil actions where the harm suffered by a plaintiff results from conduct outlawed by foreign rather than U.S. law. This argument gets the presumption against extraterritoriality exactly backward.

For more than two centuries, the Supreme Court has recognized that open-ended statutory language should not automatically be read as extending prescriptive regulation extraterritorially. *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 630

(1818). At least since its decision in *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991), the Court has addressed this problem through use of a presumption that bars extension of a statutory regulatory regime outside the United States absent evidence that its "text provides a 'clear indication of an extraterritorial application.'" *WesternGeco LLC v. Ion Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018) (quoting *Morrison v. National Australia Bank Ltd.,* 561 U.S. 247, 255 (2010)). The presumption involves a two-step process. A court must first determine whether the presumption has been rebutted, and, if not, determine the focus of the statute and "asking whether the conduct relevant to that focus occurred in United States territory." *Id.* In the case of *WesternGeco*, for example, the Court determined that the statute focused on where a patent infringement occurred, namely the supplying from the United States of a component of a patented device. Because the statute treated such supplying as wrongful, its remedial provision requiring compensation for lost profits also applied, even though the harm suffered by the plaintiff occurred outside the United States.

The Government of Mexico argues in its brief that the presumption against extraterritoriality applies separately to prescriptive rules and enforcement mechanisms. It cites *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016), as an instance where the presumption allows extraterritorial criminal

23

enforcement of a prescriptive rule, but not of civil enforcement of that rule through a private right of action. What this argument misses, however, is that in *RJR* Congress did want to regulate foreign conduct, in that case certain kinds of criminal fraud. What the presumption against extraterritoriality did in that case was limit the kinds of enforcement that applies to RICO violations, not the regulation itself. The PLCAA, by contrast, is intended to block a particular form of regulation, namely civil suits dispensing with normal rules of proximate cause that lack U.S. legislative endorsement. For the PLCAA, civil suits are not a remedy to enforce a prescriptive rule, but rather exactly the activity that Congress wishes to regulate.

The PLCAA does not impose any liability on people in Mexico for the unlawful use of defendants' products. Indeed, it does not sanction any activity outside the United States. It limits only the scope of U.S. regulation of the firearms industry, and only by forbidding a narrow if important class of private-attorney-general lawsuits that overlap with that regulation.

The focus of the PLCAA is litigation in U.S. courts brought against specified U.S. businesses notwithstanding those businesses' compliance with U.S. regulation. Congress indicated its concern with the legal risk that such litigation presents to the U.S. firearms industry. It responded by barring qualified civil liability actions, with certain exceptions not relevant to this brief. The class of suits barred are those that

seek from firms operating lawfully in the United States compensation for injuries caused by the criminal or unlawful misconduct of third parties. Its remedial provision is to ban particular civil actions, a rule it applies only to domestic courts.

The Government of Mexico argues the focus of the PLCAA is not the place where defendants made or sold firearms or the place of a lawsuit, but rather the place of harm or the source of the law that defines the wrongfulness of third-party conduct. It asserts that third-party misconduct to which U.S. law does not apply can be ignored for purposes of determining the proximate cause of these injuries and thus the validity of its claim. According to the Government of Mexico, in spite of the express concern of Congress with what it described as unprecedented and unjust legal theories that distort proximate cause to impose legal liability, those theories become unobjectionable when the intervening misconduct takes place outside the United States. Theories that U.S. courts cannot adopt in the absence of legislative authority become available when foreign sovereigns use them.

This seemingly absurd result is necessary, the Government of Mexico suggests, because Congress could not have believed that U.S. judges are capable of assessing whether conduct that takes place where U.S. law does not apply could be

criminal or unlawful under foreign law.[10] Yet, the Government of Mexico in this suit has called on a U.S. court to base defendants' liability on Mexican law. Its complaint states throughout that its claims rest on injuries caused by Mexican criminals. Indeed, a common thread of its claims is that criminal activity in Mexico is so pervasive and evident that defendants are culpable for not anticipating it and not taking safeguards that U.S. law does not require.

It is fully consistent with the presumption against territoriality to interpret the PLCAA as doing what it clearly states it does, namely bar the filing in U.S. courts of civil actions against U.S. firms that comply with the U.S. law regulating their activities, no matter where the harm for which the civil action seeks compensation occurs. The focus of the statute is the prevention of lawmaking by U.S. judges that would undermine an existing statutory and regulatory scheme that applies to manufacturing and sales in the United States. It concentrates on the question of proximate cause, barring suits where the wrongful conduct of third parties is the direct cause of harm. Honoring this mandate does not interfere with the regulatory jurisdiction of any foreign state, but rather preserves U.S. regulatory authority over

---

[10] Brief of Appellant Estados Unidos Mexicanos, pp. 36-37: It is "improbable that Congress intended to incorporate foreign criminal law into the statute, especially here given the extremes among, and wide variations in, foreign gun laws."

U.S. commercial activity in the face of intended encroachments implemented through U.S. civil actions.

## <u>CONCLUSION</u>

The district court correctly determined that the PLCAA applies to plaintiff's suit and requires its dismissal. Plaintiff is a person for purposes of the PLCAA, and its claims rest entirely on what its complaint identifies as the criminal or unlawful activity of people in Mexico, in particular organized crime cartels. The plain language of the PLCAA, including the legislative findings embedded in the statute, makes it manifest that the focus of the PLCAA is civil actions brought in U.S. courts against law-abiding U.S. producers and sellers of firearms for harm caused by the illegal or unlawful acts of third persons. The PLCAA attaches no significance to the fact that the wrongdoers who caused the harm on which the Government of Mexico's case is based acted outside the United States. This suit fits squarely within the definition of a "qualified civil liability action," § 7903(5), which the PLCAA bars from being heard in a U.S. court. § 7902(a). Accordingly, this court should affirm the decision of the district court.

Respectfully submitted,

NATIONAL SHOOTING SPORTS
FOUNDATION, INC.,
By its attorneys,

*/s/ Christopher A. Kenney*
_____

Christopher A. Kenney, # 35397
cakenney@KSlegal.com
KENNEY & SAMS, P.C.
144 Turnpike Road, Suite 350
Southborough, MA 01772
Tel.: (508) 490-8500
Fax: (508) 490-8501

Paul B. Stephan        *
***First Circuit Admission Application Pending***
University of Virginia School of Law
580 Massie Road
Charlottesville, VA 22903
(434) 924-7098

Dated: May 19, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed R. App. P. 32(a)(7)(B) because the brief contains 6,083 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 Point Times New Roman Font.

/s/ *Christopher A. Kenney*

Christopher A. Kenney, # 35397
cakenney@KSlegal.com
KENNEY & SAMS, P.C.
144 Turnpike Road, Suite 350
Southborough, MA 01772
Tel.: (508) 490-8500
Fax: (508) 490-8501

Dated: May 19, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Christopher A. Kenney*

Christopher A. Kenney, # 35397
cakenney@KSlegal.com
KENNEY & SAMS, P.C.
144 Turnpike Road, Suite 350
Southborough, MA 01772
Tel.: (508) 490-8500
Fax: (508) 490-8501

Dated: May 19, 2023