# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, DC 20001.2113

TELEPHONE: +1.202.879.3939 • JONESDAY.COM

Direct Number: (202) 879-5485
njfrancisco@jonesday.com

May 22, 2023

VIA CM/ECF

Maria R. Hamilton, Clerk of Court
United States Court of Appeals for the First Circuit
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210

Re:    *Estados Unidos Mexicanos v. Smith & Wesson Brands Inc., et al.,*
       *No. 22-1823 (1st Cir.)*

Dear Ms. Hamilton:

We write to notify the panel of the Supreme Court's attached recent decision in *Twitter, Inc. v. Taamneh*, No. 21-1496, 2023 WL 3511531 (U.S. May 18, 2023). There, a collection of plaintiffs sued Facebook, Twitter, and Google for allegedly aiding and abetting ISIS, on the theory that they "knew that ISIS was using their platforms but failed to stop it from doing so." *Id.* at *5 (slip op. at 2). The Court unanimously rejected this aiding-and-abetting theory, holding that the plaintiffs failed to state a claim. *Id.*

The Court explained that a company cannot be held liable under traditional aiding-and-abetting principles just because it knows that some bad downstream actors are misusing its products. Instead, such liability requires "that the defendant consciously and culpably '*participate[d]*' in a wrongful act so as to help 'make it succeed.'" *Id.* at *11 (slip op. at 17) (emphasis added). "In other words, the defendant has to take some 'affirmative act' 'with the intent of facilitating the offense's commission.'" *Id.* at *10 (slip op. at 13–14). If the rule were otherwise, "ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer." *Id.* at *9 (slip op. at 13).

The reasoning of *Taamneh* is instructive here, especially since both cases arise in the motion-to-dismiss posture. Mexico is seeking to hold Defendants liable for aiding and abetting criminal activity because they allegedly know that some remote actors obtain firearms through independent wholesalers and retailers and then smuggle them

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Maria R. Hamilton, Clerk of Court
May 22, 2023
Page 2

abroad where they are put to criminal use by drug cartels. But because Defendants themselves are not alleged to "participate" in this wrongful conduct at all, much less with any plausible intent of facilitating it, they cannot be deemed accomplices.

Respectfully submitted,


*/s/ Noel J. Francisco*
Noel J. Francisco
*Counsel for Defendant-Appellee*
*Smith & Wesson Brands Inc.*

**CERTIFICATE OF COMPLIANCE**

I certify that this letter is written in Garamond 14-point font, and the body of this letter contains 294 words as determined by the word-count feature of Microsoft Word. I further certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses and is free from viruses.


Dated: May 22, 2023                     Respectfully submitted,


                                        */s/ Noel J. Francisco*
                                        Noel J. Francisco
                                        *Counsel for Defendant-Appellee*
                                        *Smith & Wesson Brands Inc.*

**CERTIFICATE OF SERVICE**

I certify that on May 22, 2023, I electronically filed this letter with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel for the United States are registered CM/ECF users and will be served by the CM/ECF system.

Dated: May 22, 2023                    Respectfully submitted,

                                       */s/ Noel J. Francisco*
                                       Noel J. Francisco
                                       *Counsel for Defendant-Appellee*
                                       *Smith & Wesson Brands Inc.*

**Attachment:**

*Twitter, Inc. v. Taamneh*, No. 21-1496 (U.S. May 18, 2023)

(Slip Opinion)          OCTOBER TERM, 2022          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TWITTER, INC. *v.* TAAMNEH ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 21–1496.  Argued February 22, 2023—Decided May 18, 2023

In 2017, Abdulkadir Masharipov carried out a terrorist attack on the Reina nightclub in Istanbul, Turkey, on behalf of the Islamic State of Iraq and Syria (ISIS), a designated Foreign Terrorist Organization. Masharipov killed Nawras Alassaf and 38 others. Alassaf's family then brought this suit under 18 U. S. C. §2333, an Antiterrorism Act (ATA) provision that permits U. S. nationals who have been "injured . . . by reason of an act of international terrorism" to file a civil suit for damages. Instead of suing ISIS directly under §2333(a), the plaintiffs (respondents here) invoked §2333(d)(2) to sue three of the largest social-media companies in the world—Facebook, Twitter (petitioner here), and Google (which owns YouTube)—for aiding and abetting ISIS.

The parties today agree on the basic aspects of these platforms: Billions of people from around the world have signed up for them and upload massive amounts of content each day. Defendants profit from that content by placing advertisements on or near it and use "recommendation" algorithms that match content, advertisements, and users based on information about the use, advertisement, and content being viewed. As the parties represent things, the algorithms here match any content with any user who is more likely to view that content, and the platforms perform little to no front-end screening on any content before it is uploaded.

Plaintiffs, however, allege that for several years the companies have knowingly allowed ISIS and its supporters to use their platforms and "recommendation" algorithms as tools for recruiting, fundraising, and spreading propaganda; plaintiffs further allege that these companies have, in the process, profited from the advertisements placed on ISIS' tweets, posts, and videos. The District Court dismissed the complaint

for failure to state a claim, but the Ninth Circuit reversed.

*Held*: Plaintiffs' allegations that these social-media companies aided and abetted ISIS in its terrorist attack on the Reina nightclub fail to state a claim under 18 U. S. C. §2333(d)(2). Pp. 6–31.

(a) In 2016, Congress enacted the Justice Against Sponsors of Terrorism Act (JASTA) to impose secondary civil liability on anyone "who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." §2333(d)(2). The question here is whether the conduct of the social-media company defendants gives rise to aiding-and-abetting liability for the Reina nightclub attack. Pp. 6–8.

(b) The text of JASTA begs two questions: What does it mean to "aid and abet"? And, what precisely must the defendant have "aided and abetted"? Pp. 8–21.

(1) Nothing in the statute defines any of the critical terms in the phrase "aids and abets, by knowingly providing substantial assistance." The term "aids and abets," however, is a familiar common-law term and thus presumably "brings the old soil" with it. *Sekhar* v. *United States*, 570 U. S. 729, 733. Congress also provided additional context in JASTA by pointing to *Halberstam* v. *Welch*, 705 F. 2d 472, as "provid[ing] the proper legal framework" for "civil aiding and abetting and conspiracy liability." 130 Stat. 852. *Halberstam*'s legal framework, viewed in context of the common-law tradition from which it arose, confirms that "aids and abets" in §2333(d)(2) refers to a conscious, voluntary, and culpable participation in another's wrongdoing. Pp. 9–17.

(i) In *Halberstam*, the D. C. Circuit undertook an extensive survey of the common law with respect to aiding and abetting and synthesized the surveyed cases as resting on three main elements: (1) there must be a wrongful act causing an injury performed by the person whom the defendant aided; (2) at the time assistance was provided, the defendant must have been "generally aware of his role as part of an overall illegal or tortious activity;" and (3) the defendant must have "knowingly and substantially assist[ed] the principal violation." 705 F. 2d, at 477. The court then articulated six factors to help determine whether a defendant's assistance was "substantial." They are (1) "the nature of the act assisted," (2) the "amount of assistance" provided, (3) whether the defendant was "present at the time" of the principal tort, (4) the defendant's "relation to the tortious actor," (5) the "defendant's state of mind," and (6) the "duration of the assistance" given. *Id.*, at 488 (emphasis deleted). *Halberstam* also clarified that those who aid and abet "a tortious act may be liable" not only for the act itself but also "for other reasonably foreseeable acts done in connection with it." *Id.*, at 484. Finally, the court warned that its formulations should "not

be accepted as immutable components" but should be "adapted as new cases test their usefulness in evaluating vicarious liability." *Id.*, at 489. Pp. 9–11.

(ii) Because the allegations here—involving international terrorist networks and world-spanning internet platforms—are a far cry from the facts of *Halberstam*, the Court must ascertain the basic thrust of *Halberstam*'s elements to determine how to adapt them to the facts of this case. To do so, the Court turns to the common law of aiding and abetting upon which *Halberstam* rested, and to which JASTA's common-law terminology points. At common law, the basic "view of culpability" animating aiding and abetting liability is that "a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Rosemond* v. *United States*, 572 U. S. 65, 70. However, the concept of "helping" in the commission of a crime or a tort has never been boundless and ordinarily requires some level of blameworthy conduct; those limits ensure that aiding and abetting does not sweep in mere passive bystanders or those who, for example, simply deliver mail that happens to aid criminals. In tort law, many cases have thus required a voluntary, conscious, and culpable participation in the wrongful conduct to establish aiding and abetting. In doing so, they further articulated *Halberstam*'s framework to capture those limits. As above, that framework requires that the defendant give knowing and substantial assistance to the primary tortfeasor; notably, courts often viewed those twin requirements as working in tandem, with a lesser showing of one demanding a greater showing of the other to establish a conscious, culpable participation in the tort. Pp. 11–16.

(iii) *Halberstam* differentiated types of aid along the same culpability axis that grounded the common law. And its six factors for "substantial assistance" call for the same balancing that courts had undertaken previously between the nature and amount of assistance and the defendant's scienter. Pp. 16–17.

(2) The parties then vigorously dispute what precisely a defendant must aid and abet under §2333(d)(2). Plaintiffs assert that it is "the person," while defendants insist that it is the "act of international terrorism." That syntactic dispute makes little difference here, because aiding and abetting is inherently a rule of secondary liability for specific wrongful acts. In the tort context, liability is imposed only when someone commits (not merely agrees to commit) an actual tort. And in this case, the ATA limits that liability to injuries caused by an "act of international terrorism," §2333(a). It thus is not enough for a defendant to have given substantial assistance to a transcendent enterprise. A defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the

Syllabus

actionable wrong—here, an act of international terrorism. However, that does not require a strict nexus between the assistance and the wrongful act; defendants are liable for other torts that are the foreseeable risk of an intended tort, and an aider and abettor can assist someone without knowing all the details of his plan. Plus, in appropriate circumstances, a defendant's role in an illicit enterprise can be so systemic and intentional that the defendant aids and abets each act of the enterprise—as in *Halberstam* itself.

To summarize the requirements of §2333(d)(2), the phrase "aids and abets, by knowingly providing substantial assistance" points to the elements and factors articulated by *Halberstam*. Those elements and factors should not be taken as inflexible codes but should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably "participate[d] in" a tortious act in such a way as to help "make it succeed." *Nye & Nissen* v. *United States,* 336 U. S. 613, 619. Pp. 17–21.

(c) Plaintiffs have satisfied *Halberstam*'s first two elements by alleging both that ISIS committed a wrong and that defendants knew they were playing some sort of role in ISIS' enterprise. But plaintiffs' allegations do not show that defendants gave such knowing and substantial assistance to ISIS that they culpably participated in the Reina attack. Pp. 21–30.

(1) Plaintiffs allege that defendants aided and abetted ISIS in the following ways: First, they provided social-media platforms, which are generally available to the internet-using public; ISIS was able to upload content to those platforms and connect with third parties on them. Second, defendants' recommendation algorithms matched ISIS-related content to users most likely to be interested in that content. And, third, defendants knew that ISIS was uploading this content but took insufficient steps to ensure that its content was removed. Plaintiffs do not allege that ISIS or Masharipov used defendants' platforms to plan or coordinate the Reina attack. Nor do plaintiffs allege that defendants gave ISIS any special treatment or words of encouragement. Nor is there reason to think that defendants carefully screened any content before allowing users to upload it onto their platforms.

None of plaintiffs' allegations suggest that defendants culpably "associate[d themselves] with" the Reina attack, "participate[d] in it as something that [they] wishe[d] to bring about," or sought "by [their] action to make it succeed." *Nye & Nissen,* 336 U. S., at 619 (internal quotation marks omitted). Defendants' mere creation of their media platforms is no more culpable than the creation of email, cell phones, or the internet generally. And defendants' recommendation algorithms are merely part of the infrastructure through which all the content on their platforms is filtered. Moreover, the algorithms have been

presented as agnostic as to the nature of the content.  At bottom, the allegations here rest less on affirmative misconduct and more on passive nonfeasance.  To impose aiding-and-abetting liability for passive nonfeasance, plaintiffs must make a strong showing of assistance and scienter.  Plaintiffs fail to do so.

First, the relationship between defendants and the Reina attack is highly attenuated.  Plaintiffs make no allegations that defendants' relationship with ISIS was significantly different from their arm's length, passive, and largely indifferent relationship with most users.  And their relationship with the Reina attack is even further removed, given the lack of allegations connecting the Reina attack with ISIS' use of these platforms.  Second, plaintiffs provide no reason to think that defendants were consciously trying to help or otherwise participate in the Reina attack, and they point to no actions that would normally support an aiding-and-abetting claim.

Plaintiffs' complaint rests heavily on defendants' failure to act; yet plaintiffs identify no duty that would require defendants or other communication-providing services to terminate customers after discovering that the customers were using the service for illicit ends.  Even if such a duty existed in this case, it would not transform defendants' distant inaction into knowing and substantial assistance that could establish aiding and abetting the Reina attack.  And the expansive scope of plaintiffs' claims would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world.  The allegations plaintiffs make here are not the type of pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act by ISIS.

In this case, the failure to allege that the platforms here do more than transmit information by billions of people—most of whom use the platforms for interactions that once took place via mail, on the phone, or in public areas—is insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted ISIS' acts.  A contrary conclusion would effectively hold any sort of communications provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them.  That would run roughshod over the typical limits on tort liability and unmoor aiding and abetting from culpability.  Pp. 21–27.

(2) The Ninth Circuit's analysis obscured the essence of aiding-and-abetting liability.  First, the Ninth Circuit framed the issue of substantial assistance as turning on defendants' assistance to ISIS' activities in general, rather than with respect to the Reina attack.  Next, the Ninth Circuit misapplied the "knowing" half of "knowing and substantial assistance," which is designed to capture the defendants' state

6                    TWITTER, INC. *v.* TAAMNEH

Syllabus

of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act). Finally, the Ninth Circuit appears to have regarded *Halberstam*'s six substantiality factors as a sequence of disparate, unrelated considerations without a common conceptual core. In doing so, the Ninth Circuit focused primarily on the value of defendants' platforms *to ISIS*, rather than whether defendants culpably associated themselves with ISIS' actions. Pp. 27–29.

   (3) There is also one set of allegations specific to Google: that Google reviewed and approved ISIS videos on YouTube as part of a revenue-sharing system and thereby shared advertising revenue with ISIS. But the complaint here alleges nothing about the amount of money that Google supposedly shared with ISIS, the number of accounts approved for revenue sharing, or the content of the videos that were approved. Nor does it give any other reason to view Google's revenue sharing as substantial assistance. Without more, plaintiffs thus have not plausibly alleged that Google knowingly provided substantial assistance to the Reina attack, let alone (as their theory of liability would require) every single terrorist act committed by ISIS. Pp. 29–30.

   (d) The concepts of aiding and abetting and substantial assistance do not lend themselves to crisp, bright-line distinctions. Applying the guideposts provided by the common law and *Halberstam*, the nexus between defendants and the Reina attack is far removed. As alleged by plaintiffs, defendants designed virtual platforms and knowingly failed to do "enough" to remove ISIS-affiliated users and ISIS-related content from their platforms. Yet, plaintiffs have failed to allege that defendants intentionally provided any substantial aid to the Reina attack or otherwise consciously participated in it—much less that defendants so pervasively and systemically assisted ISIS as to render them liable for every ISIS attack. Plaintiffs accordingly have failed to state a claim under §2333(d)(2). Pp. 30–31.

2 F. 4th 871, reversed.

   THOMAS, J., delivered the opinion for a unanimous Court. JACKSON, J., filed a concurring opinion.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 21–1496

———

## TWITTER, INC., PETITIONER v. MEHIER TAAMNEH, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 18, 2023]

JUSTICE THOMAS delivered the opinion of the Court.

Under 18 U. S. C. §2333, United States nationals who have been "injured . . . by reason of an act of international terrorism" may sue for damages. §2333(a). They are not limited to suing the individual terrorists or organizations that directly carried out the attack, however. That is because §2333(d)(2) also imposes civil liability on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." Victims of terrorist acts therefore may seek to recover from those who aided and abetted the terrorist act that injured them.

The plaintiffs (who are respondents) contend that they have stated a claim for relief under §2333(d)(2). They were allegedly injured by a terrorist attack carried out by ISIS. But plaintiffs are not suing ISIS. Instead, they have brought suit against three of the largest social-media companies in the world—Facebook, Twitter (who is petitioner), and Google (which owns YouTube)—for allegedly aiding and abetting ISIS. As plaintiffs allege, ISIS has used defendants' social-media platforms to recruit new terrorists

and to raise funds for terrorism. Defendants allegedly
knew that ISIS was using their platforms but failed to stop
it from doing so. Plaintiffs accordingly seek to hold Face-
book, Twitter, and Google liable for the terrorist attack that
allegedly injured them. We conclude, however, that plain-
tiffs' allegations are insufficient to establish that these de-
fendants aided and abetted ISIS in carrying out the rele-
vant attack.

I

Plaintiffs' case arises from a 2017 terrorist attack on the
Reina nightclub in Istanbul, Turkey. The attack was car-
ried out by Abdulkadir Masharipov on behalf of the Islamic
State of Iraq and Syria (ISIS).[1] Born in Uzbekistan,
Masharipov had received military training with al Qaeda
in Afghanistan in 2011 and eventually became affiliated
with ISIS. In 2016, he was ordered by ISIS to travel to Tur-
key and launch an attack in Istanbul on New Year's Eve.
After planning and coordinating the attack with ISIS emir
Abu Shuhada, Masharipov entered the Reina nightclub in
the early hours of January 1, 2017, and fired over 120
rounds into a crowd of more than 700 people. In total,
Masharipov killed 39 people and injured 69 others. The
next day, ISIS released a statement claiming responsibility
for the attack. Two weeks later, Masharipov was arrested
in Istanbul after hiding out in ISIS safe houses.

One of Masharipov's victims was Nawras Alassaf, who
was killed in the attack. Several members of Alassaf's fam-
ily then brought the present lawsuit under §2333, alleging
that they had been injured by the attack.[2] Invoking

––––––––––

[1] In one form or another, ISIS has been designated a Foreign Terrorist
Organization since 2004; it has also been known as the Islamic State of
Iraq and the Levant, al Qaeda in Iraq, and the al-Zarqawi Network.

[2] Plaintiffs appear to offer several theories as to the nature of their in-
jury; because that question is not before us, we take no position as to any
of those theories.

§2333(d)(2), plaintiffs sued three major social-media companies—Facebook, Inc., Google, Inc., and Twitter, Inc.—claiming that they aided and abetted ISIS and thus were liable for the Reina nightclub attack.[3]

As is common knowledge, these three companies control three of the largest and most ubiquitous platforms on the internet: Facebook, YouTube, and Twitter. At the time of the Reina attack, Facebook had over 2 billion active users each month, YouTube had over 1 billion, and Twitter had around 330 million. See Facebook, Inc., Form 10–K for Fiscal Year Ended Dec. 31, 2017, p. 34; Twitter, Inc., Form 10–K for Fiscal Year Ended Dec. 31, 2017, p. 47; YouTube, YouTube Hits a Billion Monthly Users (Mar. 21, 2013), https://blog.youtube/news-and-events/onebillionstrong. At least for Facebook and YouTube, those numbers are even higher today. See Meta Platforms, Inc., Form 10–K for Fiscal Year Ended Dec. 31, 2022, p. 56 (nearly 3 billion); L. Ceci, Statista, YouTube–Statistics & Facts (Mar. 22, 2023), https://www.statista.com/topics/2019/youtube/#topicOverview (2.56 billion).

Everyone before us today agrees on the basic aspects of these platforms' business models. People from around the world can sign up for the platforms and start posting content on them, free of charge and without much (if any) advance screening by defendants. Once on the platforms, users can upload messages, videos, and other types of content, which others on the platform can then view, respond to, and share. As noted above, billions of people have done just that. As a result, the amount of content on defendants' platforms is staggering. It appears that for *every minute* of the day, approximately 500 hours of video are uploaded to

---

[3] Although Twitter, Inc., is the named petitioner and defendant, Twitter, Inc., has since been merged into X Corp., a subsidiary of X Holdings Corp. Similarly, although Facebook, Inc., and Google, Inc., are the named defendants, Facebook, Inc., is now known as Meta Platforms, Inc., and Google, Inc., is now Google LLC, a subsidiary of Alphabet, Inc.

YouTube, 510,000 comments are posted on Facebook, and 347,000 tweets are sent on Twitter. See Statista, Media Usage in an Internet Minute as of April 2022 (2023), https://www.statista.com/statistics/195140/new-user-generated-content-uploaded-by-users-per-minute; Statista, YouTube–Statistics & Facts; B. Marr, How Much Data Do We Create Every Day? Forbes, May 21, 2018. On YouTube alone, users collectively watch more than 1 billion hours of video *every day*. See YouTube Advertising, Reach Your Customers—and Discover New Ones, https://youtube.com/intl/en_us/ads/how-it-works/set-up-a-campaign/audience.

Defendants profit from this content largely by charging third parties to advertise on their platforms. Those advertisements are placed on or near the billions of videos, posts, comments, and tweets uploaded by the platforms' users. To organize and present all those advertisements and pieces of content, defendants have developed "recommendation" algorithms that automatically match advertisements and content with each user; the algorithms generate those outputs based on a wide range of information about the user, the advertisement, and the content being viewed. So, for example, a person who watches cooking shows on YouTube is more likely to see cooking-based videos and advertisements for cookbooks, whereas someone who likes to watch professorial lectures might see collegiate debates and advertisements for TED Talks.

But not all of the content on defendants' platforms is so benign. As plaintiffs allege, ISIS and its adherents have used these platforms for years as tools for recruiting, fundraising, and spreading their propaganda. Like many others around the world, ISIS and its supporters opened accounts on Facebook, YouTube, and Twitter and uploaded videos and messages for others to see. Like most other content on those platforms, ISIS' videos and messages were then matched with other users based on those users' information

Opinion of the Court

and use history.  And, like most other content, advertisements were displayed with ISIS' messages, posts, and videos based on information about the viewer and the content being viewed.  Unlike most other content, however, ISIS' videos and messages celebrated terrorism and recruited new terrorists.  For example, ISIS uploaded videos that fundraised for weapons of terror and that showed brutal executions of soldiers and civilians alike.  And plaintiffs allege that these platforms have been crucial to ISIS' growth, allowing it to reach new audiences, gain new members, and spread its message of terror.

Plaintiffs also allege that defendants have known that ISIS has used their platforms for years.  Yet, plaintiffs claim that defendants have failed to detect and remove a substantial number of ISIS-related accounts, posts, and videos. (For example, plaintiffs aver that defendants "have failed to implement . . . a basic account detection methodology" to prevent ISIS supporters from generating multiple accounts on their platforms.  App. 150.)  Accordingly, plaintiffs assert that defendants aided and abetted ISIS by knowingly allowing ISIS and its supporters to use their platforms and benefit from their "recommendation" algorithms, enabling ISIS to connect with the broader public, fundraise, and radicalize new recruits.  And, in the process, defendants allegedly have profited from the advertisements placed on ISIS' tweets, posts, and videos.

Plaintiffs also provide a set of allegations specific to Google.  According to plaintiffs, Google has established a system that shares revenue gained from certain advertisements on YouTube with users who posted the videos watched with the advertisement.  As part of that system, Google allegedly reviews and approves certain videos before Google permits ads to accompany that video.  Plaintiffs allege that Google has reviewed and approved at least some ISIS videos under that system, thereby sharing some amount of revenue with ISIS.

The District Court dismissed plaintiffs' complaint for failure to state a claim.[4] But the Ninth Circuit reversed, finding that plaintiffs had plausibly alleged that defendants aided and abetted ISIS within the meaning of §2333(d)(2) and thus could be held secondarily liable for the Reina nightclub attack. *Gonzalez* v. *Google*, 2 F. 4th 871 (2021). We granted certiorari to resolve whether plaintiffs have adequately stated such a claim under §2333(d)(2). See 598 U. S. ___ (2022).

## II

Section 2333 was originally enacted as part of the Antiterrorism Act (ATA) in 1990. 104 Stat. 2250. At that time, Congress authorized United States nationals or their "estate, survivors, or heirs" to bring civil lawsuits when "injured in [their] person, property, or business by reason of an act of international terrorism." *Id.*, at 2251.[5] In such a

---

[4] Plaintiffs also raised other claims, including that defendants were directly liable for having provided material support to ISIS. See, *e.g.*, 18 U. S. C. §§2333(a), 2339A, 2339B, 2339C. The District Court dismissed those claims as well, and plaintiffs did not appeal them.

[5] The ATA defines "international terrorism" to mean

"activities that—

"(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

"(B) appear to be intended—

"(i) to intimidate or coerce a civilian population;

"(ii) to influence the policy of a government by intimidation or coercion; or

"(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

"(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." §2331(1).

lawsuit, the plaintiff could recover treble damages and the cost of the suit, including attorney's fees. See 18 U. S. C. §2333(a). But the ATA did not explicitly impose liability on anyone who only helped the terrorists carry out the attack or conspired with them. Prior to 2016, some courts accordingly determined that the ATA did not authorize that sort of secondary civil liability. See, *e.g.*, *Rothstein* v. *UBS AG*, 708 F. 3d 82, 97–98 (CA2 2013).

Then, in 2016, Congress enacted the Justice Against Sponsors of Terrorism Act (JASTA) to provide for a form of secondary civil liability. 130 Stat. 852. Thus, as the law now stands, those injured by an act of international terrorism can sue the relevant terrorists directly under §2333(a)—or they can sue anyone "who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism" under §2333(d)(2). For such a secondary-liability claim, there is an additional condition: The "act of international terrorism" must have been "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under [8 U. S. C. §1189] as of the date on which such act of international terrorism was committed, planned, or authorized." *Ibid.* Plaintiffs seeking secondary liability can likewise recover treble damages and the cost of the suit, including attorney's fees. See §§2333(a), (d)(2).

The parties here do not dispute that the first three components of §2333(d)(2) have been adequately alleged: The Reina nightclub attack was an "act of international terrorism"; the attack was "committed, planned, or authorized" by ISIS; and ISIS was "designated as a foreign terrorist organization" as of the date of the Reina nightclub attack.

---

In short, the act generally must be violent, criminal, intended to intimidate or coerce civilians or a government, and occur either primarily outside the United States or transcending national boundaries. See *ibid.*

§2333(d)(2). The central question is thus whether defendants' conduct constitutes "aid[ing] and abett[ing], by knowingly providing substantial assistance," such that they can be held liable for the Reina nightclub attack. *Ibid.*

### III

As always, we start with the text of §2333. See *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 74 (2023). Here, that text immediately begs two questions: First, what exactly does it mean to "aid and abet"? Second, what precisely must the defendant have "aided and abetted"?

### A

We turn first to the meaning of the phrase "aids and abets, by knowingly providing substantial assistance." Nothing in the statute defines any of those critical terms. Yet terms like "aids and abets" are familiar to the common law, which has long held aiders-and-abettors secondarily liable for the wrongful acts of others. See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 181 (1994). We generally presume that such common-law terms "brin[g] the old soil" with them. *Sekhar* v. *United States*, 570 U. S. 729, 733 (2013) (internal quotation marks omitted). In enacting JASTA, Congress provided additional context by pointing to *Halberstam* v. *Welch*, 705 F. 2d 472 (CADC 1983), as "provid[ing] the proper legal framework" for "civil aiding and abetting and conspiracy liability." §2(a)(5), 130 Stat. 852.[6] We thus begin with *Halberstam*'s "legal framework," viewed in context of the common-law tradition from which it arose.

---

[6]The provision reads in full: "The decision of the United States Court of Appeals for the District of Columbia in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States, provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code." §2(a)(5), 130 Stat. 852.

Opinion of the Court

1

Long regarded as a leading case on civil aiding-and-abetting and conspiracy liability, see 130 Stat. 852, *Halberstam* arose from a distinctive fact pattern.  Bernard Welch was a serial burglar who had killed Michael Halberstam during a break-in.  705 F. 2d, at 474.  Halberstam's estate then sued Welch's live-in partner, Linda Hamilton, for aiding and abetting and conspiring with Welch.  *Id.*, at 474, 476.[7]  Hamilton was not present for Halberstam's murder, or even allegedly aware of the murder.  See *id.*, at 474–476.  But the facts made clear that "[s]he was a willing partner in [Welch's] criminal activities."  *Id.*, at 474 (internal quotation marks omitted).  Hamilton had lived with Welch for five years, during which time the couple had risen from modest circumstances to possess a substantial fortune.  *Ibid.*  This rapid ascent was remarkable because Welch had no outside employment.  *Id.*, at 475.  Rather, he left the house most evenings and returned with antiques, jewelry, and precious metals—some of which he melted down into gold and silver ingots by using a smelting furnace that he had installed in their garage.  Meanwhile, Hamilton did bookkeeping work for Welch's "business," facilitating the sale of those stolen goods.  *Ibid.*  She had Welch's customers make checks payable to her, falsified her tax returns at Welch's direction, and kept records of incoming payments from Welch's customers—with no records of outgoing funds to his "suppliers."  *Ibid.*  Their arrangement continued until Welch was arrested after he killed Halberstam while burglarizing Halberstam's home.  *Ibid.*

To determine Hamilton's liability, the D. C. Circuit undertook an extensive survey of the common law, examining

_____

[7] Halberstam's estate also sued Welch himself; a default judgment was entered against Welch, who did not appeal.  See *Halberstam*, 705 F. 2d, at 474.

a series of state and federal cases, the Restatement (Second) of Torts, and prominent treatises that discussed secondary liability in tort. *Id.*, at 476–478, 481–486. With respect to aiding and abetting, the court synthesized the cases as resting on three main elements: First, "the party whom the defendant aids must perform a wrongful act that causes an injury." *Id.*, at 477. Second, "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Ibid.* And, third, "the defendant must knowingly and substantially assist the principal violation." *Ibid.* (citing, *e.g.*, *Landy* v. *Federal Deposit Ins. Corp.*, 486 F. 2d 139, 162–163 (CA3 1973); *Woodward* v. *Metro Bank of Dallas*, 522 F. 2d 84, 94–95 (CA5 1975)). *Halberstam* then articulated six factors to help determine whether a defendant's assistance was "substantial." 705 F. 2d, at 486–488. Those factors are (1) "the nature of the act assisted," (2) the "amount of assistance" provided, (3) whether the defendant was "present at the time" of the principal tort, (4) the defendant's "relation to the tortious actor," (5) the "defendant's state of mind," and (6) the "duration of the assistance" given. *Id.*, at 488 (emphasis deleted). Last, *Halberstam* clarified that those who aid and abet "a tortious act may be liable" not only for the act itself but also "for other reasonably foreseeable acts done in connection with it." *Id.*, at 484.

Applying that framework, the D. C. Circuit held that Hamilton was liable for aiding and abetting Halberstam's murder. *Id.*, at 489.[8] The court first determined that Welch had committed a wrong (in killing Halberstam during the burglary) and that Hamilton was generally aware of her role in Welch's criminal enterprise. *Id.*, at 488. It then explained that Hamilton had given knowing and substantial

---

[8] The D. C. Circuit also held that Hamilton was liable as a co-conspirator. *Id.*, at 489.

assistance to Welch's activities by helping him turn his "stolen goods into 'legitimate' wealth," thereby intending to help Welch succeed by performing a function crucial to any thief. *Ibid.* And it clarified that Hamilton knew Welch was committing some sort of "personal property crime," the "foreseeable risk" of which was "violence and killing." *Ibid.* The court therefore concluded that Hamilton substantially helped Welch commit personal property crimes and was liable for Halberstam's death, which was a foreseeable result of such crimes. *Ibid.*

That articulation of the common law thus resolved *Halberstam*. But *Halberstam* recognized that the elements and factors it provided could "be merged or articulated somewhat differently without affecting their basic thrust." *Id.*, at 478, n. 8. It thus cautioned—in a typical common-law fashion—that its formulations should "not be accepted as immutable components." *Id.*, at 489. Rather, *Halberstam* suggested that its framework should be "adapted as new cases test their usefulness in evaluating vicarious liability." *Ibid.*

2

The allegations before us today are a far cry from the facts of *Halberstam*. Rather than dealing with a serial burglar and his live-in partner-in-crime, we are faced with international terrorist networks and world-spanning internet platforms. By *Halberstam*'s own lights, its precise three-element and six-factor test thus may not be entirely adequate to resolve these new facts. *Ibid.* And JASTA itself points only to *Halberstam*'s "framework," not its facts or its exact phrasings and formulations, as the benchmark for aiding and abetting. §2(a)(5), 130 Stat. 852. We therefore must ascertain the "basic thrust" of *Halberstam*'s elements and determine how to "adap[t]" its framework to the facts before us today. See 705 F. 2d, at 478, 489, and n. 8. To do so, we turn to the common law of aiding and abetting upon

which *Halberstam* rested and to which JASTA's common-law terminology points.

As we have recognized, "[a]iding and abetting is an ancient criminal law doctrine" that has substantially influenced its analog in tort. *Central Bank of Denver*, 511 U. S., at 181. In one early statement of the criminal-law doctrine, William Blackstone explained that those who were "present, aiding and abetting the fact to be done," or "procure[d], counsel[ed], or command[ed] another to commit a crime," were guilty and punishable. 4 Commentaries on the Laws of England 34, 36 (1795). Over the years, many statutes and courts have offered variations on that basic rule. See *United States* v. *Peoni*, 100 F. 2d 401, 402 (CA2 1938) (L. Hand, J., for the court) (collecting authorities). Yet, to this day, the basic "view of culpability" that animates the doctrine is straightforward: "[A] person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Rosemond* v. *United States*, 572 U. S. 65, 70 (2014).

Importantly, the concept of "helping" in the commission of a crime—or a tort—has never been boundless. That is because, if it were, aiding-and-abetting liability could sweep in innocent bystanders as well as those who gave only tangential assistance. For example, assume that any assistance of any kind were sufficient to create liability. If that were the case, then anyone who passively watched a robbery could be said to commit aiding and abetting by failing to call the police. Yet, our legal system generally does not impose liability for mere omissions, inactions, or nonfeasance; although inaction can be culpable in the face of some independent duty to act, the law does not impose a generalized duty to rescue. See 1 W. LaFave, Substantive Criminal Law §6.1 (3d ed. 2018) (LaFave); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 373–375 (5th ed. 1984) (Prosser & Keeton). Moreover, both criminal and tort law typically sanction only

"wrongful conduct," bad acts, and misfeasance. J. Goldberg, A. Sebok, & B. Zipursky, Tort Law: Responsibilities and Redress 31 (2004). Some level of blameworthiness is therefore ordinarily required. But, again, if aiding-and-abetting liability were taken too far, then ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer. And those who merely deliver mail or transmit emails could be liable for the tortious messages contained therein. See Restatement (Second) of Torts §876, Comment *d*, Illus. 9, p. 318 (1979) (cautioning against this result).

For these reasons, courts have long recognized the need to cabin aiding-and-abetting liability to cases of truly culpable conduct. They have cautioned, for example, that not "all those present at the commission of a trespass are liable as principals" merely because they "make no opposition or manifest no disapprobation of the wrongful" acts of another. *Brown* v. *Perkins*, 83 Mass. 89, 98 (1861); see also *Hilmes* v. *Stroebel*, 59 Wis. 74, 17 N. W. 539 (1883); *Duke* v. *Feldman*, 245 Md. 454, 457–458, 226 A. 2d 345, 347 (1967). Put another way, overly broad liability would allow for "one person [to] be made a trespasser and even a felon against his or her consent, and by the mere rashness or precipitancy or overheated zeal of another." *Bird* v. *Lynn*, 49 Ky. 422, 423 (1850). Moreover, unlike its close cousin conspiracy, aiding and abetting does not require any agreement with the primary wrongdoer to commit wrongful acts, thus eliminating a significant limiting principle. See *Nye & Nissen* v. *United States*, 336 U. S. 613, 620 (1949).

To keep aiding-and-abetting liability grounded in culpable misconduct, criminal law thus requires "that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed'" before he could be held liable. *Id.*, at 619 (quoting *Peoni*, 100 F. 2d, at 402). In other words, the defendant has to take some

"affirmative act" "with the intent of facilitating the offense's commission." *Rosemond*, 572 U. S., at 71. Such intentional participation can come in many forms, including abetting, inducing, encouraging, soliciting, or advising the commission of the offense, such as through words of encouragement or driving the getaway car. 2 LaFave §13.2(a), at 457–460; see also J. Hawley & M. McGregor, The Criminal Law 81 (3d ed. 1899). Regardless of the particulars, however, it is clear that some culpable conduct is needed. See *Rosemond*, 572 U. S., at 73, 77.[9]

Similar principles and concerns have shaped aiding-and-abetting doctrine in tort law, with numerous cases directly employing them to help articulate the standard for tortious aiding and abetting. See, *e.g.*, *Zoelsch* v. *Arthur Andersen & Co.*, 824 F. 2d 27, 35–36 (CADC 1987); *Woodward*, 522 F. 2d, at 95, n. 23; *Landy*, 486 F. 2d, at 163–164 (all relying on *Nye & Nissen*, 336 U. S., at 619); see also *Camp* v. *Dema*, 948 F. 2d 455, 459 (CA8 1991) (relying on *People* v. *Terman*, 4 Cal. App. 2d 345, 346–347 (1935), another criminal case). Similar to the criminal-law rule, some cases have required that the defendant's assistance "must have had a direct relation to the trespass, and have been calculated and intended to produce it" to warrant liability for the resulting tort. *Bird*, 49 Ky., at 423; see also *Smith* v. *Thompson*, 103 Idaho 909, 911, 655 P. 2d 116, 118 (App. 1982); *Brown*, 83 Mass., at 98. Other cases have emphasized the need for some "culpable conduct" and "some degree of knowledge that [a defendant's] actions are aiding the primary violator" before holding the defendant secondarily liable. *Camp*, 948 F. 2d, at 460. Still others have explained that "[c]ulpability

---

[9] Conversely, conspiracy liability could be premised on a "more attenuated relation with the principal violation" because the defendant and the principal wrongdoer had agreed to a wrongful enterprise. *Halberstam*, 705 F. 2d, at 485; see also Restatement (Second) of Torts §876, Comment *a*, p. 316 (1979) ("The theory of the early common law was that there was a mutual agency of each to act for the others").

of some sort is necessary to justify punishment of a secondary actor," lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions. *Monsen* v. *Consolidated Dressed Beef Co.*, 579 F. 2d 793, 799 (CA3 1978). And others have suggested that "inaction cannot create liability as an aider and abettor" absent a duty to act. *Zoelsch*, 824 F. 2d, at 36; see also *Woodward*, 522 F. 2d, at 96.

In articulating those limits, courts simultaneously began to crystalize the framework for aiding and abetting that *Halberstam* identified and applied. See, *e.g.*, *Monsen*, 579 F. 2d, at 799 (stating a similar three-part test).[10] As in *Halberstam*, that framework generally required what the text of §2333(d)(2) demands: that the defendant have given knowing and substantial assistance to the primary tortfeasor. See, *e.g.*, *Monsen*, 579 F. 2d, at 799; *Landy*, 486 F. 2d, at 162–163. Notably, courts often viewed those twin requirements as working in tandem, with a lesser showing of one demanding a greater showing of the other. *E.g.*, *Woodward*, 522 F. 2d, at 97; *Woods* v. *Barnette Bank of Ft. Lauderdale*, 765 F. 2d 1004, 1010 (CA11 1985). In other words, less substantial assistance required more scienter before a court could infer conscious and culpable assistance. See *Woodward*, 522 F. 2d, at 97. And, vice versa, if the assistance were direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort. See *ibid.* In moving back and forth between all these guideposts, the courts thus largely tracked the same distinctions drawn above to ensure that liability fell only on

---

[10] Others, however, have wondered whether any of these "elaborate discussions of the aiding and abetting standard . . . 'have added anything except unnecessary detail' " to the formulation set forth by Judge Learned Hand in *United States* v. *Peoni*, 100 F. 2d 401 (CA2 1938), and adopted by this Court in *Nye & Nissen* v. *United States*, 336 U. S. 613 (1949). *SEC* v. *Apuzzo*, 689 F. 3d 204, 212, n. 9 (CA2 2012) (quoting *IIT, an Int'l Inv. Trust* v. *Cornfeld*, 619 F. 2d 909, 922 (CA2 1980)).

those who had abetted the underlying tort through conscious, "culpable conduct." *Camp*, 948 F. 2d, at 460.

### 3

*Halberstam*'s framework reflected and distilled those common-law principles. Indeed, *Halberstam* started with a survey of many earlier common-law cases, including many of the same cases cited above. 705 F. 2d, at 477, 483 (citing, *e.g.*, *Woodward*, 522 F. 2d, at 94–95; *Landy*, 486 F. 2d, at 162–163; *Duke*, 245 Md., at 457–458, 226 A. 2d, at 347). As part of that survey, *Halberstam* explicitly distinguished different types of aid along the same culpability axis that grounded the common law. 705 F. 2d, at 481–483. For example, *Halberstam* recognized that giving verbal encouragement (such as yelling "'Kill him!'") could be substantial assistance, *id.*, at 481, but that passively watching an assault after hearing an assailant threaten the victim likely would not be, *id.*, at 483. Those same lines have long been drawn for aiding-and-abetting liability under the common law. See *Rosemond*, 572 U. S., at 70; see also, *e.g.*, 2 LaFave §13.2(a), at 457–460; Restatement (Second) of Torts §876, Comment *d*, Illus. 9–10, at 318; *Brown*, 83 Mass., at 98. And *Halberstam*'s six factors for "substantial assistance" call for the same balancing that courts had undertaken previously between the nature and amount of assistance on the one hand and the defendant's scienter on the other. 705 F. 2d, at 484–485, 487–488.

Despite that deep-rooted common-law basis, the Ninth Circuit appears to have understood JASTA's approval of *Halberstam*'s "legal framework" as requiring it to hew tightly to the precise formulations that *Halberstam* used. The parties before us similarly make a conscious effort to draw analogies to the facts of that case. But any approach that too rigidly focuses on *Halberstam*'s facts or its exact phraseology risks missing the mark. *Halberstam* is by its own terms a common-law case and provided its elements

Opinion of the Court

and factors as a way to synthesize the common-law approach to aiding and abetting. And JASTA employs the common-law terms "aids and abets," pointing to *Halberstam*'s common-law "framework" as the primary guidepost for understanding the scope of §2333(d)(2).

At bottom, both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably "participate[d]" in a wrongful act so as to help "make it succeed." *Nye & Nissen*, 336 U. S., at 619. To be sure, nuances may establish daylight between the rules for aiding and abetting in criminal and tort law; we have described the doctrines as "rough[ly] simila[r]," not identical. *Central Bank of Denver*, 511 U. S., at 181. But we need not resolve the extent of those differences today; it is enough for our purposes to recognize the framework that *Halberstam* set forth and the basis on which it rests. The phrase "aids and abets" in §2333(d)(2), as elsewhere, refers to a conscious, voluntary, and culpable participation in another's wrongdoing.

## B

The next question, however, is what precisely a defendant must aid and abet. As noted above, JASTA imposes liability on anyone "who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." §2333(d)(2). The parties vigorously dispute the textual object of the term "aids and abets": Plaintiffs assert that it is "the person," and defendants insist that it is the "act of international terrorism." So, plaintiffs contend, defendants can be liable if they aided and abetted ISIS generally—there is no need for defendants to have aided and abetted the specific Reina nightclub attack. Conversely, defendants posit that they are liable only if they directly aided and

abetted the Reina nightclub attack, with a strict nexus between their assistance and that attack. Neither side is quite right.

To start, we find it unnecessary to parse whether the textual object of "aids and abets" is "the person" or the "act of international terrorism." That syntactic dispute makes little difference here, because aiding and abetting is inherently a rule of secondary liability for specific wrongful acts. See Prosser & Keeton 323. As stated above, the rule imposes liability for a wrong on those who "hel[p] another to complete *its commission*." *Rosemond*, 572 U. S., at 70 (emphasis added). Or, as *Halberstam* put it, the defendant must aid and abet "a tortious act." 705 F. 2d, at 484.

Nor would a contrary rule make sense for torts. That is because tort law imposes liability only when someone commits an actual tort; merely agreeing to commit a tort or suggesting a tortious act is not, without more, tortious. See Prosser & Keeton 324; *Halberstam*, 705 F. 2d, at 479.[11] "Enterprises" or "conspiracies" alone are therefore not tortious—the focus must remain on the tort itself. The same is true here: The ATA opens the courthouse doors only if the plaintiff is "injured . . . by reason of an act of international terrorism." §2333(a). JASTA further restricts secondary liability by requiring that the "act of international terrorism" be "committed, planned, or authorized by" a foreign terrorist organization designated as such "as of the date on which such act of international terrorism was committed, planned, or authorized." §2333(d). Thus, it is not enough,

---

[11] In this respect, tort law is different from criminal law, which *does* punish mere agreements to commit crimes. See, *e.g.*, 2 LaFave §12.2(b), at 372 ("At common law a conspiracy was punishable even though no act was done beyond the mere making of the agreement"); see also 1 J. Ohlin, Wharton's Criminal Law §8.7, p. 242 (16th ed. 2021) (noting that statutory requirements of an "overt act" generally do not require that the overt act be criminal); *Iannelli* v. *United States*, 420 U. S. 770, 785, n. 17 (1975) (similar).

as plaintiffs contend, that a defendant have given substantial assistance to a transcendent "enterprise" separate from and floating above all the actionable wrongs that constitute it. Rather, a defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong—here, an act of international terrorism. See, *e.g.*, Restatement (Second) of Torts §876(b), and Comment *d*; *Halberstam*, 705 F. 2d, at 488.

Plaintiffs insist that *Halberstam* proves the contrary, but their argument misses the gist of that case. To be sure, Linda Hamilton was not on the scene for the burglary of Halberstam's house and did not lend any specific support to Halberstam's murder. *Ibid.* But Hamilton's assistance to Welch was so intentional and systematic that she assisted each and every burglary committed by Welch; any time that Welch left the house to burglarize, he would have relied on Hamilton's assistance in laundering the stolen goods and transforming them into usable wealth. See *ibid.* Thus, Hamilton did aid and abet Welch in burglarizing Halberstam's home—and, as noted above, killing Halberstam was a foreseeable consequence of that burglary. See *ibid.*

On the other hand, defendants overstate the nexus that §2333(d)(2) requires between the alleged assistance and the wrongful act. To start, aiding and abetting does not require the defendant to have known "all particulars of the primary actor's plan." Restatement (Third) of Torts: Intentional Torts to Persons §10, Comment *c*, p. 104 (Tent. Draft No. 3, Apr. 6, 2018). For example, a defendant might be held liable for aiding and abetting the burning of a building if he intentionally helped others break into the building at night and then, unknown to him, the others lit torches to guide them through the dark and accidentally started a fire. See *American Family Mutual Ins. Co.* v. *Grim*, 201 Kan. 340, 345–347, 440 P. 2d 621, 625–626 (1968); Restatement (Second) of Torts §876, Comment *d*, Illus. 10, at 318. That leads

to the next problem: As *Halberstam* makes clear, people
who aid and abet a tort can be held liable for other torts
that were "a foreseeable risk" of the intended tort. 705
F. 2d, at 488. Accordingly, a close nexus between the assis-
tance and the tort might help establish that the defendant
aided and abetted the tort, but even more remote support
can still constitute aiding and abetting in the right case.

Moreover, in appropriate circumstances, a secondary de-
fendant's role in an illicit enterprise can be so systemic that
the secondary defendant is aiding and abetting every
wrongful act committed by that enterprise—as in *Hal-
berstam* itself. *Id.*, at 487–488. At this point, aiding-and-
abetting liability begins to blur with conspiracy liability,
which typically holds co-conspirators liable for all reasona-
bly foreseeable acts taken to further the conspiracy. See
*Pinkerton* v. *United States*, 328 U. S. 640, 647–648 (1946);
see also *Halberstam*, 705 F. 2d, at 482–483 (noting the oc-
casional overlap). Yet, as noted above, aiding and abetting
lacks the requisite agreement that justifies such extensive
conspiracy liability. See Restatement (Second) of Torts
§876, Comment *a*, at 316 ("The theory of the early common
law was that there was mutual agency of each [conspirator]
to act for the others"); *Pinkerton*, 328 U. S., at 646. Thus,
while the facts of *Halberstam* are not totemic (lest courts
strain to compare Linda Hamilton with international crim-
inal syndicates), its facts are useful when determining
whether a defendant has so consciously "participate[d] in"
a series of tortious acts in order to "make [each one] suc-
ceed." *Nye & Nissen*, 336 U. S., at 619 (internal quotation
marks omitted).

\*     \*     \*

To summarize the requirements of §2333(d)(2), the
phrase "aids and abets, by knowingly providing substantial
assistance," points to the elements and factors articulated
by *Halberstam*. But, those elements and factors should not

be taken as inflexible codes; rather, they should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably "participate[d] in" a tortious act in such a way as to help "make it succeed." *Nye & Nissen*, 336 U. S., at 619 (internal quotation marks omitted).  And the text requires that defendants have aided and abetted the act of international terrorism that injured the plaintiffs—though that requirement does not always demand a strict nexus between the alleged assistance and the terrorist act.

## IV

Under the appropriate framework, some aspects of today's case become immediately clear: First, because they are trying to hold defendants liable for the Reina attack, plaintiffs must plausibly allege that defendants aided and abetted ISIS[12] in carrying out that attack.  Next, plaintiffs have satisfied *Halberstam*'s first two elements by alleging both that ISIS committed a wrong and that defendants knew they were playing some sort of role in ISIS' enterprise.  The key question, therefore, is whether defendants gave such knowing and substantial assistance to ISIS that they culpably participated in the Reina attack.  The allegations here fall short of that showing under *Halberstam*'s framework as properly understood by reference to the common-law principles it applied.

## A

To start, recall the basic ways that defendants as a group allegedly helped ISIS.  First, ISIS was active on defendants'

---

[12] For purposes of this case, we need not resolve whether defendants must have aided and abetted ISIS, Masharipov, or some subgroup of ISIS operatives in committing the Reina attack.  In other words, we need not resolve whether "the person" referred to in §2333(d)(2) encompasses international terrorist syndicates or is somehow otherwise limited; either way, defendants need to have aided and abetted that "person" in carrying out the Reina attack.

social-media platforms, which are generally available to the internet-using public with little to no front-end screening by defendants. In other words, ISIS was able to upload content to the platforms and connect with third parties, just like everyone else. Second, defendants' recommendation algorithms matched ISIS-related content to users most likely to be interested in that content—again, just like any other content. And, third, defendants allegedly knew that ISIS was uploading this content to such effect, but took insufficient steps to ensure that ISIS supporters and ISIS-related content were removed from their platforms. Notably, plaintiffs never allege that ISIS used defendants' platforms to plan or coordinate the Reina attack; in fact, they do not allege that Masharipov himself ever used Facebook, YouTube, or Twitter.

None of those allegations suggest that defendants culpably "associate[d themselves] with" the Reina attack, "participate[d] in it as something that [they] wishe[d] to bring about," or sought "by [their] action to make it succeed." *Nye & Nissen*, 336 U. S., at 619 (internal quotation marks omitted). In part, that is because the only affirmative "conduct" defendants allegedly undertook was creating their platforms and setting up their algorithms to display content relevant to user inputs and user history. Plaintiffs never allege that, after defendants established their platforms, they gave ISIS any special treatment or words of encouragement. Nor is there reason to think that defendants selected or took any action at all with respect to ISIS' content (except, perhaps, blocking some of it).[13] Indeed, there is not even reason to think that defendants carefully screened any content before allowing users to upload it onto their platforms. If anything, the opposite is true: By plaintiffs' own

_____

[13] Plaintiffs concede that defendants attempted to remove at least some ISIS-sponsored accounts and content after they were brought to their attention.

allegations, these platforms appear to transmit most content without inspecting it.

The mere creation of those platforms, however, is not culpable. To be sure, it might be that bad actors like ISIS are able to use platforms like defendants' for illegal—and sometimes terrible—ends. But the same could be said of cell phones, email, or the internet generally. Yet, we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large. Nor do we think that such providers would normally be described as aiding and abetting, for example, illegal drug deals brokered over cell phones—even if the provider's conference-call or video-call features made the sale easier. See *Doe* v. *GTE Corp.*, 347 F. 3d 655, 659 (CA7 2003).

To be sure, plaintiffs assert that defendants' "recommendation" algorithms go beyond passive aid and constitute active, substantial assistance. We disagree. By plaintiffs' own telling, their claim is based on defendants' "provision of the infrastructure which provides material support to ISIS." App. 53. Viewed properly, defendants' "recommendation" algorithms are merely part of that infrastructure. All the content on their platforms is filtered through these algorithms, which allegedly sort the content by information and inputs provided by users and found in the content itself. As presented here, the algorithms appear agnostic as to the nature of the content, matching any content (including ISIS' content) with any user who is more likely to view that content. The fact that these algorithms matched some ISIS content with some users thus does not convert defendants' passive assistance into active abetting. Once the platform and sorting-tool algorithms were up and running, defendants at most allegedly stood back and watched; they are not alleged to have taken any further action with respect to ISIS.

At bottom, then, the claim here rests less on affirmative

misconduct and more on an alleged failure to stop ISIS from using these platforms. But, as noted above, both tort and criminal law have long been leery of imposing aiding-and-abetting liability for mere passive nonfeasance. To show that defendants' failure to stop ISIS from using these platforms is somehow culpable with respect to the Reina attack, a strong showing of assistance and scienter would thus be required. Plaintiffs have not made that showing.

First, the relationship between defendants and the Reina attack is highly attenuated. As noted above, defendants' platforms are global in scale and allow hundreds of millions (or billions) of people to upload vast quantities of information on a daily basis. Yet, there are no allegations that defendants treated ISIS any differently from anyone else. Rather, defendants' relationship with ISIS and its supporters appears to have been the same as their relationship with their billion-plus other users: arm's length, passive, and largely indifferent. Cf. *Halberstam*, 705 F. 2d, at 488. And their relationship with the Reina attack is even further removed, given the lack of allegations connecting the Reina attack with ISIS' use of these platforms.

Second, because of the distance between defendants' acts (or failures to act) and the Reina attack, plaintiffs would need some other very good reason to think that defendants were consciously trying to help or otherwise "participate in" the Reina attack. *Nye & Nissen*, 336 U. S., at 619 (internal quotation marks omitted). But they have offered no such reason, let alone a good one. Again, plaintiffs point to no act of encouraging, soliciting, or advising the commission of the Reina attack that would normally support an aiding-and-abetting claim. See 2 LaFave §13.2(a), at 457. Rather, they essentially portray defendants as bystanders, watching passively as ISIS carried out its nefarious schemes. Such allegations do not state a claim for culpable assistance or participation in the Reina attack. See *Halberstam*, 705 F. 2d, at 481, 483.

Opinion of the Court

Because plaintiffs' complaint rests so heavily on defendants' failure to act, their claims might have more purchase if they could identify some independent duty in tort that would have required defendants to remove ISIS' content. See *Woodward*, 522 F. 2d, at 97, 100. But plaintiffs identify no duty that would require defendants or other communication-providing services to terminate customers after discovering that the customers were using the service for illicit ends. See *Doe*, 347 F. 3d, at 659; *People* v. *Brophy*, 49 Cal. App. 2d 15, 33–34 (1942).[14] To be sure, there may be situations where some such duty exists, and we need not resolve the issue today. Even if there were such a duty here, it would not transform defendants' distant inaction into knowing and substantial assistance that could establish aiding and abetting the Reina attack.

If there were any doubt, the expansive scope of plaintiffs' claims would put it to rest. Given the lack of any concrete nexus between defendants' services and the Reina attack, plaintiffs' claims would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world. Under plaintiffs' theory, any U. S. national victimized by an ISIS attack could bring the same claim based on the same services allegedly provided to ISIS. Plaintiffs thus must allege that defendants so systemically and pervasively assisted ISIS that defendants could be said to aid and abet every single ISIS attack. Viewed in that light, the allegations here certainly

——————

[14] Plaintiffs have not presented any case holding such a company liable for merely failing to block such criminals despite knowing that they used the company's services. Rather, when legislatures have wanted to impose a duty to remove content on these types of entities, they have apparently done so by statute. See, *e.g.*, Telecommunications Act of 1996, §502, 110 Stat. 133–134 (codified, as amended, at 47 U. S. C. §223); but see *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 857, 874 (1997) (holding parts of §223 unconstitutional under the First Amendment).

fall short.  Plaintiffs do not claim that defendants intentionally associated themselves with ISIS' operations or affirmatively gave aid that would assist each of ISIS' terrorist acts.  Nor have they alleged that defendants and ISIS formed a near-common enterprise of the kind that could establish such broad liability.  These allegations are thus a far cry from the type of pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act.

To be sure, we cannot rule out the possibility that some set of allegations involving aid to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts.  There may be, for example, situations where the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack.  Cf. *Direct Sales Co.* v. *United States*, 319 U. S. 703, 707, 711–712, 714–715 (1943) (registered morphine distributor could be liable as a co-conspirator of an illicit operation to which it mailed morphine far in excess of normal amounts).  Or, if a platform consciously and selectively chose to promote content provided by a particular terrorist group, perhaps it could be said to have culpably assisted the terrorist group.  Cf. *Passaic Daily News* v. *Blair*, 63 N. J. 474, 487–488, 308 A. 2d 649, 656 (1973) (publishing employment advertisements that discriminate on the basis of sex could aid and abet the discrimination).

In those cases, the defendants would arguably have offered aid that is more direct, active, and substantial than what we review here; in such cases, plaintiffs might be able to establish liability with a lesser showing of scienter.  But we need not consider every iteration on this theme.  In this case, it is enough that there is no allegation that the platforms here do more than transmit information by billions of

people, most of whom use the platforms for interactions that once took place via mail, on the phone, or in public areas.  The fact that some bad actors took advantage of these platforms is insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted those wrongdoers' acts.  And that is particularly true because a contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them.  That conclusion would run roughshod over the typical limits on tort liability and take aiding and abetting far beyond its essential culpability moorings.

### B

In holding that plaintiffs had stated a claim, the Ninth Circuit went astray through a series of missteps that, together, obscured the essence of aiding-and-abetting liability.  To correct those errors, we proceed through the Ninth Circuit's application of *Halberstam*'s framework.

The Ninth Circuit framed the issue of substantial assistance as turning on defendants' assistance to ISIS' activities in general.  See 2 F. 4th, at 909.  But, as we explained above, the question is whether defendants gave substantial assistance to ISIS with respect to the Reina attack.  The focus thus must remain on the Reina attack; plaintiffs' failure to allege any definable nexus between the defendants' assistance and that attack therefore—at minimum—drastically increases their burden to show that defendants somehow consciously and culpably assisted the attack.

Next, the Ninth Circuit misapplied the "knowing" half of "knowing and substantial assistance."  It first separated the "knowing" and "substantial" subelements; it then analyzed the "knowing" subelement as a carbon copy of the antecedent element of whether the defendants were "generally aware" of their role in ISIS' overall scheme.  *Ibid.*; see also

*id.*, at 908. But, as discussed above, "the knowledge and substantial assistance" components "should be considered relative to one another" as part of a single inquiry designed to capture conscious and culpable conduct. *Camp*, 948 F. 2d, at 459 (internal quotation marks omitted). The "knowing" part of that inquiry is therefore designed to capture the defendants' state of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act), not the same general awareness that defines *Halberstam*'s second element.

Finally, when applying *Halberstam*'s six substantiality factors, the Ninth Circuit appears to have regarded the factors as a sequence of disparate, unrelated considerations without a common conceptual core. See 2 F. 4th, at 909–910. That is incorrect. The point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor. The Ninth Circuit thus erred in focusing (as it did) primarily on the value of defendants' platforms *to ISIS*, rather than whether defendants culpably associated themselves with ISIS' actions. For example, when applying the second factor (the amount and kind of assistance), the Ninth Circuit should have considered that defendants' platforms and content-sorting algorithms were generally available to the internet-using public. That focus reveals that ISIS' ability to benefit from these platforms was merely incidental to defendants' services and general business models; it was not attributable to any culpable conduct of defendants directed toward ISIS. And, when considering the fourth and fifth factors (the defendants' relationship to ISIS and the defendants' state of mind), the Ninth Circuit should have given much greater weight to defendants' arm's-length relationship with ISIS—which was essentially no different from their relationship

with their millions or billions of other users—and their un-
disputed lack of intent to support ISIS. See *id.*, at 910.

Taken as a whole, the Ninth Circuit's analytic approach
thus elided the fundamental question of aiding-and-
abetting liability: Did defendants consciously, voluntarily,
and culpably participate in or support the relevant wrong-
doing? As we have explained above, the answer in this case
is no. Plaintiffs allege only that defendants supplied gen-
erally available virtual platforms that ISIS made use of,
and that defendants failed to stop ISIS despite knowing it
was using those platforms. Given the lack of nexus between
that assistance and the Reina attack, the lack of any de-
fendant intending to assist ISIS, and the lack of any sort of
affirmative and culpable misconduct that would aid ISIS,
plaintiffs' claims fall far short of plausibly alleging that de-
fendants aided and abetted the Reina attack.

### C

That leaves the set of allegations specific to Google. As
explained above, plaintiffs allege that Google reviewed and
approved ISIS videos on YouTube as part of its revenue-
sharing system and thereby shared advertising revenue
with ISIS. The Ninth Circuit briefly mentioned those alle-
gations when analyzing plaintiffs' complaint here. How-
ever, in addressing another, materially identical complaint,
the Ninth Circuit held that the same allegations "failed to
state a claim for aiding-and-abetting liability" because they
were "devoid of any allegations about how much assistance
Google provided" and therefore did not plausibly allege
"that Google's assistance was substantial." *Id.*, at 907.

We think that the Ninth Circuit was correct in that hold-
ing. The complaint here alleges nothing about the amount
of money that Google supposedly shared with ISIS, the
number of accounts approved for revenue sharing, or the
content of the videos that were approved. It thus could be
the case that Google approved only one ISIS-related video

and shared only $50 with someone affiliated with ISIS; the
complaint simply does not say, nor does it give any other
reason to view Google's revenue sharing as substantial as-
sistance.  Without more, plaintiffs thus have not plausibly
alleged that Google knowingly provided substantial assis-
tance to the Reina attack, let alone (as their theory of lia-
bility requires) every single terrorist act committed by ISIS.

## V

By their very nature, the concepts of aiding and abetting
and substantial assistance do not lend themselves to crisp,
bright-line distinctions.  However, both the common law
and *Halberstam* provide some clear guideposts: The point
of aiding and abetting is to impose liability on those who
consciously and culpably participated in the tort at issue.
The focus must remain on assistance to the tort for which
plaintiffs seek to impose liability.  When there is a direct
nexus between the defendant's acts and the tort, courts may
more easily infer such culpable assistance.  But, the more
attenuated the nexus, the more courts should demand that
plaintiffs show culpable participation through intentional
aid that substantially furthered the tort.  And, if a plain-
tiff's theory would hold a defendant liable for all the torts
of an enterprise, then a showing of pervasive and systemic
aid is required to ensure that defendants actually aided and
abetted each tort of that enterprise.

Here, however, the nexus between defendants and the
Reina attack is far removed.  As alleged by plaintiffs, de-
fendants designed virtual platforms and knowingly failed
to do "enough" to remove ISIS-affiliated users and ISIS-
related content—out of hundreds of millions of users world-
wide and an immense ocean of content—from their plat-
forms.  Yet, plaintiffs have failed to allege that defendants
intentionally provided any substantial aid to the Reina at-
tack or otherwise consciously participated in the Reina at-

Opinion of the Court

tack—much less that defendants so pervasively and sys-temically assisted ISIS as to render them liable for every ISIS attack.  Plaintiffs accordingly have failed to state a claim under §2333(d)(2).

We therefore reverse the judgment of the Ninth Circuit.

*It is so ordered.*

Cite as: 598 U. S. ____ (2023)    1

JACKSON, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–1496

_____

## TWITTER, INC., PETITIONER *v.* MEHIER TAAMNEH, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 18, 2023]

JUSTICE JACKSON, concurring.

I join the opinion of the Court with the understanding that today's decisions are narrow in important respects. In this case and its companion, *Gonzalez* v. *Google*, 598 U. S. ___ (2023) (*per curiam*), the Court has applied 18 U. S. C. §2333(d)(2) to two closely related complaints, filed by the same counsel. Both cases came to this Court at the motion-to-dismiss stage, with no factual record. And the Court's view of the facts—including its characterizations of the social-media platforms and algorithms at issue—properly rests on the particular allegations in those complaints. Other cases presenting different allegations and different records may lead to different conclusions.

The Court also draws on general principles of tort and criminal law to inform its understanding of §2333(d)(2). General principles are not, however, universal. The common-law propositions this Court identifies in interpreting §2333(d)(2) do not necessarily translate to other contexts.